RAY D. HACKE
OSB No. 173647
PACIFIC JUSTICE INSTITUTE
1850 45th Ave. NE, Suite 33
Salem, OR 97305
503-917-4409
rhacke@pji.org
*Lead Counsel*
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **RACHEL G. DAMIANO** and **KATIE S. MEDART**, | Case No. _____ |
| *Plaintiffs,* | |
| *v.* | |
| **GRANTS PASS SCHOOL DISTRICT 7**, an Oregon public body; **THE MEMBERS OF THE BOARD OF EDUCATION OF GRANTS PASS SCHOOL DISTRICT 7**[1]—Scott Nelson, Cliff Kuhlman, Gary Richardson, Debbie Brownell, Cassie Wilkins, Brian Delagrange, and Casey Durbin—in their official and personal capacities; **KIRK T. KOLB**, Superintendent, Grants Pass School District 7, in his official and personal capacity; and **THOMAS M. BLANCHARD**, Principal, North Middle School, Grants Pass School District 7, in his official and personal capacity, | **VERIFIED COMPLAINT** **DEMAND FOR JURY TRIAL** |
| *Defendants.* | |

---

[1] Members of the Board of Education are named as Defendants out of an abundance of caution because the law is unclear regarding whether a school district in Oregon is an entity subject to suit under Oregon law.

## PLAINTIFFS' VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Rachel G. Damiano and Katie S. Medart, for their Verified Complaint against Defendants and Demand for Jury Trial, state as follows:

### INTRODUCTION

1.    This action challenges the content- and viewpoint-based retaliation by Defendants against Plaintiffs, Rachel Damiano and Katie Medart, for their speech on an issue that is front and center on the local, state, and national levels: How should our public schools address the many issues and the divergent and often-conflicting interests among students, parents, and educators when a student struggles with gender identity?

2.    Rachel and Katie, both Oregon educators in Grants Pass School District 7, proposed what they viewed as a reasonable, science-based, and loving policy for local, state, and federal policymakers to address these complex issues. They crafted their proposal based on years of experience as educators and their deeply held philosophical and religious beliefs.

3.    Rachel and Katie have never claimed to have all the answers on the complex issues presented when students struggle with gender identity. In fact, before publicly communicating their proposed policy, they sought the input of Grants Pass School District 7 officials, including the Defendant superintendent and the Defendant North Middle School principal.

4.    The principal and superintendent at first expressed support for Rachel and Katie's right to speak on gender-identity education policy. In fact, the principal reviewed the proposed policy and provided feedback. And the superintendent, upon reading the proposed policy, said he would consider bringing it to the school board of education for a vote.

5. Neither the superintendent nor principal hinted disapproval about the proposed policy or suggested that Rachel and Katie would violate any school district policy if they spoke about the proposed policy.

6. But when Rachel and Katie made their proposed policy publicly known through a gentle, well-communicated video that they posted on the internet in late March 2021—a video they produced on their own time, away from school—the superintendent and principal, along with the other Defendants, quickly resorted to retaliation and censorship to appease public critics of Rachel and Katie's speech.

7. And the principal, who led the school district's investigation of Rachel and Katie, even subjected them to questioning on whether their religious beliefs make them unfit to be public educators.

8. Rachel and Katie are now on administrative leave and facing termination of their employment for their speech that the First Amendment protects.

9. Rachel and Katie also challenge two school district policies—the "Original Speech Policy" and "Amended Speech Policy"—that district officials have used and are using to regulate, suppress, and censor Rachel and Katie's speech.

10. When Rachel and Katie first expressed their views on how to address gender identity issues in the context of primary and secondary education, the Original Speech Policy was in effect. The policy demanded that employees, "[o]n all controversial issues, . . . designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint."

11. But the Original Speech Policy did not define what constituted a "controversial issue[ ]." Instead, district employees were left to guess whether their speech was on a "controversial issue[ ]." And district officials could declare after the fact the content and viewpoint of speech that would be deemed "controversial" and thus subject to the policy's disclaimer requirement.

12.   Defendants are using the Original Speech Policy as a basis to justify their adverse employment actions against Rachel and Katie for their speech on gender-identity education policy.

13.   The Amended Speech Policy, which the board of education adopted in late April 2021, suffers from the same principal flaws as the old one: The policy is facially content- and viewpoint-discriminatory, gives school district officials unbridled discretion to regulate, suppress, and censor employee speech, and fails to give district employees notice about what speech the policy regulates and how to avoid charges for violating the policy.

14.   The Amended Speech Policy prohibits district employees, "[w]hile on District premises or acting within the scope of employment" from "display[ing] or engag[ing] in speech . . . supporting one side of any political or controversial civil issue." The policy also includes a disclaimer requirement that reads: "When engaged in off duty activities, on all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint."

15.   The Amended Speech Policy's flaws include the fact that it circularly defines critical terms. For instance, the policy defines "political or civil issue" as including, "but not be[ing] limited to, any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree."

16.   And all but indistinguishable from that definition is the policy's definition of "controversial civil issue." "A controversial civil issue," the policy states, "shall specifically include issues which appear likely to create controversy among students, employees or the public . . . ."

17.   As district employees, Rachel and Katie must comply with the Amended Speech Policy.

18.    Because of the unbridled discretion the Amended Speech policy gives to district officials to decide what is a "political issue" or a "controversial issue," Rachel and Katie have discontinued much of their speech on the gender-identity issues confronting students, parents, educators, and society as a whole.

19.    Defendants' retaliation against Rachel and Katie for their speech, the Original Speech Policy (as applied), and the Amended Speech policy (both facially and as applied) violate the First and Fourteenth Amendments to the United States Constitution and Article I of the Oregon Constitution.

20.    Rachel and Katie challenge the Amended Speech Policy as it applies to their speech in two ways: (1) its prohibition on discussion of "political or controversial civil issue[s]" while on district premises; and (2) its requirement to speak its disclaimer when discussing "controversial" issues off campus.

21.    A temporary restraining order and preliminary and permanent injunctive relief are necessary to immediately stop Defendants' retaliation against Rachel and Katie for expressing their viewpoints as private citizens on a matter of public concern and to prohibit Defendants' enforcement of the unconstitutional Speech Policies.

## JURISDICTION & VENUE

22.    This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

23.    This Court has original jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

24.    This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; the requested injunctive relief under 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

25.   This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

26.   Venue is proper in this district and division under 28 U.S.C. § 1391(b) and D. Or. L.R. 3 because Defendants reside in this district and division and all the acts described in this Complaint occurred in this district and division.

## PLAINTIFFS

27.   Rachel Damiano is a resident of Oregon and an assistant principal at North Middle School, part of Grants Pass School District 7.

28.   Katie Medart is a resident of Oregon and a teacher at North Middle School.

## DEFENDANTS

29.   Defendant Grants Pass School District 7 (below "the School District" or "District") is, and was at all times relevant to this Complaint, a public school district operated under the laws of Oregon and a public body as defined in Or. Rev. Stat. §§ 30.260(4) and 174.109.

30.   The School District is a body corporate under Oregon law. Or. Rev. Stat. § 332.072.

31.   Oregon law authorizes the School District Board of Directors to transact all business coming within the jurisdiction of the District, namely to exercise control of District schools and take responsibility for educating children in the District. Or. Rev. Stat. § 332.072.

32.   Defendants Scott Nelson, Cliff Kuhlman, Gary Richardson, Debbie Brownell, Cassie Wilkins, Brian Delagrange, and Casey Durbin are, and were at all times relevant to this Complaint, members of the Board of Directors (collectively, "Board Defendants") and are responsible for, among other things, the adoption and authorization of policies that govern employee expression for the School District, including the Speech Policies.

33.   As members of the Board of Directors, the Board Defendants have the responsibility for final policymaking authority for rules and regulations that govern the District and its employees, including the Speech Policies. *See* Or. Rev. Stat. § 332.072.

34.   Each of the Board Defendants is responsible for the enactment, amendment, and repeal of Board policies, including the Speech Policies.

35.   As members of the Board of Directors, the Board Defendants possess the authority to change and enforce the Speech Policies.

36.   The Board Defendants failed to modify the Original Speech Policy to comply with constitutional mandates.

37.   The Board Defendants have enacted the Amended Speech Policy and have failed to modify it to comply with constitutional mandates.

38.   The Board Defendants have acquiesced in, sanctioned, and supported, and continue to acquiesce in, sanction, and support, the actions of the other Defendants in enforcing the policies and procedures governing District employees, including the Speech Policies.

39.   The Board Defendants have not instructed District personnel, including other Defendants, to change or alter the Speech Policies and practices to comply with constitutional mandates or to change the way that those policies have been and are being applied to District employees, including Rachel and Katie.

40.   At all relevant times, Defendant Kirk Kolb is and was the superintendent of the School District.

41.   As superintendent, Defendant Kolb is the chief executive officer of Grants Pass School District 7. Or. Rev. Stat. § 334.225(1).

42.   Defendant Kolb's authority and powers include oversight and control of the District.

43. Defendant Kolb's duties include, among others, authorizing, executing, enforcing, and implementing Defendant District and the Board Defendants' policies governing District employees and overseeing the operation and management of the District.

44. As superintendent, Defendant Kolb is and was aware of the retaliatory and unconstitutional actions authorized by and occurring under the Speech Policies and has not instructed District personnel, including the other Defendants, to change or alter the Amended Speech Policy or the actions taken under the Speech Policies to comply with constitutional mandates.

45. As superintendent, Defendant Kolb has the authority to review, approve, or reject the decisions of other School District officials regarding the Speech Policies.

46. Defendant Kolb has authorized, approved, and implemented the Speech Policies that were and are being used to restrict Rachel and Katie's expression.

47. Defendant Kolb has confirmed, sanctioned, and ratified District officials' application of the Speech Policies to Rachel and Katie in a discriminatory and retaliatory fashion.

48. As superintendent, Defendant Kolb directly supervises Defendant Blanchard.

49. Defendant Blanchard is, and was at all times relevant to this Complaint, the principal of North Middle School.

50. Defendant Blanchard possesses the authority and responsibility for governing and regulating District employees at North Middle School.

51. Defendant Blanchard's duties include supervising Rachel and Katie.

52. Defendant Blanchard possessed and continues to possess the authority to interpret the Speech Policies.

53. Defendants Kolb and Blanchard, independently and in consultation with each other, enforced the Original Speech Policy against Rachel and Katie.

54.   Defendants Kolb and Blanchard each has the authority under the Speech Policies to investigate, recommend disciplinary actions, and impose discipline against District employees for violating the policy in effect at the time of the violation.

55.   Upon information and belief, Defendants Kolb and Blanchard have failed to recommend any changes to the Speech Policies so that the policies comply with constitutional mandates or how the policies were and are enforced to comply with such mandates.

56.   Defendants Kolb and Blanchard have failed to stop District officials, including each other and the other Defendants, from applying the Speech Policies to District employees, including Rachel and Katie.

57.   Defendant Blanchard retaliated against Rachel and Katie because of their speech.

58.   Defendant Blanchard placed Rachel and Katie on administrative leave and launched a formal investigation into them because of their speech.

59.   Upon information and belief, Defendant Kolb acquiesced in, sanctioned, and supported, and continues to acquiesce in, sanction, and support Defendant Blanchard's retaliation against Rachel and Katie.

60.   Defendant Kolb had and has the authority to stop Defendant Blanchard from taking adverse action against Rachel and Katie, but Defendant Kolb has done nothing.

61.   Upon information and belief, the Board Defendants acquiesced in and continue to acquiesce in Defendant Blanchard's retaliation against Rachel and Katie.

62.   The Board Defendants had and have the authority to stop Defendant Blanchard from taking adverse action against Rachel and Katie, but the Board Defendants have done nothing.

63.   Plaintiffs are suing each natural-person Defendant in his or her official and personal capacities.

FACTUAL BACKGROUND

I.    **Rachel and Katie's beliefs and backgrounds**

   A. **Rachel and Katie's philosophical and religious beliefs**

64.    Rachel and Katie are concerned about the lack of coherent policies and guidance in public schools to help students, their parents or guardians (below "parents"), and teachers address the increasing number of school children who struggle with gender identity issues.

65.    Rachel and Katie believe that the policies and guidance addressing the issues that accompany a student's struggle with gender identity issues often vary from school to school and district to district.

66.    They have seen that policies and guidance documents addressing these issues often isolate parents from the decisions of their minor children.

67.    Rachel and Katie believe that the lack of consistent and coherent policies and guidance addressing issues that arise when a student struggles with gender identity issues, as well as policies and guidance that alienate parents from such a momentous decision, disserve children, their parents, and society as a whole.

68.    Rachel and Katie desire to promote what they believe is a reasonable, consistent, and respectful policy about how to address gender identity issues in the context of primary and secondary school.

69.    Rachel and Katie seek to promote fair and inclusive policy recommendations to help accommodate the often-conflicting interests and sincerely held beliefs of students, parents, and educators on such issues.

70.    Rachel and Katie believe, based on scientific evidence, that children do not have a fully developed capacity to understand the long-term consequences of their decisions.

71.    Rachel and Katie want to protect children from making potentially irreversible and life-changing decisions that they may later regret.

72.   Rachel and Katie believe that parents, with the assistance and support of educators, must help children understand the many and complex factors surrounding gender identity.

73.   Rachel and Katie believe that parents have a fundamental right to control the upbringing and education of their children.

74.   Rachel and Katie believe that any gender-identity education policy must account for this fundamental right.

75.   Rachel and Katie believe that any gender-identity education policy that does not account for parents' fundamental right to control the upbringing and education of their children is deceptive and disserves both children and their parents.

76.   Rachel and Katie believe educators have First Amendment speech and religious freedoms that may be impacted by gender-identity education policy.

77.   Rachel and Katie believe that gender-identity education policy must protect educators' fundamental freedoms.

78.   Rachel and Katie believe, based on scientific evidence, that there are only two anatomical sex presentations, which are male and female.

79.   Rachel and Katie also believe that scientifically demonstrable and anatomically correct designations of sex should be the basis for a redesignation of bathroom classifications and control access to shared public-school restrooms and locker rooms for minors.

80.   For those students who are not comfortable using facilities associated with their anatomical sex, Rachel and Katie support those students having access to and using a private restroom or locker space.

81.   To accommodate the interests of students, parents, and teachers, Rachel and Katie believe that students, with parental permission, may ask to be called by a derivative of their legal name and that teachers and student peers can—but should not be required to—use that name.

82.   To accommodate the interests of students, parents, and teachers, Rachel and Katie believe that students, with parental permission, may ask to be referred to by pronouns that do not correspond to the students' biological sex and that teachers and student peers can—but should not be required to—use those pronouns.

83.   Rachel and Katie are also professing Christians who strive to live out their faith daily.

84.   Because of their Christian faith, Rachel and Katie have sincerely held religious beliefs that govern their views about human nature, marriage, gender, sexuality, morality, politics, and social issues.

85.   Their Christian faith informs Rachel and Katie's convictions concerning human nature, the purpose and meaning of life, and ethical and moral standards that should govern human conduct.

86.   Rachel and Katie's faith teaches them that God immutably creates each person as male or female; these two distinct, complementary sexes reflect the image of God; and rejection of one's biological sex is a rejection of the image of God within that person.

87.   Rachel and Katie also believe they cannot affirm as true those ideas and concepts that they believe are not true. Doing so, they believe, would violate biblical commands against dishonesty and lying.

88.   Rachel and Katie also endeavor to treat every person with dignity, love, and care, because they believe all people are created in the image of God.

89.   Rachel and Katie object to Defendants' regulation, suppression, and censorship of their sincerely held religious beliefs.

### B. Rachel and Katie's experience in education

90.   Rachel and Katie both have extensive experience as educators and working with students. Each entered the education field because of her commitment to

educate children and serve them as they develop mentally, physically, and emotionally.

91.   Rachel, who has worked with youth for more than a decade, received her bachelor's degree in mathematics with an emphasis in secondary education from Washington State University and her master's degree in education from Concordia University.

92.   Before becoming assistant principal at North Middle School, Rachel was a high school math teacher, dean of students, and assistant principal.

93.   Rachel has served as assistant principal at North Middle School since July 2020.

94.   Katie received her bachelor's degree in honors biology, with an emphasis in cell/molecular biology and a minor in chemistry, from Southern Oregon University. She later received her master's degree in teaching, also from Southern Oregon University.

95.   Katie has taught for fourteen years. Her experience includes teaching high school science and college-level biology, chemistry, and anatomy and physiology.

96.   Katie has taught science and/or health at North Middle School since 2019.

97.   Before Defendants placed them on administrative leave in April 2021, Rachel and Katie were never the subject of any School District disciplinary actions.

98.   In fact, in mid-March 2021, Defendants renewed Rachel and Katie's contracts for the 2021–22 school year.

## II.   The "I Resolve" movement and Defendants' retaliation against Rachel and Katie

### A. The nation is currently debating how to address gender identity issues in education.

99.   In January 2021, S.B. 52 was introduced in the Oregon Senate. If passed, the bill would direct the Oregon Department of Education to develop and implement a statewide education for "plan students"—*i.e.*, those students enrolled in early

childhood through post-secondary education who "[m]ay be lesbian, gay, bisexual, transgender, queer, two-spirit, intersex, asexual, non-binary or another minority gender identity or sexual orientation" and who, "as identified by the State Board of Education by rule," have allegedly "experienced disproportionate results in education due to historical practices."

100. The month after, in February 2021, the U.S. House of Representatives passed the Equality Act, H.R. 5—a bill that would add "gender identity" among the protected categories under the Civil Rights Act of 1964.

101. If the Equality Act becomes law, it could have broad effects for public schools, including mandating that schools across the country allow students who identify as transgender to access opposite-sex restrooms, locker rooms, and showers.

102. The Act, under the ostensible aim of preventing harassment and bullying, could also compel teachers and students to use pronouns that do not correspond to a student's biological sex.

103. And in or about February 2021, the School District circulated to select District employees a memorandum about guidelines relating to gender identity issues (*e.g.*, pronoun usage).

### B. Rachel and Katie's "I Resolve" movement proposes solutions for gender-identity education policy.

104. Rachel and Katie—based on their deeply held philosophical and religious beliefs and in the context of the local, state, and national debate about gender-identity education policy—sought to have a constructive dialogue on that topic.

105. So in March 2021, they started "I Resolve"—a grassroots movement to promote a sound, gender-identity educational policy on a local, state, and federal level in a loving and tolerant way that seeks to account for the divergent and often conflicting views about gender-identity education policy, while also upholding fundamental freedoms.

106. Rachel and Katie intended to promote I Resolve online, including through a website and social media, and through in-person contact.

107. While school was not in session and while away from school, Rachel and Katie created a website called "I Resolve," available at https://www.iresolvemovement.com/ (last viewed June 2, 2021). A true, accurate, and complete copy of the homepage of the website as of June 2, 2021 is Exhibit A.

108. The I Resolve website presents Rachel and Katie's deeply held philosophical and religious beliefs.

109. The I Resolve website proposes model resolutions for adoption by local, state, and federal leaders.

110. The I Resolve website proposes that bathrooms and locker rooms currently designated by sex (*e.g.*, as either "boys" or "girls" bathrooms and locker rooms) should be "re-designated as 'anatomically-male' or 'anatomically-female' spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built." Ex. A at 2.

111. The I Resolve website proposes that any person not comfortable using anatomically correct spaces can request access to a private bathroom or locker room. Ex. A at 3.

112. The I Resolve movement also endorses individual, gender-neutral bathrooms. Ex. A at 3.

113. The I Resolve website proposes two other resolutions to provide "caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey":

    a. A student, with parental permission, may request to be called by a derivative of the student's legal name, but other students or staff are not required to use that name; and

b. A student, with parental permission, may request to be referred to by pronouns that do not correspond to the student's biological sex, but other students and staff are not required to use those pronouns. Ex. A at 2–3.

114. The I Resolve website allows visitors to electronically sign the resolutions to show their support.

115. As part of the I Resolve movement, Rachel and Katie created a video while off duty during spring break 2021. They did so with personal property at a local church.

116. The video presents Rachel and Katie alone discussing their deeply held beliefs and their proposed I Resolve resolutions.

117. While developing the website and video, Rachel met with Defendants Kolb and Blanchard separately at school.

118. Rachel informed Defendants Kolb and Blanchard about the I Resolve movement and the proposed website and video.

119. Rachel provided Defendants Kolb and Blanchard with copies of the draft I Resolve resolutions.

120. During the development stage, Defendants Kolb and Blanchard never expressed any disapproval about Rachel and Katie's work on I Resolve.

121. During the development stage, Defendants Kolb and Blanchard never informed Rachel or Katie that their work on I Resolve was interfering with Rachel and Katie's relationships with colleagues and supervisors.

122. During the development stage, Defendants Kolb and Blanchard never warned Rachel and Katie that they were violating any District policy by working on I Resolve.

123. In fact, Defendant Kolb said that he would consider bringing the I Resolve resolutions to the Board Defendants to consider whether the Board should adopt the resolutions as District policy.

124. And Defendant Blanchard even gave Rachel feedback on the draft I Resolve resolutions.

125.  Neither on the I Resolve website nor in any I Resolve video has Rachel or Katie ever identified herself as an employee of the School District or North Middle School or worn any gear featuring School or District emblems, logos, or insignia.

126. Rachel and Katie never reference any District employee in their speech related to I Resolve.

127. I Resolve never interfered with Rachel and Katie's duties as assistant principal and science teacher, respectively.

128. Rachel and Katie never approached students about I Resolve or discussed I Resolve during class time.

129. I Resolve was not part of Rachel and Katie's official duties assigned to them by Defendants.

130. On March 25, 2021, Rachel and Katie made the video publicly available on YouTube.

### C. Defendants Blanchard and Kolb backtrack.

131. On March 31, 2021, less than one week after the website's public launch, Defendant Kolb met with Rachel and Katie separately.

132. Defendant Kolb informed Rachel and Katie that the School District had received complaints about I Resolve.

133.  Defendant Kolb told Rachel and Katie that complainants said they were "appalled," "offended," and "disgusted" by Rachel and Katie's views and at least one complainant claimed that they were "targeting transgender students."

134. Defendant Kolb also told Rachel and Katie that some District staff members perceived the I Resolve video to be "anti-transgender."

135. Defendant Kolb told Rachel and Katie that legal counsel was examining the lawfulness of their speech in the I Resolve video.

136. Defendant Kolb recommended that Rachel and Katie remove the I Resolve video and website from public view.

137. During Defendant Kolb's meeting with Katie, he told her that because of the views she expressed as part of I Resolve, he had prevented her from attending a meeting of the LGBTQ+ student club earlier that day, March 31.

138. Defendant Kolb prohibited Katie's attendance even though the club's student membership had voted to allow Katie to attend.

139. Katie had sought to attend the club meeting to better understand student perspectives on LGBTQ+ issues and better support those students.

140. Defendant Kolb told Katie that he overrode the students' decision because of the views Katie expressed under the I Resolve movement.

141. Defendant Kolb threatened that if "disruption" (apparently, the complaints received) to the functioning of the District continued, he could pursue disciplinary action against them, including termination of employment. However, on information and belief, apart from the complaints received by Defendants from those outside the school, no other "disruption" had occurred as a result of the I Resolve website, and the functioning of the District was not impaired in any way.

**D. Defendants place Rachel and Katie on administrative leave.**

142. Between April 1 and 3, 2021, Defendant Blanchard received formal complaints from five District employees against Rachel and Katie.

143. At least three employee complainants claimed that Rachel and Katie's I-Resolve-related speech violated the Original Speech Policy because they did not comply with the policy's disclaimer requirement.

144. Another employee complainant alleged that "separation of church and state" prohibited Rachel and Katie from sharing I Resolve's resolutions at work since the resolutions are influenced by Rachel and Katie's Christian faith.

145. Each of the five complainants focused on Rachel and Katie's speech about I Resolve.

146. Upon information and belief, Defendant Blanchard has not told any of the five complainants that he met with Rachel during the development stage of I Resolve and provided feedback on the I Resolve resolutions.

147. On April 5, 2021, a school administrator entered Katie's classroom right before she started class and directed her—in the presence of Katie's students—to take her belongings and report to Defendant Blanchard.

148. When Katie reported to Defendant Blanchard, he handed her a notice that he had written and signed. The notice placed Katie on administrative leave effective immediately and informed her that she was under investigation for "inappropriate behavior." A true, accurate, and complete copy of the notice is Exhibit B.

149. Rachel also met with Defendant Blanchard that same day. During the meeting he provided her a notice that he had written and signed. Like Katie's notice, Rachel's notice placed her on administrative leave and informed her that she was under investigation for "inappropriate behavior." A true, accurate, and complete copy of the notice is Exhibit C.

150. Katie learned during her meeting with Defendant Blanchard that five District employees had filed formal complaints against her.

151. Defendants placed Rachel and Katie on administrative leave based on those five complaints, which focused on their I-Resolve-related speech.

152. As a condition of administrative leave, Rachel and Katie cannot conduct any school business.

153. Because of administrative leave, Katie cannot complete a certification training course related to helping students prepare for college that the District had paid for, that the District was going to pay her for, and that she had started before Defendants placed her on leave.

154. Because of administrative leave, Katie could not complete the final confirmation of a proposal she had previously submitted to work for pay at a District summer camp.

155. Because of administrative leave, Rachel and Katie have lost opportunities to develop their skills as an administrator and educator, respectively, and have lost opportunities to mentor their students.

156. Upon information and belief, the outcome of Defendants' formal investigation into Rachel and Katie may include employer discipline up to and including termination.

### E. Defendant Kolb emails District staff, parents, and students to condemn I Resolve.

157. On April 6, 2021, Defendant Kolb emailed the entire District staff under the subject line: "We are [Grants Pass]; We ALL belong." A true, accurate, and complete copy of the email is Exhibit D.

158. Defendant Kolb wrote that the I Resolve "movement" was purportedly "in direct conflict with the values of Grants Pass School District 7." Ex. D at 1.

159. Defendant Kolb wrote, "To be very clear, [the School District] do[es] not support or endorse this message." Ex. D at 1.

160. Defendant Kolb wrote, "District 7 is unequivocally committed to providing welcoming and safe learning environments for **all** students, including our LGBTQ students. In Grants Pass schools, we **ALL** belong, regardless of race, religion, gender, sex, or ability." Ex. D at 1.

161. After Defendant Kolb sent the email, Rachel and Katie received many harassing, intimidating, and menacing communications from third parties and District staff.

162. For example, a person accused Rachel and Katie in an email of starting a "transphobic hate group."

163. Another person, under the subject header, "Transphobia will kill our children," sent an email accusing Rachel and Katie of transphobia and bigotry. That person claimed Rachel and Katie were not fit to work with children because of their work on I Resolve.

164. On April 7, 2021, Defendant Kolb sent out another email, this time to all District staff, students, and families. A true, accurate, and complete copy of the email is Exhibit E.

165. Defendant Kolb wrote that there were complaints against "two staff members" over "social media postings discussing LGBTQ policies with reference to schools." Ex. E at 1.

166. The "staff members" Defendant Kolb referred to in his email are Rachel and Katie.

167. In his email, Defendant Kolb reiterated that "District 7 is committed to providing welcoming and safe learning environments for all students, including our LGBTQ students. In Grants Pass schools, we ALL belong, regardless of race, religion, gender, sex, sexual orientation or ability." Ex. E at 1.

168. Defendant Kolb assured the school community that Rachel and Katie were being "investigat[ed]" and were "not at work." Ex. E at 1.

169. Defendant Kolb did not mention in either his April 6 or 7 email meeting that he and Defendant Blanchard met with Rachel during the development stage of I Resolve, that Defendant Blanchard gave feedback to Rachel on the draft I Resolve resolutions, and that he (Defendant Kolb) reviewed the I Resolve resolutions and considered bringing them to the Board Defendants for a vote on making the resolutions District policy.

170. On April 13, Defendant Kolb attended the regular virtual meeting of the Board Defendants.

171. At the April 13 meeting, a member of the public criticized the I Resolve movement for, in the commenter's perspective, being harmful to students struggling with gender identity issues.

172. Defendant Kolb responded in the meeting's chat that the commenter was "[w]ell spoken" and that a District official would reach out to the commenter regarding how the commenter could assist the District.

### F. Defendant Blanchard questions Rachel and Katie about their religious beliefs as part of the School District's investigation.

173. Defendant Blanchard, along with another District official, led the School District's investigation of the formal complaints against Rachel and Katie.

174. As part of the investigation, Defendant Blanchard separately questioned Rachel and Katie about their I Resolve-related speech and their deeply held philosophical and religious beliefs.

175. Defendant Blanchard questioned Katie about her religious beliefs purportedly interfering with her ability to do her job.

176. Defendant Blanchard expressed "concern" that Katie's religious faith would prevent her from complying with District guidelines or policies, if adopted, that would compel teachers to use pronouns that do not correspond to a transgender student's biological sex.

177. Defendant Blanchard expressed "concern" that Katie's religious faith would make her unfit for her job.

178. The other interviewer questioned whether Katie had attempted to "push" her religious views on people in the District through I Resolve.

179. As he did with Katie, Defendant Blanchard questioned Rachel about her religious beliefs purportedly interfering with her ability to do her job.

180. Defendants then subjected Rachel and Katie to another round of questioning, this time conducted by an outside investigator, about their speech related to I Resolve.

181. Almost all of the questions in all four interviews focused on Rachel and Katie's speech related to I Resolve.

182. Defendants' investigation into Rachel and Katie's speech and religious beliefs is ongoing.

## III.  The School District's "Speech Policies"

### A. The Original Speech Policy

183. In February 2004, the School district adopted a policy governing employee speech titled, "Staff Participation in Political Activities." That policy—the Original Speech Policy—remained in effect until April 27, 2021. A true, accurate, and complete copy of the Original Speech Policy is Exhibit F.

184. The Original Speech Policy provided: "Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level on the same basis as any citizen in a comparable position in public or private employment and within the law." Ex. F at 1.

185. The Original Speech Policy also provided: "All district employees are privileged within the limitations imposed by state and federal laws and regulations to choose either side of a particular issue and to support their viewpoints as they desire by vote, discussion or the persuasion of others." Ex. F at 1.

186. But the Original Speech Policy prohibited "[s]uch discussion and persuasion . . . during the performance of district duties, except in open discussion during classroom lessons that center on a consideration of all candidates for a particular office or various sides of a particular political or civil issue." Ex. F at 1.

187. The Original Speech Policy also included a disclaimer requirement, which reads: "On all controversial issues, employees must designate that the viewpoints

they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint." Ex. F at 1.

188. The Original Speech Policy did not define "political or civil issue."

189. The Original Speech Policy did not define "controversial issues."

190. The Original Speech Policy compelled District staff, like Rachel and Katie, to issue a disclaimer anytime they spoke—on or off campus—on issues Defendants subjectively determined were "controversial."

191. By failing to define "controversial issues," the Original Speech Policy gave staff no notice as to what constituted a controversial issue or how to avoid charges that staff violated the policy.

192. Given that stances on nearly every issue of public importance generate "controversy," the Original Speech Policy gave Defendants limitless authority to regulate, suppress, and censor employee speech made while the policy was in effect.

193. For employee speech made while the Original Speech Policy was in effect, Defendants could discipline any employee for speech on an issue that Defendants subjectively deemed "controversial" that did not include the required disclaimer.

194. Defendants have enforced, and continue to enforce, the Original Speech Policy against Rachel and Katie for their I-Resolve-related speech that occurred before April 27, 2021.

**B. The Amended Speech Policy**

195. On April 27, 2021, Board Defendants adopted, and have since enforced, an amended "Staff Participation in Political Activities" policy that governs employee expression. A true, accurate, and complete copy of that policy—the Amended Speech Policy—is Exhibit G.

196. Like the Original Speech Policy, the Amended Speech Policy provides: (a) "Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level on the same basis as any citizen in a

comparable position in public or private employment and within the law"; and (b) "[a]ll district employees are privileged within the limitations imposed by state and federal laws and regulations to choose either side of a particular issue and to support their viewpoints as they desire by vote, discussion or the persuasion of others." Ex. G at 1.

197. The Amended Speech Policy prohibits employees, "[w]hile on District premises or acting within the scope of employment" from "display[ing] or engag[ing] in speech . . . supporting one side of any political or controversial civil issue." Ex. G at 2.

198. The Amended Speech Policy defines "political or civil issue" circularly as "includ[ing], but not be[ing] limited to, any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree." Ex. G at 1.

199. The Amended Speech Policy, like the Original Speech Policy, also includes a disclaimer requirement.

200. The Amended Speech Policy's disclaimer requirement reads: "When engaged in off duty activities, on all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint." Ex. G at 1.

201. The Amended Speech Policy defines "controversial civil issue" circularly to "specifically include issues which appear likely to create controversy among students, employees or the public, or which the District determines may be disruptive to its educational mission or instruction." Ex. G at 1.

202. As part of its definition of "controversial civil issue," the Amended Speech Policy also directs: "In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions." Ex. G at 1.

203. Thus, under the policy Defendants may regulate, suppress, and censor any speech on an issue that they subjectively deem controversial under the policy's unlimited definition of "controversial civil issue."

204. Thus, by majority vote, Board Defendants have the power under the Amended Speech Policy to regulate, suppress, and censor viewpoints held by District employees with which District officials disagree by adopting policies or resolutions that silence those viewpoints.

205. The Amended Speech Policy defines "political or civil issue" and "controversial civil issue" using such elusive, subjective, and circular terminology that the policy gives staff no notice as to what constitutes a "political or civil issue" or "controversial civil issue" or how to avoid charges that staff violate the policy.

206. Given nearly every issue of public importance is (a) an issue "for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree" (*i.e.*, a "political or civil issue"); and (b) an "issue[ ] which appear[s] likely to create controversy among students, employees or the public" (*i.e.*, a "controversial civil issue") the Amended Speech Policy gives Defendants limitless authority to regulate, suppress, and censor employees' speech on and off District property, during and after school hours, and on and off duty.

207. The Amended Speech Policy's definitions of "political or civil issue" and "controversial civil issue" are also materially indistinguishable.

208. The policy gives staff no notice as to what off-duty speech triggers the required disclosure. So, in effect, the policy compels staff to issue the disclaimer nearly every time they speak on any topic.

209. District employees must follow all Board policies and are subject to discipline, including termination of employment, if they do not.

210. Defendants have and are exercising their power under the Amended Speech Policy to regulate, censor, and suppress speech on "political or civil issues" and "controversial civil issue[s]," including against Plaintiffs.

211. Thus, for example, depending on what School District officials, including Defendants, subjectively deem a "political issue" or "controversial civil issue," they may regulate, suppress, and censor:

    a.  A debate among staff in the teachers' lounge during the lunch hour about the efficacy or wisdom of COVID-19 restrictions;

    b.  A discussion between two coaches walking the school track after school hours about whether Title IX of the Education Amendments of 1972 has gone far enough to promote women's athletics;

    c.  An exchange of opposing views among social studies teachers in the hallway before or after class on violence in the Middle East or whether Oregon should lower the voting age to 16;

    d.  A parley between American government teachers about the wisdom of "court packing" while working out together after school in the high school weight room; or

    e.  A teacher's off-duty Twitter post about the City of Grants Pass ballot measure to fund public services or an upcoming "RedForEd" rally, unless the teacher also includes Defendants' required disclaimer in her tweet or her tweet aligns with District Policies and resolutions.

**C. The classroom exception to censorship under the Speech Policies**

212. On the same day that the School District adopted the Original Speech Policy in February 2004, the District also adopted a policy on "Studying Controversial Issues." A true, accurate, and complete copy of the policy is Exhibit H.

213. That policy, which has not been amended since February 2004 and has been in effect at all times relevant to this Complaint, emphasizes the need to "teach[ ]

about our American heritage, the rights and privileges we enjoy as citizens and the citizenship responsibilities that must be assumed in maintaining our American way of life." Ex. H at 1.

214. The policy recognizes that "[i]n training for effective citizenship, it is frequently necessary for students to study issues that are controversial." Ex. H at 1.

215. The policy adds: "In considering such issues, it shall be the purpose of our schools to recognize the student's right and/or obligation to: 1. Study any controversial issue concerning which (at his/her level) the student should begin to have an opinion; 2. Have free access to all relevant information, including the materials that circulate freely in the community; 3. Study under competent instruction in an atmosphere of freedom from bias and prejudice; 4. Form and express his/her own judgment on controversial issues without thereby jeopardizing his/her relations with teachers or the school; 5. Recognize that reasonable compromise is often an important facet in the decision making in our society; 6. Respect minority opinion." Ex. H at 1.

216. As for addressing controversial issues with captive audiences in K–12 classrooms, Defendants entrust District educators with the discretion "to carefully weigh the risks against the significance and educational merit of the issues, methods, materials and personnel involved and, when doubt remains, . . . to seek the counsel of their supervisors." Ex. H at 1.

217. The only exception the Amended Speech Policy allows to discuss "political or controversial civil issue[s]" during the performance of district duties is pursuant to the "Studying Controversial Issues" policy. Ex. G at 1.

218. But District officials, including Defendants, do not entrust District staff with that discretion when speaking outside the classroom on controversial issues.

219. Defendants have instead given themselves unrestrained, post hoc discretion under the Speech Policies to regulate, suppress, and censor staff expression on such issues.

220. Defendants seek to respect minority opinions in the classroom.

221. But Defendants seek to silence minority opinions held by District staff if they express those opinions outside the classroom.

222. Defendants have no adequate justification for allowing employees such discretion to teach on controversial issues but then prohibiting them from discussing those same issues outside of class or for requiring a disclaimer anytime employees speak off campus.

## IV. Defendants' subjective and inconsistent enforcement of the Speech Policies

### A. Defendant's viewpoint-based enforcement—or non-enforcement—of the Original Speech Policy

223. District employees regularly made statements on "controversial issues" under the Original Speech Policy and without including the required disclaimer.

224. For example, on March 30, 2021, Defendant Kolb sent an email during school hours to all District staff under the subject line: "Posters and other items that may be considered controversial political or civil issues." A true, accurate, and complete copy of the email is Exhibit I.

225. In that email, Defendant Kolb expressed: "[T]he phrase ['Black Lives Matter'] should probably not be controversial, [but] it nonetheless has created controversy, including in our community." Ex. I at 3.

226. Defendant Kolb did not include with his opinion that "the phrase ['Black Lives Matter'] should probably not be controversial" the required disclaimer that the viewpoint was his and should not be interpreted as the School District's official viewpoint.

227. Upon information and belief, Defendant Board Members have not subjected Defendant Kolb to the disciplinary process.

228. During school hours the next day, March 31, a District teacher using the District email system replied to Defendant Kolb's email and copied all District Staff. In the email, the teacher expressed support for the Black Lives Matter movement. Ex. I at 1.

229. In the email, the teacher wrote, "Black Lives Matter is an uplifting and wholesome message and way of thinking that is perfectly appropriate for our classrooms." Ex. I at 1. The teacher added, "there is no other side, Black Lives Matter or they don't." Ex. I at 1.

230. That same day, also during school hours, another District educator replied to all using the District email system, writing, "First off Black Lives Matters is on its face a racist statement." Ex. I at 1.

231. Neither teacher complied with the Original Speech Policy's disclaimer requirement.

232. Upon information and belief, Defendants have not subjected either educator to the disciplinary process for speaking on a "controversial issue" and/or violating the disclaimer requirement.

233. As further example, on April 27, 2021, a North Middle School teacher made a public social media post during school hours criticizing those who advocated for looser pandemic restrictions.

234. The speaker did not comply with the Original Speech Policy's disclaimer requirement.

235. Upon information and belief, Defendants have not subjected that teacher to the disciplinary process for speaking on a "controversial issue" and/or violating the disclaimer requirement.

236. Defendants have also not subjected to the disciplinary process those educators and staff members who have expressed viewpoints different from those of Rachel and Katie on issues relating to I Resolve.

237. On April 15, 2021, the staff member-club advisor of the LGBTQ+ club at North Middle School sent a message to the club during school hours and on campus discussing an upcoming meeting between the club and "school district members." The April 15 message referred to the "recent Anti-Trans 'movement' that has unfortunately spread on our campus" and the availability of school District members to show support for members of the LGBTQ+ club.

238. The April 15 message's reference to a so-called "Anti-Trans 'movement'" was to I Resolve.

239. The staff member-club advisor did not include a disclaimer that her viewpoint was her own and not the School District's.

240. Upon information and belief, Defendants have not subjected that staff member to the disciplinary process for speaking on a "controversial issue" and/or violating the Original Speech Policy's disclaimer requirement.

241. As further example, on April 16, 2021, a different teacher while on District premises, during school hours, and while wearing a District-provided shirt, posted a photo of herself on social media objecting to I Resolve.

242. That teacher did not comply with the Original Speech Policy's disclaimer requirement.

243. Upon information and belief, Defendants have not subjected that teacher to the disciplinary process.

244. Upon information and belief many other examples of District employees speaking on "controversial issues" under the Original Speech Policy and violating the disclaimer requirement have occurred without School District officials, including Defendants, taking adverse action against the employees.

245. But for the content and viewpoint of Rachel and Katie's I-Resolve-related speech, Defendants would not have taken adverse action against Rachel or Katie.

246. Any other purported justification by Defendants to take adverse action against Rachel and Katie is pretextual.

## B. Defendant's viewpoint-based enforcement—or non-enforcement—of the Amended Speech Policy

247. On April 28, 2021, the day after Board Defendants adopted the Amended Speech Policy, a North Middle School teacher made public social media posts during school hours and on property criticizing those who advocated for looser pandemic restrictions.

248. There is "more than one reasonable interpretation or position" about pandemic restrictions "on which reasonable persons may disagree." Ex. G at 1.

249. And pandemic restrictions are also among those issues that are "likely to create controversy among students, employees or the public." Ex. G at 1.

250. Upon information and belief, Defendants have not subjected that teacher to the disciplinary process for engaging in speech supporting one side of a political or controversial civil issue "[w]hile on District premises or acting within the scope of employment." Ex. G at 2.

251. Another example of Defendants viewpoint discrimination under the Amended Speech Policies involves the School District controversy over Black Lives Matter posters in classrooms.

252. Before the Board Defendants adopted the Amended Speech Policy, Defendant Kolb sent an email on March 30, 2021 stating, in part:

> I am sending this message regarding a very difficult and emotive topic. I have had a few people express a desire to put up "Black Lives Matter" posters in their classrooms and have had legal counsel review and consult with the Board.

* * *

While it is a fact that black lives do matter and discrimination against black students, or students of any color, is absolutely prohibited, the issue with the phrase "Black Lives Matter", is that it has become identified with a political/civil rights movement that has generated substantial controversy throughout Oregon and the country, including spawning *counter-movements such as the "Blue Lives Matter" and "All Lives Matter"*. These movements and related posters and signs would also be considered controversial civil issues as related and should not be displayed in classrooms or on school property. The concern is that once "Black Lives Matter" posters are posted, then it becomes difficult for the District, under the First Amendment, to object to other posters which may be similar or responsive to "Black Lives Matter" or which cover controversial or disputed subjects of a civil or political nature without engaging in *viewpoint discrimination.* . . .

Ex. I at 2 (emphasis added).

253. Defendants' view changed after Board Defendants adopted the Amended Speech Policy in April 2021.

254. On May 5, 2021, Defendant Kolb sent an email to the entire District staff. A true, accurate, and complete copy of the email is Exhibit J.

255. In the email, Defendant Kolb wrote: "The attached Board policy was revised and adopted by the Board last Tuesday. For clarification, [the Amended Speech Policy] now allows for the [Oregon Education Association's] Black Lives Matter poster to be present on the walls of your classrooms." Ex. J at 1.

256. Defendant Kolb did not state in his May 5 email that the Amended Speech Policy permits teachers to hang the "counter-movements" "Blue Lives Matter" and "All Lives Matter" posters in their classrooms.

257. As to the Amended Speech Policy, Defendant Kolb explained: "The significant change . . . is the following statement: '*In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions.*' It is deemed by the District that this poster is consistent with our Board Policy ["All Students Belong," adopted in December 2020] and the Board Resolution on Equity, Diversity, and Inclusion [adopted in January 2021]." Ex. J at 1.

258.    Thus, Defendants have by fiat found that permitting Black Lives Matter posters no longer constitutes "viewpoint discrimination." Ex. I at 2. But Defendants have made no similar concession to Blue Lives Matter or All Lives Matter posters.

**V.    Defendants' unconstitutional Amended Speech Policy is preventing Rachel and Katie from freely speaking as citizens on matters of public concern and compels them to comply with the disclaimer requirement.**

259. From April 8 to April 29, 2021, Rachel and Katie made frequent social media posts, often daily, about issues relating to I Resolve on the I Resolve Instagram account.

260. Rachel and Katie intended to continue to make similar daily social media posts indefinitely into the future about issues relating to I Resolve.

261. On April 29, 2021, Rachel and Katie immediately stopped making such Instagram posts when they discovered that the Board Defendants had adopted the Amended Speech Policy.

262. Rachel and Katie stopped making social media posts about I Resolve because of Defendants' elusive, subjective, and circular definition of "controversial civil issue" in the Amended Speech Policy. *See* Ex. G.

263. If Rachel and Katie make another social media post about I Resolve or gender-identity education policy, the Amended Speech Policy would compel them to write a disclaimer on every post on this "controversial" issue.

264. If Rachel and Katie make another social media post about I Resolve or gender-identity education policy without including the compelled disclaimer, they would be subject to adverse employment consequences if Defendants later assessed their speech to be "controversial."

265. If Rachel and Katie, upon their reinstatement to their positions, make any statements relating to I Resolve or gender-identity education policy while on District premises or acting within the scope of their employment, they would be subject to adverse employment consequences.

266. In fact, Defendants have already subjected Rachel and Katie to administrative leave and formal investigation in part because of District employee complaints that they violated the Original Speech Policy's disclaimer requirement.

267. The Amended Speech Policy's disclaimer requirement has also compelled Rachel and Katie to add a disclaimer to the I Resolve website stating that the website espouses personal views only and not the views of any education entity. Ex. A at 4.

268. Rachel and Katie do not want the compelled disclaimer on the I Resolve website, and but for Defendants' disclaimer requirement, Rachel and Katie would delete the disclaimer.

269. Rachel and Katie do not believe or wish to communicate that their speech is official school speech or that it represents the views of the District. However, they do not want to make the required disclaimer because they wish to avoid placing language on their website and social media that may disparage their speech in the eyes of their readers, or otherwise confuse their readers, by suggesting that the District opposes or disapproves of their speech.

270. Rachel and Katie, upon reinstatement, also desire to discuss issues relating to I Resolve and gender-identity education policy during school hours and while on District premises.

271. But the Amended Speech Policy regulates, censors, and suppresses Rachel and Katie's views on gender-identity education policy unless District officials, including Defendants, subjectively deem those views to be consistent with District policy and resolutions.

272. Defendants' Amended Speech Policy has limited and compelled and continues to limit and compel Rachel and Katie's speech in other contexts.

273. For example, during the weekend of May 15, 2021, Rachel was on a float trip with friends on the Rogue River. Under the Amended Speech Policy, Rachel was forced to speak the compelled disclaimer to her friends when expressing her views on

any issue that may, in the discretion of School District officials, including Defendants, be deemed "controversial." Rachel included the disclaimer when discussing issues including the wisdom of pandemic restrictions and immigration policy.

274. The Amended Speech Policy has also stopped and is stopping Rachel from making personal social media posts she otherwise would because she does not wish to comply with the disclaimer requirement.

275. For example, on May 22, 2021, Defendants' Amended Speech Policy compelled Katie, while at her son's soccer match, to speak the disclaimer when talking with other families about issues related to I Resolve.

## STATEMENTS OF LAW

276. At all times relevant to the Complaint, each and all of the acts and policies alleged in this Complaint were attributed to Defendants who acted under color of a statute, regulation, or custom of the State of Oregon (*i.e.*, under color of state law and authority).

277. The Original Speech Policy gives School District officials, including Defendants, unbridled discretion to determine whether an employee's speech is about a "controversial issue" and thus subject to the disclaimer requirement under that policy.

278. The Original Speech Policy's disclaimer requirement discriminates based on viewpoint and content.

279. The Amended Speech Policy gives School District officials, including Defendants, unbridled discretion to determine whether an employee's speech is about a "political or controversial civil issue" and thus prohibited while the employee is on District premises or acting within the scope of employment.

280. The Amended Speech Policy's prohibition against employee speech about "political or civil issues" while on District premises or acting within the scope of duty discriminates based on viewpoint and content.

281. The Amended Speech Policy gives School District officials, including Defendants, unbridled discretion to determine whether an employee's speech while off duty is about a "controversial" issue and thus subject to the disclaimer requirement under that policy.

282. The Amended Speech Policy's disclaimer requirement discriminates based on viewpoint and content.

283. Defendants enforced the Original Speech Policy and Amended Speech Policy against Plaintiffs.

284. Defendants knew or should have known that they were violating Plaintiffs' constitutional rights by:

    a. Subjecting Plaintiffs to disciplinary action because they spoke in a way that communicated their philosophical and religious beliefs regarding gender-identity education policy;

    b. Subjecting Plaintiffs to discipline based on a content- and viewpoint-discriminatory determination of what constitutes a "controversial issue" under the Original Speech Policy;

    c. Subjecting Plaintiffs to discipline for not speaking the Original Speech Policy's compelled disclaimer when they communicated their philosophical and religious beliefs regarding gender-identity education policy;

    d. Failing to define "controversial issue" under the Original Speech Policy.

285. Defendants know or should know that the Amended Speech Policy violates Plaintiffs' constitutional rights by:

    a. Subjecting Plaintiffs to disciplinary action if they speak in a way that communicates their philosophical and religious beliefs regarding gender-identity education policy;

b.  Subjecting Plaintiffs to discipline based on the policy's content- and viewpoint-discriminatory definitions of "political or civil issue" and "controversial civil issue";

c.  Subjecting Plaintiffs to discipline if they, while on School District premises acting within the scope of their duties, engage in speech supporting one side of any "political or controversial civil issue," including communicating their philosophical and religious beliefs regarding gender-identity education policy;

d.  Subjecting Plaintiffs to discipline if they, while off duty, speak on any "controversial issue," including gender-identity education policy, without also communicating the policy's compelled disclaimer; and

e.  Compelling Plaintiffs, while off duty and speaking on any controversial issue, including gender-identity education policy, to speak the policy's compelled disclaimer.

286. The policy and practices that led to the violation of Plaintiffs' constitutional rights remain in effect.

287. Plaintiffs are suffering irreparable harm from Defendants' retaliatory action and the enforcement of the Speech Policies.

288. Plaintiffs have no adequate or speedy remedy at law to correct the deprivation of their rights by Defendants.

289. Defendants' actions and policies, as set forth above, do not serve any legitimate or compelling state interest and are not narrowly tailored to serve any such interests.

290. Defendants' Speech Policies and related practices are not narrowly tailored as applied to Plaintiffs because Plaintiffs' expression implicates none of the legitimate interests Defendants might have.

291. Under 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to appropriate relief enjoining Defendants' challenged Amended Speech Policy and related conduct.

292. This Verified Complaint serves as timely and adequate notice of the Oregon law claims below. Or. Rev. Stat. § 30.275(3)(c).

293. Defendants also have already engaged in an exhaustive investigation of the facts pertaining to the issues in the case, and thus have full notice of the Oregon law claims below.

### FIRST CAUSE OF ACTION
### Violation of Plaintiffs' First Amendment Right to Freedom of Speech: Retaliation
### (42 U.S.C. § 1983)

294. Plaintiffs repeat and reallege each of the allegations in paragraphs 1–293 of this Complaint.

295. By punishing and threatening to punish Plaintiffs for expressing their views regarding gender-identity education policy, Defendants have retaliated and are retaliating against Plaintiffs for exercising their First Amendment rights.

296. When Plaintiffs communicated their views regarding gender-identity education policy, they were speaking as private citizens on a matter of public concern and engaging in expression the First Amendment protects.

297. Plaintiffs' interest as private citizens discussing matters of public concern outweighs Defendants' interest in the efficient provision of services.

298. Defendants' disciplinary action and their threatened future disciplinary action would deter a person of ordinary firmness from exercising her right to free speech in the future.

299. Defendants have taken disciplinary action against Plaintiffs and threaten to do so in the future because of the views Plaintiffs have expressed on matters of public concern, expression that the First Amendment protects.

300. Defendants subjected Plaintiffs to discipline and threaten to do so in the future due to the content and viewpoint of Plaintiffs' speech.

301. By placing Plaintiffs on administrative leave, threatening to terminate them, launching a formal investigation into them, prohibiting them from conducting school business, and preventing them from taking other opportunities for pay, Defendants have punished Plaintiffs for engaging in expression the First Amendment protects.

302. Defendants' disciplinary action violates Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution.

### SECOND CAUSE OF ACTION
**Violation of Plaintiffs' First Amendment Right to Freedom of Speech: Prior Restraint and Content and Viewpoint Discrimination (42 U.S.C. § 1983)**

303. Plaintiffs repeat and reallege each of the allegations in paragraphs 1–293 of this Complaint.

304. Plaintiffs challenge the part of Defendants' Original Speech Policy that censored speech on "controversial issues" as applied to Plaintiffs.

305. Plaintiffs challenge those parts of Defendants' Amended Speech Policy that censor speech on "political or civil issues," "controversial civil issue[s]," and "controversial issues" both facially and as applied to them.

306. By punishing and threatening to punish Plaintiffs for expressing their views regarding gender-identity education policy, Defendants have engaged in content and/or viewpoint discrimination in violation of the First Amendment.

307. Defendants' Original Speech Policy required officials to evaluate the content and viewpoint of employee expression to determine whether it constituted speech on a "controversial issue."

308. Defendants' Amended Speech Policy requires officials to evaluate the content and viewpoint of employee expression to determine whether it constitutes speech on a "political or civil issue," "controversial civil issue," and "controversial issue."

309. Defendants considered the content and viewpoint of Plaintiffs' expression when they decided to enforce their Original Speech Policy against Plaintiffs. And

Defendants threaten to do so again under the Amended Speech Policy if Plaintiffs continue to express their views.

310. Defendants' Original Speech Policy placed a prior restraint on speech by prohibiting discussion of political or civil issues during the performance of District duties.

311. Defendants' Amended Speech Policy places a prior restraint on speech by prohibiting employees from speaking on one side of any political or controversial civil issue while on District premises or within the scope of their employment.

312. Defendants' Speech Policies confer unbridled discretion upon School District officials, including Defendants, to discriminate based on content or viewpoint.

313. Defendants exercised this unbridled discretion when they punished Plaintiffs for expressing their views regarding gender-identity education policy.

314. Under the Original Speech Policy, Defendants have allowed and failed to punish speech by District employees on other "controversial issues."

315. Under the Amended Speech Policy, Defendants have allowed and failed to punish speech by District employees, made while on District premises or acting within the scope of employment, on other "political or controversial civil issue[s]."

316. Defendants' Speech Policies and enforcement of those policies are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

317. The overbreadth of Defendants' Amended Speech Policy chills the speech of Plaintiffs, who seek to engage in protected expression, including expression about gender-identity education policy, in their interactions with students, staff, and the public both on and off campus.

318. Plaintiffs' expression regarding gender-identity education policy is protected by the First Amendment.

319. Defendants' Speech Policies and enforcement of those policies violates Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution.

### THIRD CAUSE OF ACTION
### Violation of Plaintiffs' First Amendment Right to Freedom of Speech: Compelled Speech
### (42 U.S.C. § 1983)

320. Plaintiffs repeat and reallege each of the allegations in paragraphs 1–293 of this Complaint.

321. Plaintiffs challenge the Original Speech Policy's required disclaimer as applied to them.

322. Plaintiffs challenge the Amended Speech Policy's required disclaimer facially and as applied to them.

323. By punishing and threatening to punish Plaintiffs for refusing to communicate a District-mandated disclaimer when speaking on issues the District deems "controversial," Defendants have attempted and are attempting to compel Plaintiffs' speech, in violation of their rights under the First Amendment.

324. Defendants' Speech Policies and enforcement of those policies compelled and continue to compel Plaintiffs to communicate a disclaimer that they do not wish to communicate and otherwise would not communicate.

325. Defendants' Speech Policies and enforcement of those policies violate Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution.

### FOURTH CAUSE OF ACTION
### Violation of Plaintiffs' First Amendment Right to Free Exercise of Religion
### (42 U.S.C. § 1983)

326. Plaintiffs repeat and reallege each of the allegations in paragraphs 1–293 of this Complaint.

327. By punishing and threatening to punish Plaintiffs for exercising their sincerely held religious beliefs in the way they discuss issues regarding gender-identity education policy, Defendants have violated and are violating Plaintiffs' right to free exercise of religion under the First Amendment.

328. Plaintiffs' views and expression related to gender-identity education policy are motivated by their sincerely held religious beliefs, are avenues through which they exercise their religious faith, and constitute a central component of their sincerely held religious beliefs.

329. Defendants' Speech Policies and related practices are neither neutral nor generally applicable. The policies instead allow Defendants to target religious expression and activities specifically and to demonstrate hostility to that expression.

330. Defendants' Speech Policies and related practices are neither neutral nor generally applicable because they represent a system of individualized assessments.

331. Defendants' Speech Policies and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to the District's asserted interests unprohibited.

332. Defendants violated Plaintiffs' right to free exercise of religion when they applied their Original Speech Policy to Plaintiffs and disciplined them for communicating their religiously informed views on issues related to gender-identity education policy. And Defendants continue to do so under the Amended Speech Policy by threatening to punish them if they continue to communicate their beliefs.

333. Defendants showed hostility to Plaintiffs' religious beliefs by questioning whether those religious beliefs on gender identity made Plaintiffs unfit to work as educators.

334. Defendants' Speech Policies and related practices and Defendants' discipline and threatened discipline of Plaintiffs for speaking their deeply held religious beliefs violate Plaintiffs' right to free exercise of religion as guaranteed by the First Amendment to the United States Constitution.

## FIFTH CAUSE OF ACTION
### Violation of Plaintiffs' Fourteenth Amendment Right to Due Process of Law
### (42 U.S.C. § 1983)

335. Plaintiffs repeat and reallege each of the allegations in paragraphs 1–293 of this Complaint.

336. By punishing and threatening to punish Plaintiffs under vague and overbroad Speech Policies, Defendants have violated and are violating Plaintiffs' right to due process of law under the Fourteenth Amendment.

337. Defendants' Speech Policies and related practices are overbroad because they encompass a substantial amount of constitutionally protected speech.

338. Plaintiffs' expression regarding gender-identity education policy is protected by the First Amendment.

339. By placing Plaintiffs on administrative leave, threatening to terminate them, launching a formal investigation into them, prohibiting them from conducting school business, and preventing them from taking other opportunities for pay, Defendants have punished Plaintiffs for engaging in expression the First Amendment protects.

340. Defendants' Speech Policies and related practices are unconstitutionally vague.

341. The Original Speech Policy granted, and as applied to Plaintiffs continues to grant, School District Officials, including Defendants, unbridled discretion in deciding what constitutes a "controversial issue."

342. The Amended Speech Policy gives School District officials, including Defendants, unbridled discretion in deciding what constitutes a "political or civil issue," "controversial civil issue," and "controversial issue."

343. The Speech Policies used and continue to use terms that are inherently subjective and elude any precise or objective definition that would be consistent from one official, teacher, or student to another and because they were and are incapable of providing meaningful guidance to District officials, including Defendants.

344. The Original Speech Policy forced Plaintiffs to guess whether expression that the First Amendment protected was in fact allowed.

345. The Original Speech Policy forced Plaintiffs to guess whether their expression that the First Amendment protected had to be accompanied by the compelled disclaimer.

346. The Amended Speech Policy forces District employees, including Plaintiffs, to guess whether their expression that the First Amendment protects is in fact allowed while on District premises or acting within the scope of employment.

347. The Amended Speech Policy forces District employees, including Plaintiffs, to guess whether their off-duty expression that the First Amendment protects must be accompanied by the policy's compelled disclaimer.

348. The lack of objective criteria, factors, or standards in Defendants' Speech Policies and related practices renders the policies and practices unconstitutionally vague and in violation of Plaintiffs' right to due process of law under the Fourteenth Amendment.

**SIXTH CAUSE OF ACTION**
**Violation of Plaintiffs' Fourteenth Amendment Right to**
**Equal Protection of the Laws**
**(42 U.S.C. § 1983)**

349. Plaintiffs repeat and reallege each of the allegations in paragraphs 1–293 of this Complaint.

350. By punishing and threatening to punish Plaintiffs for expressing their views regarding gender-identity education policy when they have not punished District employees who express opposite views on those same subjects and other "controversial issues," "political issues," or "controversial civil issue[s]," Defendants have violated and are violating Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment.

351. Plaintiffs are similarly situated to other employees at the District.

352. Defendants have taken no disciplinary action against employees who support and endorse the concept of shifting gender identity.

353. But Defendants have taken, and continue to take, disciplinary action against Plaintiffs, who have different views on those concepts.

354. Defendants' Speech Policies have been and are applied to discriminate intentionally against Plaintiffs' rights to freedom of speech, right to be free from compelled speech, free exercise of religion, right to be free from unconstitutional conditions, and right to due process of law.

355. Thus, discriminatory intent is presumed.

356. Defendants' Speech Policies and related practices have burdened and are burdening Plaintiffs' fundamental rights and have targeted and are targeting a suspect class (*i.e.*, religious adherents).

357. Defendants' Speech Policies and related practices are underinclusive, prohibiting some expression while leaving other expression equally harmful to the District's asserted interests unprohibited.

358. Defendants have applied and are applying their Speech Policies and related practices to Plaintiffs in a discriminatory and unequal manner, granting other employees the right to express their views on issues related to gender identity while denying that right to Plaintiffs, in violation of Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment.

SEVENTH CAUSE OF ACTION
**Violation of Plaintiffs' Right to be Free from Unconstitutional Conditions
(42 U.S.C. § 1983)**

359. Plaintiffs repeat and reallege each of the allegations in paragraphs 1–293 of this Complaint.

360. By conditioning Plaintiffs' status as staff in good standing in the District (and ultimately their employment at the District) on their willingness to surrender various constitutional rights, Defendants have imposed and are imposing an unconstitutional condition on Plaintiffs in violation of the First Amendment.

361. Defendants' Speech Policies and enforcement of those policies imposed and continue to impose an unconstitutional condition upon staff members' right to free speech and their receipt of state benefits (*e.g.*, avoiding disciplinary actions, including termination, remaining staff at a public school district).

362. Defendants' Speech Policies and enforcement of those policies required and continue to require Plaintiffs and other District staff to surrender their constitutionally protected rights to freedom of speech, free exercise of religion, due process, and equal protection to avoid disciplinary actions, including termination.

363. Defendants' Speech Policies and enforcement of those policies violate Plaintiffs' right to be free from unconstitutional conditions.

EIGHTH CAUSE OF ACTION
**Violation of Plaintiffs' Rights of Speech: Retaliation, Prior Restraint,
Content and Viewpoint Discrimination, and Compelled Speech
(Oregon Const. Art. I § 8; Or. Rev. Stat. § 30.265)**

364. Plaintiffs repeat and reallege each of the allegations in paragraphs 1–293 of this Complaint.

365. By punishing and threatening to punish Plaintiffs for expressing their views regarding gender-identity education policy, Defendants have retaliated and are retaliating against Plaintiffs for exercising their free speech rights.

366. When Plaintiffs communicated their views regarding gender-identity education policy, they were speaking as private citizens on a matter of public concern and engaging in expression the Oregon Constitution protects.

367. Plaintiffs' interest, as private citizens discussing matters of public concern outweighs Defendants' interest in the efficient provision of services.

368. Defendants' disciplinary action and their threatened future disciplinary action would deter a person of ordinary firmness from exercising her right to free speech in the future.

369. Defendants have taken disciplinary action against Plaintiffs and threaten to do so in the future because of the views Plaintiffs have expressed on matters of public concern in the context of teaching and scholarship, expression that the Oregon Constitution protects.

370. Defendants subjected Plaintiffs to discipline and threaten to do so again in the future due to the content and viewpoint of Plaintiffs' speech.

371. By placing Plaintiffs on administrative leave, Defendants have punished Plaintiffs for engaging in expression the Oregon Constitution protects.

372. Defendants' Speech Policies required and continue to require officials to evaluate the content and viewpoint of employee expression to determine whether it constitutes speech on a "controversial issue."

373. Defendants considered the content and viewpoint of Plaintiffs' expression when they decided to enforce their Original Speech Policy against Plaintiffs. And Defendants threaten to do so again under the Amended Speech Policy if Plaintiffs continue to express their views.

374. Defendants' Original Speech Policy placed a prior restraint on speech by prohibiting discussion of political or civil issues during the performance of District duties.

375. Defendants' Amended Speech Policy places a prior restraint on speech by prohibiting employees from speaking on one side of any political or controversial civil issue while on District premises or within the scope of their employment.

376. Defendants' Speech Policies confer unbridled discretion upon School District officials, including Defendants, to discriminate based on content or viewpoint.

377. Defendants exercised this unbridled discretion when they punished Plaintiffs for expressing their views regarding gender-identity education policy.

378. Defendants' Speech Policies and enforcement of those policies are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.

379. The overbreadth of Defendants' Amended Speech Policy chills the speech of Plaintiffs, who seek to engage in protected expression in their interactions with students, staff, and the public on and off District premises, on and off duty, and within the scope of their employment.

380. By punishing and threatening to punish Plaintiffs for refusing to communicate a District-compelled disclaimer on speech the District considers "controversial," Defendants have attempted and are attempting to compel Plaintiffs' speech, in violation of their rights under the Oregon Constitution.

381. Defendants' Speech Policies and enforcement of those policies compelled and continue to compel Plaintiffs to communicate a disclaimer that they do not wish to communicate and otherwise would not communicate.

382. Plaintiffs challenge, on an as-applied basis, that part of Defendants' Original Speech Policy that censored speech on "controversial issues" and compelled Plaintiffs to speak the required disclaimer.

383. Plaintiffs challenge, both facially and on an as-applied basis, those parts of Defendants Amended Speech Policy that censor speech on "political or civil issues,"

"controversial civil issue[s]," and "controversial issues" and that compels Plaintiffs to speak the required disclaimer.

384. Defendants' Speech Policies, their enforcement of those policies, and the disciplinary actions taken against Plaintiffs based on their speech violate Plaintiffs' right to free speech as guaranteed by Article I, § 8, of the Oregon Constitution.

**NINTH CAUSE OF ACTION**
**Violation of Plaintiffs' Rights of Conscience, Free Exercise of Religion, and Enjoyment of Religious Opinions**
**(Oregon Const. Art. I § 3; Or. Rev. Stat. § 30.265)**

385. Plaintiffs repeat and reallege each of the allegations in paragraphs 1–293 of this Complaint.

386. By punishing and threatening to punish Plaintiffs for exercising and expressing their sincerely held religious beliefs according to the dictates of their own consciences in the way they discuss issues regarding gender-identity education policy, Defendants have violated and are violating Plaintiffs' right to free exercise of religion under Article I, § 3, of the Oregon Constitution.

387. The religious convictions Plaintiffs expressed and with which they sought to live in accordance are sincerely held religious beliefs.

388. Defendants have infringed on Plaintiffs' right to engage freely in their religious practices and opinions by disciplining Plaintiffs for expressing their religious views and enforcing Defendants' Speech Policies to censor Plaintiffs.

389. Defendants' Speech Policies and related practices do not serve any government interests of sufficient magnitude to override Plaintiffs' right to live out the dictates of their faith according to their own conscience and express their religious opinions.

390. Defendants also showed hostility to Plaintiffs' religious beliefs by questioning whether those religious beliefs on gender identity made Plaintiffs unfit to work as educators.

391. Defendants' disciplinary actions, Speech Policies, and their enforcement of those policies violate Plaintiffs' right to free exercise of religion and enjoyment of opinions as guaranteed by Article I, § 3, of the Oregon Constitution.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

A. A judgment declaring:

1. Defendants' retaliation against Plaintiffs for expressing their views regarding gender-identity education policy violates their rights under the First and Fourteenth Amendments to the United States Constitution and under Article I, § 8, of the Oregon Constitution;

2. As applied, the Original Speech Policy's failure to define "controversial issue" and disclaimer requirement violate the First and Fourteenth Amendments to the United States Constitution and Article I, §§ 3 and 8, of the Oregon Constitution;

3. Both facially and as applied, the Amended Speech Policy's (a) definition of "political or civil issue"; (b) definition of "controversial civil issue"; (c) disclaimer requirement; and (d) prohibition against employees engaging in speech supporting one side of "political or controversial civil issue" while on District premises or acting within the scope of employment violate the First and Fourteenth Amendments to the United States Constitution and Article I, §§ 3 and 8, of the Oregon Constitution;

B. A temporary restraining order and a preliminary and permanent injunction directing Defendants sued in their official capacities and their agents, officials, servants, employees, and any other persons acting on their behalf to reinstate Plaintiffs to their respective positions at North Middle School.

C. A preliminary and permanent injunction directing Defendants sued in their official capacities and their agents, officials, servants, employees, and any other persons acting on their behalf to remove from Plaintiffs' personnel files any reference to the discipline Defendants imposed on Plaintiffs for expressing their views regarding gender-identity education policy;

D. A temporary restraining order and a preliminary and permanent injunction prohibiting Defendants sued in their official capacities and their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing Defendants' Amended Speech Policy to (1) prohibit Plaintiffs from, or punish Plaintiffs for, expressing their views on a "political or controversial civil issue," including gender-identity education policy, while on District premises; (2) prohibit Plaintiffs from, or punish Plaintiffs for, expressing their views on a "controversial civil issue," including gender-identity education policy, while off duty; and (3) compel Plaintiffs to speak the required disclaimer.

E. A preliminary and permanent injunction prohibiting Defendants sued in their official capacities and their agents, officials, servants, employees, and any other persons acting on their behalf from enforcing the Amended Speech Policy's (a) definition of "political or civil issue"; (b) definition of "controversial civil issue"; (c) disclaimer requirement; and (d) prohibition against employees engaging in speech supporting one side of "political or controversial civil issue" while on District premises or acting within the scope of employment.

F. Nominal damages;

G. Compensatory damages;

H. Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action under to 42 U.S.C. § 1988; and

I. All other further relief to which Plaintiffs may be entitled.

Respectfully submitted this 7th day of June, 2021.

*/s/RAY D. HACKE*
RAY D. HACKE
OSB No. 173647
PACIFIC JUSTICE INSTITUTE
1850 45TH AVE. NE, SUITE 33
SALEM, OR 97305
503-917-4409
rhacke@pji.org
*Lead Counsel*
*Attorneys for Plaintiffs*

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury for all issues so triable.

/s/ RAY D. HACKE
RAY D. HACKE
*Attorney for Plaintiffs*

**DECLARATION UNDER PENALTY OF PERJURY**

I, RACHEL G. DAMIANO, a citizen of the United States and a resident of the State of Oregon, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing and that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of June, 2021, at Grants Pass, Oregon.

_____

RACHEL G. DAMIANO

### DECLARATION UNDER PENALTY OF PERJURY

I, KATIE S. MEDART, a citizen of the United States and a resident of the State of Oregon, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing and that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of June, 2021, at Grants Pass, Oregon.

_____
KATIE S. MEDART

## PROOF OF SERVICE

I am employed in the County of Marion, State of Oregon.  I am over the age of eighteen and not a party to the within action; my business address is 1850 45th Ave., Suite 33, Salem, OR 97305.

On or about June 7, 2021, I served the following documents on the interested parties by placing a true copy thereof enclosed in sealed envelope(s) addressed to said parties:

**VERIFIED COMPLAINT**

**DEMAND FOR JURY TRIAL**

### PLEASE SEE ATTACHED SERVICE LIST

___BY MAIL:  I am readily familiar with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, it would be deposited with the U.S. postal service on that same date with postage thereon fully prepaid at Salem, Oregon in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_X_BY PERSONAL SERVICE:  I caused such envelope to be delivered by hand to the office of the addressee(s).

___BY FACSIMILE TRANSMISSION:  The facsimile machine I used complied with California Rules of Court 2003(3) and no error was reported by the machine.  Pursuant to rule 2005(i), I caused the machine to print a record of the transmission, a copy of which is attached to this proof of service.

___(State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_X_(Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on June 7, 2021, at Salem, Oregon.

*/s/ RAY D. HACKE*
Ray D. Hacke

# SERVICE LIST

Willard L. Ransom
Attorney For Grants Pass School District No. 7
133 NW D Street
Grants Pass, OR 97526

Kirk Kolb
Superintendent
Grants Pass School District
725 NE Dean Drive
Grants Pass, OR 97526

Thomas Blanchard
Principal
North Middle School
1725 NW Highland Ave.
Grants Pass, OR 97526

Scott Nelson
Member
Grants Pass School Board
725 NE Dean Drive
Grants Pass, OR 97526

Scott Nelson
Member
Grants Pass School Board
725 NE Dean Drive
Grants Pass, OR 97526

Cliff Kuhlman
Member
Grants Pass School Board
725 NE Dean Drive
Grants Pass, OR 97526

Gary Richardson
Member
Grants Pass School Board
725 NE Dean Drive
Grants Pass, OR 97526

Debbie Brownell
Member
Grants Pass School Board
725 NE Dean Drive
Grants Pass, OR 97526

Cassie Wilkins
Member
Grants Pass School Board
725 NE Dean Drive
Grants Pass, OR 97526

Brian Delagrange
Member
Grants Pass School Board
725 NE Dean Drive
Grants Pass, OR 97526

Casey Durbin
Member
Grants Pass School Board
725 NE Dean Drive
Grants Pass, OR 97526

# EXHIBIT  A

 **I Resolve**
Reasonable, loving and tolerant solutions for education.

Sign the Resolution

Home    Take Action    T-Shirts

# I Resolve

Reasonable, loving, and tolerant solutions for education policies that respect everyone's rights.





## T-Shirts Now Available

T-Shirts are sold by a third party vendor, with no profit going to I Resolve.

Buy Your Shirt Here



# Proposed Solutions for Education Systems

### Honoring All Students, Staff and Community Members

I Resolve is a grassroots movement intended to protect the hearts and minds of our youth and stand up for truth in our society. We believe that resolutions that are reasonable and fair in both form and operation, are beneficial in helping to safeguard the mental, emotional and physical well-being of all public-school students.

We need communities to band together, through individual and corporate commitment, to protect our youth and make their voice heard to local, state and national leaders and policy makers.

# Current Proposal

We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved.

The resolution statements regarding bathroom and locker room shared space use are suggestions for current structures, until such a time that individual gender neutral bathrooms are required and fully funded for education and youth facilities.

The last two resolutions are proposed as a caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey.

Sign the Resolution

# Resolution 2021-01

Therefore, be it resolved that we urge our local, state and federal leaders to adopt the following principles and policies:

**Premise**

**Point 1**

We recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female;

**Resolution 1a**

**Point 2**

Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designations) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built;

Resolution 1b

**Point 3**

For any person who is not comfortable using their anatomically-correct space, they may request access to a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available**;

Resolution 2

**Point 4**

A student may, with parent permission, request to be called by a derivative of their legal name but it will not be mandated that students or staff be required to call the student by their preferred name; and

Resolution 3

**Point 5**

A student may, with parent permission, request to be referred to with preferred pronouns, but it will not be mandated that students or staff be required to use the preferred pronouns.

Footnote

**Note**

**Please note that although not specified in the resolutions, individual gender neutral bathrooms are endorsed by I Resolve and encouraged to be fully funded by the state to be implemented in education facilities.

## I Resolve Movement

▶  Play Video

i



# Instagram Feed








Show More

The views expressed on this site and any related video(s) produced by I Resolve are the expression of the individuals, as private citizens and do not necessarily represent the views or opinions of any specific education entity.

I Resolve Team

©2021 by I Resolve. Proudly created with Wix.com. The ideas expressed on this site are the views of the individuals, expressed as private citizens.

# EXHIBIT  B



**North Middle School**

1725 NW Highland Avenue, Grants Pass, OR 97526 · Phone: (541) 474-5740
www.grantspass.k12.or.us/North · Fax: (541) 474-5739

PRINCIPAL
**Tommy Blanchard**

VICE PRINCIPAL
**Bill Gladbach**

VICE PRINCIPAL
**Rachel Damiano**

COUNSELORS
**Eli Bland**
**Diana Tonnesen**

April 5, 2021

HAND DELIVERED

Dear Katie Medart:

This letter is to formally notify you that you are being placed on paid leave effective today, April 5, 2021, pending investigation into allegations of inappropriate behavior. You will be permitted to be at the District for interviews.

A meeting will be scheduled at which time you will have the opportunity to present your side of the story. This leave in no way is to be construed that you are guilty of said allegations. You will be notified when we have scheduled the date and time of the meeting.

Sincerely,

Tommy Blanchard
Principal

cc: Kirk Kolb
    Mickey Jarvis
    Personnel File
    Payroll

*Developing our unique potential as a community of responsible and resourceful lifelong learners.*

EXHIBIT  C



# North Middle School

1725 NW Highland Avenue, Grants Pass, OR 97526 · Phone: (541) 474-5740
www.grantspass.k12.or.us/North · Fax: (541) 474-5739

PRINCIPAL
**Tommy Blanchard**

VICE PRINCIPAL
**Bill Gladbach**

VICE PRINCIPAL
**Rachel Damiano**

COUNSELORS
**Eli Bland**
**Diana Tonnesen**

April 5, 2021

HAND DELIVERED

Dear Rachel Damiano:

This letter is to formally notify you that you are being placed on paid leave effective today, April 5, 2021, pending investigation into allegations of inappropriate behavior. You will be permitted to be at the District for interviews.

A meeting will be scheduled at which time you will have the opportunity to present your side of the story. This leave in no way is to be construed that you are guilty of said allegations. You will be notified when we have scheduled the date and time of the meeting.

Sincerely,

Thomas M. Blanchard

Tommy Blanchard
Principal

cc:  Kirk Kolb
     Personnel File
     Payroll

*Developing our unique potential as a community of responsible and resourceful lifelong learners.*

EXHIBIT  D



From: **Office of the Superintendent** office_of_the_superintendent@grantspass.k12.or.us
Subject: We are GP; We ALL Belong
Date: April 6, 2021 at 4:31 PM
To: Office of the Superintendent office_of_the_Superintendent@grantspass.k12.or.us

D7 Family,

I am writing today to address reports of a "movement" circulating on social media that is in direct conflict with the values of Grants Pass School District 7.

To be very clear, we do not support or endorse this message.

District 7 is unequivocally committed to providing welcoming and safe learning environments for **all** students, including our LGBTQ students. In Grants Pass schools, we **ALL** belong, regardless of race, religion, gender, sex, or ability.

Please contact me or our Human Resources Director, Danny Huber-Kantola, with any additional concerns or needed support.

Thank you,

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com

# EXHIBIT  E

**From: Office of the Superintendent** Office_of_the_Superintendent@grantspass.k12.or.us
**Subject:** We are GP; We All Belong
**Date:** April 7, 2021 at 4:21 PM
**To:** Grants Pass SD 7 Recipients recipients@grantspass.parentlink.net



Scroll down to read in Spanish - *Desplácese hacia abajo para leer en español.*

Grants Pass staff, students, and families,

You may have heard about social media postings discussing LGBTQ policies with reference to schools. We are aware of complaints that two staff members made these postings. At this time, an investigation is underway, and the individuals are not at work.

Grants Pass School District 7 is committed to providing welcoming and safe learning environments for all students, including our LGBTQ students. In Grants Pass schools, we ALL belong, regardless of race, religion, gender, sex, sexual orientation or ability.

We have policies in place to support safe environments for students, including All Students Belong (Policy ACB) and our Equity, Diversity, and Inclusion Resolution (2021-03). We will continue protecting the well-being of all students in our schools, and all complaints alleging violations of District policies are taken seriously and thoroughly investigated.

Thank you,

El personal, los estudiantes y las familias de Grants Pass,

Es posible que haya escuchado sobre publicaciones en las redes sociales que discuten las políticas de LGBTQ con referencia a las escuelas.  Somos conscientes de las quejas de que dos miembros del personal hicieron estas publicaciones.  En este momento, se está llevando a cabo una investigación y las personas no están trabajando.

El Distrito Escolar 7 de Grants Pass se compromete a proporcionar entornos de aprendizaje seguros y acogedores para todos los estudiantes, incluidos nuestros estudiantes LGBTQ.  En las escuelas Grants Pass, TODOS pertenecemos, sin importar raza, religión, género, sexo o capacidad.

Contamos con políticas para apoyar entornos seguros para los estudiantes, incluidos todos los estudiantes pertenecen (Política ACB) y nuestra Resolución de Equidad, Diversidad e Inclusión (2021-03).  Continuaremos protegiendo el bienestar de todos los estudiantes en nuestras escuelas, y todas las quejas que alegan violaciones de las políticas del Distrito se toman en serio y se investigan a fondo.

Gracias,

**Kirk T. Kolb**

Superintendent

Grants Pass School District 7

You are receiving this email because of your relationship with Grants Pass SD 7. If you wish to stop receiving email updates sent through the Blackboard service, please unsubscribe.
Grants Pass SD 7 | 725 NE Dean Drive, Grants Pass, OR 97526 | 541-474-5700

EXHIBIT  F

| Grants Pass School District 7 | Code: GBG<br>Adopted: 6/14/88<br>Revised/Readopted: 2/24/04<br>Orig. Code(s):  GBG |
| --- | --- |

## Staff Participation in Political Activities

Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level on the same basis as any citizen in a comparable position in public or private employment and within the law.

All district employees are privileged within the limitations imposed by state and federal laws and regulations to choose either side of a particular issue and to support their viewpoints as they desire by vote, discussion or the persuasion of others. Such discussion and persuasion, however, will not be carried on during the performance of district duties, except in open discussion during classroom lessons that center on a consideration of all  candidn «s  for a particular office or  various  sides  of a particular  political  or civil issue.

On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.

No employee will use district facilities, equipment or supplies in connection with political campaigning, nor will any employee use anytime during the working day for campaign purposes.

END OF POLICY

Legal Reference(s):

   ORS Chapter 244
   ORS 260.432

   Oregon Constitution, Article XV, Section 8.

Cross Reference(s):

   INB - Studying Controversial Issues

1-1

EXHIBIT  G

# Grants Pass School District 7

Code:               GBG
Adopted:            6/14/88
Revised/Readopted:  2/24/04; 4/27/21
Orig. Code:         GBG

## Staff Participation in Political Activities

"Employees" shall include all District employees (including administrators, certified employees, classified employees and part-time employees) while acting within the scope of their employment or on behalf of the District, contractors working for the District under District contracts on District premises while performing work for the District, and District volunteers while on District premises or engaged in a District-sponsored activity.

"Speech" shall mean any oral or written statements made by an employee in the course of his or her District duties, including, but not limited to, the display of posters, flyers, clothing or apparel or buttons, stickers or other accessories, which contain a message related to controversial political or civil issues, ballot measures, electoral issues or candidates for an elected position.

"District facilities" shall include, but shall not be limited to, all District buildings, District grounds and parking lots, District transportation vehicles, District sponsored computer networks and e-mail systems, District sponsored social media accounts, District or school sponsored events and District-sponsored virtual classrooms. Board Member e-mail addresses shall not be considered "District facilities" for purposes of this policy.

"District Equipment and Supplies" shall include, but not be limited to, District computers, printers, copiers, mailing or e-mail address lists for students or families, District provided uniforms or sporting equipment, stationary, or other personal property which is owned by the District or provided to students or employees by the District for a school-sponsored event.

"Political or civil issue" shall include, but not be limited to, any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree. A controversial civil issue shall specifically include issues which appear likely to create controversy among students, employees or the public, or which the District determines may be disruptive to its educational mission or instruction. In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions.

Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level on the same basis as any citizen in a comparable position in public or private employment and within the law.

All district employees are privileged within the limitations imposed by state and federal laws and regulations to choose either side of a particular issue and to support their viewpoints as they desire by vote, discussion or the persuasion of others. Such discussion and persuasion, however, will not be carried on during the performance of district duties, except as described in Policy INB. When engaged in off duty activities, on all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.

No employee will use district facilities, computer networks or e-mail systems, equipment or supplies in connection with political campaigning, nor will any employee use any time during the working day for campaign purposes. While on District premises or acting within the scope of employment, no employee shall display or engage in speech supporting a candidate for elected office or supporting one side of any political or controversial civil issue.

END OF POLICY

---

**Legal Reference(s):**

ORS Chapter 244                    ORS 260.432

Or. Const., art. XV, § 8.

**Cross Reference(s):**

INB - Studying Controversial Issues

EXHIBIT  H

<table>
<tr><td></td><td>Code:</td><td>**INB**</td></tr>
</table>

| | Code: | **INB** |
|---|---|---|
| **Grants Pass School District 7** | Adopted: | 6/14/88 |
| | Readopted: | 2/24/04 |
| | Orig. Code(s): | INB |

### Studying Controversial Issues

Training for effective citizenship is accepted as one of the major goals of our public schools.  Our instructional program developed to achieve this purpose properly places great emphasis upon teaching about our American heritage, the rights and privileges we enjoy as citizens and the citizenship responsibilities that must be assumed in maintaining our American way of life.

In training for effective citizenship, it is frequently necessary for students to study issues that are controversial.  In considering such issues, it shall be the purpose of our schools to recognize the student's right and/or obligation to:

1.    Study any controversial issue concerning which (at his/her level) the student should begin to have an opinion;

2.    Have free access to all relevant information, including the materials that circulate freely in the community;

3.    Study under competent instruction in an atmosphere of freedom from bias and prejudice;

4.    Form and express his/her own judgments on controversial issues without thereby jeopardizing his/her relations with teachers or the school;

5.    Recognize that reasonable compromise is often an important facet in the decision making in our society;

6.    Respect minority opinion.

Controversial issues, as well as controversial instructional methods, materials and resource personnel associated with them, by definition generate dissension.  There is also an inherent risk that such dissension may escalate into antagonism which may be sufficient to disrupt the educational process.  Members of the professional staff are expected to be sensitive to student, staff and community attitudes, to carefully weigh the risks against the significance and educational merit of the issues, methods, materials and personnel involved and, when doubt remains, they are to seek the counsel of their supervisors.

END OF POLICY

---

Legal Reference(s):

ORS 336.067                              OAR 581-022-1020
                                         OAR 581-022-1910

Studying Controversial Issues – INB
(continued)

United States Constitution, Amendment I.
Oregon Constitution, Article 1.

Cross Reference(s):

IB - Freedom of Expression
IICB - Community Resource Persons

# EXHIBIT  I

**From: Kevin Bishop** KBishop@grantspass.k12.or.us 
**Subject:** Re: Posters and other items that may be considered controversial political or civil issues
**Date:** March 31, 2021 at 3:40 PM
**To:** Michael Endicott MENDICOTT@grantspass.k12.or.us, Kirk Kolb KKOLB@grantspass.k12.or.us
**Cc:** d7allstaff d7allstaff@grantspass.k12.or.us

First off Black Lives Matter is on its face a racist statement

Get Outlook for iOS

---

**From:** Michael Endicott <MENDICOTT@grantspass.k12.or.us>
**Sent:** Wednesday, March 31, 2021 1:44:41 PM
**To:** Kirk Kolb <KKOLB@grantspass.k12.or.us>
**Cc:** d7allstaff <d7allstaff@grantspass.k12.or.us>
**Subject:** RE: Posters and other items that may be considered controversial political or civil issues

Mr. Kolb,
I read your message and believe you when you say this District is committed equity and belonging for all students, but I feel compelled to point out my concerns to you and our colleagues, about some of the statements made therein.

With respect:

First, I'll say Black Lives Matter is an uplifting and wholesome message and way of thinking that is perfectly appropriate for our classrooms.

You mentioned that Blue Lives Matter is a counter movement to Black Lives Matter, I agree that it is a counter movement. But we have to ask ourselves why. Blue lives have always and explicitly mattered throughout our county's history. We teach our children to respect and trust police officers from a very early age. Police officers are part of the great *goes-without-saying* idea that all lives matter. Blue Lives have always mattered in the way that the dominant culture values lives. But Black Americans are objectively not a part of that *goes-without-saying* ideal and the examples are legion.

So why is Blue Lives Matter a counter movement? And why does that make Black Lives Matter controversial? There is no comparison between Black Lives Matter and blue Lives Matter, it is a false equivalence. Black people are members of a race that has experienced racism and discrimination for 400 years on the North American continent while police have not. Being a police officer is a career choice being Black is not. If a police officer is persecuted for being a police officer that person, after availing themselves of all available remedies, can choose to do something else. A Black person cannot choose to not be black in the face of persecution.

I am very concerned about the statement that it would be hard for the District to "object" to speech that is "similar" or "responsive" to Black Lives Matter. These are vague terms that do not justify curtailing anyone's 1st Amendment rights. And I am trying to think of similar or responsive speech that would agree with Board policy, but I can't think of anything that would make Black lives not matter, it is a one sided issue, there is no other side, Black Lives Matter or they don't.

If we are to curtail our 1st Amendment rights I think we deserve an enumerated list of objections, rather than a vague statement that Black Lives Matter is controversial.

Display of the phrase Black Lives Matter or Black Lives Matter symbols in classrooms do not violate any state policy or law. Black Lives Matter is supported by the Oregon School Board Association among many other Oregon education groups. We already teach about the civil rights movement of the 60' and 70's, both sides - the right side and the wrong side. Let's be on the right side of history during this civil rights movement.

Instead of quashing Black Lives Matter posters because some misunderstand the message and make it controversial, we should use it as a tool for education and dialog. We need to stand four square behind the civil rights of our students and they should see it. I think this District is capable of that. After 400 years of racism we can take the time that is given us to help rectify as much of that injustice as we can. Hiding from it as an institution is not the way.

Thank you for listening,
Michael

Stay Safe

---

**From:** Kirk Kolb
**Sent:** Tuesday, March 30, 2021 9:46 AM
**Subject:** Posters and other items that may be considered controversial political or civil issues

Good Morning D7 Family,

I am sending this message regarding a very difficult and emotive topic.  I have had a few people express a desire to put up "Black Lives Matter" posters in their classrooms and have had legal counsel review and consult with the Board.

First, please know that The District is committed to equity and making sure that all students belong. I hope that effort has been made clear with the passage of our "All Students Belong" policy and our School Board Resolution on Equity, Diversity, and Inclusion.

While it is a fact that black lives do matter and discrimination against black students, or students of any color, is absolutely prohibited,  the issue with the phrase "Black Lives Matter", is that it has become identified with a political/civil rights movement that has generated substantial controversy throughout Oregon and the country, including spawning counter-movements such as the "Blue Lives Matter" and "All Lives Matter". These movements and related posters and signs would also be considered controversial civil issues as related and should not be displayed in classrooms or on school property. The concern is that once "Black Lives Matter" posters are posted, then it becomes difficult for the District, under the First Amendment, to object to other posters which may be similar or responsive to "Black Lives Matter" or which cover controversial or disputed subjects of a civil or political nature without engaging in viewpoint discrimination. Board Policy GBG, as written, prohibits employees from expressing one-sided viewpoints on

controversial political or civil issues in the classroom.  Although the phrase should probably not be controversial, it nonetheless has created controversy, including in our community.   District Administration is currently reviewing Policy GBG with the Board and with legal counsel, and the Board has been forwarded information from GPEA regarding Black Lives Matter posters for consideration.  District Administration's role is to enforce policies while the ultimate interpretation and formation of District policy is up to the School Board.

Please be reassured that it continues to be our highest priority to ensure all student feel welcome and a part of our D7 family and we will not tolerate any form or racism or bias.

My sincerest appreciation,

Kirk

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com


*"Fostering Hope, Engagement, and Resiliency  for the Community of Grants Pass"*



EXHIBIT  J

**From:** Kirk Kolb  KKOLB@grantspass.k12.or.us  📎
**Subject:** Updated Board Policy
**Date:** May 5, 2021 at 8:35 AM
**To:**



Good Morning D7 Family,

The attached Board policy was revised and adopted by the Board last Tuesday.  For clarification, this policy now allows for the OEA's Black Lives Matter poster to be present on the walls of your classrooms.

The significant change to the policy is the following statement: '*In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions.*'  It is deemed by the District that this poster is consistent with our Board Policy ACB and the Board Resolution on Equity, Diversity, and Inclusion.

If you have further questions regarding what can and cannot be present in our schools, please inquire with your building administrator, our HR Director Dan Huber-Kantola, or myself.

Please carefully consider when choosing items to display in your classroom.  Our schools should not be a place of controversy nor a place of promoting one side of a political or civil issue.  Items displayed in your classroom should have an inherent educational purpose tied directly to the education we provide and consistent with district policies or resolutions.

Sincerely,
Kirk

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com

*"Fostering Hope, Engagement, and Resiliency  for the Community of Grants Pass"*





GBG.doc