RAY HACKE
OSB No. 173647
PACIFIC JUSTICE INSTITUTE
1850 45th Ave. NE, Suite 33
Salem, OR 97305
503-917-4409
rhacke@pji.org
*Lead Counsel*
*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **RACHEL G. DAMIANO** and **KATIE S. MEDART**, <br> Plaintiffs, <br><br> v. <br><br> **GRANTS PASS SCHOOL DISTRICT 7**, an Oregon public body, **THE MEMBERS OF THE BOARD OF EDUCATION OF GRANTS PASS SCHOOL DISTRICT 7**—Scott Nelson, Cliff Kuhlman, Gary Richardson, Debbie Brownell, Cassie Wilkins, Brian Delagrange, and Casey Durbin—in their official and personal capacities; **KIRK T. KOLB**, Superintendent, Grants Pass School District, in his official and personal capacity; and **THOMAS M. BLANCHARD**, Principal, North Middle School, Grants Pass School District 7, in his official and personal capacity, <br><br> Defendants. | Case No:  1-21-CV-00859-MC <br><br><br> **PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [Fed. R. Civ. P. 65]** <br><br> EXPEDITED HEARING REQUESTED |

## LOCAL RULE 7-1 COMPLIANCE

Compliance with District of Oregon Local Rule 7-1 is not required for this motion for a temporary restraining order and preliminary injunction.  D. Or. LR 7-1(a)(1).

## MOTION

Pursuant to Fed, R, Civ. P. 65, Plaintiffs RACHEL DAMIANO ("Damiano") and KATIE MEDART ("Medart," and collectively with Damiano "Plaintiffs") hereby move the Court for a temporary restraining order and preliminary injunction reinstating Plaintiffs as assistant principal and teacher, respectively, and enjoining Defendants GRANTS PASS SCHOOL DISTRICT NO. 7 *et al.* from enforcing their Amended Speech Policy.

Damiano is an assistant principal at North Middle School ("NMS"), part of Grants Pass School District 7.  Medart is a science teacher at NMS.  Defendants are GRANTS PASS SCHOOL DISTRICT NO. 7 ("GPSD" or the "District"); GPSD board members SCOTT NELSON, CLIFF KUHLMAN, GARY RICHARDSON, DEBBIE BROWNELL, CASSIE WILKINS, BRIAN DELAGRANGE, and CASEY DURBIN (collectively the "Board Defendants"); GPSD Superintendent KIRK KOLB ("Kolb"); and NMS Principal THOMAS BLANCHARD ("Blanchard").

Plaintiffs spoke as private citizens about gender identity education policy, a matter of public concern. Without adequate justification, Defendants have taken adverse employment action – namely, placing Plaintiffs on administrative leave – and launching a formal investigation into their speech Plaintiffs' speech because of their speech. Plaintiffs remain on administrative leave and Defendants' investigation remains ongoing. Plaintiffs require immediate injunctive relief to end Defendants' ongoing unconstitutional retaliation.

The Board Defendants have adopted the Amended Speech Policy, which Defendants Kolb and Blanchard enforce. The Amended Speech Policy prohibits GPSD employees from "supporting one side of any political or controversial civil

issue" while on District premises or acting within the scope of employment. Compl., Ex. "G." The policy also discriminates based on viewpoint because it requires District employees to issue a disclaimer that the views they express are their own and not those of the District when speaking about "controversial issues" off campus. *Id.* The policy defines "political or civil issue" to include "any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree." *Id.* The policy defines "controversial civil issue" to include issues which appear likely to create controversy among students, employees or the public." *Id.* Even more concerning, the policy gives Defendants the power to determine what is controversial by reference to its educational mission or the District's other policies.

The Amended Speech Policy imposes a prophylactic, content and viewpoint-based restriction on Plaintiffs' speech. It sweeps in all manner of speech on matters of public concern made by private citizens. Defendants cannot meet their burden to show an adequate justification for the policy, and even if they could, their extremely overbroad policy is not sufficiently tailored to that justification.

Defendants' Amended Speech Policy has both chilled Plaintiffs' speech and compelled them to speak the disclaimer. Plaintiffs desire to speak daily about gender-identity education policy, but the Amended Speech Policy stops them from doing so on District premises, even before or after school hours or off campus, without complying with the disclaimer requirement. Defendants' Amended Speech Policy has also forced Plaintiffs to communicate the required disclaimer in their off-campus speech. Plaintiffs are suffering ongoing irreparable harm to their First Amendment freedoms because of Defendants' Amended Speech Policy. Plaintiffs require immediate injunctive relief to enjoin Defendants' unconstitutional policy.

Accordingly, Plaintiffs respectfully move for a temporary restraining order and preliminary injunction reinstating Damiano to her post as assistant principal and Medart to her post as teacher.

Plaintiffs thus respectfully move for a temporary restraining order and preliminary injunction enjoining Defendants and those acting on their behalf from enforcing Defendants' Amended Speech Policy to (1) prohibit Plaintiffs from, or punish Plaintiffs for, expressing their views on a "political or controversial civil issue," including gender-identity education policy, while on District premises; (2) prohibit Plaintiffs from, or punish Plaintiffs for, expressing their views on a "controversial civil issue," including gender-identity education policy, while off duty; and (3) compel Plaintiffs to speak the required disclaimer.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ 7

INTRODUCTION .................................................................................... 11

BACKGROUND ....................................................................................... 12

I. Plaintiffs and Their Speech ............................................................. 12

II. Defendants Punish Plaintiffs and Attack Their Speech ................. 13

III. The Amended Speech Policy and Its Chilling Effect on Free Speech ........... 15

LEGAL STANDARD ............................................................................... 18

ARGUMENT ........................................................................................... 19

I. Plaintiffs have a strong likelihood of success on the merits ........... 19

A. Plaintiffs are likely to succeed on their retaliation claim ........... 20

1. Plaintiffs spoke on gender-identity education policy, an area of clear public concern ........................................................... 20

2. Plaintiffs spoke as private citizens ..................................... 21

3. Defendants placed Plaintiffs on administrative leave because of their speech ........................................................... 22

4. Defendants had no adequate justification for treating Plaintiffs differently from members of the general public ................. 25

5. Defendants would not have placed Plaintiffs on leave but for their speech ........................................................... 30

B. Plaintiffs are likely to succeed on their claims against Defendants' Amended Speech Policy ........................................................... 30

1. Defendants' Amended Speech Policy restricts private citizen speech on matters of public concern because it limits "controversial" speech and applies to District employees at all times and in all places ............ 32

2. Defendants' Amended Speech Policy epitomizes nearly every violation of First Amendment law and has no close and rational relationship to any legitimate government interest ........................................................ 35

II. Plaintiffs have already suffered and will continue to suffer irreparable harm without an injunction ......................................................................... 40

III. The balance of equities sharply favors Plaintiffs ........................................... 41

IV. An injunction would serve the public interest ................................................. 42

CONCLUSION .................................................................................................... 42

CERTIFICATION OF COMPLIANCE WITH BRIEF LENGTH REQUIREMENTS ................................................................................................ 43

PROOF OF SERVICE ......................................................................................... 44

# TABLE OF AUTHORITIES

*Allen v. Iranon,*
    283 F.3d 1070 (9th Cir. 2002)............................................................. 22, 23

*Am. Beverage Ass'n v. City & Cnty. of San Francisco,*
    916 F.3d 749 (9th Cir. 2019)................................................................... 41

*Anthoine v. N. Central Counties Consortium,*
    605 F.3d 740 (9th Cir. 2010)................................................................... 30

*Associated Press v. Otter,*
    682 F.3d 821 (9th Cir. 2012)................................................................... 42

*Barone City of Springfield,*
    902 F.3d 1091 (9th Cir. 2018).........................................................*passim*

*Boy Scouts of America v. Dale,*
    530 U.S. 640 (2000)................................................................................ 26

*Coszalter v. City of Salem,*
    320 F.3d 968 (9th Cir. 2003)............................................................. 24, 25

*Creighton v. City of Livingston,*
    628 F. Supp. 2d 1199 (E.D. Cal. 2009) .................................................. 22

*Dahlia v. Rodriguez,*
    735 F.3d 1060 (9th Cir. 2013) (en banc)............................. 19, 22, 24, 25

*Demers v. Austin,*
    746 F.3d 402 (9th Cir. 2014).......................................................... 20, 21

*Dyer v. SW Oregon Community College,*
    2018 WL 3431930 (D. Or. July 16, 2018).............................................. 28

*Elrod v. Burns,*
    427 U.S. 347 (19760).............................................................................. 40

*Eng v. Cooley,*
    552 F.3d 1062 (9th Cir. 2009)............................................................... 30

*Faison v. Jones,*
    440 F. Supp. 3d 1123 (E.D. Cal. 2020) ................................................. 19

*Garcetti v. Ceballos*,
   547 U.S. 410 (2006) ............................................................................. 21

*Greisen v. Hanken*,
   252 F. Supp. 3d 1042 (D. Or. 2017) .............................................. 22, 23

*Greisen v. Hanken*,
   925 F.3d 1097 (9th Cir. 2019) ......................................................... 21, 22

*Harman v. City of Santa Cruz*,
   261 F. Supp. 3d 1031 (N.D. Cal. 2017) .............................................. 19

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) .............................................................. 18

*Hyland v. Wonder*,
   972 F.2d 1129 (9th Cir. 1992) ............................................................ 27

*Index Newspapers LLC v. City of Portland*,
   474 F. Supp. 3d 1113 (D. Or. 2020) ......................................... 18, 19, 40

*Janus v. AFSCME, Council 31*,
   138 S. Ct. 2448 (2018) .................................................... 20, 21, 31, 36

*Johnson v. Multnomah Cnty.*,
   48 F.3d 420 (9th Cir. 1995) ............................................................... 27

*Johnson v. Poway Unified Sch. Dist.*,
   658 F.3d 954 (9th Cir. 2011) .............................................................. 22

*Lane v. Franks*,
   573 U.S. 228 (2014) ........................................................................... 19

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995) ........................................................................... 26

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) .............................................................. 42

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ......................................................... 21, 26

*Monico v. City of Cornelius*,
   2015 WL 1538786 (D. Or. Apr. 6, 2015) ............................................. 25

*Moonin v. Tice,*
868 F.3d 853 (9th Cir. 2017) ............................................................................*passim*

*Moser v. Las Vegas Metropolitan Police Dep't,*
984 F.3d 900 (9th Cir. 2021) ....................................................... 20, 25, 26

*Nat'l Ass'n of Wheat Growers v. Zeise,*
309 F. Supp. 3d 842 (E.D. Cal. 2018) ................................................ 41

*Nat'l Institute of Family & Life Advocates v. Becerra,*
138 S. Ct. 2361 (2018) ........................................................................ 39

*Ne. Penn. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.,*
938 F.3d 424 (3d Cir. 2019) ............................................................ 39

*Peterson v. Minidoka Cnty. Sch. Dist. No. 331,*
118 F.3d 1351 (9th Cir. 1997) ...................................................... 28, 29

*Pickering v. Board of Education of Township High School Dist. 205,*
391 U.S. 563 (1968) ................................................................. 19, 26, 31

*Rankin v. McPherson,*
483 U.S. 378 (1987) ........................................................................ 29, 42

*Sabatini v. Las Vegas Metropolitan Police Department,*
369 F. Supp. 3d 1066 (D. Nev. 2019)
*rev'd on other grounds sub nom Moser,* 984 F.3d 900 ........................... 33

*Schwartzman v. Valenzuela,*
846 F.2d 1209 (9th Cir. 1988) .......................................................... 23

*Tucker v. State of Cal. Dep't of Educ.,*
97 F.3d 1204 (9th Cir. 1996) ................................................. 32, 33, 35, 37

*Ulrich v. City & Cnty. of San Francisco,*
308 F.3d 968 (9th Cir. 2002) ............................................................ 25

*United States v. Nat'l Treasury Employees Union,*
513 U.S. 454 (1995) ..................................................................... 31, 36

*W. Va. State Bd. of Educ. v. Barnette,*
319 U.S. 624 (1943) ........................................................................ 40

*White v. Taylor by and through City of Turner Police Dep't,*
2020 WL 5649629 (D. Or. July 2, 2020) ................................................................. 25

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ............................................................................................... 18, 19

*Wittmer v. Phillips 66 Co.,*
915 F.3d 328 (5th Cir. 2019) .................................................................................. 21

## INTRODUCTION

When Plaintiffs RACHEL DAMIANO ("Damiano") and KATIE MEDART ("Medart"), middle school educators, proposed a science-based and loving policy to help deal with gender identity issues in schools, Defendants – their school district and its leaders – retaliated against them. Plaintiffs spoke up about an issue at the front and center of local, state, and national debates: how public schools address the increasing number of students struggling with gender identity issues. They built on their extensive experience as educators to create a grassroots movement called "I Resolve." I Resolve proposes policy to deal with gender identity issues in school that is respectful of the rights and interests of children, their parents or guardians, and teachers. Defendants initially appeared supportive of Plaintiffs' efforts, but after some members of the public took offense, Defendants quickly turned to censorship and punishment. They placed Plaintiffs on administrative leave and launched an ongoing formal investigation into them because of their protected speech.

While investigating Plaintiffs, Defendants enacted and began to enforce a content and viewpoint-discriminatory Amended Speech Policy. That policy prohibits discussion of "controversial" issues while on campus – except while teaching – and compels staff off campus to issue a disclaimer that they are speaking their own views and not those of GPSD. Moreover, Defendants gave themselves complete discretion to decide whether speech is "controversial" after the fact. The Amended Speech Policy has both chilled and compelled Plaintiffs' speech: They have stopped making personal social media posts about I Resolve because of the disclaimer requirement, and the Amended Speech Policy has forced them to add the disclaimer to their I Resolve website.

Plaintiffs require immediate injunctive relief to stop Defendants' ongoing unconstitutional retaliation and enjoin Defendants' unconstitutional Amended Speech Policy. They have a strong likelihood of success on both of their First

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support                                                                11

Amendment claims. Plaintiffs spoke as private citizens on a matter of public concern, and Defendants retaliated against them because of their speech with no adequate justification. The Amended Speech Policy imposes a prophylactic, content- and viewpoint-based restriction and a compelled disclaimer on speech of public concern by private citizens. Defendants' retaliation and Amended Speech Policy have deprived and continue to deprive Plaintiffs of their precious First Amendment freedoms. As a result, Plaintiffs have suffered and are suffering ongoing irreparable injury. To prevent the hollowing out of the First Amendment, Plaintiffs deserve immediate injunctive relief.

## BACKGROUND

### I.  Plaintiffs and Their Speech

Plaintiffs, combined, have more than two decades of experience working with youth. Compl., ¶¶ 91, 95. They both became educators out of a genuine desire to help safeguard youth and protect their mental, physical, and emotional well-beings. *Id.*, ¶ 90. Damiano is currently a vice principal and Medart is currently a science teacher at North Middle School ("NMS"), part of GPSD. *Id.*, ¶¶ 93, 96. Plaintiffs have been model employees and never faced discipline before the retaliation that gave rise to this suit. *Id.*, ¶ 97. In fact, in mid-March 2021, Defendants extended Plaintiffs' contracts for the 2021-22 school year. *Id.*, ¶ 98.

Plaintiffs have recently become concerned with the increasing number of middle-school children dealing with gender identity issues. *Id.,* ¶¶ 99-105. Plaintiffs recognize that gender identity in schools exists at the fraught confluence of the interests and freedoms of children, their parents/guardians, and teachers. *Id.,* ¶ 72- 77. Plaintiffs saw that current gender-identity education policy varies widely from school to school. *Id.,* ¶ 65. School policies that deal with gender identity issues, such as requests by minor students to be called names other than their given names or referred to with pronouns that do not correspond to their biological sex, often fail to

account for the interests and freedoms of parents/guardians and teachers. *Id.,* ¶¶ 72-77. Plaintiffs believe parents/guardians have the fundamental right to control their children's upbringing and that teachers have First Amendment speech and religious rights, including the right to express views on proposed gender-identity education policy and to live out their religious beliefs about gender identity. *Id.,* ¶¶ 76-77. Plaintiffs' sincerely held philosophical and religious beliefs include that, based on scientific evidence, there are only two biological sexes, male and female, and biological sex is immutable. *Id.* ¶¶ 78, 86.

To create gender-identity education policies that respect all interested parties, Plaintiffs began a grassroots movement called "I Resolve." Compl., ¶ 105. Based on Plaintiffs' deeply held philosophical and religious beliefs, I Resolve seeks reasonable, loving, and tolerant solutions for education policies that respect everyone's rights. *Id.* While off duty and away from school, they developed an I Resolve website and video about their resolutions. *Id.,* ¶ 115. I Resolve proposes that schools designate shared bathrooms and locker rooms as "anatomically male" or "anatomically female" and let students who are uncomfortable using those spaces request access to a private bathroom or locker room. *Id.,* ¶¶ 110-11. The resolutions also proposed that students, with parental/guardian permission, could ask to be called by a derivative of their legal name or preferred pronouns, but that teachers and peer students are not mandated to obey those requests. *Id.,* ¶ 113. In March 2021, Plaintiffs made the I Resolve website and video public. *Id.,* ¶ 105.

## II.    Defendants Punish Plaintiffs and Attack Their Speech

During I Resolve's development stages, Defendants KIRK KOLB ("Kolb"), GPSD's superintendent, and THOMAS BLANCHARD ("Blanchard"), principal of NMS, initially appeared to support I Resolve: Defendant Kolb told Damiano he would consider bringing the I Resolve resolutions to the school board for a vote, and

Defendant Blanchard provided feedback to Damiano on the resolutions. Compl., ¶¶ 123-24. Kolb and Blanchard's supportive stance changed when some members of the community took offense to Plaintiffs' proposed resolutions. *Id.,* ¶ 130-35. For example, members of the public and District employees wrote to the district to complain about I Resolve being "anti-transgender." *Id.,* ¶¶ 133-34.

In response to these complaints, on March 31, 2021, Defendant Kolb met separately with Plaintiffs to recommend they remove their speech about I Resolve from the Internet and threatened disciplinary action. Compl., ¶¶ 131, 141. Defendant Kolb also told Medart he had prevented her from attending a meeting of the LGBTQ student club because of her speech related to I Resolve. *Id.,* ¶ 137. Still, Plaintiffs did not take down their speech, and Defendants wasted little time imposing the threatened discipline: On April 5, 2021, Defendant Blanchard placed Plaintiffs on indefinite administrative leave for alleged "inappropriate behavior," effective immediately. *Id.,* ¶¶ 147-51. As a condition of administrative leave, Plaintiffs cannot conduct school business. *Id.,* ¶ 152. Plaintiffs can no longer interact with their students or develop their teaching and administrative skills. *Id.,* ¶¶ 153-55. And administrative leave forced Medart to stop in the middle of a paid certification program related to her teaching duties. *Id.,* ¶ 153.

The day after Defendant Blanchard placed Plaintiffs on administrative leave, Defendant Kolb sent an email to the entire District staff about I Resolve. Compl., ¶ 157. He told GPSD staff that I Resolve was "in direct conflict with [GPSD's] values[.]" *Id.,* ¶ 158, Ex. "D." Rather, GPSD was "unequivocally committed to providing welcoming and safe learning environments for **all** students, including our LGBTQ students." *Id.,* ¶ 160, Ex. "D." The next day, Defendant Kolb broadcast via e-mail his condemnation of Plaintiffs' speech to all GPSD staff, students, and families. *Id.,* ¶ 164, Ex. "E." Kolb referred to Plaintiffs' proposed school policies on

gender identity and assured the community that "an investigation is underway" about that speech and that Plaintiffs were "not at work." *Id.,* ¶ 168.

After placing Plaintiffs on administrative leave, Defendant Blanchard began a formal investigation into Plaintiffs' speech related to I Resolve. Compl., ¶ 173. He interviewed Plaintiffs separately, asking invasive questions about whether their religious beliefs precluded them from being able to perform their work. *Id.,* ¶¶ 174-79. Defendants then subjected Plaintiffs to another round of interviews about I Resolve, this time conducted by a third-party investigator. *Id.,* ¶ 180. The investigation remains ongoing. *Id.,* ¶ 182.

While Defendants took adverse action against Plaintiffs, they have taken no action against other employees who have spoken out on hot-button issues. For example, Defendants have taken no action against other District employees have made social media posts criticizing those who advocated for looser pandemic restrictions. Compl., ¶¶ 233, 235. Neither have Defendants taken adverse action against an employee who, during the school day, sent a message to the LGBTQ+ club on campus referring to I Resolve as the "recent Anti-Trans 'movement' that has unfortunately spread on our campus." *Id.,* ¶¶ 237-40.

## III.    The Amended Speech Policy and Its Chilling Effect on Free Speech

On April 27, 2021, while Plaintiffs were on administrative leave, the Board Defendants enacted the Amended Speech Policy, which discriminates based on the content and viewpoint of employees' speech. Compl., ¶ 247, Ex. "G." The Amended Speech Policy prohibits District educators, like Plaintiffs, from taking one side of "any political or controversial civil issue" while on campus or "acting within the scope of employment." *Id.,* ¶ 197, Ex. "G." While off duty, the policy requires GPSD employees to issue a disclaimer that they are speaking their own views, not those of GPSD, when talking about "controversial" issues. *Id.,* ¶ 200, Ex. "G."

The Amended Speech Policy provides a circular definition of "political or civil issue" and "controversial" and ultimately gives GPSD power to determine what is "controversial." Compl., ¶¶ 198, 201, 205, and 262, Ex. "G." A "[c]ivil or political issue" is "any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree." *Id.*, ¶ 198, Ex. "G." Controversial issues include those "which appear likely to create controversy among students, employees or the public, or which the District determines may be disruptive to its educational mission or instruction." *Id.*, ¶ 201, Ex. "G." When determining whether an issue is controversial, the District "shall consider whether the speech is consistent with District policy and resolutions." *Id.*, ¶ 202. Curiously, the Amended Speech Policy exempts classroom speech from the ban on discussing controversial issues on campus. *Id.*, ¶ 216, Ex. "H." In the classroom, Defendants govern speech by a much more permissive standard that recognizes the need to discuss and study controversial issues, to have access to relevant information on controversial issues, and to develop respect for minority opinions. *Id.* Failure to comply with the Amended Speech Policy can lead to discipline, up to and including termination. *Id.*, ¶¶ 361-62.

The Amended Speech Policy has invaded every aspect of Plaintiffs' lives, forcing Plaintiffs to stop speaking and compelling them to issue the District's required disclaimer. Prior to the passage of the Amended Speech Policy, Plaintiffs had made daily social media posts from the I Resolve Instagram account on issues relating to their proposed resolutions. Compl., ¶ 259. Plaintiffs intended to continue to make daily posts. *Id.*, ¶ 260. But after learning of the Amended Speech Policy, they realized the District may, in its subjective estimation, classify their speech "controversial." *Id.*, ¶¶ 262, 264. That would require Plaintiffs to issue the disclaimer with each and every social media post, something they do not wish to do. *Id.*, ¶ 263. Plaintiffs have stopped making social media posts because of the

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support                                                                                    16

disclaimer requirement. *Id.,* ¶¶ 261-62. Additionally, to keep the I Resolve website public, Plaintiffs must comply with the disclaimer requirement and have unwillingly placed the disclaimer on their website. *Id.* ¶ 267, Ex. "A." Plaintiffs also wish and intend to talk about issues related to I Resolve while on campus. *Id.,* ¶ 270. But Defendants have apparently classified such speech "controversial," so the Amended Speech Policy prohibits Plaintiffs from speaking about gender-identity education policy while on campus. *Id.*, Ex. "G."

Further, the Amended Speech Policy's content and viewpoint discriminatory definition of "controversial" and the disclaimer requirement have no territorial or temporal limitations. *See* Compl., ¶ 280. They apply to every District employee, at all times, in every location. *Id.,* ¶ 7, Ex. "G." For example, Defendants' Amended Speech Policy has compelled Damiano, even while floating down the Rogue River with friends on a weekend, to speak its disclaimer. *Id.,* ¶ 273. The Amended Speech Policy's definition of "controversial" provides no comfort: People can reasonably disagree on just about every issue of importance. *Id.,* ¶ 206. And Defendants retained the discretion to define "controversial." *Id.,* ¶ 219. So the Amended Speech Policy reaches any speech Defendants judge to be controversial after the fact. That leaves Plaintiffs with no option but to avoid talking about I Resolve and other purportedly controversial issues while on campus and to speak the disclaimer on issues that may even be remotely considered controversial.

Defendants have recognized that the Amended Speech Policy is facially viewpoint discriminatory: Before the Board Defendants passed the Amended Speech Policy, Defendant Kolb sent an email to all District staff discussing why the District did not allow Black Lives Matter posters in classrooms. Compl., ¶¶ 224-26, Ex. "I." Defendant Kolb wrote that Black Lives Matter – the organization, not the statement itself – had "generated substantial controversy," so it was a "controversial" issue. *Id.,* ¶ 225, Ex. "I." At that time, Defendant Kolb recognized

that allowing Black Lives Matter posters on campus without allowing Blue Lives Matter or All Lives Matter posters would be "viewpoint discrimination." *Id.,* ¶ 258. As if to confirm the issue's controversial nature, two staff members responded to all recipients. *Id.,* ¶¶ 229-30, Ex. "I." One supported Black Lives Matter and the other criticized it. *Id.* Nevertheless, after the Board Defendants passed the Amended Speech Policy, Defendant Kolb wrote to all staff that Black Lives Matter posters were now allowed in classrooms because that speech was "consistent with district policies and resolutions," specifically the District's general inclusion policies. *Id.,* ¶ 255, Ex. "J." Yet, Defendant Kolb refused to allow Blue Lives Matter or All Lives Matter posters in classrooms. *Id.,* ¶ 256.

Plaintiffs filed suit to enjoin Defendants' unconstitutional retaliation based on their speech and Defendants' facially viewpoint and content discriminatory Amended Speech Policy. They require preliminary relief to redress Defendants' ongoing retaliation and enjoin enforcement of the Amended Speech Policy which daily both chills and compels their speech.

## LEGAL STANDARD

Substantially the same standard applies to requests for temporary restraining orders and requests for preliminary injunctions. *Index Newspapers LLC v. City of Portland*, 474 F. Supp. 3d 1113, 1118 (D. Or. 2020). To obtain a preliminary injunction or restraining order, Plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's "sliding scale" approach, "a stronger showing of one element may offset a weaker showing of another." *Hernandez v. Sessions*, 872 F.3d 976, 990 (9th Cir. 2017).

To prevail, plaintiffs need not "prove [their] case in full, or show [they are] more likely than not to prevail"; "[r]ather, the moving part[ies] must demonstrate a fair chance of success on the merits or raise questions serious enough to require litigation." *Harman v. City of Santa Cruz*, 261 F. Supp. 3d 1031, 1041 (N.D. Cal. 2017) (cleaned up). Where, as here, the "hardship balance . . . tips sharply toward the plaintiff[s]" and the other *Winter* factors are met, plaintiffs need only show "serious questions going to the merits." *Index Newspapers*, 474 F. Supp. 3d at 1118.[1]

## ARGUMENT

### I.   Plaintiffs have a strong likelihood of success on the merits.

For more than 50 years, the Supreme Court has repeatedly declared that "citizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014). That means government actors cannot "abuse [their] position as employer to stifle the First Amendment rights [their] employees would otherwise enjoy as citizens to comment on matters of public interest." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066 (9th Cir. 2013).

Plaintiffs are likely to succeed on the merits of both their retaliation and Amended Speech Policy claims. On the retaliation claim, Plaintiffs satisfy the test established by *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968): Plaintiffs spoke on a matter of public concern as private citizens and Defendants took adverse employment action against them because of their speech. Because Defendants cannot justify that retaliation, they violated the First Amendment.

As for the claim against the Amended Speech Policy, Defendants cannot meet the exacting scrutiny required for a prospective restriction on their employees' First Amendment rights. Speech on "controversial" issues is speech on matters of public

---

[1] Both of Plaintiffs' injunctions will return the parties to the status quo ante litem, so they are prohibitory injunctions. *Faison v. Jones*, 440 F. Supp. 3d 1123, 1131 (E.D. Cal. 2020).

concern and the Amended Speech Policy extends well beyond speech pursuant to official duties to invade the private speech of District educators and staff. Furthermore, the litany of constitutional ills that plague the Amended Speech Policy prevent it from being tailored to any adequate governmental justification. The Amended Speech Policy is overbroad, imposes a prior restraint, gives Defendants unbridled discretion, discriminates on the basis of content and viewpoint, and compels speech. It cannot withstand constitutional scrutiny.

## A. Plaintiffs are likely to succeed on their retaliation claim.

Governments unconstitutionally retaliate against their employees because of protected speech when (1) the employees speak on a matter of public concern; (2) the employees speak as private citizens rather than public employees; and (3) the relevant speech is a substantial or motivating factor in the adverse employment action. *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 904–05 (9th Cir. 2021). Once the plaintiffs make that showing, the government must show it (4) had an adequate justification for treating the employees differently than other members of the general public, or (5) would have taken the adverse employment action even absent the protected speech. *Id.* Plaintiffs have a strong likelihood of success on the first three prongs, and Defendants cannot meet their burden on the last two factors.

### 1. Plaintiffs spoke on gender-identity education policy, an area of clear public concern.

"Public concern" encompasses any speech that "can fairly be considered to relate to any matter of political, social, or other concern to the community." *Demers v. Austin*, 746 F.3d 402, 415 (9th Cir. 2014) (internal quotation marks omitted). Plaintiffs' speech on gender-identity education policy easily meets that standard. Still, Defendants placed Plaintiffs on leave precisely because of this speech.

The Supreme Court has recognized that "gender identity" is "undoubtedly [a] matter[] of profound value and concern to the public." *Janus*, 138 S. Ct. 2448, 2476

(2018) (cleaned up). Identifying "sexual orientation and gender identity," the Court indicated that speech regarding gender identity (and other issues) is of "profound value and concern to the public," occupying "the highest rung of the hierarchy of First Amendment values" and meriting "special protection." *Id.* (cleaned up).

Here, Plaintiffs proposed gender-identity education policy in the context of a national debate about these issues. That debate "affects virtually every school, college, dormitory, athletic activity, and locker room in America." *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 337–38 (5th Cir. 2019) (Ho, J., concurring). Plaintiffs made their website, video, and social media posts publicly available to encourage all concerned parties to contact their local, state, and federal representatives about tolerant and science-based gender-identity education policy. Compl., ¶ 105. Plaintiffs wanted to create grassroots support for policies respectful of the freedoms of children, their parents/guardians, and educators. *Id.*

The form and context of Plaintiffs' speech, publicly available materials on a subject of intense national debate, only confirm the public concern inherent in their speech. Furthermore, even Defendants appear to think the gender-identity education policy debate is an issue of public concern: "Otherwise, why would [they] forbid [Plaintiffs] from explaining [their] 'personal and religious beliefs about gender identity'"? *Meriwether v. Hartop*, 992 F.3d 492, 509 (6th Cir. 2021). "In short, when [Plaintiffs] waded into the [gender identity] debate, [they] waded into a matter of public concern." *Id.*

### 2. Plaintiffs spoke as private citizens.

Plaintiffs spoke as private citizens because they "had no official duty to make the questioned statements" and their speech "was not the product of performing the tasks the employee was paid to perform."[2] *Greisen v. Hanken*, 925 F.3d 1097, 1111

---

[2] Plaintiffs do not concede that the "official duties" test, derived from *Garcetti v. Ceballos*, 547 U.S. 410 (2006), applies to their speech as educators. *See Demers v. Austin*, 746 F.3d 402, 409 (9th Cir.

(9th Cir. 2019). Defendants did not direct Plaintiffs to craft the policies Plaintiffs proposed, which are meant to apply on a state and national level or to any locality in the country, not merely to Grants Pass. Compl., ¶ 104.

Furthermore, after seeing the public backlash to I Resolve, Defendant Kolb recommended Plaintiffs remove their speech. Compl., ¶¶ 131-36. Plaintiffs did not heed Defendant Kolb's recommendation and left the I Resolve website and video public and continued making social media posts. Compl. ¶¶ 107-18, 267-69, Ex. "A"; *see also Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1055 (D. Or. 2017) ["(W)hen a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties" (quoting *Dahlia*, 735 F.3d at 1075)]. Nor were Plaintiffs paid to create I Resolve. Rather, they drafted the resolution, created the website, and filmed the video on their own time and dime. Compl., ¶ 115. Plaintiffs spoke "at non-[District] owned property, during off-duty time." *Creighton v. City of Livingston*, 628 F. Supp. 2d 1199, 1211 (E.D. Cal. 2009). And they made I Resolve social media posts when they were off duty using their personal social media accounts. Compl., ¶¶ 259, 261.

Nowhere in their speech related to I Resolve do Plaintiffs identify themselves as educators in employed by GPSD. Compl., ¶ 125. Plaintiffs' speech likewise does not "owe[] its existence to [their] positions[s]." *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 967 (9th Cir. 2011). Rather, Plaintiffs spoke "just as any non-employee citizen could have." *Id.* Plaintiffs have thus satisfied the private citizen factor.

### 3. Defendants placed Plaintiffs on administrative leave because of their speech.

Either direct or circumstantial evidence can show causation for a retaliation claim. *Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002). Even at this early stage,

---

2014) ["*Garcetti*'s holding does not extend to speech and academic writing by a publicly employed teacher"]. But because it is clear under any test that Plaintiffs' off-duty, off-campus speech does not come within their official duties, the Court need not decide this issue.

Plaintiffs have both in spades: While initially supportive of or neutral towards Plaintiffs' efforts, Defendant Kolb changed his tune after receiving complaints about I Resolve. Compl., ¶¶ 131-36. He also threatened future disciplinary action if complaints about speech related to I Resolve continued. *Id.,* ¶ 141. Defendants carried out the threat five days later when Defendant Blanchard placed Plaintiffs on administrative leave. *Id.,* ¶¶ 147-51. In the next two days, Defendant Kolb declared the reasons for Defendants' actions in e-mails to GPSD staff and families. *Id.,* ¶¶ 157-60, Ex. "D," and ¶¶ 164-68, Ex. "E."  Kolb said I Resolve was "in direct conflict with" GPSD's values. *Id.,* ¶ 158, Ex. "D."  Kolb also assured the community that Plaintiffs were "not at work" after making "social media postings discussing LGBTQ policies with reference to schools." *Id.,* ¶ 168, Ex. "E."

The circumstantial evidence is equally unfavorable for Defendants. The Ninth Circuit considers three types of circumstantial evidence relevant: (1) proximity in time between the protected speech and the retaliation; (2) the employer's expressed opposition to the speech; and (3) other evidence that the employer's reasons for the adverse employment action were false and pretextual. *Greisen*, 252 F. Supp. 3d at 1056. A plaintiff need only present one type of circumstantial evidence to prevail [*see Allen*, 283 F.3d at 1077], but Plaintiffs have all three: Defendants suspended Plaintiffs a mere five days after Defendant Kolb received complaints about I Resolve and warned them about disciplinary action related to I Resolve. *See Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir. 1988) [finding causation when director had "warn(ed)" employee that he was not authorized to speak on certain matters]. Plaintiffs' discipline occurred only days after Defendants received five formal complaints from staff about Plaintiffs' speech related to I Resolve. Compl., ¶ 142; *see also Allen*, 283 F.3d at 1078 [calling "an eleven-month gap in time" sufficient "to support an inference that an employment decision was retaliatory"]. In the two days after Defendants placed Plaintiffs on administrative leave, Defendant Kolb sent out

e-mails linking the discipline to Plaintiffs' speech, showing both proximity and Defendants' opposition to the speech.

Any other reasons Defendants may offer for the adverse action are pretextual: Plaintiffs had been, and are, model educators. Defendants had not previously disciplined them. Compl., ¶ 97. In fact, in mid-March 2021, Defendants extended both Plaintiffs' contracts. *Id.,* ¶ 98. The evidence reflects that Defendants took no similar action against other educators who made "controversial" social media posts, not even an educator who made known her opposition to I Resolve. *Id.,* ¶¶ 228-40. "[I]nconsistent application" of a policy shows that "motivation for enforcing the policy (if there even was such a policy) . . . was retaliation for . . . constitutionally protected speech." *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003).

Placing employees on paid administrative leave qualifies as adverse employment action. *Dahlia*, 735 F.3d at 1078. Adverse employment action "need not be severe and it need not be of a certain kind." *Coszalter*, 320 F.3d at 975. "[E]ven minor acts of retaliation can infringe on an employee's First Amendment rights" because those actions "chill the exercise of protected First Amendment rights." *Id.* at 975 (cleaned up). The "proper inquiry is whether the action is reasonably likely to deter employees from engaging in protected activity." *Dahlia*, 735 F.3d at 1078.

Defendants placed Plaintiffs on administrative leave, prevented them from conducting any school-related business, opened a formal investigation into them that has included multiple interviews with District personnel and an independent investigator, sent an email to the Grants Pass community condemning their speech, and prevented Katie from obtaining a certification in a class that was already in progress. Compl., ¶¶ 152-53, 157-60, and 173-81. Defendants' actions are reasonably likely to deter other GPSD employees from speaking out on issues similar to I Resolve and fit well within the realm of adverse employment actions previously found by courts: For example, in *Dahlia*, the inability to take a promotional exam,

loss of holiday and overtime pay, loss of investigative opportunities, and "the general stigma resulting from placement on administrative leave" were adverse administrative action. 735 F.3d at 1079. Similarly, here, Medart could not take her certification exam, both Plaintiffs lost the opportunity to conduct school business and develop their teaching and administrative skills, and both suffered the stigma of administrative leave.

A formal investigation with a threat of further discipline is also an adverse employment action. *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 977 (9th Cir. 2002). So, too, is an employer's insult, like Defendant Kolb's e-mail to the school community condemning Plaintiffs. *See Coszalter*, 320 F.3d at 975. And this Court has allowed a retaliation claim to proceed based on an allegation of administrative leave even though the record did "not establish what consequences [the plaintiff] experienced as a result of" that leave. *Monico v. City of Cornelius*, 2015 WL 1538786, at *16 (D. Or. Apr. 6, 2015); *accord White v. Taylor by and through City of Turner Police Dep't*, 2020 WL 5649629, at *5 (D. Or. July 2, 2020). Defendants placed Plaintiffs on administrative leave with its attendant consequences—adverse employment action—because of their protected speech.

### 4. Defendants had no adequate justification for treating Plaintiffs differently from members of the general public.

Because Plaintiffs have established their prima facie case, Defendants must show they had "adequate justification" for treating Plaintiffs differently than members of the general public. *Moser*, 984 F.3d at 904. This *Pickering* balancing test weighs Plaintiffs' interest as "citizen[s], in commenting upon matters of public concern and the interests of [Defendants], as . . . employer in promoting the efficiency of the public services it performs through its employees." *Id.,* 906.

Plaintiffs' speech is entitled to the utmost First Amendment protection because they entered a debate on a matter of public importance and because they proposed

policy solutions for schools like theirs: As the Supreme Court has emphasized, "[n]o form of speech is entitled to greater constitutional protection" than "advocacy of a politically controversial viewpoint." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). That is because the "core value of the Free Speech Clause of the First Amendment" lies in the "public interest in having free and unhindered debate on matters of public importance." *Pickering*, 391 U.S. at 573. Thus, the Supreme Court has "frequently reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Id.* (cleaned up).

Plaintiffs' "First Amendment interest[s] are especially strong here" because their speech "also relates to [their] core religious and philosophical beliefs." *Meriwether*, 992 F.3d at 509. "[T]he premise that gender identity [theory] is an idea 'embraced and advocated by increasing numbers of people is all the more reason to protect the First Amendment rights of those who wish to voice a different view.'" *Id.,* 501 [quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660 (2000)].

"At the apex of the First Amendment rests speech addressing problems at the government agency where the employee works." *Moser*, 984 F.3d at 906. I Resolve proposes policy solutions for thorny problems involved in navigating gender identity issues in schools, including the one where Plaintiffs work. Compl., Ex. "A." Not only do Plaintiffs have an interest in sharing their ideas to help schools, the public also has an interest in their speech because it showcases "the well-informed views of government employees engaging in civic discussion." *Barone v. City of Springfield*, 902 F.3d 1091 (9th Cir. 2018). Plaintiffs' and the public's "interests are powerful" [*Meriwether*, 992 F.3d at 510] and weigh heavily in their favor.

Because the First Amendment "more tightly" embraces Plaintiffs' speech, Defendants must make even "more vigorous a showing of disruption" to the

government's functions. *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 426 (9th Cir. 1995). Defendants cannot.

It is unclear what legitimate governmental interest Defendants' Amended Speech Policy attempts to achieve. As the record stands now, Defendants appear to have amended the policy to promote viewpoint discrimination and allow only Black Letter Matter signs in classrooms. Compl., ¶¶ 255-56, Ex. "J." Given the timing of the amendment—less than a month after Plaintiffs were put on leave—it perhaps could be seen as an attempt to stifle Plaintiffs' speech related to I Resolve. *Id.,* ¶ 195. The only indication given by the policy is that Defendants amended the policy to define "controversial" to include those issues "which the District determines may be disruptive to its educational mission or instruction." *Id.,* ¶ 201.

For disruption to serve as an adequate justification for First Amendment retaliation, Defendants must show "actual, material and substantial disruption"; "[m]ere allegations of interference with a working relationship cannot serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views." *Hyland v. Wonder*, 972 F.2d 1129, 1140 (9th Cir. 1992) (cleaned up). That some in the community complained about Plaintiffs' speech does not help Defendants: "Even where the employer provides evidence of a negative reaction to speech, courts require evidence that it will disrupt the workplace." *Moser*, 984 F.3d at 910. But Plaintiffs continued without disruption in their roles up to the day Defendants placed them on leave. Compl., ¶¶ 97, 141. They continued to execute their duties, and there is no evidence that their speech related to I Resolve interfered with their work. *Id.,* ¶ 121.

Notably, Defendant Kolb did not reference any disruption to GPSD's operations when he e-mailed District staff and families. *Id.,* ¶¶ 164-65, Ex. "E." Rather, he focused only on Plaintiffs' "social media postings." *Id.,* ¶ 165, Ex. "E." Importantly, Defendant Blanchard explicitly stated he was placing Plaintiffs on administrative

leave for allegedly "inappropriate behavior," but he made no mention of any disruption to District business. *Id.,* ¶¶ 148-49, Exs. "B"-"C." To the contrary, *Defendants* disrupted GPSD's business by taking Medart out of class to place her on leave. *Id.,* ¶ 147.

Plaintiffs did not "publish[] thinly veiled, derisive comments about faculty members" or otherwise "target[] co-workers." *Dyer v. SW Oregon Community College*, 2018 WL 3431930, at *13 (D. Or. July 16, 2018). Nowhere in any speech related to I Resolve do Plaintiffs identify themselves as GPSD employees or identify any colleagues or any Defendants. Compl., ¶ 125.  Nowhere do Plaintiffs deride or target GPSD. Whatever feeble justifications Defendants might raise cannot summit the "apex" of First Amendment protection for Plaintiffs' speech.

Defendants' initial awareness of I Resolve weighs against any interest they assert in preventing workplace disruption: Damiano brought her proposed resolutions and idea for a video to Defendants Kolb and Blanchard before they ever became public. Compl., ¶¶ 117-18. Defendant Blanchard offered feedback on the resolutions, and Defendant Kolb even said he would consider bringing the proposed resolution to the Board for a vote. *Id.,* ¶¶ 123-24. At no time before receiving negative public feedback did Defendants Kolb and Blanchard tell Plaintiffs to stop working on I Resolve to prevent disruption to District business. *Id.,* ¶ 120. At no time did Defendant Kolb and Blanchard inform Plaintiffs that their work on I Resolve was interfering with Plaintiffs' relationships with their supervisors or colleagues. *Id.,* ¶ 121.

Only after I Resolve received negative feedback did Defendants retaliate against Plaintiffs. Compl., ¶ 131-36.  But "the District was bound to take account of the fact that [Plaintiffs were] exercising a constitutional right" and that the "accommodation of uninformed" complainants does not "outweigh[] that exercise." *Peterson v. Minidoka Cnty. Sch. Dist. No. 331*, 118 F.3d 1351, 1357 (9th Cir. 1997). In *Peterson*,

the plaintiff-principal's statement that he was considering homeschooling his children caused "quite a turmoil amongst the staff," the school secretary received 25 calls from parents critical of the principal's plan, and individual school board members also received calls from parents or teachers. *Id.,* 1354. Just like in *Peterson*, Defendants here took a "supine response to [Plaintiffs'] critics" but Defendants still had the responsibility "not to trammel" Plaintiffs' speech regardless if some took offense. *Id.,* 1357.

Further undermining any purported interest in preventing disruption, Defendants have used the viewpoint-discriminatory powers they granted themselves precisely to allow speech that has demonstrably caused an on-campus controversy: Defendant Kolb's March 30 email to District staff regarding Black Lives Matter posters started a debate. Compl., ¶¶ 224-30. Teachers replied to all staff voicing opposing opinions on the issue, one that Defendant Kolb himself had labeled "controversial." Id., ¶¶ 225, 228-30, Ex. "I." Plunging ahead despite the controversy, Defendants passed the Amended Speech Policy to allow for Black Lives Matter posters in classrooms. *Id.,* ¶ 195. They appeared to adopt the policy not to prevent disruption, but precisely to discriminate on the basis of viewpoint. By retaliating against Plaintiffs' speech when some complained but changing District policy to allow for certain controversial speech, Defendants have shown they retaliated not to avoid disruption, but because they disagreed with Plaintiffs' message. The First Amendment prohibits this: "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987). Defendants thus cannot show an adequate justification for their retaliation.

### 5.  Defendants would not have placed Plaintiffs on leave but for their speech.

If Plaintiffs had not created and spoken about their I Resolve movement, there would be no case because Defendants would not have taken adverse action. Under this factor, Defendants must prove that "the employee's protected speech was not a but-for cause of the adverse employment action." *Eng v. Cooley*, 552 F.3d 1062, 1072 (9th Cir. 2009). All the evidence points to but-for causation. Plaintiffs were model employees. They had never been disciplined by the District. Compl., ¶ 97. Not even a month before placing Plaintiffs on leave, Defendants renewed their contracts. *Id.,* ¶ 98. The only material change in that critical interval was the I Resolve movement.

But-for causation is closely related to the substantial or motivating prong, discussed above. *Eng*, 552 F.3d at 1072. The proximity, direct opposition to speech, and inconsistent treatment among educators all weigh in Plaintiffs' favor there, *see supra*, and do so here as well. Given the absence of other evidence and Plaintiffs' evidence that their "protected speech was a motivating factor in the adverse actions," Defendants have not met their burden here. *Anthoine v. N. Central Counties Consortium*, 605 F.3d 740, 752 (9th Cir. 2010).

Based on the foregoing, Plaintiffs have shown a likelihood of success on – or at the very least have raised serious questions going to – the merits of their First Amendment retaliation claim.

### B.  Plaintiffs are likely to succeed on their claims against Defendants' Amended Speech Policy.

Defendants must shoulder an even "heavier burden" to justify their Amended Speech Policy because it is "an ex ante speech restriction." *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017). A prospective restriction on employee speech is especially problematic because it "chills potential speech before it happens." *Id.* Thus, "the Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future

expression are outweighed by that expression's necessary impact on the actual operation of the Government." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995) (cleaned up).

This test involves more "exacting scrutiny than the traditional *Pickering* analysis." *Janus*, 138 S. Ct. at 2472. Under this scrutiny, a court first examines whether the speech restriction (1) impacts speech on matters of public concern and (2) reaches outside a public employee's official duties. *Moonin*, 868 F.3d at 861. The government then must meet its "greater" burden to show an "adequate justification" for the speech restriction. *Barone*, 902 F.3d at 1104–05. This prong includes a tailoring requirement: the government must show a "close and rational relationship between the policy and legitimate government interests." *Barone*, 902 F.3d at 1104.

Here, Defendants' speech policy: (1) regulates District educators' speech anytime and anywhere; (2) applies to "controversial" speech, *i.e.* topics of public concern; (3) is overbroad; (4) imposes a prior restraint; (5) gives Defendants unbridled discretion; (6) discriminates on the basis of content and viewpoint; and (7) compels speech. Defendants can give no adequate justification for their policy and its violation of nearly every blackletter First Amendment principle, so it meets no form of tailoring, no matter how loose.[3] Plaintiffs are likely to succeed in their claim against it or, at the very least, have raised serious questions about it.

---

[3] Plaintiffs do not concede that even the exacting scrutiny contemplated by *Janus* and the Ninth Circuit's decisions in cases like *Barone* applies to their compelled speech claim. Rather, standard First Amendment doctrine may apply, rendering the Amended Speech Policy's unconstitutionality almost a foregone conclusion. The Supreme Court has given good reason why the First Amendment should apply in full force. The Court has noted that the First Amendment "calculus is very different" when a public employer "commands that its employees mouth a message on its own behalf." *Janus*, 138 S. Ct. at 2473. Outside of an employee's official duties, "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." *Id.* The Court has "never applied *Pickering* in such a case." *Id.* And the Ninth Circuit has not decided a public employee compelled speech case post-*Janus*. At this early stage, this Court need not decide this issue, however, because Plaintiffs are likely to prevail on the merits even under the exacting scrutiny test. *See Barone*, 902 F.3d at 1102.

1.  **Defendants' Amended Speech Policy restricts private citizen speech on matters of public concern because it limits "controversial" speech and applies to District employees at all times and in all places.**

Defendants' Amended Speech Policy applies to District employees everywhere, on or off campus, and defines "controversial" by referring to issues on which "reasonable persons may disagree" or those that "appear likely to create controversy." Compl., Ex. "G." So, by its own terms, it applies to private citizen speech on matters of public concern. The text of the policy "determine[s] the extent to which it implicates public employees' speech as citizens speaking on matters of public concern." *Barone*, 902 F.3d at 1102. That is, a court must consider "all speech to which the challenged policy applies." *Moonin*, 868 F.3d at 864.

Ninth Circuit precedent forecloses any argument that Defendants' Amended Speech Policy does not extend to matters of public concern. In *Barone*, the Ninth Circuit reversed a district court's ruling that an employer's prospective speech policy did not reach matters of public concern. 902 F.3d at 1109. The policy prohibited employees from "speak[ing] or writ[ing] anything of a disparaging or negative manner related to the [public employer or city] or its Employees." *Id.,* 1102. In holding that the policy affected matters of public concern, the Ninth Circuit reasoned that the bar on speech was "not limited to speech on internal issues such as logistics or individual personnel disputes," but rather swept up "*any* negative speech" about the employer's or city's misconduct or any other city-related issues. *Id.,* 1102–03 (emphasis added). Those issues, the Ninth Circuit concluded, were undoubtedly topics of public concern.

Just as in *Barone*, here, "[i]t is clear that [Defendants' Amended Speech Policy] extends to matters of public concern." 902 F.3d at 1102. The policy is not limited to internal issues relating to District logistics or personnel relations. Rather, it applies prophylactically to "almost *any* matter other than speech that relates to internal power struggles within the workplace." *See Tucker v. State of Cal. Dep't of Educ.*, 97

F.3d 1204, 1210 (9th Cir. 1996). Notably, Defendants' policy goes even farther than the one invalidated in *Barone*: The policy's definition of "controversial," as issues on which reasonable minds could disagree or that are likely to cause controversy, targets precisely speech that "can be fairly considered as relating to any matter of political, social, or other concern to the community." *Barone*, 902 F.3d at 1102 (cleaned up). But far beyond *any* matter of concern to the community, the definition of controversial applies to *all* matters of concern to the community.

Defendants' enforcement of their Amended Speech Policy shows just how the policy applies to matters of public concern: Before the Board Defendants adopted the policy, Defendant Kolb wrote to District staff that Black Lives Matter signs could not be hung in classrooms because they were considered "controversial." Compl., ¶ 252, Ex. "I." But after the policy's amendment, Defendants allowed such signs because, though controversial, they were purportedly consistent with District policy. *Id.,* ¶ 255, Ex. "J." At the same time, Defendants' Amended Speech Policy still prohibits All Lives Matter or Blue Lives Matter signs. *Id.,* ¶ 256, 258.

Given the ongoing debates raging in our country and the back-and-forth e-mails among Grants Pass educators, the statements "Black Lives Matter," "All Lives Matter," and "Blue Lives Matter" all present various sides of an issue of public concern. *See Sabatini v. Las Vegas Metropolitan Police Department*, 369 F. Supp. 3d 1066, 1085 (D. Nev. 2019), *rev'd on other grounds sub nom Moser*, 984 F.3d 900. Defendants have used the Amended Speech Policy to restrict speech on some issues of public concern while allowing other speech. Further, Defendants' reaction to Plaintiffs' speech combined with the public complaints against I Resolve also prove that issue to be controversial and thus within the scope of Defendants' Amended Speech Policy. As discussed *supra*, issues regarding gender identity surely are issues of public concern. Defendants' speech policy thus restricts speech on matters of public concern.

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support                                                                 33

Defendants' Amended Speech Policy also applies to speech as private citizens. Under this prong, "[t]he critical question is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Moonin*, 868 F.3d at 862 (cleaned up). Courts will strike down prophylactic speech restrictions even if some speech implicated by those restrictions falls within an employee's official duties. *Id.* For example, the Ninth Circuit has affirmed a district court's denial of qualified immunity to government officials who created a policy that prohibited direct contact between employees and those outside the department discussing two of the department's programs. *Id.,* 859. The policy, said the Ninth Circuit, was "not confined to official agency business nor to information that would harm pending investigations or expose sources and methods." *Id.,* 862 (cleaned up). It also reached employees' opinions about the programs and had no "qualification regarding what types of information or opinions regarding the [programs] are subject to the policy." *Id.,* 862. Naturally, the Ninth Circuit could not hold that the policy "affect[ed] only speech made pursuant to . . . official duties." *Id.,* 862–63.

Here, Defendants' Amended Speech Policy chills "even more speech than the polic[ies] at issue in *Moonin*" and *Barone. Barone*, 902 F.3d at 1103. Unlike in *Moonin*, where the policy prohibited discussion only of two specific programs, Defendants' policy is not limited to particular subject matter but rather applies to all "controversial" speech on campus and requires a disclaimer for that speech off campus. Also, unlike in *Barone*, where the restriction only applied to disparaging or negative speech about the employer, Defendants' restriction applies to any and all "controversial" issues. Furthermre, while a bar only on "controversial" speech and compelling a disclaimer may be "narrower than a prohibition on all speech," those restrictions suggest that, to the extent Defendants' Amended Speech Policy "is

targeted at all, it is targeted at speech *not* made pursuant to [Plaintiffs'] official duties." *Barone*, 902 F.3d at 1103.

The breathtaking scope of Defendants' Amended Speech Policy shows exactly how it targets private citizen speech. As to speech "[w]hile on District premises," Defendants' policy "prevents free expression by employees, whenever they are in the workplace, even during lunch breaks, coffee breaks, and after-hours." *Tucker*, 97 F.3d at 1217. As for off-campus speech, Defendants' policy compels a disclaimer for "speech directed to community groups, to city and state legislators, to state and federal officials, and even to family members and friends." *Moonin*, 868 F.3d at 863. And Defendants' policy has already both chilled and compelled Plaintiffs' speech as private citizens. To avoid the disclaimer requirement, Plaintiffs stopped posting from their private I Resolve social media account. Compl., ¶ 261. And Damiano has been compelled to speak Defendants' required disclaimer when rafting down the Rogue River with friends on a weekend. *Id.,* ¶ 273. Defendants' Amended Speech Policy prohibits and compels speech on issues of public concern by private citizens.

### 2. Defendants' Amended Speech Policy epitomizes nearly every violation of First Amendment law and has no close and rational relationship to any legitimate government interest.

Defendants cannot meet their burden to show that their Amended Speech Policy is tailored to any governmental interest. Under this factor, courts balance the interests of employees as citizens in commenting on matters of public concern against the interest of the government, as an employer, in promoting the efficiency of public services. *Barone*, 902 F.3d at 1104. Importantly, when the government defends a regulation on speech as a means to prevent anticipated harms, as with the prophylactic speech restriction here, it "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Moonin*, 868 F.3d at 865.

The same strong interests of employees in their speech discussed *supra* apply with even more force when government attempts to restrict First Amendment rights of "potential audiences and a vast group of present and future employees in a broad range of present and future expression." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995). Defendants' Amended Speech Policy restricts all manner of speech on campus and compels employee speech off campus. The broad and ill-defined policy sweeps in essentially all speech. That includes political speech, speech on religious and philosophical beliefs, and speech about problems at Defendants' schools, all speech entitled to maximum First Amendment protection, raising Defendants' already high burden to show disruption even further out of reach.

But no evidence exists that Defendants' Amended Speech Policy has alleviated any disruption to District functioning in a direct and material way. In fact, the evidence at this stage shows Defendants adopted the policy to allow for viewpoint discrimination on an issue that had already caused controversy within the District. Defendants appear to have adopted the policy to allow for Black Lives Matter signs in the classroom. *See* Compl., ¶¶ 251-58, Exs. "I"-"J." Those signs purportedly are not "controversial" because they comport with District policy. *Id.,* ¶ 255. But Defendants knew when they adopted the policy that Black Lives Matter signs had already been a source of debate among staff and thus had at least the possibility of causing disruption. *Id.,* ¶¶ 224-30. Regardless, Defendants plowed ahead with the Amended Speech Policy, heedless of the potential for disruption. Nor does any evidence exist of past disruption caused by employees who failed to disclaim that they spoke their personal opinion and not that of the District. Indeed, "it is not easy to imagine a situation" where a government has a "legitimate need" for a compelled disclaimer. *Janus*, 138 S. Ct. at 2473.

Defendants' relatively permissive treatment of teaching controversial issues also undermines any adequate justification they purport to have. The Amended Speech Policy allows one exception to its otherwise all-encompassing ban on discussing controversial issues on campus: teaching controversial issues. *See* Compl. at ¶ 217. Defendants recognize that teaching controversial issues is necessary to "train[] for effective citizenship." *Id.,* ¶ 214, Ex. "H." Therefore, students have the "right" to study controversial issues, have access to all relevant information, and study free from bias and prejudice. *Id.,* ¶¶ 212-17. Teaching controversial issues also will show that reasonable compromise is important in our society and cultivate a respect for minority opinions. *Id.,* ¶ 215, Ex. "H." Defendants give educators discretion over how to teach these issues. *Id.,* ¶ 216. As soon as educators stop teaching and start talking with each other Defendants turn oppressive: At that point, educators can no longer discuss controversial issues at all. *Id.,* ¶ 217. Defendants cannot justify this differential treatment: Why does teaching a group of minors about controversial topics not cause disruption? But two colleagues in the teachers' lounge discussing court packing or the 1619 Project, subjects they may have taught earlier that day, are suddenly verboten. Compl., ¶ 211.

In any event, by virtue of its host of First Amendment violations, the Amended Speech Policy flunks tailoring. The Ninth Circuit has repeatedly emphasized in the public employment context that traditional First Amendment violations show that a speech restriction lacks tailoring. *See Barone*, 902 F.3d at 1106 [content and viewpoint discrimination]; *Moonin*, 868 F.3d at 867 [unbridled discretion]; *Tucker*, 97 F.3d at 1217 [overbreadth]. For starters, the Amended Speech Policy is breathtakingly overbroad: The policy's restriction "is not limited to employment-related speech, let alone speech that reasonably could cause a disruption." *Barone*, 902 F.3d at 1106. Rather the policy applies to educators' speech anytime and anywhere. The Amended Speech Policy "makes no distinction between speech" that

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum in Support                                                                 37

"reasonably could be expected to disrupt [Defendants' operations] and speech that plainly would not, or that would do so only inasmuch as it engendered legitimate public debate." *Moonin*, 868 F.3d at 867.

In any topic related to public concern, reasonable minds certainly could differ. Defendants' policy thus prohibits two teachers from catching up in the teachers' lounge on yesterday's news. Compl., ¶ 211.  Co-workers also can't discuss the previous night's big game because undoubtedly fans of the losing team would find the issue "likely to create controversy." *Id*. What's good for on-campus is also good for off-campus, according to Defendants, because even if the teachers moved their current affairs discussion to the local park, they would both have to issue disclaimers to each other that they were expressing their personal viewpoints. Same if a teacher wanted to discuss the big game with her husband at home on their couch: disclaim or face employer discipline. Not only do these examples show the incredible reach of Defendants' policy, they are also untethered to reality. Teachers, staff, and, really, everyone discuss controversial issues both at work and at home all the time. Especially considering how expansive Defendants define "controversial," an employee can't help but talk about controversial issues. It strains credulity to think that educators and staff do not discuss these issues as part of a normal workplace – or even that it is possible, let alone constitutional, to regulate and restrict all discussion of controversial issues.

The Amended Speech Policy also fits comfortably within the Ninth Circuit's invalidation of prior restraints in the public employment context. *E.g.*, *Barone*, 902 F.3d at 1105; *Moonin*, 868 F.3d at 868. The policy creates a blanket ban on discussing controversial issues in the workplace. This prior restraint is "not limited to employment-related speech, let alone speech that reasonably could cause a disruption at the [District]." *Barone*, 902 F.3d at 1106. That failure is "fatal." *Id*.

To continue with the litany of First Amendment abuses, Defendants' Amended Speech Policy gives them unbridled discretion to define "controversial" issues. Controversial is what the "District determines may be disruptive to its educational mission." Compl., ¶ 201, Ex. "G."  Alternatively, Defendants can simply use District policies to redefine controversial issues. "Such unbounded discretion as to substance raises the specter of arbitrary or viewpoint-discriminatory enforcement." *Moonin*, 868 F.3d at 867. Grants Pass educators did not have to wait long to see unbridled-discretion-as-viewpoint-discrimination in action. Less than a month after admitting that allowing Black Lives Matter signs in classrooms but not All Lives Matter signs would be "viewpoint discrimination," Defendant Kolb wrote that such viewpoint discrimination was now permissible under the Amended Speech Policy. Compl., ¶¶ 224-26,251-55, Exs. "I"-"J."

Moving beyond the specter of viewpoint discrimination, Defendants' policy is, plainly and simply, facially content- and viewpoint-based. "The censorship of messages *because* they are controversial is viewpoint discrimination." *Ne. Penn. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 439 (3d Cir. 2019). The ban and disclaimer requirement for "controversial" speech discriminate on viewpoint just like the prohibitions on "disparaging or negative" speech in *Barone*. 902 F.3d at 1106. Defendants' "posterchild of overt viewpoint discrimination" here is not tailored to preventing disruption. *Id.*

Defendants' policy also compels staff to speak a disclaimer, a necessarily content-based restriction. "By compelling individuals to speak a particular message, such notices alter the content of their speech." *Nat'l Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (cleaned up). Indeed, the Court has recognized that compelled speech presents even more serious First Amendment concerns than compelled silence: "It would seem that involuntary affirmation could

be commanded only on even more immediate and urgent grounds than silence." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943).

Compelling a disclaimer for *any* off-campus speech bears no relationship to preventing a disruption to the District. Defendants have given no indication how Damiano's speech while floating down the river on a weekend would disrupt the school or why they have justification to compel speech when a teacher speaks in private to her husband or her pastor. "In sum, [Defendants have] not shown any past disruption sufficient to justify the expansive policy announced, nor [have they] demonstrated that any harms anticipated are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Moonin*, 868 F.3d at 867–68 (cleaned up).

Based on the foregoing, Plaintiffs are likely to succeed on, or at the very least have presented serious questions about, the merits of their claim against Defendants' speech policy.

## II.  Plaintiffs have already suffered and will continue to suffer irreparable harm without an injunction.

The Supreme Court, Ninth Circuit and this Court have all repeatedly held that "the deprivation of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality). Furthermore, in the First Amendment context, a plaintiff need only establish "the existence of a colorable First Amendment claim" to "establish irreparable injury sufficient to merit the grant of relief." *Index Newspapers*, 474 F. Supp. 3d at 1125.

Here, Defendants' retaliation on the basis of Plaintiffs' protected speech is ongoing. Both remain on administrative leave because of their speech and each day brings another irreparable injury. The Amended Speech Policy has already chilled Plaintiffs' speech and compelled them to speak an ongoing disclaimer for other

speech. Defendants have deprived and continue to deprive Plaintiffs of their First Amendment freedoms, causing them irreparable injury.

## III.   The balance of equities sharply favors Plaintiffs.

When, as here, plaintiffs "raise[] serious First Amendment questions," a court must "find[] that the balance of hardships tips sharply in Plaintiffs' favor." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (cleaned up). Defendants have put Plaintiffs on administrative leave because of their protected speech, stopped Plaintiffs from speaking, and compelled Plaintiffs to speak a disclaimer. The gravity of the First Amendment violations here alone tips the balance of hardships in favor of Plaintiffs.

Even putting aside the irreparable First Amendment harms here, Defendants would suffer no hardship from a temporary restraining order and permanent injunction. Plaintiffs have served as model educators without incident up to this point. Compl., ¶ 97. They have extensive experience working with children. *Id.,* ¶¶ 91, 95. In fact, as recently as mid-March, Defendants have shown their confidence in retaining Plaintiffs by renewing their contracts for another year. *Id.,* ¶ 98. No hardship would come from Plaintiffs' reinstatement, especially since their extended contracts contemplated just that.

As to the Amended Speech Policy, Defendants have "no legitimate interest in enforcing an unconstitutional law." *Nat'l Ass'n of Wheat Growers v. Zeise*, 309 F. Supp. 3d 842, 854 (E.D. Cal. 2018). And there is no indication that the Amended Speech Policy is required to prevent purported disruption. There is no evidence that the District was not able to fulfill its educational mission prior to April 27, 2021. To the contrary, the evidence indicates that Defendants enacted the Amended Speech Policy precisely to discriminate based on viewpoint. Defendants would suffer no hardship from a temporary restraining order and preliminary injunction.

**IV.    An injunction would serve the public interest.**

"Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012). And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). A temporary restraining order and preliminary injunction here preventing further retaliation against Plaintiffs and enjoining the unconstitutional Amended Speech Policy undoubtedly serves the public interest. Relief would allow Medart to return to her classroom and Damiano to return to the administration where they served without incident until Defendants' retaliation. They would get back to serving their students, the reason they entered education in the first place. *See* Compl., ¶ 90. And injunctive relief here sends a strong message that state actors cannot suppress messages because they disagree with their viewpoint and content. *See Rankin*, 483 U.S. at 384.

## CONCLUSION

For the above reasons, Plaintiffs Rachel Damiano and Katie Medart respectfully request a temporary restraining order and preliminary injunction reinstating them to their previous positions and enjoining Defendants' content and viewpoint discriminatory Amended Speech Policy as soon as possible.

Respectfully submitted this 22nd day of June, 2021.

PACIFIC JUSTICE INSTITUTE

*/s/ RAY D. HACKE*
RAY HACKE
OSB NO. 173647
ATTORNEYS FOR PLAINTIFFS
RACHEL DAMIANO AND KATIE MEDART
1850 45TH AVE. NE, SUITE 33
SALEM, OR 97305
503-917-4409

## CERTIFICATE OF COMPLIANCE WITH BRIEF LENGTH REQUIREMENTS

I hereby certify that (1) this brief complies with the word-count limitation set forth in Local Rule 7-2(b) and (2) that the word count of this brief is 10,978 words.

Dated:  June 22, 2021                    PACIFIC JUSTICE INSTITUTE

_/s/ RAY D. HACKE_
Ray D. Hacke
OSB No. 173647
Attorney for Plaintiffs
RACHEL DAMIANO and
KATIE MEDART

## PROOF OF SERVICE

I am employed in the County of Marion, State of Oregon.  I am over the age of eighteen and not a party to the within action; my business address is 1850 45th Ave., Suite 33, Salem, OR 97305.

On or about June 22, 2021, I served the following documents on the interested parties by placing a true copy thereof enclosed in sealed envelope(s) addressed to said parties:

**PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION [Fed. R. Civ. P. 65]**

### PLEASE SEE ATTACHED SERVICE LIST

_____BY MAIL:  I am readily familiar with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, it would be deposited with the U.S. postal service on that same date with postage thereon fully prepaid at Salem, Oregon in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

\_\_X\_\_\_BY PERSONAL SERVICE:  I caused such envelope to be delivered by hand to the office of the addressee(s).

_____BY FACSIMILE TRANSMISSION:  The facsimile machine I used complied with California Rules of Court 2003(3) and no error was reported by the machine.  Pursuant to rule 2005(i), I caused the machine to print a record of the transmission, a copy of which is attached to this proof of service.

_____(State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

\_\_X\_\_\_(Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on June 22, 2021, at Salem, Oregon.

*/s/ RAY D. HACKE*_____
Ray D. Hacke

## SERVICE LIST

Karen Vickers
Attorney For Defendants
Vickers Plass, LLC
5200 SW Meadows Road
Suite 150
Lake Oswego, OR 97035