Ray D. Hacke
OSB No. 173647
Pacific Justice Institute
1850 45th Ave. NE, Suite 33
Salem, OR 97305
503-917-4409
rhacke@pji.org
*Lead Counsel*
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DIVISION

| | |
|---|---|
| **RACHEL G. DAMIANO** and **KATIE S. MEDART**, | Case No. 1-21-CV-00859-CL |
| *Plaintiffs*, | _____ |
| *v.* | |
| **GRANTS PASS SCHOOL DISTRICT 7**, an Oregon public body; **THE MEMBERS OF THE BOARD OF EDUCATION OF GRANTS PASS SCHOOL DISTRICT 7**[1]—Scott Nelson, Cliff Kuhlman, Gary Richardson, Debbie Brownell, Cassie Wilkins, and Brian Delagrange—in their official and personal capacities; Casey Durbin, in her personal capacity; **KIRK T. KOLB**, Superintendent, Grants Pass School District 7, in his official and personal capacity; and **THOMAS M. BLANCHARD**, Principal, North Middle School, Grants Pass School District 7, in his official and personal capacity, | **AMENDED VERIFIED COMPLAINT & DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

---

[1] Members of the Board of Education are named as Defendants out of an abundance of caution because the law is unclear regarding whether a school district in Oregon is an entity subject to suit under Oregon law.

Plaintiffs Rachel G. Damiano and Katie S. Medart, for their Verified Complaint against Defendants and Demand for Jury Trial, state as follows:

INTRODUCTION

This action challenges the content- and viewpoint-based retaliation by Defendants against Plaintiffs, Rachel Damiano ("Damiano") and Katie Medart ("Medart," and collectively with Damiano "Plaintiffs"), for their speech on an issue that is front and center on the local, state, and national levels: How should our public schools address the many issues and the divergent and often-conflicting interests among students, parents, and educators when a student struggles with gender identity?

Plaintiffs, formerly employees of Grants Pass School District No. 7 ("GPSD" or the "District"), posted a video on YouTube proposing what they viewed as a reasonable, science-based, and loving policy that would allow local, state, and federal policymakers to address these complex issues. Plaintiffs crafted their proposal based on years of experience as educators and their deeply held philosophical and religious beliefs. Plaintiffs sought the input of GPSD officials, including the Defendant superintendent, Kirk Kolb ("Kolb"), and the Defendant North Middle School principal, Thomas Blanchard ("Blanchard").

In their video, Plaintiffs neither stated nor even implied that they were speaking on behalf of GPSD, nor did they wear any apparel that would readily identify them as District employees. Still, when community members and/or fellow GPSD staff members saw the video, recognized Plaintiffs, and began complaining to Kolb, the superintendent "threw them under the bus," so to speak: Kolb placed Plaintiffs on paid administrative leave for the final two-plus months of the school year while the District investigated their conduct. Pursuant to that investigation, Blanchard subjected Plaintiffs to questioning as to whether their religious beliefs rendered them unfit to be public educators. Ultimately, on July 15, 2021, following

a 4-3 vote by GPSD's Board of Directors, the District fired Plaintiffs. While GPSD claims that the Educators' firing was due not to the content of their speech, but their failure to abide by certain District policies concerning the use of District resources, statements from Kolb and individual board members make clear that the content of the Educators' speech is the true underlying reason for the District's actions.

### JURISDICTION & VENUE

1.    This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2.    This Court has original jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

3.    This Court has authority to award the requested damages pursuant to 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; the requested injunctive relief under 28 U.S.C. § 1343 and FED. R. CIV. P. 65; and costs and attorneys' fees under 42 U.S.C. § 1988.

4.    This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

5.    Venue is proper in this district and division under 28 U.S.C. § 1391(b) and D. Or. L.R. 3 because all Defendants reside in this district and division and all acts described in this Complaint occurred in this district and division.

### PLAINTIFFS

6.    Rachel Damiano ("Damiano") is a resident of Oregon and a former assistant principal at North Middle School ("NMS"), a school governed by Grants Pass School District No. 7 ("GPSD" or the "District").

7.    Katie Medart ("Medart," and collectively with Damiano "Plaintiffs") is a resident of Oregon and a former science teacher at NMS.

## DEFENDANTS

### The District

8.    Defendant GPSD is, and was at all times relevant to this Complaint, a public school district operated under the laws of Oregon and a public body as defined in Or. Rev. Stats. §§ 30.260(4) and 174.109.  GPSD is a body corporate under Oregon law.  Or. Rev. Stat. § 332.072.

9.    Oregon law authorizes GPSD's Board of Directors (the "Board") to transact all business coming within the jurisdiction of the District, namely to exercise control of District schools and take responsibility for educating children in the District. Or. Rev. Stat. § 332.072.

### The Board Defendants

10.    Defendants Scott Nelson ("Nelson"), Cliff Kuhlman ("Kuhlman"), Gary Richardson ("Richardson"), Debbie Brownell ("Brownell"), Cassie Wilkins ("Wilkins"), Brian Delagrange ("Delagrange"), and Casey Durbin ("Durbin") either are or were at all times relevant to this Complaint, members of the Board of Directors (collectively, "Board Defendants") and either are or were responsible for (1) enacting, amending, and/or repealing policies that either once governed, or currently govern, the expression of GPSD employees (the "Speech Policies") [*see* Or. Rev. Stat. § 332.072], and (2) the termination of Plaintiffs' employment.[2]

### The Superintendent

11.    At all relevant times, Defendant Kirk Kolb ("Kolb") is and was the superintendent of the School District.

---

[2] Durbin's tenure as a member of the Board of Directors ended on June 30, 2021.  She is named as a Defendant in this case because she voted to enact one of the speech policies that Plaintiffs are challenging herein.  Todd Neville replaced Durbin on the Board of Directors on July 1, 2021. He is not named as a Defendant here because he was not a member of the Board when it adopted the Amended Speech Policy (discussed in greater detail below) and voted against terminating Plaintiffs' employment on July 15, 2021.

12.  As superintendent, Defendant Kolb is GPSD's chief executive officer.  Or. Rev. Stat. § 334.225(1).

13.  Defendant Kolb's duties include overseeing the operation and management of the District – including supervising all GPSD employees at every school in the District – and authorizing, executing, enforcing, and implementing Defendant GPSD and the Board Defendants' policies governing employee conduct.  Defendant Kolb has the authority to review, approve, or reject the decisions of other GPSD officials regarding such policies.

### The Middle School Principal

14.  Defendant Thomas Blanchard ("Blanchard") is, and was at all times relevant to this Complaint, the principal of NMS.

15.  As superintendent, Defendant Kolb directly supervises Defendant Blanchard.

16.  Defendant Blanchard possesses the authority and responsibility for governing and regulating District employees at NMS.

17.  Defendant Blanchard's duties included supervising Plaintiffs.

18.  Defendants Kolb and Blanchard each have the authority pursuant to the Speech Policies to investigate, recommend disciplinary actions, and impose discipline against GPSD employees for violating the policy in effect at the time of the violation.

19.  Plaintiffs are suing each natural-person Defendant in his or her official and personal capacities.

### FACTUAL BACKGROUND

### Plaintiffs' Beliefs

20.  Plaintiffs are professing Christians who strive to live out their faith daily. Because of their Christian faith, Plaintiffs have sincerely held religious beliefs that govern their views about human nature, marriage, gender, sexuality, politics, the

purpose and meaning of life, and ethical and moral standards that should govern human conduct.

21.  Plaintiffs also believe they cannot affirm as true those ideas and concepts that they believe are not true. Doing so, they believe, would violate biblical commands against dishonesty and lying.

22.  In accordance with biblical principles, Plaintiffs also endeavor to treat every person with dignity, love, and care, because they believe all people are created in the image of God.

23.  Plaintiffs' faith teaches them that (1) God immutably creates each person as male or female; (2) these two distinct, complementary sexes reflect the image of God; and (3) rejection of one's biological sex is a rejection of the image of God within that person.

24.  Plaintiffs are concerned about the lack of coherent policies and guidance in public schools to help students, their parents or guardians (below "parents"), and teachers address the increasing number of school children who struggle with gender identity issues. Plaintiffs believe that policies and guidance addressing the issues that accompany a student's struggle with gender identity issues often vary from school to school and district to district.

25.  Plaintiffs believe the lack of consistent and coherent policies and guidance addressing issues that arise when a student struggles with gender identity issues, as well as policies and guidance that alienate parents from assisting their children when their children struggle with those issues, disserve children, their parents, and society as a whole.

26.  Accordingly, Plaintiffs desire to promote what they believe is a reasonable, consistent, and respectful policy about how to address gender identity issues in the context of primary and secondary school.  This policy, Plaintiffs believe, contains

fair, inclusive policy recommendations to help accommodate the often-conflicting interests and sincerely held beliefs of students, parents, and educators on such issues.

27.  Plaintiffs believe, based on scientific evidence, that children do not have a fully developed capacity to understand the long-term consequences of their decisions.  Plaintiffs thus want to protect children from making potentially irreversible, life-changing decisions they may later regret.  Plaintiffs furthermore believe that responsible parents, with the assistance and support of educators, can and should – nay, must – help children understand the many and complex factors surrounding gender identity, but that current gender-identity policies and related procedures either hinder their ability or outright prevent them from doing so.

28.  Plaintiffs believe parents have a fundamental right to control the upbringing and education of their children.  Plaintiffs also believe that any gender-identity education policy and related procedures must account for this fundamental right, and any policy that does not do so disserves both children and their parents.

29.  Plaintiffs believe gender-identity education policies must protect educators', students', and community members' First Amendment-protected freedoms of speech and religion, which are often impacted by gender-identity education policy.

30.  Plaintiffs believe, based on scientific evidence and acknowledging that there are extremely rare cases of intersex, that there are only two anatomical sex presentations – i.e., male and female.  Plaintiffs also believe that scientifically demonstrable and anatomically correct designations of sex should be the basis for a redesignation of bathroom and locker room classifications and control access to shared public-school restrooms and locker rooms for minors.  For those students who are not comfortable using facilities associated with their anatomical sex, Plaintiffs support those, and all, students having access to and using a private restroom or locker space so long as they exist or can be established.

31.  To accommodate the interests of students, parents, and teachers, Plaintiffs believe that students, with parental permission, may ask to be called by a derivative of their legal name and that teachers and student peers can – but should not be required to – use that name.  Along the same lines, Plaintiffs believe that students, with parental permission, may ask to be referred to by pronouns that do not correspond to the students' biological sex and that teachers and student peers can – but should not be required to – use those pronouns.

### The "I Resolve" Movement

32.  In January 2021, S.B. 52 was introduced in the Oregon Senate.  If passed, the bill would direct the Oregon Department of Education to develop and implement statewide education for "plan students" – *i.e.*, those students enrolled in early childhood through post-secondary education who "[m]ay be lesbian, gay, bisexual, transgender, queer, two-spirit, intersex, asexual, non-binary or another minority gender identity or sexual orientation" and who, "as identified by the State Board of Education by rule," have allegedly "experienced disproportionate results in education due to historical practices."

33.  The month after, in February 2021, the U.S. House of Representatives passed the Equality Act, H.R. 5—a bill that would add "gender identity" among the protected categories under the Civil Rights Act of 1964.  If the Equality Act becomes law, it could have broad effects for public schools, including mandating that schools across the country allow students who identify as transgender to access opposite-sex restrooms, locker rooms, and showers. The Equality Act, under the ostensible aim of preventing harassment and bullying, could also compel teachers and students to use pronouns that do not correspond to a student's biological sex.

34.  Also in or about February 2021, GPSD circulated to select District employees a memorandum about guidelines relating to gender identity issues (*e.g.*, pronoun usage).

35.  Against this backdrop, Plaintiffs – based on their deeply held philosophical and religious beliefs and in the context of the local, state, and national debate about gender-identity education policy – sought to have a constructive dialogue on that topic.

36.  Thus, in March 2021, with the knowledge of GPSD personnel, Plaintiffs started "I Resolve," a grassroots movement to promote sound gender-identity educational policies at the local, state, and federal levels in a loving and tolerant way that seeks to account for the divergent and often conflicting views about gender identity while also upholding fundamental freedoms.

37.  Plaintiffs intended to promote "I Resolve" online, including through a website and social media, and through in-person contact.

38.  While school was not in session and while away from school, Plaintiffs created the "I Resolve" website, available at https://www.iresolvemovement.com/ (last viewed June 2, 2021).  A true, accurate, and complete copy of the homepage of the website as of June 2, 2021 is attached hereto as **Exhibit A.**

39.  The "I Resolve" website presents Plaintiffs' deeply held philosophical and religious beliefs and proposes model resolutions for adoption by local, state, and federal leaders.  The "I Resolve" website also proposes that bathrooms and locker rooms currently designated by sex (*e.g.*, as either "boys" or "girls" bathrooms and locker rooms) should be "re-designated as 'anatomically-male' or 'anatomically-female' spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built."  Ex. A at 2.  The "I Resolve" website furthermore proposes that any person not comfortable using anatomically correct spaces can request access to a private, gender-neutral bathroom or locker room so long as such a space exists or can be established.  *Id.* at 3.

40.   The "I Resolve" website proposes two other resolutions to provide "caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey":

    a.   A student, with parental permission, may request to be called by a derivative of the student's legal name, but other students or staff are not mandated to use that name; and

    b.   A student, with parental permission, may request to be referred to by pronouns that do not correspond to the student's biological sex, but other students and staff are not required to use those pronouns. Ex. A at 2–3.

41.   When created, the "I Resolve" website allowed visitors to electronically sign the resolutions to show their support.

42.   As part of the "I Resolve" movement, Plaintiffs created a video while off duty during spring break 2021.  They did so with personal property at a local church. The video presents Plaintiffs alone discussing their deeply held beliefs and their proposed "I Resolve" resolutions.

43.   While developing the website and video, Damiano met with Defendants Kolb and Blanchard separately at school and informed them about the "I Resolve" movement and the proposed website and video. Damiano provided Defendants Kolb and Blanchard with drafts of the "I Resolve" resolutions, and Plaintiffs later provided a link to the webpage to both Defendants.  Defendant Kolb, in fact, received his link before the webpage even went public.  Defendant Blanchard, meanwhile, received his link via text from Medart after the webpage went public.During the development stage, Defendants Kolb and Blanchard never expressed disapproval of Plaintiffs' work on "I Resolve," nor did they ever inform Plaintiffs that their work on "I Resolve" was interfering with Plaintiffs' relationships with colleagues and supervisors.

44.   Defendants Kolb and Blanchard also never warned Plaintiffs that they were violating any District policy by working on "I Resolve."   In fact, Defendant Kolb said he would consider bringing the "I Resolve" resolutions to the Board Defendants to consider whether the Board should adopt the resolutions as District policy.

45.   Defendant Blanchard even gave Plaintiffs feedback on their drafts of the "I Resolve" resolutions. Specifically, Defendant Blanchard asked Plaintiffs -- in person with Damiano, via text message with Medart -- clarifying questions about mandating that staff or students use preferred names and/or pronouns only when parents approve.   Plaintiffs both responded that such a mandate would violate their constitutionally protected right of free speech.   The ruling issued by the United States Court of Appeals for the Sixth Circuit in *Merriwether v. Shawnee State University* confirms that such a mandate violates teachers' right of free speech.

46.   Neither on the "I Resolve" website nor in any "I Resolve" video has either Plaintiff identified herself as an employee of GPSD or NMS or worn any gear featuring district or school emblems, logos, or insignia.

47.   Plaintiffs never reference any District employee or board member in their speech related to "I Resolve."

48.   "I Resolve" never interfered with Damiano's duties as an assistant principal or Medart's duties as a science teacher.

49.   Plaintiffs never approached students about "I Resolve" or discussed "I Resolve" during class time.

50.   "I Resolve" was not part of Plaintiffs' official duties assigned to them by Defendants.

51.   On March 25, 2021, Plaintiffs made their video publicly available for viewing on YouTube.

## Defendant Kolb Backtracks in Response to Backlash

52.  On March 31, 2021, approximately a week after the website's public launch, Defendant Kolb met with Plaintiffs separately.  Defendant Kolb informed Plaintiffs that GPSD staff had raised concerns about "I Resolve," about "I Resolve," telling Plaintiffs that the complainants were "appalled," "offended," and "disgusted" by Plaintiffs' views.

53.  According to Defendant Kolb, at least one complainant claimed Plaintiffs were "targeting transgender students."  Defendant Kolb also told Plaintiffs that some GPSD staff members perceived the "I Resolve" video to be "anti-transgender."

54.  Defendant Kolb told Plaintiffs that legal counsel was examining the lawfulness of their speech in the "I Resolve" video and recommended that Plaintiffs remove the "I Resolve" video and website from public view.

55.  During Defendant Kolb's meeting with Medart, he told her that because of the views she expressed as part of "I Resolve," he had prevented her from attending a meeting of the LGBTQ+ student club earlier that day, March 31 – even though the club's student membership had voted to allow Medart to attend.  Medart had sought to attend the club meeting to better understand student perspectives on LGBTQ+ issues and better support those students.  Even so, Defendant Kolb overrode the students' decision.

56.  Defendant Kolb threatened that if "disruption" to the functioning of GPSD continued – i.e., if the District continued receiving complaints – he would pursue disciplinary action against Plaintiffs, including terminating their employment. However, on information and belief, apart from the complaints received by Defendants from GPSD staff, no other "disruption" occurred as a result of the "I Resolve" website, and GPSD's ability to function was not impaired in any way.

57.  Furthermore, Defendant Kolb stated in an e-mail to Medart, "Although I do not anticipate any disciplinary action, this is a very sensitive and emotive topic and is having an impact on your colleagues."

### Defendants Place Plaintiffs on Administrative Leave

58.  Between April 1 and 3, 2021, Defendant Blanchard received formal complaints from five GPSD employees about Plaintiffs' "I Resolve" speech.  At least three employee complainants claimed Plaintiffs' speech violated the District's policy governing employee speech at the time (the "Original Speech Policy") because Plaintiffs did not comply with the policy's disclaimer requirement.  Another employee complainant alleged that "separation of church and state" prohibited Plaintiffs from sharing "I Resolve" resolutions at work since the resolutions are influenced by Plaintiffs' Christian faith.

59.  Upon information and belief, Defendant Blanchard has not told any of the five complainants that he met with Damiano during the development stage of "I Resolve" and provided feedback on the "I Resolve" resolutions.

60.  On April 5, 2021, a school administrator entered Medart's classroom right before she started class and directed her – in the presence of her students – to take her belongings and report to Defendant Blanchard.

61.  When Medart reported to Defendant Blanchard, he handed her a notice he had written and signed.  The notice placed Medart on administrative leave, effective immediately, and informed her that she was under investigation for "inappropriate behavior." A true, accurate, and complete copy of the notice is attached hereto as **Exhibit B.**

62.  Damiano met with Defendant Blanchard that same day. During the meeting, he provided her with a notice he had written and signed.  Like Medart's notice, Damiano's notice placed her on administrative leave, effective immediately, and

informed her that she was under investigation for "inappropriate behavior." A true, accurate, and complete copy of the notice is attached hereto as **Exhibit C.**

63.  Defendants placed Plaintiffs on administrative leave based on the aforementioned five complaints from GPSD employees, which focused on the content of Plaintiffs' "I Resolve" -related speech.

64.  While they were on administrative leave, Plaintiffs lost opportunities to develop their skills as an administrator (in Damiano's case) and educator (in Medart's case) as well as to mentor their students.

65.  Upon information and belief, the outcome of Defendants' formal investigation into Plaintiffs may include employer discipline up to and including termination.

### A. Defendant Kolb emails District staff, parents, and students to condemn I Resolve.

66.  On April 6, 2021, Defendant Kolb emailed the entire District staff under the subject line: "We are [Grants Pass]; We ALL belong." A true, accurate, and complete copy of the e-mail is attached as **Exhibit D.**

67.  In that e-mail, Defendant Kolb declared that the "I Resolve" movement was purportedly "in direct conflict with the values of Grants Pass School District 7" and that GPSD "do[es] not support or endorse this message." Ex. D at 1.  Defendant Kolb further wrote that "District 7 is unequivocally committed to providing welcoming and safe learning environments for **all** students, including our LGBTQ students. In Grants Pass schools, we **ALL** belong, regardless of race, religion, gender, sex, or ability." *Id.*

68.  Defendant Kolb furthermore stated in the e-mail, "Please contact me or our Human Resources Director, Danny Huber-Kantola, with any additional concerns or needed support." Ex. "D."  In other words, Defendant Kolb actively solicited

complaints from GPSD staff, thereby causing the very disruption he accused Plaintiffs of creating.

69.  After Defendant Kolb sent the e-mail, Plaintiffs received many harassing, intimidating, and menacing communications from third parties and District staff. These e-mails accused Plaintiffs of transphobia, hatred, and bigotry. One claimed Plaintiffs were not fit to work with children because of their work on "I Resolve."

70.  On April 7, 2021, Defendant Kolb sent out another e-mail, this time to all District staff, students, and families. A true, accurate, and complete copy of the email is attached as **Exhibit E.**

71.  In the April 7 e-mail Defendant Kolb wrote that there were complaints against "two staff members" over "social media postings discussing LGBTQ policies with reference to schools."  Ex. E at 1.  The "staff members" Defendant Kolb referred to in his e-mail are Plaintiffs.

72.  Defendant Kolb reiterated in the April 7 e-mail that "District 7 is committed to providing welcoming and safe learning environments for all students, including our LGBTQ students. In Grants Pass schools, we ALL belong, regardless of race, religion, gender, sex, sexual orientation or ability." Ex. E at 1.  Defendant Kolb further assured the GPSD community that Plaintiffs were being "investigat[ed]" and were "not at work."  *Id.*

73.  Defendant Kolb did not mention in either his April 6 or 7 e-mails that he and Defendant Blanchard met with Damiano during the development stage of "I Resolve," that Defendant Blanchard gave feedback to Damiano on her drafts of "I Resolve" resolutions, or that Defendant Kolb reviewed the "I Resolve" resolutions and considered bringing them to the Board Defendants for a vote on making the resolutions District policy.

74.  On April 13, Defendant Kolb attended the regular virtual meeting of the Board Defendants.  At that meeting, a member of the public criticized the "I

Resolve" movement for, in the commenter's perspective, being harmful to students struggling with gender identity issues.  Defendant Kolb responded in the meeting's chat that the commenter was "[w]ell spoken" and that a GPSD official would reach out to the commenter regarding how the commenter could assist the District.

### B. Defendant Blanchard questions Plaintiffs about their religious beliefs as part of the School District's investigation.

75.  Defendant Blanchard, along with Danny Huber-Kantola, GPSD's Human Resources Director, led the District's investigation of the formal complaints against Plaintiffs.

76.  As part of the investigation, Defendant Blanchard separately questioned Plaintiffs about their "I Resolve"-related speech and their deeply held philosophical and religious beliefs purportedly interfering with their ability to do their respective jobs.  Almost all of the questions raised during Defendants' interviews of Plaintiffs focused on Plaintiffs' speech related to "I Resolve."

77.  Defendant Blanchard expressed "concern" that Medart's religious faith would prevent her from complying with District guidelines or policies, if adopted, that would compel teachers to use pronouns that do not correspond to a transgender student's biological sex, thereby making her unfit for her job.  The other interviewer questioned whether Medart had attempted to "push" her religious views on people in the District through "I Resolve."

78.  Defendants then subjected Plaintiffs to another round of questioning, this time conducted by an outside investigator, about their speech related to I Resolve.

### C. The School District's "Speech Policies"

#### 1. The Original Speech Policy

79.  In February 2004, the School district adopted a policy governing employee speech titled, "Staff Participation in Political Activities." That policy — the Original

Speech Policy — remained in effect until April 27, 2021. A true, accurate, and complete copy of the Original Speech Policy is attached hereto as **Exhibit F.**

80.  The Original Speech Policy provided: "Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level ***on the same basis as <u>any</u> citizen*** in a comparable position in public or private employment and within the law." Ex. F at 1 (emphasis added).  The policy also provided: "All district employees are privileged within the limitations imposed by state and federal laws and regulations ***to choose either side of a particular issue and to support their viewpoints as they desire*** by vote, ***discussion or the persuasion of others***." *Id.* (emphasis added).

81. However, the Original Speech Policy prohibited "[s]uch discussion and persuasion ... during the performance of district duties, except in open discussion during classroom lessons that center on a consideration of all candidates for a particular office or various sides of a particular political or civil issue." Ex. F at 1.

82.  The Original Speech Policy also included a disclaimer requirement, which reads: "On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint." Ex. F at 1.

83.  The Original Speech Policy did not define the terms, "political or civil issue" or "controversial issues."

84.  By failing to define "controversial issues," the Original Speech Policy gave GPSD staff – including Plaintiffs – no notice as to what constituted a controversial issue or how to avoid charges that staff violated the policy.

85.  Given that stances on nearly every issue of public importance generate "controversy," the Original Speech Policy gave Defendants limitless authority to regulate, suppress, and censor employee speech made while the policy was in effect.

86.  For employee speech made while the Original Speech Policy was in effect, Defendants could discipline any employee for speech on an issue that Defendants subjectively deemed "controversial" that did not include the required disclaimer.

87.  In placing Plaintiffs on administrative leave, Defendants enforced the Original Speech Policy against Plaintiffs for their "I Resolve"-related speech that occurred before April 27, 2021.

### 2. The Amended Speech Policy

88.  On April 27, 2021, the Board Defendants adopted, and have since enforced, an amended "Staff Participation in Political Activities" policy that governs employee expression. A true, accurate, and complete copy of that policy — the Amended Speech Policy — is **Exhibit G.**

89.  Like the Original Speech Policy, the Amended Speech Policy provides: (a) "Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level *on the same basis as any citizen* in a comparable position in public or private employment and within the law"; and (b) "[a]ll district employees are privileged within the limitations imposed by state and federal laws and regulations *to choose either side of a particular issue and to support their viewpoints as they desire* by vote, *discussion or the persuasion of others*." Ex. G at 1 (emphasis added).

90.  The Amended Speech Policy defines "political or civil issue" and "controversial civil issue" using such elusive, subjective, and circular terminology that the policy gives staff no notice as to what constitutes a "political or civil issue" or "controversial civil issue" or how to avoid charges that staff violate the policy:

      a. The Amended Speech Policy defines "political or civil issue" circularly as "includ[ing], but not be[ing] limited to, any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree." Ex. G at 1.

b. The Amended Speech Policy likewise defines "controversial civil issue" circularly to "specifically include issues which appear likely to create controversy among students, employees or the public, or which the District determines may be disruptive to its educational mission or instruction." Ex. G at 1.  As part of its definition of "controversial civil issue," the Amended Speech Policy also directs: "In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions." *Id.*

91.   The Amended Speech Policy, like the Original Speech Policy, also includes a disclaimer requirement, which reads: "When engaged in off duty activities, on all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint." Ex. G at 1. The policy gives staff no notice as to what off-duty speech triggers the required disclosure. *Id.* So, in effect, the policy compels staff to issue the disclaimer nearly every time they speak on any topic.

92.   Given that nearly every issue of public importance is (a) an issue "for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree" (*i.e.*, a "political or civil issue") and (b) an "issue[ ] which appear[s] likely to create controversy among students, employees or the public" (*i.e.*, a "controversial civil issue"), the Amended Speech Policy gives Defendants limitless authority to regulate, suppress, and censor employees' speech on and off District property, during and after school hours, and on and off duty.  The Amended Speech Policy's "controversial civil issue" provision thus gives Defendants limitless power to regulate, suppress, and censor any GPSD staff member's speech on an issue that Defendants subjectively deem controversial – especially speech expressing viewpoints with which District officials disagree.

93.  District employees must follow all Board policies and are subject to discipline, including termination of employment, if they do not.

94.  Defendants have exercised their power under the Amended Speech Policy to regulate, censor, and suppress speech on "political or civil issues" and "controversial civil issue[s]," including against Plaintiffs.

### 3.  The classroom exception to censorship under the Speech Policies

95.   On the same day that the School District adopted the Original Speech Policy in February 2004, the District also adopted a policy on "Studying Controversial Issues." A true, accurate, and complete copy of that policy is attached hereto as **Exhibit H.**

96.  That policy, which has not been amended since February 2004 and was in effect at all times relevant to this Complaint, emphasizes the need to "teach[ ] about our American heritage, the rights and privileges we enjoy as citizens and the citizenship responsibilities that must be assumed in maintaining our American way of life." Ex. H at 1.  The policy recognizes that "[i]n training for effective citizenship, it is frequently necessary for students to study issues that are controversial." *Id.*

97.  The policy adds: "In considering such issues, it shall be the purpose of our schools to recognize the student's right and/or obligation to: 1. Study any controversial issue concerning which (at his/her level) the student should begin to have an opinion; 2. Have free access to all relevant information, including the materials that circulate freely in the community; 3. Study under competent instruction *in an atmosphere of freedom from bias and prejudice*; 4. Form and express his/her own judgment on controversial issues without thereby jeopardizing his/her relations with teachers or the school; 5. Recognize that reasonable compromise is often an important facet in the decision making in our society; 6. *Respect minority opinion*." Ex. H at 1 (emphasis added).

98. As for addressing controversial issues with captive audiences in K–12 classrooms, Defendants entrust District educators with the discretion "to carefully weigh the risks against the significance and educational merit of the issues, methods, materials and personnel involved and, when doubt remains, . . . to seek the counsel of their supervisors." Ex. H at 1.

99. The only exception the Amended Speech Policy allows for discussion of "political or controversial civil issue[s]" during the performance of district duties is pursuant to the "Studying Controversial Issues" policy. Ex. G at 1. District officials, including Defendants, do not entrust GPSD staff with the same discretion when speaking outside the classroom on controversial issues.

100. Defendants have instead given themselves unrestrained, post hoc discretion under the Speech Policies to regulate, suppress, and censor staff expression on such issues.

101. Defendants seek to respect minority opinions in the classroom.

102. But Defendants seek to silence minority opinions held by District staff if they express those opinions outside the classroom.

103. Defendants have no adequate justification for allowing employees such discretion to teach on controversial issues but then prohibiting them from discussing those same issues outside of class or for requiring a disclaimer anytime employees speak off campus.

### D. Defendants' subjective and inconsistent enforcement of the Speech Policies

#### 1. Defendant's viewpoint-based enforcement—or non-enforcement—of the Original Speech Policy

104. District employees – including Defendants – have regularly made statements on "controversial issues" under the Original Speech Policy and without including the required disclaimer:

a. On March 30, 2021, Defendant Kolb sent an e-mail during school hours to all District staff under the subject line: "Posters and other items that may be considered controversial political or civil issues." A true, accurate, and complete copy of the email is **Exhibit I.**  In that e-mail, Defendant Kolb expressed: "[T]he phrase ['Black Lives Matter'] should probably not be controversial, [but] it nonetheless has created controversy, including in our community." *Id.* at 3.  Defendant Kolb did not include with his opinion that "the phrase ['Black Lives Matter'] should probably not be controversial" – the required disclaimer that the viewpoint was his and should not be interpreted as the District's official viewpoint. Upon information and belief, Defendant Board Members have not subjected Defendant Kolb to the disciplinary process.

b. During school hours the next day, March 31, a GPSD teacher using the District email system replied to Defendant Kolb's e-mail and copied all GPSD staff. Ex. I at 1.  In the e-mail, the teacher expressed support for the Black Lives Matter movement, writing, "Black Lives Matter is an uplifting and wholesome message and way of thinking that is perfectly appropriate for our classrooms." *Id.* The teacher added, "there is no other side, Black Lives Matter or they don't." *Id.*

c. That same day, also during school hours, another GPSD educator replied to all using the District email system, writing, "First off Black Lives Matters is on its face a racist statement." Ex. I at 1. Neither the educator who expressed opposition to Black Lives Matter nor the teacher who expressed support for the organization complied with the Original Speech Policy's disclaimer requirement.  Upon information and belief, Defendants have not subjected either educator to the

disciplinary process for speaking on a "controversial issue" and/or violating the disclaimer requirement.

    d.  Yet another example: On April 27, 2021, an NMS teacher made a public social media post during school hours criticizing those who advocated for looser pandemic restrictions.  The speaker did not comply with the Original Speech Policy's disclaimer requirement.  Upon information and belief, Defendants have not subjected that teacher to the disciplinary process for speaking on a "controversial issue" and/or violating the disclaimer requirement.

105. Defendants have also not subjected to the disciplinary process those GPSD staff members who have expressed viewpoints different from those of Plaintiffs on issues relating to "I Resolve."

106. On April 15, 2021, the staff member who serves as club advisor to NMS' LGBTQ+ club sent a message to the club during school hours, while on campus, discussing an upcoming meeting between the club and "school district members." The April 15 message referred to the "recent Anti-Trans 'movement' that has unfortunately spread on our campus" and the availability of GPSD members to show support for members of the LGBTQ+ club.  The April 15 message's reference to a so-called "Anti-Trans 'movement'" was to "I Resolve."

107. The staff member/club advisor did not include a disclaimer that her viewpoint was her own and not GPSD's. Upon information and belief, Defendants have not subjected that staff member to discipline for speaking on a "controversial issue" and/or violating the Original Speech Policy's disclaimer requirement.

108. On April 16, 2021, a different teacher – while on District premises, during school hours, and wearing a District-provided shirt – posted a photo of herself on social media objecting to "I Resolve."  That teacher did not comply with the Original

Speech Policy's disclaimer requirement. Upon information and belief, Defendants have not subjected that teacher to the disciplinary process.

109. The teacher mentioned above would be required to utter a disclaimer under the Amended Speech Policy if her speech had occurred off campus. The Amended Speech Policy prohibits GPSD personnel from speaking on controversial topics on campus at all unless the classroom exception applies. Because GPSD had deemed "I Resolve" to be controversial, the teacher engaged in controversial speech by discussing it in a social media post while on campus, and under the Amended Speech Policy, the teacher should have been disciplined.

110. But for the content and viewpoint of Plaintiffs' "I Resolve"-related speech, Defendants would not have taken adverse action against Plaintiffs. Any other purported justification by Defendants to take adverse action against Plaintiffs is pretextual.

### 2. Defendant's viewpoint-based enforcement — or non-enforcement — of the Amended Speech Policy

111. On April 28, 2021, the day after Board Defendants adopted the Amended Speech Policy, an NMS teacher made public social media posts during school hours and on school property criticizing those who advocated for looser pandemic restrictions. There is "more than one reasonable interpretation or position" about pandemic restrictions "on which reasonable persons may disagree," making the subject an issue that is "likely to create controversy among students, employees or the public." Ex. G at 1. Upon information and belief, Defendants have not subjected that teacher to the disciplinary process for engaging in speech supporting one side of a political or controversial civil issue "[w]hile on District premises or acting within the scope of employment." *Id.* at 2.

112. Another example of Defendants' viewpoint discrimination under the Amended Speech Policies involves the controversy over Black Lives Matter posters in classrooms:

    a. Before the Board Defendants adopted the Amended Speech Policy, Defendant Kolb sent an email on March 30, 2021 stating, in part:

> I am sending this message regarding a very difficult and emotive topic. I have had a few people express a desire to put up "Black Lives Matter" posters in their classrooms and have had legal counsel review and consult with the Board.
>
>         * * *
>
> While it is a fact that black lives do matter and discrimination against black students, or students of any color, is absolutely prohibited, the issue with the phrase "Black Lives Matter", is that it has become identified with a political/civil rights movement that has generated substantial controversy throughout Oregon and the country, including spawning ***counter-movements such as the "Blue Lives Matter" and "All Lives Matter"***. These movements and related posters and signs would also be considered controversial civil issues as related and should not be displayed in classrooms or on school property. The concern is that once "Black Lives Matter" posters are posted, then it becomes difficult for the District, under the First Amendment, to object to other posters which may be similar or responsive to "Black Lives Matter" or which cover controversial or disputed subjects of a civil or political nature without engaging in ***viewpoint discrimination***.

Ex. I at 2 (emphasis added).

    b. Defendants' view changed after Board Defendants adopted the Amended Speech Policy in April 2021: On May 5, 2021, Defendant Kolb sent an email to the entire District staff. A true, accurate, and complete copy of the email is attached hereto as **Exhibit J.**

    c. In the email, Defendant Kolb wrote: "The attached Board policy was revised and adopted by the Board last Tuesday. For clarification, [the

Amended Speech Policy] now allows for the [Oregon Education Association's] Black Lives Matter poster to be present on the walls of your classrooms." Ex. J at 1. Defendant Kolb did not state in his May 5 email that the Amended Speech Policy permits teachers to hang the "counter-movements" "Blue Lives Matter" and "All Lives Matter" posters in their classrooms.

d. Attempting to justify his reversal concerning Black Lives Matter posters, Defendant Kolb explained: "The significant change ... is the following statement: '***In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions.***' It is deemed by the District that this poster is consistent with our Board Policy ["All Students Belong," adopted in December 2020] and the Board Resolution on Equity, Diversity, and Inclusion [adopted in January 2021]." Ex. J at 1.

113.    Thus, Defendants have by fiat found that permitting Black Lives Matter posters no longer constitutes "viewpoint discrimination." Ex. I at 2. But Defendants have made no similar concession to Blue Lives Matter or All Lives Matter posters.

**E. Defendants' unconstitutional Amended Speech Policy prevented Plaintiffs from freely speaking as citizens on matters of public concern and compels them to comply with the disclaimer requirement.**

114. From April 8 to April 29, 2021, Plaintiffs made frequent social media posts, often daily, about issues relating to "I Resolve" on the "I Resolve" Instagram account. Plaintiffs intended to continue to make similar daily social media posts indefinitely into the future about issues relating to "I Resolve."

115. On April 29, 2021, however, Plaintiffs immediately stopped making such Instagram posts when they discovered that the Board Defendants had adopted the

Amended Speech Policy.   Plaintiffs did so because of Defendants' elusive, subjective, and circular definition of "controversial civil issue" in the Amended Speech Policy. *See* Ex. G.  Given that they were already on administrative leave at that time, Plaintiffs did not want to run afoul of the Amended Speech Policy and thus be subject to possible further discipline, including termination of employment.

116. The Original Speech Policy's disclaimer requirement compelled Plaintiffs to add a disclaimer to the "I Resolve" website stating that the website espouses personal views only and not the views of any education entity, including GPSD. Ex. A at 4.  But for the disclaimer requirement in the Original Speech Policy -- which Plaintiffs added at the behest of the District after the March 31 meeting, before the District put Plaintiffs on leave and before GPSD started receiving complaints -- Plaintiffs would not have included the disclaimer.

117. Plaintiffs did not believe or wish to communicate that their speech is official GPSD speech or that it represents the views of the District. However, they do not want to make the required disclaimer because they wish to avoid placing language on their website and social media that may disparage their speech in the eyes of their readers, or otherwise confuse their readers, by suggesting that the District opposes or disapproves of their speech.

118. Defendants' Amended Speech Policy has also limited and compelled Plaintiffs' speech in other contexts:

    a. During the weekend of May 15, 2021, Damiano was on a float trip with friends on the Rogue River. Under the Amended Speech Policy, Damiano was forced to speak the compelled disclaimer to her friends when expressing her views on any issue that could, in the discretion of District officials, including Defendants, be deemed "controversial." Damiano included the disclaimer when discussing issues including the wisdom of pandemic restrictions and immigration policy.

    b.  The Amended Speech Policy also stopped Damiano from making personal social media posts she otherwise would because she does not wish to comply with the disclaimer requirement.

    c.  On May 22, 2021, Defendants' Amended Speech Policy compelled Medart, while at her son's soccer match, to speak the disclaimer when talking with other families about issues related to "I Resolve."

### Defendants Fire Plaintiffs

119.  Before Defendants placed them on administrative leave in April 2021, Plaintiffs had never faced disciplinary action from GPSD for any reason.  In fact, in mid-March 2021, Defendants renewed Plaintiffs' contracts for the 2021–22 school year -- the District offered Plaintiffs letters of intent to sign and return for the 2021-22 school year, and Plaintiffs did sign and return them.  Medart also received an actual contract to sign and return, which we did.

120.  After placing Plaintiffs on administrative leave, Defendants hired Bill Landis ("Mr. Landis"), a former Grants Pass police chief, to investigate Plaintiffs' conduct.  Plaintiffs fully cooperated with the investigation.

121.  Following his investigation, Landis determined that Plaintiffs:

    a.  Used GPSD facilities, equipment, and supplies for political campaigning efforts.  Nothing Plaintiffs did, however, meets the definition of political campaigning as set forth in Or. Rev. Stat. § 260.432: Plaintiffs did not "solicit any money, influence, service or other thing of value or otherwise promote or oppose any political committee or promote or oppose the nomination or election of a candidate, the gathering of signatures on an initiative, referendum or recall petition, the adoption of a measure or the recall of a public office holder while on the job during working hours."  Oregon law also explicitly permits public employees to express personal political views,

even during working hours. *Id.* Even if Plaintiffs did use GPSD facilities, equipment, and supplies, such use was minimal: Damiano estimates that she used $2 worth of printer paper, and Medart forwarded one e-mail related to "I Resolve" that she received at her GPSD e-mail address from another GPSD employee who did not receive discipline. This use of District resources was not a violation of policy – in fact, Policy GBB explicitly permits teachers and administrators to participate in policy discussions [*see* Ex. "O," cited below] – and was consistent with the use of District resources by all, or at least many, other GPSD staff members. Effectively, the District unfairly and unlawfully singled out Plaintiffs for discriminatory treatment.

b. Used paid District time to support and promote their work on "I Resolve." As stated above, Plaintiffs admit discussing their work with their supervisors, which Oregon law does not prohibit -- in fact, "lobbying" is actually encouraged. Or. Rev. Stat. § 260.432. So, for that matter, is making policy proposals: Attached hereto as **Exhibit "O"** is a copy of GPSD's Policy GBB, which states in relevant part as follows (emphasis added):

"***The Board will encourage employees to contribute their ideas for the continuing betterment of the district. The staff will be asked to help in developing policies and regulations***, in establishing goals and objectives and in planning curriculum, services, budget and facilities.

In devising rules and procedures for the operation of the schools, administrators will seek the suggestions of those employees who will be affected by such provisions. The professional staff ***will be given opportunities*** to contribute to curriculum development and ***to recommend policies and regulations pertaining to students and instructions***."

Furthermore, given that Defendant Blanchard offered feedback to Damiano on drafts of resolutions "I Resolve" and Defendant Kolb offered to take Plaintiffs' proposals to the Board for adoption, Defendants Blanchard and Kolb were willing participants in such discussion.

c. Failed to utter the disclaimer required under the Original Speech Policy in their "I Resolve" video. Granting that this is true, it is clear from Plaintiffs' video that they were speaking as private citizens on a matter of public concern and not as employees of GPSD: Plaintiffs identified themselves as educators in southern Oregon – a fairly vast place that extends roughly from just south of Eugene to the California border and from the Pacific coast to the Idaho border. Plaintiffs wore no apparel identifying them as GPSD employees. Furthermore, the disclaimer required under the Original Speech Policy constitutes compelled speech, and if the policy were to be applied across the board as written, every GPSD teacher would have to utter the disclaimer when speaking on even relatively trivial matters, such as the quality of food in a given restaurant.

d. Used social media in a manner that caused a substantial disruption to the school environment. Plaintiffs' social media use did no such thing: GPSD might have received some angry e-mails and/or phone calls from District staff and members of the Grants Pass community, but that did not adversely affect GPSD's ability to function. The disapproval of Plaintiffs' peers and community members, however vehement, does not constitute a substantial disruption. Any disruption that occurred was caused not by Plaintiffs, but by two other individuals: 1) Kate Weber, a GPSD employee, who used District resources and time to locate

Plaintiffs' "I Resolve" video and e-mail it to other District staff members, at least one of whom forwarded the video to another staff member; and 2) Defendant Kolb, who actively solicited complaints from GPSD staff members -- and anyone in the Grants Pass community who had a child in a GPSD school -- by deeming Plaintiffs to be in opposition to District values. Any disruption that occurred was caused not by Plaintiffs, but by two other individuals: 1) Kate Weber, a GPSD employee, who used District resources and time to locate Plaintiffs' "I Resolve" video and e-mail it to other District staff members, at least one of whom forwarded the video to another staff member; and 2) Defendant Kolb, who actively solicited complaints from GPSD staff members -- and anyone in the Grants Pass community who had a child in a GPSD school -- by deeming Plaintiffs to be in opposition to District values.

122.    Based on the foregoing, following a 4-3 vote at a pre-termination hearing that took place before the District's Board on July 15, 2021, Defendants fired Plaintiffs.

123.    Landis' findings were merely a pretext to fire Plaintiffs. But for the content of Plaintiffs' speech in their "I Resolve" video, GPSD would not have fired Plaintiffs.

## FIRST CAUSE OF ACTION
## Violation of Plaintiffs' First Amendment Right to Freedom of Speech

### 42 U.S.C. § 1983)

124.    Plaintiffs repeat and reallege each of the allegations in paragraphs 1–120 of this Complaint.

<u>Retaliation</u>

125.   When Plaintiffs communicated their views regarding gender-identity education policy via YouTube, they spoke as private citizens on a matter of public concern and engaged in expression the First Amendment protects.

126.   Plaintiffs' interest as private citizens in discussing matters of public concern outweighs Defendants' interest in the efficient provision of educational services.

Content- and Viewpoint-Based Discrimination

127.   Plaintiffs challenge the part of Defendants' Original Speech Policy that censored speech on "controversial issues" as applied to Plaintiffs.  Plaintiffs also challenge those parts of Defendants' Amended Speech Policy that censor speech on "political or civil issues," "controversial civil issue[s]," and "controversial issues" both facially and as applied to Plaintiffs.

128.   Defendants exercised the unbridled discretion conferred upon them by the Speech Policies to discriminate against Plaintiffs based on both content and viewpoint to punish Plaintiffs for expressing their views regarding gender-identity education policy.

129.   Under both Speech Policies, Defendants have allowed and failed to punish speech by GPSD employees other than Plaintiffs, made while on District premises during school hours – and, in at least one instance, while wearing GPSD apparel – and not while acting within the scope of their employment, on other "political or controversial civil issue[s]."

130.   Furthermore, in firing Plaintiffs, Defendants have violated the District's own Policy GBB, which makes clear that GPSD employees are encouraged to contribute policy proposals concerning students and instruction.  *See* Ex. "O."

Prior Restraint

131.   Defendants' Speech Policies are unconstitutionally overbroad because they restrict a significant amount of constitutionally protected speech.  Defendants'

Speech Policies and related practices are also underinclusive, prohibiting some expression while leaving other expression equally harmful to GPSD's asserted interests unprohibited.

132.   Defendants' Original Speech Policy placed a prior restraint on speech by prohibiting discussion of political or civil issues during the performance of District duties.

133.   Defendants' Amended Speech Policy likewise places a prior restraint on speech by prohibiting employees from speaking on one side of any political or controversial civil issue while on District premises or within the scope of their employment.

134.   The overbreadth of Defendants' Amended Speech Policy chilled the speech of Plaintiffs, who sought to engage in protected expression, including expression about gender-identity education policy, in their interactions with students, staff, and the public both on and off campus.

<u>Compelled Speech</u>

135.   Plaintiffs challenge the Speech Policies' required disclaimers as applied to them.

136.   By placing Plaintiffs on administrative leave, threatening to terminate their employment, launching a formal investigation into them, engaging in public mischaracherization, prohibiting them from conducting school business, preventing them from taking other opportunities for pay, and ultimately terminating their employment, Defendants punished Plaintiffs for engaging in expression that the First Amendment protects.  GPSD's assertions that Plaintiffs violated District policy notwithstanding, Defendants would not have subjected Plaintiffs to discipline due to the content and viewpoint of Plaintiffs' speech.

137.   Plaintiffs have suffered irreparable harm from Defendants' retaliatory action and the enforcement of the Speech Policies.  They also have no adequate or speedy remedy at law to correct Defendants' deprivation of their rights.

138.   Defendants' actions and policies, as set forth above, serve no legitimate or compelling state interest and are not narrowly tailored to serve any such interests.

139.   Defendants' Speech Policies and related practices are not narrowly tailored as applied to Plaintiffs because Plaintiffs' expression implicates no legitimate interests Defendants might have.

### SECOND CAUSE OF ACTION
### Violation of Plaintiffs' State Law Right to Freedom of Speech
### (Or. Const. art. I, § 8; Or. Rev. Stat. § 30.265)

140.   Plaintiffs repeat and reallege each of the allegations in paragraphs 1–135 of this Complaint.

141.   Article I, § 8 of the Oregon Constitution declares that "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely *on any subject whatsoever*" (emphasis added).  Oregon's appellate courts have recognized that Article I, § 8 protects freedom of speech to an even greater degree than the First Amendment does.  Indeed, the sweeping protection of Article I, § 8 "extends to all forms of speech, regardless of the social acceptability or offensiveness of the content." *Merrick v. Bd. of Higher Educ.*, 841 P.2d 646, 650 (Or. App. 1992).

142.   Under Oregon law, content-based regulations of speech are only permissible if they fall "within some historical exception that was well established when the first American guarantees of freedom of expression were adopted and that the guarantees then or in 1859 [the year Oregon achieved statehood] demonstrably were not intended to reach." *State v. Robertson*, 649 P.2d 569, 576 (Or. 1982).

143.    With regard to the subject of sexuality, no historical exception to the guarantees of free expression were ever intended.  In fact, Oregon law makes clear that "[f]ree and open expression about sexual orientation" – which includes gender identity – "*may __not be punished__* in the interest of a uniform vision on how human sexuality should be regarded or portrayed."  *Merrick*, 841 P.2d a 650 [citing *State v. Henry*, 732 P.2d 9, 18 (Or. 1987)]; *see also* Or. Admin. Rule 839-005-0003(16) [defining "sexual orientation" to include "gender identity"].

144.    When Plaintiffs made and published their "I Resolve" video, they spoke about gender identity, a component of sexuality.

145.    By placing Plaintiffs on administrative leave, threatening to terminate their employment, launching a formal investigation into them, prohibiting them from conducting school business, preventing them from taking other opportunities for pay, and ultimately terminating their employment, Defendants punished Plaintiffs for engaging in expression that Article I, § 8 of the Oregon Constitution clearly protects.  In doing so, they punished Plaintiffs in the interest of a uniform vision on how sexuality – gender identity in particular – should be regarded or portrayed, thereby violating Oregon's public policy encouraging free and open expression about gender identity.

### THIRD CAUSE OF ACTION
### Violation of Plaintiffs' Fourteenth Amendment Right to
### Equal Protection of the Laws
### (42 U.S.C. § 1983)

146.    Plaintiffs repeat and reallege each of the allegations in paragraphs 1–141 of this Complaint.

147.    Defendants have taken no disciplinary action against employees who have expressed support for, and endorsed, the concept of shifting gender identity.

However, Defendants have taken disciplinary action against Plaintiffs, who dared openly present dissenting views on those concepts.

148.    Furthermore, Defendants' actions have made clear that those GPSD employees who hold secular viewpoints concerning gender identity will be favored and those who hold Christian or opposing scientific and medical viewpoints – and dare to express them openly – are not.  Such a message directly violates Policy GBB, as it discourages those who hold religious or scientific viewpoints that the District deems anti-transgender from making policy proposals that will better respect the rights of both GPSD's employees and its students.  *See* Ex. "O."

149.    Defendants have thus applied their unconstitutional Speech Policies and related practices to Plaintiffs in a discriminatory and unequal manner, granting other employees the right to express their views on issues related to gender identity while denying that right to Plaintiffs, in violation of Plaintiffs' right to equal protection of the laws under the Fourteenth Amendment.

### FOURTH CAUSE OF ACTION
### Employment Discrimination
### (Title VII)

150.    Plaintiffs repeat and reallege each of the allegations in paragraphs 1–145 of this Complaint.

151.    Title VII prohibits employers from discriminating on the basis of religion. For purposes of Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year …" 42 U.S.C. § 2000e(b).  The term "person" includes governments.  42 U.S.C. § 2000e(a).

152.    Defendant GPSD qualifies as an employer under Title VII.

153.   The term "religion," for purposes of Title VII, "includes **_all_** aspects of religious observance and **_practice_**, as well as **_belief_** …" 42 U.S.C. § 2000e(j) (emphasis added).

154.   In threatening to punish, and ultimately punishing, Plaintiffs by placing them on administrative leave and threatening them with dismissal for expressing their biblically-based views on gender and sexuality, Defendants have discriminated against Plaintiffs on the basis of their religion.  Such threats constitute adverse employment actions.  Defendants' unlawful actions were compounded by their termination of Plaintiffs' employment. Defendants' actions have made clear that Defendants are hostile to Plaintiffs' religious viewpoint and impliedly grant to Plaintiffs' former fellow GPSD teachers who do not share their viewpoint the privilege of being able to express their views without fear of punishment.

155.   A copy of Plaintiffs' right-to-sue letter from the Department of Justice is attached hereto as **Exhibit K.**

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

A. A judgment declaring:

1. Defendants' retaliation against Plaintiffs for expressing their views regarding gender-identity education policy violates their rights under the First and Fourteenth Amendments to the United States Constitution;

2. As applied, the Original Speech Policy's failure to define "controversial issue" and disclaimer requirement violate the First and Fourteenth Amendments to the United States Constitution;

3. Both facially and as applied, the Amended Speech Policy's (a) definition of "political or civil issue"; (b) definition of "controversial civil issue"; (c) disclaimer requirement; and (d) prohibition against employees

engaging in speech supporting one side of "political or controversial civil issue" while on District premises or acting within the scope of employment violate the First and Fourteenth Amendments to the United States Constitution;

B. Preliminary and permanent injunctive relief directing Defendants sued in their official capacities and their agents, officials, servants, employees, and any other persons acting on their behalf to do the following:

1. Reinstate Plaintiffs to their respective positions at NMS;

2. Remove from Plaintiffs' personnel files any reference to discipline Defendants imposed on Plaintiffs for expressing their views regarding gender-identity education policy, and furthermore draft a letter stating that Plaintiffs did not violate any District policy;

3. Refrain from enforcing Defendants' Amended Speech Policy to prohibit Plaintiffs from, or punish Plaintiffs for, (a) expressing their views on a "political or controversial civil issue," including gender-identity education policy, while on District premises; (b) expressing their views on a "controversial civil issue," including gender-identity education policy, while off duty; and (c) declining to speak the required disclaimer;

4. Refrain from enforcing the Amended Speech Policy's (a) definition of "political or civil issue"; (b) definition of "controversial civil issue"; (c) disclaimer requirement; and (d) prohibition against employees engaging in speech supporting one side of "political or controversial civil issue" while on District premises or acting within the scope of employment; and

5. Ultimately invalidate the Amended Speech Policy.

C. Nominal damages;

D. Compensatory damages;

E.  Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action under to 42 U.S.C. § 1988; and

F.  All other further relief to which Plaintiffs may be entitled

Respectfully submitted this 18th day of November, 2021.

*/s/RAY D. HACKE*
RAY D. HACKE
OSB NO. 173647
PACIFIC JUSTICE INSTITUTE
1850 45TH AVE. NE, SUITE 33
SALEM, OR 97305
503-917-4409
rhacke@pji.org
*Lead Counsel*
*Attorneys for Plaintiffs*

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury for all issues so triable.

*/s/ RAY D. HACKE*
_____

RAY D. HACKE
*Attorney for Plaintiffs*

### DECLARATION UNDER PENALTY OF PERJURY

I, RACHEL G. DAMIANO, a citizen of the United States and a resident of the State of Oregon, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing and that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of November, 2021, at Grants Pass, Oregon.

_____

RACHEL G. DAMIANO

**DECLARATION UNDER PENALTY OF PERJURY**

I, KATIE S. MEDART, a citizen of the United States and a resident of the State of Oregon, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have read the foregoing and that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of November, 2021, at Grants Pass, Oregon.

_Karie S Medart_

KATIE S. MEDART

## PROOF OF SERVICE

I am employed in the County of Marion, State of Oregon.  I am over the age of eighteen and not a party to the within action; my business address is 1850 45th Ave., Suite 33, Salem, OR 97305.

On or about November 18, 2021, I served the following documents on the interested parties by placing a true copy thereof enclosed in sealed envelope(s) addressed to said parties:

**SECOND AMENDED VERIFIED COMPLAINT & DEMAND FOR JURY TRIAL**

### PLEASE SEE ATTACHED SERVICE LIST

 X    BY MAIL:  I am readily familiar with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, it would be deposited with the U.S. postal service on that same date with postage thereon fully prepaid at Salem, Oregon in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___BY PERSONAL SERVICE:  I caused such envelope to be delivered by hand to the office of the addressee(s).

___(State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

 X   (Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 18, 2021, at Salem, Oregon.

*/s/ LAUREN PEFFERLE*_____
Lauren Pefferle

## <u>SERVICE LIST</u>

Karen Vickers and Beth Plass
Attorneys for All Defendants
Vickers Plass LLC
5200 SW Meadows Rd., Suite 150
Lake Oswego, OR 97035

# EXHIBIT  A

 **I Resolve**
Reasonable, loving and tolerant solutions for education.

Sign the Resolution

Home    Take Action    T-Shirts

# I Resolve

Reasonable, loving, and tolerant solutions for education policies that respect everyone's rights.





## T-Shirts Now Available

T-Shirts are sold by a third party vendor, with no profit going to I Resolve.

Buy Your Shirt Here



## Proposed Solutions for Education Systems

Honoring All Students, Staff and Community Members

I Resolve is a grassroots movement intended to protect the hearts and minds of our youth and stand up for truth in our society. We believe that resolutions that are reasonable and fair in both form and operation, are beneficial in helping to safeguard the mental, emotional and physical well-being of all public-school students.
We need communities to band together, through individual and corporate commitment, to protect our youth and make their voice heard to local, state and national leaders and policy makers.

## Current Proposal

We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved.
The resolution statements regarding bathroom and locker room shared space use are suggestions for current structures, until such a time that individual gender neutral bathrooms are required and fully funded for education and youth facilities.
The last two resolutions are proposed as a caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey.

Sign the Resolution

## Resolution 2021-01

Therefore, be it resolved that we urge our local, state and federal leaders to adopt the following principles and policies:

Premise
**Point 1**

We recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female;

Resolution 1a
**Point 2**

Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designations) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built;

Resolution 1b

**Point 3**

For any person who is not comfortable using their anatomically-correct space, they may request access to a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available**;

Resolution 2

**Point 4**

A student may, with parent permission, request to be called by a derivative of their legal name but it will not be mandated that students or staff be required to call the student by their preferred name; and

Resolution 3

**Point 5**

A student may, with parent permission, request to be referred to with preferred pronouns, but it will not be mandated that students or staff be required to use the preferred pronouns.

Footnote

**Note**

**Please note that although not specified in the resolutions, individual gender neutral bathrooms are endorsed by I Resolve and encouraged to be fully funded by the state to be implemented in education facilities.

I Resolve Movement

▶  Play Video

i



# Instagram Feed













Show More

The views expressed on this site and any related video(s) produced by I Resolve are the expression of the individuals, as private citizens and do not necessarily represent the views or opinions of any specific education entity.

I Resolve Team

©2021 by I Resolve. Proudly created with Wix.com. The ideas expressed on this site are the views of the individuals, expressed as private citizens.

# EXHIBIT B

**From:** **Katie Medart** kmedart@grantspass.k12.or.us 📎
**Subject:** Fwd: Meeting today?
**Date:** April 5, 2021 at 10:36 AM
**To:** mkmedart0210@gmail.com



Get Outlook for iOS

**From:** Kirk Kolb <KKOLB@grantspass.k12.or.us>
**Sent:** Wednesday, March 31, 2021 1:55:38 PM
**To:** Mickey Jarvis <MJarvis@grantspass.k12.or.us>; Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** RE: Meeting today?

Hi Mickey,

Yes, I am asking that you, or another association representative be present as I meet with Katie.  Although I do not anticipate any disciplinary action, this is a very sensitive and emotive topic and is having an impact on your colleagues.

Katie, Mickey would prefer to meet at 2:45 and I can make that work if you can make it.

Let me know.

Thanks,
Kirk

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com

*"Fostering Hope, Engagement, and Resiliency  for the Community of Grants Pass"*



**From:** Mickey Jarvis <MJarvis@grantspass.k12.or.us>
**Sent:** Wednesday, March 31, 2021 1:19 PM
**To:** Kirk Kolb <KKOLB@grantspass.k12.or.us>
**Subject:** Meeting today?

Hello,

I'm just confirming you are asking to meet with Katie today.  If so, I proposed a 2:45 time if possible as Trish and I are meeting with ODE at 3:30 today – unless we are going to be less than say 28 minutes (feels like a tee time).

Thanks,

Thanks.
Mickey

# EXHIBIT C



**North Middle School**

1725 NW Highland Avenue, Grants Pass, OR 97526 · Phone: (541) 474-5740
www.grantspass.k12.or.us/North · Fax: (541) 474-5739

PRINCIPAL
**Tommy Blanchard**

VICE PRINCIPAL
**Bill Gladbach**

VICE PRINCIPAL
**Rachel Damiano**

COUNSELORS
**Eli Bland**
**Diana Tonnesen**

April 5, 2021

HAND DELIVERED

Dear Katie Medart:

This letter is to formally notify you that you are being placed on paid leave effective today, April 5, 2021, pending investigation into allegations of inappropriate behavior. You will be permitted to be at the District for interviews.

A meeting will be scheduled at which time you will have the opportunity to present your side of the story. This leave in no way is to be construed that you are guilty of said allegations. You will be notified when we have scheduled the date and time of the meeting.

Sincerely,

*Thomas M. Blanchard*

Tommy Blanchard
Principal

cc:  Kirk Kolb
     Mickey Jarvis
     Personnel File
     Payroll

*Developing our unique potential as a community of responsible and resourceful lifelong learners.*

# EXHIBIT D



# North Middle School

1725 NW Highland Avenue, Grants Pass, OR 97526 · Phone: (541) 474-5740
www.grantspass.k12.or.us/North · Fax: (541) 474-5739

PRINCIPAL
**Tommy Blanchard**

VICE PRINCIPAL
**Bill Gladbach**

VICE PRINCIPAL
**Rachel Damiano**

COUNSELORS
**Eli Bland**
**Diana Tonnesen**

April 5, 2021

HAND DELIVERED

Dear Rachel Damiano:

This letter is to formally notify you that you are being placed on paid leave effective today, April 5, 2021, pending investigation into allegations of inappropriate behavior. You will be permitted to be at the District for interviews.

A meeting will be scheduled at which time you will have the opportunity to present your side of the story. This leave in no way is to be construed that you are guilty of said allegations. You will be notified when we have scheduled the date and time of the meeting.

Sincerely,

*Thomas M. Blanchard*

Tommy Blanchard
Principal

cc: Kirk Kolb
    Personnel File
    Payroll

# EXHIBIT E

From: **Office of the Superintendent** office_of_the_superintendent@grantspass.k12.or.us
Subject: We are GP; We ALL Belong
Date: April 6, 2021 at 4:31 PM
To: Office of the Superintendent office_of_the_Superintendent@grantspass.k12.or.us



D7 Family,

I am writing today to address reports of a "movement" circulating on social media that is in direct conflict with the values of Grants Pass School District 7.

To be very clear, we do not support or endorse this message.

District 7 is unequivocally committed to providing welcoming and safe learning environments for **all** students, including our LGBTQ students. In Grants Pass schools, we **ALL** belong, regardless of race, religion, gender, sex, or ability.

Please contact me or our Human Resources Director, Danny Huber-Kantola, with any additional concerns or needed support.

Thank you,

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com

# EXHIBIT F



**From: Office of the Superintendent** Office_of_the_Superintendent@grantspass.k12.or.us
**Subject:** We are GP; We All Belong
**Date:** April 7, 2021 at 4:21 PM
**To:** Grants Pass SD 7 Recipients recipients@grantspass.parentlink.net

---

Scroll down to read in Spanish - *Desplácese hacia abajo para leer en español.*

Grants Pass staff, students, and families,

You may have heard about social media postings discussing LGBTQ policies with reference to schools. We are aware of complaints that two staff members made these postings. At this time, an investigation is underway, and the individuals are not at work.

Grants Pass School District 7 is committed to providing welcoming and safe learning environments for all students, including our LGBTQ students. In Grants Pass schools, we ALL belong, regardless of race, religion, gender, sex, sexual orientation or ability.

We have policies in place to support safe environments for students, including All Students Belong (Policy ACB) and our Equity, Diversity, and Inclusion Resolution (2021-03). We will continue protecting the well-being of all students in our schools, and all complaints alleging violations of District policies are taken seriously and thoroughly investigated.

Thank you,

El personal, los estudiantes y las familias de Grants Pass,

Es posible que haya escuchado sobre publicaciones en las redes sociales que discuten las políticas de LGBTQ con referencia a las escuelas.  Somos conscientes de las quejas de que dos miembros del personal hicieron estas publicaciones.  En este momento, se está llevando a cabo una investigación y las personas no están trabajando.

El Distrito Escolar 7 de Grants Pass se compromete a proporcionar entornos de aprendizaje seguros y acogedores para todos los estudiantes, incluidos nuestros estudiantes LGBTQ.  En las escuelas Grants Pass, TODOS pertenecemos, sin importar raza, religión, género, sexo o capacidad.

Contamos con políticas para apoyar entornos seguros para los estudiantes, incluidos todos los estudiantes pertenecen (Política ACB) y nuestra Resolución de Equidad, Diversidad e Inclusión (2021-03).  Continuaremos protegiendo el bienestar de todos los estudiantes en nuestras escuelas, y todas las quejas que alegan violaciones de las políticas del Distrito se toman en serio y se investigan a fondo.

Gracias,

**Kirk T. Kolb**

Superintendent

Grants Pass School District 7

---

You are receiving this email because of your relationship with Grants Pass SD 7. If you wish to stop receiving email updates sent through the Blackboard service, please unsubscribe.
Grants Pass SD 7 | 725 NE Dean Drive, Grants Pass, OR 97526 | 541-474-5700

# EXHIBIT G

| | Code: GBG |
|---|---|
| **Grants Pass School District 7** | Adopted: 6/14/88 |
| | Revised/Readopted: 2/24/04 |
| | Orig. Code(s): GBG |

## Staff Participation in Political Activities

Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level on the same basis as any citizen in a comparable position in public or private employment and within the law.

All district employees are privileged within the limitations imposed by state and federal laws and regulations to choose either side of a particular issue and to support their viewpoints as they desire by vote, discussion or the persuasion of others. Such discussion and persuasion, however, will not be carried on during the performance of district duties, except in open discussion during classroom lessons that center on a consideration of all candidn «s for a particular office or various sides of a particular political or civil issue.

On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.

No employee will use district facilities, equipment or supplies in connection with political campaigning, nor will any employee use anytime during the working day for campaign purposes.

END OF POLICY

---

Legal **Reference(s):**

ORS Chapter 244
**ORS 260**.432

**Oregon Constitution,** Article **XV, Section 8.**

**Cross Reference(s):**

**INB - Studying Controversial Issues**

1-1

# EXHIBIT H

# Grants Pass School District 7

Code:                 GBG
Adopted:              6/14/88
Revised/Readopted:    2/24/04; 4/27/21
Orig. Code:           GBG

## Staff Participation in Political Activities

"Employees" shall include all District employees (including administrators, certified employees, classified employees and part-time employees) while acting within the scope of their employment or on behalf of the District, contractors working for the District under District contracts on District premises while performing work for the District, and District volunteers while on District premises or engaged in a District-sponsored activity.

"Speech" shall mean any oral or written statements made by an employee in the course of his or her District duties, including, but not limited to, the display of posters, flyers, clothing or apparel or buttons, stickers or other accessories, which contain a message related to controversial political or civil issues, ballot measures, electoral issues or candidates for an elected position.

"District facilities" shall include, but shall not be limited to, all District buildings, District grounds and parking lots, District transportation vehicles, District sponsored computer networks and e-mail systems, District sponsored social media accounts, District or school sponsored events and District-sponsored virtual classrooms. Board Member e-mail addresses shall not be considered "District facilities" for purposes of this policy.

"District Equipment and Supplies" shall include, but not be limited to, District computers, printers, copiers, mailing or e-mail address lists for students or families, District provided uniforms or sporting equipment, stationary, or other personal property which is owned by the District or provided to students or employees by the District for a school-sponsored event.

"Political or civil issue" shall include, but not be limited to, any political or civil issue for which there is more than one reasonable interpretation or position and on which reasonable persons may disagree. A controversial civil issue shall specifically include issues which appear likely to create controversy among students, employees or the public, or which the District determines may be disruptive to its educational mission or instruction. In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions.

Employees may exercise their right to participate fully in affairs of public interest on a local, county, state and national level on the same basis as any citizen in a comparable position in public or private employment and within the law.

All district employees are privileged within the limitations imposed by state and federal laws and regulations to choose either side of a particular issue and to support their viewpoints as they desire by vote, discussion or the persuasion of others. Such discussion and persuasion, however, will not be carried on during the performance of district duties, except as described in Policy INB. When engaged in off duty activities, on all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.

No employee will use district facilities, computer networks or e-mail systems, equipment or supplies in connection with political campaigning, nor will any employee use any time during the working day for campaign purposes. While on District premises or acting within the scope of employment, no employee shall display or engage in speech supporting a candidate for elected office or supporting one side of any political or controversial civil issue.

END OF POLICY

_____

**Legal Reference(s):**

ORS Chapter 244                          ORS 260.432

OR. CONST., art. XV, § 8.

**Cross Reference(s):**

INB - Studying Controversial Issues

# EXHIBIT I

| | |
|---|---|
| **Grants Pass School District 7** | Code: **INB**<br>Adopted: 6/14/88<br>Readopted: 2/24/04<br>Orig. Code(s): INB |

## Studying Controversial Issues

Training for effective citizenship is accepted as one of the major goals of our public schools.  Our instructional program developed to achieve this purpose properly places great emphasis upon teaching about our American heritage, the rights and privileges we enjoy as citizens and the citizenship responsibilities that must be assumed in maintaining our American way of life.

In training for effective citizenship, it is frequently necessary for students to study issues that are controversial.  In considering such issues, it shall be the purpose of our schools to recognize the student's right and/or obligation to:

1.    Study any controversial issue concerning which (at his/her level) the student should begin to have an opinion;

2.    Have free access to all relevant information, including the materials that circulate freely in the community;

3.    Study under competent instruction in an atmosphere of freedom from bias and prejudice;

4.    Form and express his/her own judgments on controversial issues without thereby jeopardizing his/her relations with teachers or the school;

5.    Recognize that reasonable compromise is often an important facet in the decision making in our society;

6.    Respect minority opinion.

Controversial issues, as well as controversial instructional methods, materials and resource personnel associated with them, by definition generate dissension.  There is also an inherent risk that such dissension may escalate into antagonism which may be sufficient to disrupt the educational process.  Members of the professional staff are expected to be sensitive to student, staff and community attitudes, to carefully weigh the risks against the significance and educational merit of the issues, methods, materials and personnel involved and, when doubt remains, they are to seek the counsel of their supervisors.

END OF POLICY

---

Legal Reference(s):

ORS 336.067                    OAR 581-022-1020
                                OAR 581-022-1910

Studying Controversial Issues – INB
(continued)

United States Constitution, Amendment I.
Oregon Constitution, Article 1.

Cross Reference(s):

IB - Freedom of Expression
IICB - Community Resource Persons

# EXHIBIT J

From: **Kevin Bishop** KBishop@grantspass.k12.or.us
Subject: Re: Posters and other items that may be considered controversial political or civil issues
Date: March 31, 2021 at 3:40 PM
To: Michael Endicott MENDICOTT@grantspass.k12.or.us, Kirk Kolb KKOLB@grantspass.k12.or.us
Cc: d7allstaff d7allstaff@grantspass.k12.or.us

First off Black Lives Matter is on its face a racist statement

Get Outlook for iOS

**From:** Michael Endicott <MENDICOTT@grantspass.k12.or.us>
**Sent:** Wednesday, March 31, 2021 1:44:41 PM
**To:** Kirk Kolb <KKOLB@grantspass.k12.or.us>
**Cc:** d7allstaff <d7allstaff@grantspass.k12.or.us>
**Subject:** RE: Posters and other items that may be considered controversial political or civil issues

Mr. Kolb,
I read your message and believe you when you say this District is committed equity and belonging for all students, but I feel compelled to point out my concerns to you and our colleagues, about some of the statements made therein.

With respect:

First, I'll say Black Lives Matter is an uplifting and wholesome message and way of thinking that is perfectly appropriate for our classrooms.

You mentioned that Blue Lives Matter is a counter movement to Black Lives Matter, I agree that it is a counter movement. But we have to ask ourselves why. Blue lives have always and explicitly mattered throughout our county's history. We teach our children to respect and trust police officers from a very early age. Police officers are part of the great *goes-without-saying* idea that all lives matter. Blue Lives have always mattered in the way that the dominant culture values lives. But Black Americans are objectively not a part of that *goes-without-saying* ideal and the examples are legion.

So why is Blue Lives Matter a counter movement? And why does that make Black Lives Matter controversial? There is no comparison between Black Lives Matter and Blue Lives Matter, it is a false equivalence. Black people are members of a race that has experienced racism and discrimination for 400 years on the North American continent while police have not. Being a police officer is a career choice being Black is not. If a police officer is persecuted for being a police officer that person, after availing themselves of all available remedies, can choose to do something else. A Black person cannot choose to not be black in the face of persecution.

I am very concerned about the statement that it would be hard for the District to "object" to speech that is "similar" or "responsive" to Black Lives Matter. These are vague terms that do not justify curtailing anyone's 1st Amendment rights. And I am trying to think of similar or responsive speech that would agree with Board policy, but I can't think of anything that would make Black lives not matter, it is a one sided issue, there is no other side, Black Lives Matter or they don't.

If we are to curtail our 1st Amendment rights I think we deserve an enumerated list of objections, rather than a vague statement that Black Lives Matter is controversial.

Display of the phrase Black Lives Matter or Black Lives Matter symbols in classrooms do not violate any state policy or law. Black Lives Matter is supported by the Oregon School Board Association among many other Oregon education groups. We already teach about the civil rights movement of the 60' and 70's, both sides - the right side and the wrong side. Let's be on the right side of history during this civil rights movement.

Instead of quashing Black Lives Matter posters because some misunderstand the message and make it controversial, we should use it as a tool for education and dialog. We need to stand four square behind the civil rights of our students and they should see it. I think this District is capable of that. After 400 years of racism we can take the time that is given us to help rectify as much of that injustice as we can. Hiding from it as an institution is not the way.

Thank you for listening,
Michael

Stay Safe

---

**From:** Kirk Kolb
**Sent:** Tuesday, March 30, 2021 9:46 AM
**Subject:** Posters and other items that may be considered controversial political or civil issues

Good Morning D7 Family,

I am sending this message regarding a very difficult and emotive topic.  I have had a few people express a desire to put up "Black Lives Matter" posters in their classrooms and have had legal counsel review and consult with the Board.

First, please know that The District is committed to equity and making sure that all students belong. I hope that effort has been made clear with the passage of our "All Students Belong" policy and our School Board Resolution on Equity, Diversity, and Inclusion.

While it is a fact that black lives do matter and discrimination against black students, or students of any color, is absolutely prohibited,  the issue with the phrase "Black Lives Matter", is that it has become identified with a political/civil rights movement that has generated substantial controversy throughout Oregon and the country, including spawning counter-movements such as the "Blue Lives Matter" and "All Lives Matter". These movements and related posters and signs would also be considered controversial civil issues as related and should not be displayed in classrooms or on school property. The concern is that once "Black Lives Matter" posters are posted, then it becomes difficult for the District, under the First Amendment, to object to other posters which may be similar or responsive to "Black Lives Matter" or which cover controversial or disputed subjects of a civil or political nature without engaging in viewpoint discrimination. Board Policy GBG, as written, prohibits employees from expressing one-sided viewpoints on

controversial political or civil issues in the classroom.  Although the phrase should probably not be controversial, it nonetheless has created controversy, including in our community.   District Administration is currently reviewing Policy GBG with the Board and with legal counsel, and the Board has been forwarded information from GPEA regarding Black Lives Matter posters for consideration.  District Administration's role is to enforce policies while the ultimate interpretation and formation of District policy is up to the School Board.

Please be reassured that it continues to be our highest priority to ensure all student feel welcome and a part of our D7 family and we will not tolerate any form or racism or bias.

My sincerest appreciation,

Kirk

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com


*"Fostering Hope, Engagement, and Resiliency  for the Community of Grants Pass"*



# EXHIBIT K

From: **Kirk Kolb** KKOLB@grantspass.k12.or.us  📎
Subject: Updated Board Policy
Date: May 5, 2021 at 8:35 AM
To:



Good Morning D7 Family,

The attached Board policy was revised and adopted by the Board last Tuesday.  For clarification, this policy now allows for the OEA's Black Lives Matter poster to be present on the walls of your classrooms.

The significant change to the policy is the following statement: '*In determining whether a civil issue is controversial, the district shall consider whether the speech is consistent with district policy and resolutions.*'  It is deemed by the District that this poster is consistent with our Board Policy ACB and the Board Resolution on Equity, Diversity, and Inclusion.

If you have further questions regarding what can and cannot be present in our schools, please inquire with your building administrator, our HR Director Dan Huber-Kantola, or myself.

Please carefully consider when choosing items to display in your classroom.  Our schools should not be a place of controversy nor a place of promoting one side of a political or civil issue.  Items displayed in your classroom should have an inherent educational purpose tied directly to the education we provide and consistent with district policies or resolutions.

Sincerely,
Kirk

**Kirk T. Kolb**
Superintendent
Grants Pass SD #7
725 NE Dean Drive
Grants Pass, OR 97526
541-474-5700
www.wearegp.com

*"Fostering Hope, Engagement, and Resiliency  for the Community of Grants Pass"*





GBG.doc

# EXHIBIT L



**Grants Pass School District No. 7**

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5700
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of the SUPERINTENDENT

July 19, 2021

Katie Medart
224 NW Canyon View Drive
Grants Pass, OR 97526

Re: Termination Notice

Dear Katie:

The purpose of this letter is to notify you that the District is terminating your employment effective July 15, 2021, per the School Board's vote on July 15, 2021 to uphold my recommendation for termination.

Respectfully,

Kirk Kolb
Superintendent

*Building Bridges to the Future*

EXHIBIT M



# Grants Pass School District No. 7

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5700
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of the SUPERINTENDENT

July 19, 2021

Rachel Damiano
1069 Christie Place
Grants Pass, OR 97526

Re: Termination Notice

Dear Rachel:

The purpose of this letter is to notify you that the District is terminating your employment
effective July 15, 2021, per the School Board's vote on July 15, 2021 to uphold my
recommendation for termination.

Enclosed is your final check for July 1, 2021 – July 15, 2021.

Respectfully,

Kirk Kolb
Superintendent

*Building Bridges to the Future*

# EXHIBIT N

**U.S. Department of Justice**

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

September 16, 2021

Ms. Rachel Damiano
c/o Ray D. Hacke, Esquire
Pacific Justice Institute
PO Box 5229
Salem, OR  97304

Re:  EEOC Charge Against Grants Pass School District 7
       No. 551202103239

Dear Ms. Damiano:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC Seattle District Office, Seattle, WA.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                                 Sincerely,


                                 Kristen Clarke
                                 Assistant Attorney General
                                 Civil Rights Division


                         by        /s/ Karen L. Ferguson
                                 Karen L. Ferguson
                                 Supervisory Civil Rights Analyst
                                 Employment Litigation Section


cc: Seattle District Office, EEOC
  Grants Pass School District 7



**U.S. Department of Justice**

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

September 16, 2021

Ms. Katie Medart
c/o Ray D. Hacke, Esquire
Pacific Justice Institute
PO Box 5229
Salem, OR 97304

Re: EEOC Charge Against Grants Pass School District 7
    No. 551202103241

Dear Ms. Medart:

Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC Seattle District Office, Seattle, WA.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Kristen Clarke
Assistant Attorney General
Civil Rights Division

by        /s/ Karen L. Ferguson
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: Seattle District Office, EEOC
  Grants Pass School District 7

# EXHIBIT O

| Grants Pass School District 7 | Code: **GBB** |
| | Adopted: 6/14/88 |
| | Readopted: 2/24/04 |
| | Orig. Code(s): GBB |

## Staff Involvement in Decision Making

The Board will encourage employees to contribute their ideas for the continuing betterment of the district. The staff will be asked to help in developing policies and regulations, in establishing goals and objectives and in planning curriculum, services, budget and facilities.

In devising rules and procedures for the operation of the schools, administrators will seek the suggestions of those employees who will be affected by such provisions.  The professional staff will be given opportunities to contribute to curriculum development and to recommend policies and regulations pertaining to students and instruction.

The superintendent will develop channels for the communication of ideas among staff, administrators and Board members and will inform the Board of staff opinion when presenting recommendations for Board actions.

END OF POLICY

---

Legal Reference(s):

ORS 329.704

OAR 581-022-1720

Anderson v. Central Point School District No. 6, 554 F. Supp. 600 (D. Oregon 1982); aff'd in part, 746 F. 2d 505 (9th Cir. 1984).
Connick v. Myers, 461 U.S. 138 (1983).

1-1