```
 1               UNITED DISTRICT COURT
 2            FOR THE DISTRICT OF OREGON
 3                 MEDFORD DIVISION
 4
    RACHEL G. DAMIANO and          )
 5  KATIE S. MEDART,
                                   )
 6
                 Plaintiffs,       ) Case No.
 7
         vs.                       ) 1:21-CV-00859-CL
 8
    GRANTS PASS SCHOOL DISTRICT 7, )
 9  an Oregon public body; THE
    MEMBERS OF THE BOARD OF        )
10  EDUCATION OF GRANTS PASS
    SCHOOL DISTRICT 7 - Scott      )
11  Nelson, Cliff Kuhlman, Gary
    Richardson, Debbie Brownell,   )
12  Cassie Wilkins, Brian
    Delagrange, and Casey Durbin - )
13  in their official and personal
    capacities; KIRK T. KOLB,      )
14  Superintendent, Grants Pass
    School District 7, in his      )
15  official and personal
    capacity; and THOMAS M.        )
16  BLANCHARD, Principal, North
    Middle School, Grants Pass     )
17  School District 7, in his
    official and personal          )
18  capacity,
                                   )
19
                 Defendants.       )
20
21
22          DEPOSITION OF RACHEL G. SAGER
23                 June 6, 2022
24                   Monday
25                  8:57 a.m.
```

Page 1

Vickers Declaration
Exhibit 1 Page 1 of 88

Rachel Sager - June 6, 2022

1          A.    My name is Rachel Gianina Sager.

2          Q.    Ms. Sager, my name is Karen Vickers.

3    We've been previously introduced.  I'm an attorney

4    representing the defendants in a lawsuit that you

5    have filed.  At the time you filed the lawsuit,

6    you were using the last name Damiano; is that

7    correct?

8          A.    Yes, it is.

9          Q.    So I may mess up today and refer to

10   you as Ms. Damiano, but I'll try and call you

11   Ms. Sager.

12                How is that spelled?

13         A.    S-a-g-e-r.

14         Q.    Okay.  And did you recently marry?

15         A.    I did.

16         Q.    When were you married?

17         A.    March 19th.

18         Q.    Have you ever had your deposition

19   taken before?

20         A.    No.

21         Q.    A couple basic ground rules for the

22   deposition.  First of all, it's important that you

23   answer my questions out loud because we have a

24   court reporter here who takes down everything that

25   is said on the record.

Rachel Sager - June 6, 2022

```
 1          A.    It was.  Uh-huh.
 2          Q.    And so who interviewed you for the
 3   position?
 4          A.    Trish Evans was in that meeting, and a
 5   South Middle School teacher, Tommy Blanchard,
 6   Barrett Sail.  I don't recall -- I believe there
 7   was a sixth person, but I don't -- yeah, I believe
 8   there was another person, but I don't remember who
 9   that was.
10          Q.    And what is the position for which you
11   were hired?
12          A.    Assistant principal.
13          Q.    For North Middle School?
14          A.    No.  For the -- a middle school
15   assistant principal for the district.  And then I
16   was assigned to North Middle School.
17          Q.    Okay.  Thank you for clarifying.
18          A.    Uh-huh.
19          Q.    And I understand you've now resigned
20   from the district.  Is that correct?
21          A.    I've chosen not to renew my contract.
22   But, yes, in essence.
23          Q.    And what are you going to do next
24   year?
25          A.    I'll be the principal of a charter
```

Page 16

Vickers Declaration
Exhibit 1 Page 3 of 88

Rachel Sager - June 6, 2022

1  currently do not -- we watch Edgewater, actually,

2  online, but they don't belong to a church up in

3  Vancouver.

4          Q.    Did you always go to a Christian

5  church in your childhood?

6          A.    I did.

7          Q.    And who is the pastor for the church

8  that you're attending?

9          A.    Mat Heverly is the leading teaching

10 pastor.

11         Q.    And does it belong to any other larger

12 Christian organization?

13         A.    No.    They're an independent.    They

14 have, like, other churches that they partner with,

15 but they are not part of an organization of

16 churches, to my knowledge at least.

17         Q.    Okay.    So going back to your position

18 with Grants Pass School District for the '20 - '21

19 school year, you were hired as a middle school

20 assistant principal; correct?

21         A.    I was.

22         Q.    And who was your supervisor?

23         A.    Tommy Blanchard.

24         Q.    How did you get along with

25 Mr. Blanchard?

Page 29

Vickers Declaration
Exhibit 1 Page 4 of 88

Rachel Sager - June 6, 2022

1  because there were some home life issues and some

2  concerning things that the student was going

3  through.  And I'm not a counselor, so I wasn't

4  equipped to walk through that with them.

5              (Deposition Exhibit No. 1

6              marked for identification.)

7              MS. VICKERS:  One copy is for your

8  lawyer.

9              THE WITNESS:  Oh, I'm sorry.  There

10  you go.  I'll get the hang of this as you put more

11  exhibits in.

12  BY MS. VICKERS:

13      Q.    I've handed you what's been marked as

14  Exhibit 1, Ms. Sager.  Will you take a minute and

15  look at this document?

16      A.    Yes, I've seen this before, if it's

17  the same copy that we were given.

18      Q.    These are documents that were produced

19  to me by your counsel --

20      A.    Yes.

21      Q.    -- because they say plaintiff and then

22  they have a number at the bottom.

23      A.    Okay.  Yes.

24      Q.    When did you first see this document?

25      A.    February 9, 2021.

                                    Page 48

Rachel Sager - June 6, 2022

1       Q.    And what is this document?

2       A.    This is our administrative memo on --

3  well, I can read it to you (reading):    "Gender

4  identity, transgender, name and pronouns

5  guidance."

6       Q.    And in what context did you initially

7  see this document?

8       A.    I was in an all-admin meeting.  So

9  that's all administrators in the district gather

10 together to discuss various things in the

11 district, and this is it.  It was on Zoom.  That

12 meeting was on Zoom, and we were given this

13 document.

14      Q.    And who presented this document?

15      A.    Danny Huber-Kantola.

16      Q.    Do you know who drafted it?

17      A.    I would assume Danny Huber-Kantola

18 because he's our HR director, and he typically is

19 the one that drafts these.

20      Q.    Were you aware that this document was

21 being drafted before you saw it on February 9,

22 2021?

23      A.    No, not a specific document.  Like I

24 said, I knew discussions were happening.  They've

25 been happening for however many years this has

Page 49

1    been a conversation in terms of the public.

2              We tend to have -- as you probably

3    know, education doesn't always have policies

4    around certain things.  And then things become big

5    deals in the public eye that the public is

6    concerned about, and then we respond.

7         Q.    Did you have objections to this

8    document?

9         A.    I did.

10        Q.    And what were those objections?

11        A.    So specifically 6 about -- I believe

12   it was 6 -- using the bathrooms.  Maybe it

13   wasn't 6.

14        Q.    Take a minute and look at it because I

15   do need to know what your objections were.

16        A.    Okay.  Yeah.  Yes, 6.

17        Q.    So you had an objection to

18   paragraph 6?

19        A.    I did.

20        Q.    What were your objections?

21        A.    It was specifically around (reading):

22   "The district will not prohibit students from

23   accessing restrooms, locker rooms, or other

24   facilities which may be separated by gender --

25              (Reporter inquires.)

Page 50

Rachel Sager - June 6, 2022

1    concerns I had as an administrator and then

2    knowing the beliefs of our staff members.

3         Q.    What were Katie's concerns?

4         A.    So Katie is concerned about being

5    required to use pronouns.  Bathrooms, the safety

6    of bathroom, because she had grown up in sports

7    and grown up in locker rooms, and so some of those

8    concerns.  And then names, being required to use

9    preferred names.

10        Q.    Okay.  And then tell me --

11        A.    And parents.  She also had a huge

12   concern about parents.  She's a mom herself, and

13   so concerned about whether parents were in the

14   know or not.  And I knew that was a big concern of

15   hers because she had been on an email chain, a

16   couple of email chains that a counselor had simply

17   said, A student came and talked to me.  We're

18   going to call the student by these pronouns and

19   this name and, you know, we're just going to do it

20   because they asked us.  But parents don't know, so

21   don't tell the parents.

22        Q.    That was at North?

23        A.    Yes.

24        Q.    Who was the counselor?

25        A.    Diana Tonnesen.  And that was

Page 65

Rachel Sager - June 6, 2022

```
1    discusses, but -- and the pattern for the
2    resolution came from the way that school districts
3    write their resolution, so I was trying to be
4    helpful, and, you know, give a solution that was a
5    well-formed solution.  It's what we talk about as
6    administrators a lot amongst ourselves, having
7    well-formed solutions or solutions that are
8    flushed out are more helpful than just, Hey, have
9    you thought about -- so the actual resolution is
10   what I handed him.
11        Q.    What is I Resolve?
12        A.    So I Resolve was the -- is a platform
13   that we created to get this first resolution out.
14   The idea was that, you know, if we came up with
15   other solutions, that we could also put them on
16   I Resolve.  But it's a platform or a short-term or
17   a slang, whatever you want to call it, in regards
18   to how we got out the information about SB52 or
19   about the Equality Act.  It's another one we
20   discussed.
21             But it was a means of bringing this
22   topic to the public, because it's already a matter
23   of public concern, so it was a way to bring more
24   information to the public.
25        Q.    Who created the platform?
```

Page 79

Vickers Declaration
Exhibit 1 Page 9 of 88

Rachel Sager - June 6, 2022

```
1           A.    Which aspect?

2           Q.    The I Resolve platform.

3           A.    Yes.  So I did a lot of it.

4    Katie Medart helped with it as well.

5           Q.    When did you start working on it?

6           A.    So the resolution started first, and

7    that wasn't -- it wasn't I Resolve.  It wasn't

8    formed as I Resolve yet.  And then I want to say

9    middle of March is when the idea for I Resolve

10   came.  Yeah, there was a weekend -- originally I

11   had thought I Vow, but I Vow sounded like marriage

12   vows.

13          Q.    Middle of March?

14          A.    I believe so.  Uh-huh.

15          Q.    When did you first discuss it with

16   Katie Medart?

17          A.    So we talked about the resolution

18   first because it was the solution for other policy

19   in the district, because there is no policy for

20   the district either.  And so it was probably

21   middle of March, beginning to the middle of March.

22          Q.    What did the resolution say?

23          A.    Say that again.

24          Q.    What did the resolution say?

25          A.    There was a lot.  The whole first page
```

**Vickers Declaration**
**Exhibit 1 Page 10 of 88**

Rachel Sager - June 6, 2022

```
 1   was "whereas," because that's how resolutions are
 2   made, with "whereas," and it gives all the
 3   background.  And then the "it is resolved that,"
 4   or, "I Resolve that" was the four resolutions we
 5   have posted on our website.  You can see it on our
 6   website.
 7        Q.    And did you also create a video, like
 8   a film?
 9        A.    Yes.  The video was created during
10   spring break.
11        Q.    And did the video mention a particular
12   situation with a transgender student?
13        A.    Katie talked about a situation, yes.
14        Q.    Do you know if that was a real
15   situation?
16        A.    At the time, I didn't even know she
17   was going to give the story; it was on the fly.
18   So, no, I wouldn't have even been able to tell
19   you, and I still can't even tell you which student
20   it would apply to, if it applied to a student.
21        Q.    If it was actually a real student, do
22   you think that was a problem?
23        A.    Well, there were no confidential
24   details given, right.  There was no student name,
25   there was no address, there was no parent's name,
```

Veritext
www.veritext.com

**Vickers Declaration
Exhibit 1 Page 11 of 88**

Rachel Sager - June 6, 2022

1    there was no which period the student was in.

2    There was no identifying information that anyone

3    could have, without specific confidential

4    knowledge, know who that student was.   So, no, I

5    don't think that's an issue.

6         Q.    How many transgender students are

7    there at North Middle School?

8         A.    I don't know.   You would have to ask

9    Tommy.

10        Q.    Are there more than ten?

11        A.    I truly don't know.   At one point the

12   estimation was 12 or 13, but I'm not sure.

13        Q.    So someone could probably figure it

14   out fairly easily; correct?

15        A.    If they dug and knew -- again, you

16   would have to know confidential information, or

17   you would have to have access to certain systems

18   in order to gather that information.   The general

19   public could not figure that out.

20        Q.    You previously expressed a lot of

21   concern for parents and, you know, parents being

22   able to have control over their children's

23   education.   If you were a parent and a trusted

24   educator talked about your child's transgender

25   situation in a video that was publicly available

Page 82

Rachel Sager - June 6, 2022

```
 1                    (Recess:  10:26 a.m. to 10:37 a.m.)
 2                    THE VIDEOGRAPHER:  We are back on
 3    the record at 10:37.
 4                    (Deposition Exhibit No. 2
 5                    marked for identification.)
 6    BY MS. VICKERS:
 7          Q.    I'm going to hand you what's been
 8    marked as Exhibit 2.  Take a minute, Ms. Sager,
 9    and take a look at Exhibit 2, which is a packet of
10    emails that your lawyer provided to me.
11          A.    Yes.
12          Q.    Thank you.
13          A.    You're welcome.
14          Q.    And I've done the thing that I hate
15    when other lawyers do where they're not in Bates
16    stamp order --
17          A.    Okay.
18          Q.    -- so I'm going to refer to the
19    numbers as we go through it.
20          A.    Okay.
21          Q.    So the first document is marked
22    5415 --
23          A.    Yes.
24          Q.    -- 5416.
25          A.    Yes.
```

Page 84

Rachel Sager - June 6, 2022

1      Q.      What is this?

2      A.      This is from the I Resolve Gmail

3   account, so my name is on there.    But it's from

4   the I Resolve Gmail account.    And it is an

5   inviting to edit to Katie's school email.

6      Q.      Okay.    The next document is 5617,

7   5618.    What is this document?

8      A.      It looks like an email from Katie to

9   me on our school emails about a feedback in

10  timetable doable for responding to ODE.

11             So ODE has board meetings in the

12  middle of a school day.    And so it was response

13  about -- yeah, if we could bring it to the ODE

14  during one of their meetings.

15     Q.      And what you wanted to bring was your

16  resolution?

17     A.      Resolution, uh-huh.

18     Q.      And the first one we looked at that's

19  on the Gmail, that's the resolution; correct?

20     A.      Yes.    It's one of the copies of the

21  resolution.

22     Q.      Who drafted the resolution?

23     A.      I did.

24     Q.      Did you work with legal counsel?

25     A.      No.

Page 85

Rachel Sager - June 6, 2022

1       Q.     Have you ever gone to law school?

2       A.     No.

3       Q.     Is anybody in your family a lawyer?

4       A.     No.  Yes, my grandpa was, but ...

5       Q.     I'm assuming he did not help with it?

6       A.     No, he didn't.

7       Q.     So then we have 5227, 5228.  What is

8    that?

9       A.     It is feedback from a staff member to

10   another staff member about the feedback we were

11   trying to give to the school district.  So about

12   the resolution.

13      Q.     So Christopher Jelderks is the staff

14   member?

15      A.     Yes.  And Katie is the one who sent

16   it.

17      Q.     And then the next document is 5231

18   through 5233.  What does that appear to be?

19      A.     Yeah, it looks like an email chain

20   between Katie and Christopher, Chris, about

21   feedback on the resolutions, and then it was sent

22   to me as an FYI, as the last one.

23      Q.     Okay.  And these are Chris Jelderks's

24   comments back to Katie on your school emails;

25   correct?

Page 86

Rachel Sager - June 6, 2022

1          A.    Yes.    Yeah.   And this was all in

2    response to -- in preparing to bring the

3    resolution back to the district.   Again, I know

4    that this is isn't defending time, but this is

5    also, like, part of GBB, that policy asking staff

6    for feedback.

7          Q.    What is Chris Jelderks's position in

8    the district?

9          A.    Science teacher.

10         Q.    Do you have a relationship with

11   Chris Jelderks outside of school?

12         A.    No.

13         Q.    Did you send the resolution to

14   everyone in your building?

15         A.    No.

16         Q.    Why is it being sent to

17   Chris Jelderks?

18         A.    I didn't send it to Chris.   I believe

19   that Katie and Chris have talked about this issue

20   before as being something that they'd both

21   like resolved.   Not to use the word "resolve,"

22   but -- and so I can't tell you why she sent it to

23   him initially, but --

24         Q.    Thank you.

25         A.    -- I know it was for feedback, that

Page 87

Rachel Sager - June 6, 2022

1   part.

2         Q.      Then next document is 5234 through

3   5236.   And what is that document?

4         A.      Yeah, so that's when I was brought in.

5   I addressed some of the concerns that Chris had

6   had about the resolution and made adjustments.

7         Q.      Okay.   The next document is 3765

8   through 3767.   What is that?

9         A.      So these are comments from a professor

10  at SOU as feedback on the policy.

11        Q.      And they're being sent to

12  Katie Medart?

13        A.      Yes.   And they're being -- yes, that's

14  what it looks like.

15        Q.      The next document is 3769 through

16  3700.   What is that?

17        A.      These are the -- so in Google Docs

18  when a comment is made, when the owner of the

19  document does what's called resolves the comment

20  it means that they either took care of it or they

21  accepted the edit.   And so these are from the

22  I Resolve email.

23              So up at the top if you see comments

24  noreply@docs.google, the owner of the document is

25  I Resolve, which you can also see under where it

Page 88

Vickers Declaration
Exhibit 1 Page 17 of 88

Rachel Sager - June 6, 2022

1    says, like -- so on 3768 where it says,

2    Rachel Damiano, but next to it is I Resolve, that

3    means it's from the I Resolve.

4        Q.    Okay.  The next one is 5417 through

5    5418.  What is that?

6        A.    It looks like more comments accepting

7    suggestions from Katie.

8        Q.    The next one is 4657.  And what is

9    that?

10        A.    This is a comment from the I Resolve

11    Google Gmail to Katie just talking about the

12    website.

13        Q.    The next one is 5593.  What is this?

14        A.    It is the resolutions that were signed

15    at the time that was being shared, that

16    spreadsheet being shared with Katie.  At the time,

17    that was the email that I had for Katie.  I didn't

18    have her personal email.

19        Q.    The next one is 3788 through 3789.

20    What's that?

21        A.    Comments from Dorothy about the

22    resolution.  Dorothy has a very different

23    perspective on this situation than Katie and I

24    come from, so we wanted to make sure that we were

25    actually tolerant and fair in the way we

Page 89

Vickers Declaration
Exhibit 1 Page 18 of 88

Rachel Sager - June 6, 2022

1    approached it, so we asked Dorothy for feedback.

2         Q.    Did you know Dorothy?

3         A.    We didn't.  I didn't know Dorothy.  I

4    apologize.  I misspoke.  Katie asked Dorothy for

5    feedback, and then I was brought in.

6         Q.    Okay.

7         A.    I wasn't opposed to asking Dorothy

8    though.

9         Q.    The next document is 4807.

10        A.    Uh-huh.  So the resolution as written

11   is very wordy and very legalese sounding, and so

12   we made a layman's terms, a quicker version of it

13   for people to be able to understand it better.

14        Q.    The next one is 4665.

15        A.    That's the website.  It looks like

16   it's from Katie's email to herself.

17        Q.    Okay.  The next one is 3647.

18        A.    It looks like Katie sharing the

19   website with Chris Jelderks.

20        Q.    The next one is 4343 through 4344.

21        A.    So this -- so we worked with

22   Edgewater.  Yes, it's the church I go to.  But we

23   worked with Edgewater -- so some background on it.

24   It's an email.  Let me answer your question first,

25   I apologize.  It's an email from Johnie Collins to

Page 90

**Vickers Declaration
Exhibit 1 Page 19 of 88**

Rachel Sager - June 6, 2022

1    me about the initial video.    This was the email

2    they had on file for me, because at North Middle

3    School we had worked with -- I had worked with

4    Edgewater at Christmastime.    The entire district

5    did a Christmas drive-through, and Edgewater was

6    very gracious and let us use their radio station.

7    So this was what they had on file for me.    That's

8    where they sent it to.

9         Q.    Okay.    The next one is 5990.    What's

10   that?

11        A.    So this is an email from I Resolve on

12   spring break to the pastors -- two of the pastors

13   at Edgewater talking about the I Resolve movement,

14   and Katie is cc'd on it.

15        Q.    Okay.    The next one is 5177 through

16   5178.

17        A.    So this is an email from the I Resolve

18   email, and it's to ALEC, but Mr. Reynolds runs

19   ALEC about lobbying for them to look at our

20   resolution.    They're a group of people that do

21   legislation fair resolution.    And then Katie and I

22   are cc'd on it.

23        Q.    Okay.    The next one is 6061.    What's

24   that?

25        A.    It's an email from Katie to me that

Page 91

Rachel Sager - June 6, 2022

1    just says that our email is blocked and that no

2    one can view it.

3          Q.    Why was your website blocked?

4          A.    Because it was a newly observed on

5    domain.

6          Q.    Okay.

7          A.    And so the filter blocked it.

8          Q.    The next one is 4351, to 4352.

9          A.    It's just an unblocking of the website

10    as a new domain.

11          Q.    And then the next one is 5959.

12          A.    It's an untitled document shared from

13    I Resolve to Katie.

14          Q.    Okay.  And then the next one is 5068.

15    What is that?

16          A.    Katie sent the website to a couple of

17    the teachers.

18          Q.    Teachers at North Middle School?

19          A.    Yes.  I apologize.  I can be more

20    specific.

21          Q.    Okay.

22          A.    Mitch Meunier and Jason Wright.

23          Q.    Okay.  And the next one is 5070.

24    What's that?

25          A.    It's a conversation back and forth

Page 92

Rachel Sager - June 6, 2022

1    between Jason and Katie about the resolution on

2    the website.

3         Q.    And you talked to other people at

4    North Middle School about the I Resolve platform

5    and resolution; is that correct?

6         A.    No, not about the resolution.  I

7    talked to Katie.  I didn't talk to -- I didn't go

8    and talk to teachers about it.  There was a

9    teacher who has a -- her daughter does a lot of

10   Cricket work, and I had asked her about

11   potentially using her daughter's Cricket for

12   making signature T-shirts, but ...

13        Q.    And you used district emails to do

14   some of the work; correct?

15        A.    Can you be more specific?

16        Q.    Well, we just looked at a bunch of

17   them.

18        A.    Yeah.  So to do some of the feedback

19   work.  A lot of it was from the I Resolve email,

20   but I specifically, yes, responded to some.

21        Q.    And did you use other district

22   facilities and equipment to do the work on

23   I Resolve?

24        A.    De minimusly, but, yes.

25        Q.    What did you use?

Page 93

Rachel Sager - June 6, 2022

1      A.      So can you be -- so the platform of

2  I Resolve or the resolutions?

3      Q.    Okay.   Let's start with the

4  resolution.

5      A.      So the resolutions, again, as

6  feedback.   So I printed them off to give to Tommy,

7  printed them off to give to Danny, so there was

8  some de minimus use of paper.   Took some feedback,

9  obviously, from teachers as you see in here on

10  them.

11          And then in terms of the platform, I

12  used my own computer for most of it.   I think I

13  de min -- like, got on, and the website being

14  blocked, and it's an issue with all of our new

15  domains so I unblocked that, and I'd have to look

16  back on Time System if I used my computer for

17  anything else, but other than that it wouldn't

18  have been.

19          A lot of it was on breaks, per se,

20  because we as admin don't have -- so, like,

21  teachers have specific times that they have

22  breaks, right, in between class and a lunch break.

23  Admin don't have that.   So we kind of step out and

24  take care of our personal stuff when we need to.

25      Q.    What were your work hours for the

Page 94

Rachel Sager - June 6, 2022

1    '20 - '21 school year?

2         A.    Great question.   In reviewing

3    Bill Landis's report, he asked me the same

4    question.   We don't have exact hours as

5    administrators.   It's a hard one to answer.   And

6    our expectations differ.   Sometimes we're

7    expected -- we're expected to be there when

8    teachers and students are there, but that also

9    varies depending on sometimes the administers have

10   to go off campus and such.   And so anywhere

11   between 7:30 and 3:30ish.

12        Q.    And you said any time there's a new

13   domestic it's blocked.   Do you mean that a domain

14   new to the school district is blocked?

15        A.    By the filter, yeah.   So the same

16   thing has happened with -- we've done work at

17   GPFLEX, and it put up a new -- either a new aspect

18   or Kristin's (phonetic) had to unblock things,

19   right, for the website.   We've had websites that

20   students couldn't get to because they're either

21   newer or there are various reasons why the filter

22   would block them.   And so I can go in and unblock

23   them or ask the filter to unblock them.

24        Q.    Who was the authority to unblock

25   something?

Page 95

Rachel Sager - June 6, 2022

1      A.     So I have authority in GoGuardian to

2  unblocks for students.    In terms of new website

3  filters, so like what you saw in there, it's a

4  form that you fill out.    You click on it and you

5  request for it to be unblocked.    Anyone can do

6  that is my understanding.

7      Q.     So you used your school computer to

8  unblock the I Resolve website?

9      A.     Yeah.    So when she sent it to me, I

10  clicked on it and filled in that form right there.

11      Q.    And why did you fill in the form

12  rather than Katie?

13      A.    I don't know.  That's a great

14  question.  I think she was just asking me to.  I

15  don't know why.  I can't answer that.

16      Q.    Can anyone fill in the form, like any

17  employee?

18      A.    I don't know the answer to that.  I

19  believe the answer is yes, but I've also found

20  things in the past that I thought everyone had

21  access to, and I was the only one that had access,

22  so -- not the only one, but one of the ...

23      Q.    And why did you use time during your

24  workday to work on I Resolve?

25      A.    So different aspects.    So the

Page 96

Vickers Declaration
Exhibit 1 Page 25 of 88

Rachel Sager - June 6, 2022

1    resolutions part was because I was preparing to

2    give feedback to Danny, right.   So any of the

3    comments, any of the times that Katie said, Hey,

4    you know, this part wasn't added, that was all in

5    preparation because I was meeting with Danny,

6    right, to give feedback.

7                      And then in terms of the, like,

8    website being blocked, I couldn't tell you why I

9    didn't, right.   If I got the email, in the moment

10   I like to take care of things, so I took care of

11   it in the moment.

12                     And, again, we as administers step

13   off and take breaks sometimes.   So, like, I had my

14   personal computer with me sometimes, and so I'd do

15   something on a personal computer on a break,

16   per se.   And we have public internet at our

17   schools that we can get on to.

18        Q.   And Danny didn't direct you to create

19   I Resolve; right?

20        A.   No, not to create it.

21        Q.   And he didn't request that you create

22   I Resolve?

23        A.   No.  But he was aware once we did make

24   it.  And then in terms of feedback, we give

25   feedback as administers, right.  So when we're

Page 97

Vickers Declaration
Exhibit 1 Page 26 of 88

Rachel Sager - June 6, 2022

1    given something, it's both a general practice for

2    us all to look at it and give feedback.  You can

3    look at any email chain between administers for

4    anything that we're given.  So that was part of in

5    bringing feedback to him.

6              And then after my conversation with

7    him, I had told him, I'll bring solutions, and he

8    said okay.  So he was aware.

9         Q.    Are you aware of other administrators

10   drafting resolutions?

11        A.    No.  But I don't know their daily

12   work, and people deal with directors all the time.

13   I know they give feedback.

14        Q.    Did you believe you were authorized to

15   work on I Resolve during work time?

16        A.    The resolutions or I Resolve?  Sorry.

17   The resolutions or the platform?

18        Q.    Start with the resolutions.

19        A.    Okay.  The resolution, again, it was

20   me giving feedback.  It never -- I don't think

21   that I was doing anything wrong by working on it

22   to give feedback, no.  Do I think that Danny told

23   me --

24        Q.    So you're telling me --

25        A.    Can I finish, please?

Page 98

Rachel Sager - June 6, 2022

```
 1        Q.    Sure.
 2        A.    Do I think that Danny specifically
 3   told me, Okay.  Now go out and draft a whole
 4   solution, and come back to me with a full
 5   solution?  He didn't say go and do this.  But I
 6   said, I'm going to bring you solutions, and he
 7   said, Okay.  So I don't think I was doing anything
 8   wrong in working on it.
 9        Q.    And, in your mind, drafting a
10   resolution that disagrees with what the district
11   memo says was offering feedback?
12        A.    It doesn't fully disagree.  And part
13   of the feedback is to make sure we're compliant
14   with laws, right.  I don't want to be the
15   district, ironically, that gets sued for freedom
16   of speech violation when we mandate teachers call
17   kids by their preferred names and pronouns, right.
18   It's happened multiple times across the nation so
19   far.
20             We just saw -- in the Sixth Circuit
21   Court of Appeals we saw Meriwether win his case
22   against -- his college said, No, you don't get to
23   choose not to use pronouns.  You don't get to call
24   students by their last name.  You must use their
25   name, must use their pronouns.  And the Court of
```

Page 99

Vickers Declaration
Exhibit 1 Page 28 of 88

Rachel Sager - June 6, 2022

```
 1   belong to any particular groups or clubs or
 2   associations?
 3        A.    The United States Figure Skating
 4   Association, I'm an official for them.  AAE, which
 5   is the Association of American Educators.  It's
 6   who my, like, my liability insurance and stuff is
 7   through.  No others that I can think of.
 8        Q.    Okay.  Thank you.
 9        A.    Uh-huh.
10        Q.    So we were also talking about the
11   platform.
12        A.    Yes.
13        Q.    Were you authorized to work on the
14   platform during work time?
15        A.    No.  I mean, I wasn't given, like, Go
16   and work on this, no.
17        Q.    And what is the platform?
18        A.    The platform, so the website, the
19   video, the Instagram, we had Facebook at one
20   point.  We got rid of it after Kirk Kolb sent out
21   his email, which we'll probably get to at some
22   point in this deposition.
23        Q.    Did you work on the platform during
24   work time?
25        A.    De minimusly, yes.
```

Page 101

**Vickers Declaration**
**Exhibit 1 Page 29 of 88**

Rachel Sager - June 6, 2022

1        Q.    What did you do?

2        A.    That's a great question.   I'd have to

3   look back at when and what I did, but, I mean, as

4   you saw in here, there are a couple of resolves

5   comments.   No, that was part of the resolution.

6   So there was -- not during work time, but you'll

7   see -- like the video was on our district email,

8   that resource.   It was during spring break.

9        Q.    When did you post the video?

10       A.    March 25th of spring break.

11       Q.    And had you shown the video to anyone

12  at the district before you posted it, other than

13  Katie?

14       A.    No.

15       Q.    Why did you post the video on

16  March 25th?

17       A.    So that's when the comments were done

18  between us and Edgewater.   That's when it was

19  finalized.   And so we posted it to YouTube and

20  then put it on our website, which I had given the

21  website to Kirk at the time, and he was aware a

22  video was being made.

23       Q.    When did you make Kirk aware that a

24  video was being made?

25       A.    Friday before spring break.   It's when

Page 102

Rachel Sager - June 6, 2022

```
 1            A.    Yes.  That is correct.
 2            Q.    How did you find out you were being
 3    put on paid administrative leave?
 4            A.    Tommy brought me in for a meeting.
 5            Q.    What do you remember about that
 6    meeting?
 7            A.    I remember -- what to say?  I remember
 8    that we had just greeted all of the students
 9    coming in, and there was no issue, and then
10    suddenly I was pulled into Tommy's office and he
11    said, You're being put on leave.  And I asked why,
12    and he said, They're investigating the complaints.
13    You are not to work -- you're not to be on campus.
14    You need to get your stuff and leave.  And I
15    didn't ask him any questions because I didn't want
16    to.
17            And so I went and grabbed my stuff,
18    took care of a couple of things that were pending
19    that I needed to and he had given me permission
20    to, and then I left.
21            Q.    Okay.
22                  (Deposition Exhibit No. 5
23                  marked for identification.)
24    BY MS. VICKERS:
25            Q.    Here is Exhibit 5.   Do you recognize
```

Page 114

Rachel Sager - June 6, 2022

1    Exhibit 5?

2         A.    Yes, I do.

3         Q.    And is that notice of your paid

4    administrative leave?

5         A.    Yes, it is.

6         Q.    And then there was an investigation;

7    correct?

8         A.    Yes.

9         Q.    Who did you -- who were you

10   interviewed by?

11        A.    I was interviewed by

12   Danny Huber-Kantola first with Tommy Blanchard,

13   and then the investigation was taken to a paid

14   third-party, Bill Landis, L-a-n-d-i-s.

15        Q.    When were you interviewed by Danny and

16   Tommy?

17        A.    I don't recall exactly.  I believe

18   Katie was interviewed the next day.  I think I was

19   interviewed that week.  I'll be really honest, all

20   of that blends together.  I wasn't working, and so

21   typically when I work, I can keep track of days a

22   little more.  But it was relatively soon

23   afterwards when I was interviewed by Danny and

24   Tommy.

25        Q.    Was anyone else present?

Page 115

Rachel Sager - June 6, 2022

1          A.     No.   We had some phone conversations

2    where she said we're getting a third-party

3    investigator and some emails.   I asked to access

4    my district email a couple of times and just other

5    correspondence.   My correspondence went through

6    Sherry via email.

7                        (Deposition Exhibit No. 6

8                        marked for identification.)

9    BY MS. VICKERS:

10         Q.    I've handed you what's been marked as

11   Exhibit 6, Ms. Sager.

12         A.    Yes.

13         Q.    Do you recognize Exhibit 6?

14         A.    I do.

15         Q.    What is Exhibit 6?

16         A.    It is -- well, if this one is from

17   Sherry.   Yeah.   So this is Sherry's final

18   pronouncements, I guess, of the investigation.

19   And what is copied and pasted is directly from

20   Bill Landis's report.

21         Q.    Okay.

22         A.    Hence the quotations from her.

23                   (Reporter inquires.)

24         A.    From her.   Because she starts her

25   quotation, copies and pastes his findings, and

                                        Page 121

Rachel Sager - June 6, 2022

1      A.    Well, when I came back it was 109.  So
2  between 105 and 109.  We got a pay increase this
3  year for some reason.
4      Q.    Okay.  And then if we look at this
5  last paragraph, it says, "A pretermination hearing
6  has been scheduled with Superintendent Kolb for
7  Monday, June 21st."
8            Did you attend a pretermination
9  hearing with Superintendent Kolb?
10     A.    No, I did not.
11     Q.    Why did you not do that?
12     A.    Because I was given advice from the
13  union president, who was not my representation,
14  but she said that never in all of her years of
15  going to a pretermination has it ever changed the
16  outcome.
17            And so in terms of he and I already
18  had conversation prior, I had been interviewed
19  twice at that point.  And so I felt that it was an
20  unnecessary formality to go and be handed my
21  termination paper, which came immediately after
22  saying that I wasn't going to come to the meeting.
23  So it was already determined before I walked into
24  that meeting.
25     Q.    Okay.  What do you mean?

Page 123

Vickers Declaration
Exhibit 1 Page 34 of 88

Rachel Sager - June 6, 2022

1    A.    So I communicated to the district that

2    I wouldn't be attending the meeting, and

3    immediately afterwards, within minutes, I got my

4    termination letter or recommendation from Kirk.

5    So it was apparent that it was already drafted and

6    already determined.

7                    (Deposition Exhibit No. 7

8                    marked for identification.)

9    BY MS. VICKERS:

10   Q.    I've handed you what's been marked as

11   Exhibit 7.    Is that the letter advising that your

12   termination is going to be recommended to the

13   board?

14   A.    Yes.

15   Q.    And do you recall the date of the

16   school board hearing?

17   A.    July 15th, I believe.

18   Q.    Did you talk to anyone on the board

19   prior to the hearing about your hearing?

20   A.    Directly, no.

21   Q.    Indirectly?

22   A.    Not that I recall.  I had heard

23   feedback from others about what they were looking

24   at.  Or I knew I had been given indirect

25   communication from Gary Richardson about just

                                        Page 124

Rachel Sager - June 6, 2022

```
 1          Q.     Thank you.

 2          A.     You're welcome.  I apologize.

 3          Q.     So Jim Brumbach asked you for

 4    information to give to Gary Richardson?

 5          A.     So it was more that there were

 6    conversations and wondering -- yes.  The short

 7    answer is yes.

 8          Q.     What information did Jim Brumbach ask

 9    you for?

10          A.     The timeline of what had happened;

11    that they had been told a story from legal

12    counsel, and was there other evidence that was

13    true; is there anything in Bill Landis's report

14    that isn't true, that kind of thing.

15          Q.     So Jim Brumbach is telling you that

16    the board was told a story by legal counsel?

17          A.     So Gary -- Jim is a former pastor, and

18    I believe Gary and Jim meet pretty regularly.  I

19    don't know -- I could never imagine that Gary told

20    him anything that was confidential or things that

21    he wasn't allowed to talk to him about, but it was

22    that the responses about what had actually

23    happened had come from legal counsel and hadn't

24    been given to them by Kirk, is my understanding.

25          Q.     You asked for the board hearing to be
```

                                        Page 126

**Vickers Declaration
Exhibit 1 Page 36 of 88**

Rachel Sager - June 6, 2022

1    public; is that correct?

2        A.     We did, yes.

3        Q.     Why did you do that?

4        A.     Because in my interactions with the

5    district thus far, things had been spun and things

6    had been changed after the fact and things had

7    been not done as uprightly as I believe they

8    should have been.  We're also a public entity, and

9    things that happen in -- within our walls I

10   believe should be public, and so I wanted the

11   public to be able to see and be transparent in how

12   we interacted.

13       Q.     What had been spun after the fact and

14   not done the way you thought it should be?

15       A.     A lot.  And that's much -- that's a

16   large conversation -- or that's a long

17   conversation.  Even the fact that Kirk said, I can

18   think about bringing this to the board, and then

19   suddenly a couple of people turn in a complaint,

20   five people turn in complaints, and now it, Oh,

21   this is awful.  This is terrible.  I would never

22   bring this to legal counsel.  And that got spun

23   differently.

24              The fact that Kirk sent out an email

25   to all staff members and to all families and said,

Page 127

Rachel Sager - June 6, 2022

1    This is in direct opposition to school board -- or

2    to the school district's values.

3              The fact that things -- that they were

4    contacted -- the district was contacted by outside

5    entities that seemed to have a lot of sway over

6    how they were making decisions.  And so all of

7    that.

8              And just the behind-closed-doors and

9    things that get misrepresented, I think is not in

10   the public's best interest to have it happen

11   behind closed doors.  And so, again, that's why we

12   had it public.

13        Q.    And did you have legal counsel at the

14   board hearing?

15        A.    No, I did not.

16        Q.    You had the opportunity to bring

17   counsel, but you chose not to; correct?

18        A.    Yes.

19        Q.    You represented yourself?

20        A.    I did.

21        Q.    And the board voted four-three to

22   terminate; is that correct?

23        A.    Four-three to uphold the

24   recommendation, yes.

25        Q.    And then you were ultimately

                                        Page 128

Vickers Declaration
Exhibit 1 Page 38 of 88

1    reinstated; correct?

2        A.    They reversed the decision.    Yes.

3        Q.    And that happened in November of 2021?

4        A.    It did.

5        Q.    Did you talk to any board members

6    between July 15th of '21 and November of '21?

7        A.    After being fired?  Yes.

8        Q.    Yes.

9              Who did you speak with?

10       A.    Gary Richardson and Todd --

11       Q.    Neville?

12       A.    Neville.  Thank you.

13       Q.    When did you talk to Gary Richardson?

14       A.    It was -- I can't recall exactly.  It

15   was a few weeks after.

16       Q.    Who was present?

17       A.    My now husband and Gary and I.

18       Q.    What did you talk about?

19       A.    We talked about just appeal and if we

20   were allowed to appeal or not and what that --

21   what rights we had to appeal.

22       Q.    And where was that meeting?

23       A.    It was at Gary's work.

24       Q.    And how was the meeting set up?

25       A.    Gary texted me.

Page 129

Rachel Sager - June 6, 2022

```
 1   State of Oregon      )
                          ) ss.
 2   County of Douglas    )

 3

 4            I, Denise C. Zito Smith, CSR, a
 5   Certified Shorthand Reporter for the State of
 6   Oregon, hereby certify that the witness was sworn
 7   and the transcript is a true record of the
 8   testimony given by the witness; that at said time
 9   and place I reported by stenotype all testimony
10   and other oral proceedings had in the foregoing
11   matter; that the foregoing transcript consisting
12   of 171 pages contains a full, true, and correct
13   transcript of said proceedings reported by me to
14   the best of my ability on said date.
15            If any of the parties or the witness
16   requested review of the transcript at the time of
17   the proceedings, such correction pages are
18   included.
19            IN WITNESS WHEREOF, I have set my hand
20   this 20th day of June 2022, in the City of
21   Canyonville, County of Douglas, State of Oregon.

22

23   <%9578,Signature%>
24   Denise C. Zito Smith
     Oregon CSR No. 01-0375
25   Expires 9/30/2024
```

Page 172

**Vickers Declaration
Exhibit 1 Page 40 of 88**

Administrative Memorandum

(Gender Identity, Transgender, Name and Pronoun Guidance)

Dated February 5, 2021

1.  Grants Pass School District prohibits discrimination or harassment on any basis protected by law,
    including sexual orientation and gender identity.  See Policy AC, JB, JF/JFA, GBEA, etc.  Oregon
    department of education.

2.  On May 5, 2016, the Oregon Department of Education issued Guidance to School Districts:
    Creating a Safe and Supportive School Environment for Transgender Students (hereinafter
    "Guidance").  The Department of Education has recently confirmed to the District that this
    Guidance remains effective and operative.  A complete copy of the Guidance is attached to this
    memorandum for reference.  This Memorandum is intended to summarize the District's
    interpretation of this guidance. To the extent that issues arise which are not addressed in this
    Memorandum or the attached Guidance, District employees are encouraged to contact the
    District Office for additional review and specific guidance.

3.  As set forth in the Guidance, it is recommended that District employees accept a student'
    assertion of his/her/their own gender identity.  When parents are aware of the student's gender
    identity preferences, District employees should work closely with the student and the student's
    parents in devising an appropriate plan regarding the confidentiality of the student's transgender
    identity.  In some cases, transgender students may feel more supported and safe if other
    students are aware that they are transgender. In these cases, school district staff should work
    closely with the student, parents, and other staff members on a plan to inform and educate the
    student's peers. It may also be appropriate for school districts to engage with community
    resources to assist with educational efforts.

4.  When the student's parents are not aware of the student's gender identity preferences, and
    especially in situations where the parent or guardian may be hostile to the student's preference,
    District employees should be careful to balance the safety and concern for the well-being of the
    student with the District's obligations to maintain accurate educational records, which are
    available to parent, under the Federal Education Rights and Privacy Act ("FERPA").  FERPA
    permits parents or guardians of minor students (under the age of 18) to review the student's
    educational records.  If a student wishes to change his or her gender, name, or pronoun, in a
    classroom or at the school, these preferences, to the extent that they are documented, could be
    considered educational records that the parent is entitled to inspect under FERPA.

5.  So long as a student is a minor, the District should not change the official education records for
    the student without the knowledge and consent of at least one parent.  Parents have a
    constitutional right to direct the upbringing of their children, and any formal changes to
    educational records, such as to gender, names or pronouns should be approved beforehand.
    Once a student reaches eighteen (18) years of age, however, the student has the right to change
    records related to his or her gender, name or pronoun, including educational records.  Even if the



**Plaintiff 2527**

**Vickers Declaration**
**Exhibit 1 Page 41 of 88**

parents do not consent to a formal change of gender, name or pronoun, District employees should not prohibit other students or employees from using the student's preferred name or pronoun in informal or in-person or virtual classroom settings if requested by the student.

6. In all situations where a student approaches District employees regarding to request a change in gender, pronouns or names, the District, through its counselors and/or school administrators, should work with the student and the student's parents or guardians to ensure that appropriate accommodations can be made for the student based on his or her particular situation.  Absent circumstances that pose a risk to the safety of students, the District will not prohibit students from accessing restrooms, locker rooms or other facilities which may be separated by gender, that are associated with the student's preferred gender identity.

**Plaintiff 2528**

From: **Rachel Damiano (via Google Docs)**
Subject: Resolution 2021-01 - Invitation to edit
Time: March 10, 2021 at 9:44 AM
To:



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

 Resolution 2021-01

 I think I am getting mired in the overwhelming arguments against a lot of the policies but here is what I have started. Let me know your thoughts so far. This is a very preliminary draft.

Open in Docs

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a document with you from Google Docs.



**Plaintiff 5415**

**Vickers Declaration
Exhibit 1 Page 43 of 88**

**From:** Katie Medart <kmedart@grantspass.k12.or.us>
Re: Resolution 2021-01 - Invitation to edit
March 14, 2021 at 6:21 PM
Rachel Damiano <iresolve.gp@gmail.com>



**From:** Rachel Damiano (via Google Docs) <iresolve.gp@gmail.com>
**Sent:** Wednesday, March 10, 2021 9:44:10 AM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Resolution 2021-01 - Invitation to edit

**Email caution from the Grants Pass School District Email Filter: This email
originated from outside GPSD7. Do NOT click links or open attachments unless
you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

Resolution 2021-01

I think I am getting mired in the overwhelming arguments against a lot of the
policies but here is what I have started. Let me know your thoughts so far. This is a very
preliminary draft.
Open in Docs
iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because iresolve.gp@gmail.com shared a document with
you from Google Docs.

Google™

Plaintiff 5416

Vickers Declaration
Exhibit 1 Page 44 of 88

**From:** **Katie Medart** kmedart@grantspass.k12.or.us
**Subject:** RE: State Board of Education Meeting on March 18, 2021
**Date:** March 10, 2021 at 3:14 PM
**To:** Rachel Damiano rdamiano@grantspass.k12.or.us



Sorry, I had a huge project with Jen for science curriculum that took all day! I have to take my son to get fitted for an instrument. I will look at this the next few days and get back to you. I saw the deadline and accepted it. ☺

Thanks for all you are doing. It is exciting.

I will connect again soon,

Katie

**From:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Sent:** Wednesday, March 10, 2021 1:59 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** FW: State Board of Education Meeting on March 18, 2021

I think this timeline is doable, at least for the document. What do you think?

I shared this with you too but in case you didn't get it because it came from a different email address, here is a rough mid draft: https://docs.google.com/document/d/1XNgo-86MVuM3QMDdLvKik94RSDLTIqOZMDX1w67EvsM/edit?usp=sharing

**From:** Oregon Department of Education [mailto:ode@public.govdelivery.com]
**Sent:** Wednesday, March 10, 2021 10:24 AM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Subject:** State Board of Education Meeting on March 18, 2021

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Having trouble viewing this email? View it as a Web page.



**OREGON**
**DEPARTMENT OF**
**EDUCATION**
**BOARD** *of* **EDUCATION**

## State Board of Education Meeting

**Thursday, March 18, 2021**
**9:00 a.m.**

**Plaintiff 5617**

**Vickers Declaration**
**Exhibit 1 Page 45 of 88**

**Video Conference Only**

The State Board of Education will hold a Regular Meeting on **Thursday, March 18, 2021 at 9:00 a.m.**

To comply with the Governor's executive orders, the State Board of Education will conduct the March 18, 2021 meeting by video conference only. Members of the public may watch the board meeting live.

**Agendas and materials** for regular board meetings will be posted at least 24 hours prior to the board meeting and can be accessed at Boardbook.

## Public Comment

**Please note:** The Board will only accept written public comment for the March 18, 2021 meeting. The Board is committed to the public comment process and will consider all public comments. Members of the public may submit written comments or testimony to the State Board email address:

StateBoard.PublicEmail@ode.state.or.us; or by mail addressed to the State Board of Education: 255 Capitol Street NE, Salem, OR 97310.

- Clearly label the subject line as: "Public comment" or "Testimony" and include the topic. Example: "Public Comment: Assessment."
- All written public comment will be posted to Boardbook.
- Public comments or testimony submitted the morning of the Board meeting or during the Board meeting will be posted to Boardbook within 48 business hours.

The Board sincerely appreciates your input, and thanks you for your participation.

Corey Rosenberg
State Board of Education Administrator

Stay Connected with the Oregon Department of Education

  

SUBSCRIBER SERVICES:  |  Help
Manage Subscriptions

*It is a policy of the State Board of Education and a priority of the Oregon Department of Education that there will be no discrimination or harassment on the grounds of race, color, sex, marital status, religion, national origin, age, sexual orientation, or disability in any educational programs, activities or employment. For more information, visit the Anti-Discrimination Policy page.*

This email was sent to rdamiano@grantspass.k12.or.us using GovDelivery Communications Cloud, on behalf of: Oregon Department of Education · 255 Capitol Street NE · Salem, OR 97310



**Plaintiff 5618**

**Vickers Declaration**
**Exhibit 1 Page 46 of 88**

From: **Katie Medart** <kmedart@grantspass.k12.or.us> 
Subject: RE: Copy of Resolution 2021-01 - Invitation to edit
Date: March 15, 2021 at 4:26 PM
To: Christopher Jelderks <cjelderks@grantspass.k12.or.us>

https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift

"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.

What should schools do now?
The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Monday, March 15, 2021 4:11 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?

Sent from my iPhone

On Mar 15, 2021, at 3:00 PM, Katie Medart (via Google Docs) <drive-shares-noreply@google.com> wrote:

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

kmedart@grantspass.k12.or.us has invited you to **edit** the following document:



Plaintiff 5227



Copy of Resolution 2021-01

☐oogle Docs: Create and edit documents online.

☐oogle ☐☐C, 1600 ☐mphitheatre Parkway, Mountain ☐iew, C☐ 9404☐, ☐S☐

☐ou have received this email because kmedart@grantspass.k12.or.us shared a document with you from ☐oogle Docs.

Plaintiff 5228

**From:** Katie Medart kmedart@grantspass.k12.or.us 
**Subject:** FW: Copy of Resolution 2021-01 - Invitation to edit
**Date:** March 16, 2021 at 9:09 AM
**To:** Rachel Damiano rdamiano@grantspass.k12.or.us

FYI

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Tuesday, March 16, 2021 9:05 AM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

- **A public school student seeking to be referred to by a pronoun that is counter to their apparent anatomical presentation,**
- **such as in relation to such youth presenting apparent gender dysphoria (previously 'gender identity disorder', aka, identifies as transgender), should be reasonably accommodated by public school's staff provided with parent permission, however, that any**
- **such policy shall not be mandated upon or required of the public school's**
- <u>**staff nor shall any such policy be enacted**</u>
- **that infringes upon the public school's staffs' civil and constitutional liberties, including their freedoms of speech and expression.**

So, I thought that this was about NOT calling a kid a different name without parent permission.....now it seems the language is pushing for teachers and staff to do what they feel is morally or religiously correct.....that may open up a whole basket of worms....what happens if the person is wacky????? what happens is the person does not want to call kids their regular names?

This resolution is a whole lot broader than just the initial thought...why is that?

Sent from my iPhone

On Mar 15, 2021, at 4:26 PM, Katie Medart <kmedart@grantspass.k12.or.us> wrote:

https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift

"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.

What should schools do now?

Plaintiff 5231

Vickers Declaration
Exhibit 1 Page 49 of 88

What should schools do now?

The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Monday, March 15, 2021 4:11 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?

Sent from my iPhone

On Mar 15, 2021, at 4:04 PM, Katie Medart (via Google Docs) <drive-shares-noreply@google.com> wrote:

**Email caution from the Grants Pass School District Email**

**Filter: This email originated from outside GPSD7. Do NOT**

**click links or open attachments unless you know the content**

**is safe, and you trust the sender.**

kmedart@grantspass.k12.or.us has invited you to **edit** the following document:



Copy of Resolution 2021-01
<image001.png>
Open in Docs

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain
View, CA 94043, USA
You have received this email because

Google™

Plaintiff 5232

kmedart@grantspass.k12.or.us shared a document with you from Google Docs.

**Plaintiff 5233**

From: **Rachel Damiano**
Subject: RE: Copy of Resolution 2021-01 - Invitation to edit
Date: March 16, 2021 at 9:46 AM
To: Katie Medart



The parent permission aspect is fixed now. I am glad you guys caught that! I think we do need to leave it up to the discretion of the teacher as well though. Otherwise we risk restricting the same freedom of speech that we are fighting for.

Do you know what he means by the resolution being broader than he thought?

**From:** Katie Medart
**Sent:** Tuesday, March 16, 2021 9:10 AM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>
**Subject:** FW: Copy of Resolution 2021-01 - Invitation to edit

FYI

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Tuesday, March 16, 2021 9:05 AM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

- **A public school student seeking to be referred to by a pronoun that is counter to their apparent anatomical presentation,**
- **such as in relation to such youth presenting apparent gender dysphoria (previously 'gender identity disorder', aka, identifies as transgender), should be reasonably accommodated by public school's staff provided with parent permission, however, that any**
- **such policy shall not be mandated upon or required of the public school's**
- **staff nor shall any such policy be enacted**
- **that infringes upon the public school's staffs' civil and constitutional liberties, including their freedoms of speech and expression.**

So, I thought that this was about NOT calling a kid a different name without parent permission.....now it seems the language is pushing for teachers and staff to do what they feel is morally or religiously correct.....that may open up a whole basket of worms....what happens if the person is wacky????? what happens is the person does not want to call kids their regular names?

This resolution is a whole lot broader than just the initial thought...why is that?

Sent from my iPhone

On Mar 15, 2021, at 4:26 PM, Katie Medart <kmedart@grantspass.k12.or.us>

**Plaintiff 5234**

wrote:

https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift

"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.

What should schools do now?

The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."

**From:** Christopher Jelderks <cjelderks@grantspass.k12.or.us>
**Sent:** Monday, March 15, 2021 4:11 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Copy of Resolution 2021-01 - Invitation to edit

Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?

Sent from my iPhone

On Mar 15, 2021, at 4:04 PM, Katie Medart (via Google Docs) <drive-shares-noreply@google.com> wrote:

**Email caution from the Grants Pass School District Email**

**Filter: This email originated from outside GPSD7. Do NOT**

**click links or open attachments unless you know the content**

**is safe, and you trust the sender.**

kmedart@grantspass.k12.or.us has invited you to **edit** the following document:



**Plaintiff 5235**

**Vickers Declaration
Exhibit 1 Page 53 of 88**



Copy of Resolution 2021-01
<image001.png>

Open in Docs

Google Docs: Create and edit documents online.

Google LLC, 1600 Amphitheatre Parkway, Mountain

View, CA 94043, USA

You have received this email because

kmedart@grantspass.k12.or.us shared a document with

you from Google Docs.

Google™

Plaintiff 5236

Vickers Declaration
Exhibit 1 Page 54 of 88

From: **Katie Medart** <kmedart@grantspass.k12.or.us>
Subject: Fwd: Copy of Resolution 2021-01
Date: March 17, 2021 at 5:07 PM
To: Rachel Damiano <rdamiano@grantspass.k12.or.us>



Get Outlook for iOS

From: Dorothy Swain (Google Docs) <comments-noreply@docs.google.com>
Sent: Wednesday, March 17, 2021 5:00 PM
To: Katie Medart
Subject: Copy of Resolution 2021-01

**Email caution from the Grants Pass School District Email Filter: This email
originated from outside GPSD7. Do NOT click links or open attachments unless
you know the content is safe, and you trust the sender.**

Dorothy Swain added comments to the following document

📄 Copy of Resolution 2021-01

New
7 comments

Comments

objective

Dorothy Swain    New

I would continue to use self-evident here, rather than objective - I
don't think they are synonymous.

Reply                                              Open

'postmodernism'

**Plaintiff 3765**

**Vickers Declaration
Exhibit 1 Page 56 of 88**



Dorothy Swain    New

I think the "post-modernism" connection is the weakest part of this. I would delete the entire segment.

Reply                                                                    Open

public education is established, funded, and ordained to teach objective truths

Dorothy Swain    New

Do you have a citation for this?

Reply                                                                    Open

antithetical

Dorothy Swain    New

antithetical needs an object - antithetical to what?

Reply                                                                    Open

ideology

Dorothy Swain    New

opinion isn't necessarily ideology

Reply                                                                    Open

mirrors the rise of postmodernism ideology

Dorothy Swain    New

Plaintiff 3766

needs a citation - the critique of postmodern ideology is just as
subjective as postmodernism itself

Reply                                                                          Open

opening a discussion to the mental health of a youth believing they are
the opposite gender of their anatomy

 Dorothy Swain    New

gender is not sex - gender is social - this phrase seems downright
mean-spirited to me

Reply                                                                          Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA
94043, USA

You have received this email because you are a participant in the
updated discussion threads. Change what Google Docs sends
you. You can not reply to this email.

**Google**™

Plaintiff 3767

Vickers Declaration
Exhibit 1 Page 58 of 88



**From:** Rachel Damiano (Google Docs) comments-noreply@docs.google.com
**Subject:** Copy of Resolution 2021-01
**Date:** March 18, 2021 at 1:49 PM
**To:** fensdal@grantspass.k12.or.us

RD

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Rachel Damiano resolved comments in the following document

📄 Copy of Resolution 2021-01

Resolved
6 comments

# Resolved

## Comments

objective

Dorothy Swain
I would continue to use self-evident here, rather than objective - I don't think they are synonymous.

Rachel Damiano    New
☐arked as resol☐ed

Reply                                    Open

'postmodernism'

Plaintiff 3768



postmodernism

Dorothy Swain

I think the "post-modernism" connection is the weakest part of this. I would delete the entire segment.

Rachel Damiano    New

☐arked as resol☐ed

Reply                                    Open

antithetical

Dorothy Swain

antithetical needs an object - antithetical to what?

Rachel Damiano    New

☐arked as resol☐ed

Reply                                    Open

ideology

Dorothy Swain

opinion isn't necessarily ideology

Rachel Damiano    New

☐arked as resol☐ed

Reply                                    Open

mirrors the rise of postmodernism ideology

Dorothy Swain

**Plaintiff 3769**



Dorothy Swain

needs a citation - the critique of postmodern ideology is just as subjective as postmodernism itself

Rachel Damiano    New

☐arked as resol☐ed

Reply                                                    Open

opening a discussion to the mental health of a youth believing they are the opposite gender of their anatomy

Dorothy Swain

gender is not sex - gender is social - this phrase seems downright mean-spirited to me

Rachel Damiano    New

☐arked as resol☐ed

Reply                                                    Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because you are a participant in the updated discussion threads. Change what Google Docs sends you. You can not reply to this email.

Google™

Plaintiff 3770

From: **Katie Medart (Google Docs)** comments-noreply@docs.google.com
Subject: Resolution 2021-01.2 - Add: "essentially"
Date: March 19, 2021 at 1:56 PM
To: ireohbog@gmail.com



Katie Medart added a suggestion to the following document

📄 Resolution 2021-01.2

Katie Medart    New

**Add:** "essentially"

Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA
94043, USA

You have received this email because you are subscribed to all
discussions on Resolution 2021-01.2. Change what Google Docs
sends you. You can reply to this email to reply to the discussion.

Google™

Plaintiff 5417

Vickers Declaration
Exhibit 1 Page 62 of 88

**From:** Rachel Damiano (Google Docs)
**Subject:** Resolution 2021-01.2 - Add: "essentially"
**Date:** March 19, 2021 at 3:49 PM
**To:**



**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Rachel Damiano accepted a suggestion in the following document

📄 Resolution 2021-01.2

Katie Medart

**Add:** *"essentially"*

Rachel Damiano    New

*Accepted suggestion*

Open

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

**Google**

You have received this email because you are a participant in this thread. Change what Google Docs sends you. You can reply to this email to reply to the discussion.

Plaintiff 5418

From:  **Rachel Damiano (via Google Sites)**  
Subject:  I Resolve - Invitation to edit
Date:  March 19, 2021 at 4:17 PM
To:

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following site:

 I Resolve

The resources page is currently hidden but I think we can start adding to it and, when we are ready, unhide it for people to have access to.

Open

iresolve.gp@gmail.com is outside your organization.

Google Drive: Have all your files within reach from any device.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

Plaintiff 4657

From: **Rachel Damiano (via Google Sheets)** 
Subject: Sign Resolution 2021-01 (Responses) - Invitation to edit
Date: March 19, 2021 at 5:29 PM
To:

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following spreadsheet:

 Sign Resolution 2021-01 (Responses)

Open in Sheets

iresolve.gp@gmail.com is outside your organization.

Google Sheets: Create and edit spreadsheets online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a
spreadsheet with you from Google Sheets.



Plaintiff 5593

**Vickers Declaration**
**Exhibit 1 Page 65 of 88**

From: **Katie Medart** <kmedart@grantspass.k12.or.us> 
Subject: RE: Copy of Resolution
Date: March 22, 2021 at 4:46 PM
To: Swain, Dorothy DSwain@roguecc.edu

Hi, Dorothy,

Thank you for your time and constructive criticism. I value and appreciate it. I am collaborating with a colleague here at North on the resolution. At this time, not all of your recommendations were implemented, but I wanted to share the current version on our website: https://sites.google.com/view/iresolve/home

I hope you will see you made an impact. Thank you for making it better.  Please relay to Gary that I appreciate his time and heart felt words, as well.

You will notice on the digital form (which you can click on without signing) that we separated the resolutions (policies) we are advocating for from the why. We recognize community members may support the policies and believe they are fair in form and function, but not agree with our reason why we are advocating for them.  Our website is still under construction. I recommend checking back periodically to see what we have updated.

I miss you dearly too, and I still rave about you, but now to my current colleagues instead of my biology and A&P students. ☺

I hope this week is restful,

Katie

Oh… congrats on retirement! I am so excited and wish I could join!!

**From:** Swain, Dorothy <DSwain@roguecc.edu>
**Sent:** Wednesday, March 17, 2021 5:13 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Copy of Resolution

**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

Hi, Katie,
     I got your Google Doc, and I am honored by your request. I made a few comments on the Google drive. I think that the requests at the end are mostly fair and coherent. The weakest parts for me are in the preliminaries: the equating of "self-evident" truths in the Constitution with the "objective" truths you wish to establish, as well as the attack on post-modernism and the attempt to establish gender fluidity as a mental illness. I think that some people who don't agree with you about mental illness and post-modernism might very well agree to sign your petition if those parts were omitted or softened. Also, you get into this slippery

territory where your attacks are just as subjective as the ideology you wish to reject.
    I miss you dearly, and I wish we still had the regular opportunity to chat!
All the best,
Dorothy

**This next part is from Gary:**
*We are in the process of figuring out how to accommodate those people who identify as something other than traditional definitions. Just as we are coming to understand the depth of racism, we need to remain open to all of the variations of the human being. When we think we understand what "objective truth" is we should take a long look at our motivations. "Separate but equal" was used to justify conditions in the United States for many generations that were never equal. Our understanding of mind-body processes is constantly evolving. Middle school and high school students are indeed trying to figure out who they are and how they fit into the world.*

*We must always practice kindness. This is a teachable moment for the adults as well as the students. When we label a student with political, pseudo-scientific language like "postmodern" we are pointing a finger at their heart. We are saying they are defective.*

*There is an opportunity to show all students how we treat each other. Pretending to understand what "objective truth" is, and whose ideology is correct, only makes it harder to see that individual and their struggle toward selfhood. People trying to figure out how to adjust accommodations is a nationwide puzzle at the moment. The opportunity to be positive role models is at our door.*

*We must always practice kindness.*

Dorothy Swain
Science Faculty
Rogue Community College
3345 Redwood Highway
Grants Pass, OR  97527
(541)-956-7069
Fax (541)-471-3563

This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. This e-mail was sent in good faith to the address you provided to Rogue Community College. We trust that you have password-protected access to this e-mail account and that any transmitted confidential information is secure. If you are not the named addressee, you should not disseminate, distribute, or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail message by mistake, and then delete this e-mail and any attachments from your system. If you are not the intended recipient, you are notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.

**Plaintiff 3789**

From: **Rachel Damiano (via Google Docs)**  
Subject: Layman's Terms Resolution 2021-01 - Invitation to edit
Date: March 22, 2021 at 7:31 PM
To:

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

 Layman's Terms Resolution 2021-01

Open in Docs

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because iresolve.gp@gmail.com shared a
document with you from Google Docs.

Google™

Plaintiff 4807

Vickers Declaration
Exhibit 1 Page 68 of 88

From: **Katie Medart**
Subject: I Resolve
Date: March 22, 2021 at 4:33 PM
To: Katie Medart

https://sites.google.com/view/iresolve/home

Get Outlook for iOS

**Plaintiff 4665**

From: **Katie Medart**
Subject: Check it out
Date: March 24, 2021 at 8:52 AM
To: Christopher Jelderks

Hi, Jelly!

Check out our website at www.iresolvemovement.com

We would like for you to submit a video before Saturday if you are willing? Text or call me at 5414412222 and I will go over details!

God is good!
Katie

Get Outlook for iOS

**Plaintiff 3647**

**Vickers Declaration**
**Exhibit 1 Page 70 of 88**



**From:** Rachel Damiano &lt;rdamiano@grantspass.k12.or.us&gt;
**Subject:** Fw: Revised!
**Date:** March 25, 2021 at 2:24 PM
**To:** Katie Medart &lt;kmedart@grantspass.k12.or.us&gt;

RD

I don't have any changes but let me know if you see something! I want to get it on Youtube today to post to the site and start sending out everywhere. 😊

*Rachel Damiano*
Assistant Principal, North Middle School
Canvas Support
Admin Lead for GP Online (Middle School)

**Confidentiality Notice:** *This email and any attachments may contain confidential and privileged information intended for the addressee only. If you are not the addressee, or if you have received this email by mistake, please delete it immediately.*

**From:** Johnie Collins &lt;johnie@edgewaterfellowship.org&gt;
**Sent:** Thursday, March 25, 2021 1:41 PM
**To:** Rachel Damiano &lt;rdamiano@grantspass.k12.or.us&gt;; Josh Cunningham &lt;josh@edgewaterfellowship.org&gt;
**Subject:** Revised!

### Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.

Hey Rachel,

Here is the revised edit. Thank you for taking the time to look over the last one and make notes on it. Please share with Katie and look this one over and let me know if it can improve. Thank you!

https://www.dropbox.com/s/r1gm0suw0n4nw6/iresolveREVedit_exp2.mp4?dl=0

--
Johnie Collins



Media Assistant
Cell: 503.560.7704

**Plaintiff 4343**



**Rachel Damiano**
Re: Revised!
March 25, 2021 at 3:02 PM
Johnie Collins, Josh Cunningham, Katie Medart

It looks great! Thank you so much for all the work you guys did. We feel very blessed to have had this opportunity.

I will upload it to Youtube and embed it on the site.

Have a wonderful day!

*Rachel Damiano*
Assistant Principal, North Middle School
Canvas Support
Admin Lead for GP Online (Middle School)

**Confidentiality Notice:** *This email and any attachments may contain confidential and privileged information intended for the addressee only. If you are not the addressee, or if you have received this email by mistake, please delete it immediately.*

**From:** Johnie Collins <johnie@edgewaterfellowship.org>
**Sent:** Thursday, March 25, 2021 1:41 PM
**To:** Rachel Damiano <rdamiano@grantspass.k12.or.us>; Josh Cunningham <josh@edgewaterfellowship.org>
**Subject:** Revised!

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

Hey Rachel,

Here is the revised edit. Thank you for taking the time to look over the last one and make notes on it. Please share with Katie and look this one over and let me know if it can improve. Thank you!

https://www.dropbox.com/s/r1grn0suw0n4nw6/iresolveREVedit_exp2.mp4?dl=0

--



Johnie Collins

Cell: 503-554-7791

From: **Rachel Damiano** rachelapp@gmail.com
Subject: Updates on Resolution 2021-01
Date: March 26, 2021 at 2:50 PM
To: Matt Heverly matt@edgewaterfellowship.org, Kerry Alderson kerry@edgewaterfellowship.org
Cc: karen@grantpasschildren.com



**Email caution from the Grants Pass School District Email Filter: This email**

**originated from outside GPSD7. Do NOT click links or open attachments unless**

**you know the content is safe, and you trust the sender.**

Hi Matt and Kerry,

Thank you again for your support for the resolution regarding gender identity policies for youth. The video team was amazing to work with and they did a great job filming and editing! If you haven't gotten a chance to take a look, the video is posted on the website: iresolvemovement.com

Do you have any ideas on how we could continue to get the word out and increase momentum for the resolution? We posted the video yesterday evening and have 92 views so far and 23 signatures on the new form (we switched from a google form to an Adobe signature form) and 34 signatures from the Google form. We are reaching out to organizations and individuals that are influencers in policies (ALEC, Prager U, Ben Shapiro) to garner their support as well.

We appreciate any feedback or ideas you have for us. Thank you!

Sincerely,
Rachel and Katie

**Plaintiff 5990**

**Vickers Declaration**
**Exhibit 1 Page 73 of 88**

From: **Rachel Damiano**
Subject: Proposed Policy regarding Gender Identity Policies as they pertain to Schools
Date: March 26, 2021 at 2:31 PM
To:
Cc:



### Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.

Dear Mr. Reynolds,

We appreciate the work that ALEC does to develop fair policies that are, as stated in the mission statement, "dedicated to the principles of limited government, free markets, and federalism." As such, we would be honored if the Education Task Force would consider our resolution as an alternative policy option to proposed wording in the Equality Act or other state legislation regarding gender identity policies.

We feel the Equality Act, as well as Oregon state proposed legislation, restricts freedoms for US citizens and businesses and puts requirements on education institutions that will have negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement in the process, have been shown to be damaging to the mental, physical and emotional health of youth.

We are requesting that the task force review our proposed resolution and adopt the policy points to then be put forth at the state and federal levels by legislators. The resolution, our reasoning, and many of our research based resources can be found on our website: iresolvemovement.com On the site, we also have a Youtube link to our video explaining the need for this resolution and have outlined the resolutions below. We appreciate any feedback you or the committee may have for us regarding our proposal.

*We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved. In our current times, gender identity is a hot button topic in politics but the resolution*
*below moves away from an argument about "right" or "wrong". It instead focuses on ways in which we can be respectful to all parties involved, while ultimately protecting the hearts and minds of our youth.*

*Therefore, be it resolved that we urge our local, state and federal leaders to adopt the following principles and policies:*

- *We recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female;*

- *Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designations) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built;*

- *For any person who is not comfortable using their anatomically-correct space, they may request access to a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available;*

- *A student may, with parent permission, request to be called by a derivative of their legal name but it will not be mandated that students or staff are required to call the student by their preferred name; and*

- *A student may, with parent permission, request to be referred to with preferred pronouns, but it will not be mandated that students or staff are required to use the preferred pronouns.*

We thank you for your time and attention to this matter.

**Plaintiff 5177**

**Vickers Declaration**
**Exhibit 1 Page 74 of 88**

Sincerely,
Rachel Damiano and Katie Medart
Southern Oregon Assistant Principal and Southern Oregon Science Teacher

Plaintiff 5178

From: **Katie Medart** kmedart@grantspass.k12.or.us 
Subject: Website blocked
Date: March 29, 2021 at 8:30 AM
To: Rachel Damiano rdamiano@grantspass.k12.or.us

Good Morning,

Can we have our website unblocked?





# Web Page Blocked!

You have tried to access a web page which is in violation of your internet usage policy.

URL: http://www.iresolvemovement.com/
Category: Newly Observed Domain
User name:
Group name:

To have the rating of this web page re-evaluated please click here.

**Plaintiff 6061**

From: **Rachel Damiano**
Subject: **FW: URL Rating Update Notification: Mon, 29 Mar 2021 10:11:28 -0700**
Date: March 29, 2021 at 10:18 AM
To: Katie Medart

RD

The site should be viewable now. :)

-----Original Message-----
From: FortiGuard Web Filtering Service [mailto:fgweb@fortinet.com]
Sent: Monday, March 29, 2021 10:11 AM
To: Rachel Damiano <rdamiano@grantspass.k12.or.us>
Subject: URL Rating Update Notification: Mon, 29 Mar 2021 10:11:28 -0700

Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.

Dear Fortinet customer,

The website(s) you submitted below has been reviewed and updated:

Submission Date:        Mon, 29 Mar 2021 08:34:06 -0700
URL:        hxxp://www[.]iresolvemovement[.]com/
Customer Comment:        https://linkprotect.cudasvc.com/url?
a=https%3a%2f%2firesolvemovement.com&c=E,1,sj60CStli29Xl0cHBBsrx8AXqZMhw8xwQi5Thk-0pFxi_YuDFGbJs-CoJhGp6bxGrs-L1IrrnE6SeTyF-FkT19cMKpGChcSMjbF_HInjIOXNYGExcXrk&typo=1 is a redirect to a google site. The google site was created by me and although the domain is new, the site itself is safe.
Updated Category:        Advocacy Organizations
Update Date:        Mon, 29 Mar 2021 10:10:08 -0700

If the suggested category does not meet your expectation, kindly contact us through https://linkprotect.cudasvc.com/url?
a=http%3a%2f%2fwww.fortiguard.com%2fcontactus.html%2c&c=E,1,pKK2gY04d_ZGiSPVh4f3VOsVZcWhvIDIgQBYphHJDn6aht5yv dvCMIRr8M1UljVy3OtmAnehpTF3YlBtHfBmmY8uvduPZmwEY_dxwf0yZQ8B6IZ&typo=1 our Web Filtering team would be happy to assist you.

Note that FortiGuard Web Filtering Service categorizes websites, but it is your IT manager who decides what categories to block or allow. Therefore, if you would like access to the site, please contact your IT manager.

The rating update may not be effective immediately on your network because of the Web filtering cache. If you would like to have the update effective immediately, please contact your network administrator.

Thank you for using FortiGuard Web Filtering Service.

Regards,

FortiGuard Web Filtering Service
Fortinet Inc.

This is an automatically generated notification of rating update.
Please do not reply to this email.

*** Please note that this message and any attachments may contain confidential and proprietary material and information and are intended only for the use of the intended recipient(s). If you are not the intended recipient, you are hereby notified that any review, use, disclosure, dissemination, distribution or copying of this message and any attachments is strictly prohibited. If you have received this email in error, please immediately notify the sender and destroy this e-mail and any attachments and all copies, whether electronic or printed. Please also note that any views, opinions, conclusions or commitments expressed in this message are those of the individual sender and do not necessarily reflect the views of Fortinet, Inc., its affiliates, and emails are not binding on Fortinet and only a writing manually signed by Fortinet's General Counsel can be a binding commitment of Fortinet to Fortinet's customers or partners. Thank you. ***

**Plaintiff 4351**

Plaintiff 4352

From: **Rachel Damiano (via Google Docs)** iresolve.gp@gmail.com 
Subject: Untitled document - Invitation to edit
Date: March 29, 2021 at 1:39 PM
To: fowlton@grantspassschools.org

**Email caution from the Grants Pass School District Email Filter: This email originated from outside GPSD7. Do NOT click links or open attachments unless you know the content is safe, and you trust the sender.**

iresolve.gp@gmail.com has invited you to **edit** the following document:

 Untitled document

Open in Docs

iresolve.gp@gmail.com is outside your organization.

Google Docs: Create and edit documents online.

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA

You have received this email because iresolve.gp@gmail.com shared a document with you from Google Docs.

Plaintiff 5959

**Vickers Declaration
Exhibit 1 Page 79 of 88**

**Katie Medart** &lt;kmedart@grantspass.k12.or.us&gt;
Policy
March 30, 2021 at 1:52 PM
Mitch Meunier &lt;mmeunier@grantspass.k12.or.us&gt;, Jason Wright &lt;jwright@grantspass.k12.or.us&gt;

KM

Hi, Mitch and Jason,

Thank you for the time today! Here is the website: https://www.iresolvemovement.com/

Please let me know if you have any questions,

Katie

**Plaintiff 5068**

**Vickers Declaration**
**Exhibit 1 Page 80 of 88**

**Katie Medart** <kmedart@grantspass.k12.or.us>
RE: Policy
March 31, 2021 at 8:45 AM
Jason Wright <jwright@grantspass.k12.or.us>



Thank you for taking action! I really hope and believe if we all have our voice heard we will make change occur. The challenge is having courage and taking the time to take action.

Have a wonderful day,
Katie

**From:** Jason Wright <JWRIGHT@grantspass.k12.or.us>
**Sent:** Tuesday, March 30, 2021 6:44 PM
**To:** Katie Medart <kmedart@grantspass.k12.or.us>
**Subject:** Re: Policy

Thank You Katie. I just signed it.

Get Outlook for iOS
_____

**From:** Katie Medart <kmedart@grantspass.k12.or.us>
**Sent:** Tuesday, March 30, 2021 1:52:47 PM
**To:** Mitch Meunier <MMEUNIER@grantspass.k12.or.us>; Jason Wright <JWRIGHT@grantspass.k12.or.us>
**Subject:** Policy

Hi, Mitch and Jason,

Thank you for the time today! Here is the website: https://www.iresolvemovement.com/

Please let me know if you have any questions,

Katie

**Plaintiff 5070**



**North Middle School**

1725 NW Highland Avenue, Grants Pass, OR 97526 · Phone: (541) 474-5740
www.grantspass.k12.or.us/North · Fax: (541) 474-5739

PRINCIPAL
**Tommy Blanchard**

VICE PRINCIPAL
**Bill Gladbach**

VICE PRINCIPAL
**Rachel Damiano**

COUNSELORS
**Eli Bland**
**Diana Tonnesen**

Plaintiff 110

April 5, 2021

HAND DELIVERED

Dear Rachel Damiano:

This letter is to formally notify you that you are being placed on paid leave effective today, April 5, 2021, pending investigation into allegations of inappropriate behavior. You will be permitted to be at the District for interviews.

A meeting will be scheduled at which time you will have the opportunity to present your side of the story. This leave in no way is to be construed that you are guilty of said allegations. You will be notified when we have scheduled the date and time of the meeting.

Sincerely,

Tommy Blanchard
Principal

cc: Kirk Kolb
    Personnel File
    Payroll

Developing our unique potential as a community of responsible and resourceful lifelong learners.





**Grants Pass School District No. 7**

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5703
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of BUSINESS SERVICES

June 10, 2021
Rachel Damiano
1069 SE Christie Place
Grants Pass, OR 97526

RE:  Investigation Findings and Recommendation for Termination

Dear Rachel,

An investigation was conducted by Bill Landis at the request of the District regarding the allegations that you violated several District Policies – the findings of which you received a copy of this morning and are included below.

"ALLEGATION #1: In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School Assistant Principal Rachel Damiano was involved in a campaign of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Damiano is alleged to have:

A.  Used District facilities, equipment or supplies in connection with the political campaign. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that *"No employee will use district facilities, equipment or supplies in connection with political campaigning,* nor will any employee use any time during the working day for campaign purposes." Grants Pass School District 7 policy IIBGA-AR "Electronic Communications System Acceptable Use Regulation" (Exhibit 6E) states that *"Attempts to use the District network for Transmission of any materials regarding political campaigns is strictly prohibited."* The stated purpose of the "I Resolve" campaign was to address gender identity policies as was stated in their video and message. The "I Resolve" campaign stated in the video that it was specifically targeting the Equality Act, Oregon Senate Bill 52, and other legislation that was in the process of being voted on, developed, or proposed in legislative bodies at the Federal, State, and local levels as the "I Resolve" video explains. In the video, Ms. Damiano and Ms. Medart ask that viewers reach out to contact Senators where the next vote is scheduled and attend an ODE meeting that was scheduled for April 15th, 2021 in order to have their voices heard lobbying for support of the "I Resolve" resolutions that would modify or change the pending legislation as it had been written.

Ms. Damiano admits to using District 7 resources to include email, computers, and possibly printers however she states she doesn't recall in many of her answers when asked for specifics. The numerous email Exhibits under Exhibit 4 which included Google Docs associated with "I Resolve" and the proposed resolution, shows that Ms. Damiano used District 7 computers, email, school property, and Google Docs to share or communicate regarding the "I Resolve" campaign with staff and persons inside and outside of School District 7. While Ms. Damiano did not like referring to "I Resolve" as a political campaign, her efforts both in the video regarding legislation and through the stated purpose of "I Resolve" showed it was a political campaign. This was specifically demonstrated in emails she sent to Daily Wire host Ben Shapiro (Exhibit 4H) and another

*Building Bridges to the Future*



**GPSD 214**

**Vickers Declaration
Exhibit 1 Page 83 of 88**

to Mr. Reynolds of the American Legislative Exchange Council (Exhibit 4I) to gain support for the "I Resolve" resolutions using District 7 School resources. The goal of "I Resolve" was to influence legislators regarding pending policies and legislation effecting gender identity issues with their own resolution that would define who could use what bathrooms based on one's anatomy, legislate the use of names and pronouns for gender identity students, and require parents be involved in a student's gender identity journey. It should be noted that this allegation would not have been sustained had Ms. Damiano have chosen to not use District 7 facilities, email, equipment, or supplies for her "I Resolve" campaign.

B.  Used time during her working day for political campaign purposes. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that *No employee will use district facilities, equipment or supplies in connection with political campaigning, **nor will any employee use any time during the working day for campaign purposes.**" As stated under Allegation 1A above, the "I Resolve" campaign was determined to be a political campaign. Date and time stamps on emails shown in Exhibit 4A through 4E as well as Ms. Damiano's uncertain recollection but admitted use of email during her workday to communicate regarding "I Resolve" supported this finding. Exhibits 4A and 4B were emails sent to outside persons on March 11th, 2021 at 1:31 PM and 10:51 AM which was a school workday and were titled "file" and "Design" related to t-shirts and color choices for "I Resolve." Ms. Damiano also admitted using District 7 computers to work on "I Resolve" although unable to recall if she used District 7 printers.  Without a forensic computer analysis there is no way to quantify the actual time spent during her workday on the "I Resolve" campaign. The policy does not require a certain amount of time in order to be a violation. It states: *"nor will any employee use **any time** during the working day for campaign purposes"* which did occur on more than one occasion. Had Ms. Damiano not utilized time during her workday for the "I Resolve" campaign this would not have been a violation.

C.  Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that *On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint."* As stated under Allegation 1A, the "I Resolve" campaign was determined to be a political campaign. In the "I Resolve" video, Ms. Damiano identifies herself by stating: *"Hi, I'm Rachel and I am an administrator assistant principal in Southern Oregon at the middle school level. I've also worked at the high school level, was previously a math teacher, and I've been working with youth for over a decade now in various roles in education. And then in as a coach as well. I do not have any children of my own yet, but I do work with youth and that has been a passion of mine for a very long time now."*

Ms. Damiano doesn't introduce herself as a private citizen but rather a Southern Oregon Middle School administrator giving her first name. While she did not say Grants Pass District 7, She at no time in the video states that the views expressed are that of her own and not that of District 7 or any similar type of statement.  A simple internet search using "Rachel southern Oregon middle school assistant principal" finds an article identifying Rachel Damiano and her full name, North Middle School, District 7, when she was hired in August of 2020 https://opbnnoregon.com/southern-oregon/51/70-45/gps-district-7-welcomes-damiano-as-new-vice-head. Additionally, Ms. Damiano used District 7 email for communications for "I Resolve" to both persons inside of District 7 and outside the District which identified herself as associated with School District 7 with no disclaimer. The media coverage (Exhibits 5A-5E) shows how District 7 was intertwined with Ms. Damiano and the "I Resolve" campaign. The media coverage had no statements by Ms. Medart or Ms. Damiano that made it clear that the "I Resolve" campaign was not affiliated with District 7.

**GPSD 215**

**Vickers Declaration**
**Exhibit 1 Page 84 of 88**

Ms. Medart did tell me in my interview with her on May 13th, 2021 that there was a disclaimer on the video associated with YouTube. I did find a disclaimer on the YouTube site that, if a viewer used a drop-down box prior to playing the video, it could be seen. This however was not initially with the video as Ms. Medart admitted in her interview with Dan Huber-Kantola on April 6th, 2021 when she told him that it had been added later. The "I Resolve" video itself has no information where a viewer would know the campaign isn't associated with the District as nothing is stated. In the opening statements of the video, Ms. Damiano can be heard saying: "I Resolve" and "We Resolve." This was described in one of Ms. Damiano's statements which she felt showed it was made clear.

The word "We" however, could have been construed by a viewer as inclusive of the District. The amount of email complaints, complaints from District 7 employees, and publicity associated shortly after the video and website were published to social media and the internet were representative of how controversial the "I Resolve" proposals and campaign were. Had Ms. Damiano been clear that the expressed views in the "I Resolve" video and campaign were not those of District 7 then this would not have been a violation of District 7 policy.

D.   Used social media and public websites in such a manner that it disrupted the school environment. **"SUSTAINED"** – Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 6C) states that *"Staff members, while on duty and off duty, will treat fellow employees, students and the public with respect while posting on social media websites, etc., in order to prevent substantial disruption in school."* It is clear from the complaints received that the "I Resolve" video posted on YouTube and Facebook, as well as the "I Resolve" website, that a substantial disruption in school occurred. This included student protests (Exhibit 5E), staff complaints, citizen complaints, division among the staff, and was interpreted by some who would be affected by the "I Resolve" resolution as disrespectful.

E.   Posted confidential information about a student on social media and a public website. **"NOT SUSTAINED"**- Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 6C) states that *"Staff members, while on duty and off duty, will utilize social media websites, public websites, and blogs: in a professional manner by not posting confidential information about students, staff or district business."* In the "I Resolve" video which was posted on social media and a public website, Ms. Medart speaking to Ms. Damiano, disclosed an incident which occurred approximately one year prior within a month or two of returning to teaching at the K-12 level, where she was presented with a female student who was exploring her gender identity and made a request to identify as a male. Lysander Selvig an employee, stated in an interview with me that he absolutely knew who Ms. Medart was speaking of and disclosed the name of the student to me and circumstances regarding details. His information matched Ms. Medart's disclosure in the "I Resolve" video where the student had contacted teaching staff at North Middle School to request they call her by a different male name and male pronouns. This was corroborated by Principal Tommy Blanchard regarding the student who stated it was common knowledge on campus.

Ms. Medart in my interview recanted the story as being truthful and gave unclear responses to my questions stating that in looking back it was hypothetical although she seemed to indicate she initially believed the story as truthful. It is clear that an identified North Middle School student did exactly what Ms. Medart said occurred regarding gender identity transformation to numerous staff members at the school at the approximate time that Ms. Medart said it had occurred. That student or others viewing the "I Resolve" video as did happen with Mr. Selvig, would have identified the specific student who Ms. Medart spoke of even if she now claimed it was hypothetical. Ms. Damiano was not employed by District 7 during the previous school year when this occurred. Ms. Damiano reported that her understanding was that Ms. Medart's story

regarding the student in the "I Resolve" video was hypothetical and not based upon an actual student. There is nothing to sustain this allegation as it is unknown what Ms. Damiano knew and when she knew it to determine if this policy was violated.

F.  Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and or directed at those persons and or students "sexual orientation." **"NOT SUSTAINED"** – Grants Pass School District 7 policy "ACB" (Exhibit 6B) states that *"Bias Incident" means a person's hostile expression of animus toward another person or group of person's, relating to the other person's or group's distinguished, or perceived to be distinguished, race, color, religion, sex, gender identity, sexual orientation, disability or national origin"* It is not clear if Ms. Damiano's "I Resolve" campaign was "a hostile expression of animus toward those who use a different gender identity. The "I Resolve" campaign is an attempt to change legislation and policies affecting gender identity. Individuals may perceive her actions as biased which is understandable. However, it is not clear based upon the language of the listed policy that her actions constituted a "bias incident" as there weren't enough facts to positively conclude if the allegation was unfounded or in fact was sustained and did occur.

In reviewing Ms. Damiano's job classification (Exhibit 6F), based upon the facts including conduct, I find she failed to meet the standards in her job description under essential duties and responsibilities which included:

- **Establish and maintain effective relationships with students, parents, and staff to promote quality instruction and a healthy school climate**
- **Communicate and collaborate with students, parents, teachers, staff, community, and when appropriate, other agencies to promote an open and participatory school environment**
- **Be knowledgeable of the building's philosophy and establish effective human relationships among students, parents, and teachers, such that results in positive school climate and quality instruction**

<u>Commentary:</u> - The allegations listed were investigated and based upon the facts received, District 7 policies, and Ms. Medart's job description, the "Findings" were determined based upon those factors."

Based on the four (4) sustained Policy violation findings listed above, I am recommending to Superintendent Kolb that he terminate your employment as an Assistant Principal, with Grants Pass School District No. 7.  A pre-termination hearing has been scheduled with Superintendent Kirk Kolb for Monday, June 21, 2021 at 9 A.M at the District Office.  You are welcome to bring a representative with you to that hearing.

Respectfully,

Sherry Ely
Chief Finance & Operations Officer

CC:    Mr. Kirk Kolb, Superintendent
       Mr. Danny Huber-Kantola, Human Resources Director
       Mr. Tommy Blanchard, Principal, North Middle School

**GPSD 217**



# Grants Pass School District No. 7

725 NE Dean Drive, Grants Pass, OR 97526 · Phone: (541) 474-5700
www.grantspass.k12.or.us · Fax: (541) 474-5705

OFFICE of the SUPERINTENDENT

June 21, 2021

Rachel Damiano
1069 SE Christie Place
Grants Pass, OR 97526

RE:  Notice of Recommendation of Termination to the Grants Pass School District 7 Board of Directors

Dear Rachel,

You were provided with a notice from Director Sherry Ely on June 10, 2021 of "Investigation Findings and Recommendation for Termination" on the basis of an investigation report conducted by Pacific Consulting and Investigation.

Upon complete review of Director Ely's recommendation for termination and the report conducted Bill Landis of Pacific Consulting and Investigation, I have concluded the following:

- You used District facilities, equipment, and supplies to conduct personal business of a political nature.  This is determined to be a violation of Board Policy GBG as state in both Director Ely's letter and the third-party investigation.
- You used the district network for transmission of the related materials and information of these political campaigning efforts.  This is determined to be a violation of Board Policy IIBGR-AR.
- You used paid District time to engage in the efforts to support and promote a campaign of a political nature.  This determined to be a violation of Board Policy GBG.
- When posting the "I Resolve Movement" video, you failed to identify that your political viewpoints were yours personally and not representative of the District.  This is also determined to be a violation of Board Policy GBG.
- Your personal use of social media very much created a substantial disruption to the school environment.  This is determined to be a violation of Board Policy GCAB.

Based on the sustained violations of multiple Board Policies, I am recommending to the Grants Pass School District 7 Board of Directors that they terminate your employment with the district effective immediately.  You have the right to a hearing with the Board.  It is your choice as to whether this hearing is to be conducted in executive session or in session open to the public.  In this hearing you will hear the charges being brought forth and recommendation to the Board.  You have a right to have an attorney present and an opportunity to respond and appeal to the Board.

This hearing will be scheduled for a Special Board meeting in July 2021.  Please let me know if you would like this hearing to be in the open public session or in executive session (closed to the public).

Respectfully,



*Building Bridges to the Future*

**GPSD 966**

Vickers Declaration
Exhibit 1 Page 87 of 88

Kirk T. Kolb
Superintendent
Grants Pass School District 7

GPSD 967