what that means, and at some point you make a comment that that means at some point the district is required to follow those. Is that correct or not correct?

Rachel Damiano:

If Senate Bill 52 passes, which is what we were discussing, if Senate Bill 52 passes and creates a state of emergency, and not the ODE 2016 guidance would become what we're required to, it would be the LGBTQ2SA+ Student Success Plan that is in correlation to the Senate Bill 52. That would become no longer guidance, it would become practices that we're required to follow, because its tied to legislation. Right now, the 2016 guidance is not tied to legislation.

Bill Landis:

The 2016 guidance that you're referring to, you believe that's not something that you have to follow or required to follow?

Rachel Damiano:

It says best practices. It says, specifically, in there that its not legal advice, and its up to districts to choose what they... If it were something that we had to practice, then our district would be out of compliance for the majority of that document.

Bill Landis:

If the superintendent came out and said we're not going to follow something and gave that to you as an administrator, would that be, then, something that you would then follow?

Rachel Damiano:

I think that's a very broad hypothetical. If we're talking about this case specifically, we as administrators, when things are given to us, we are often asked for feedback. It's a practice of our district that we give feedback. If it was something that was said this is required, then I'd have a conversation and say, "Is this becoming policy?". That's the point of being in leadership is to give feedback and to be able to discuss what would work and what wouldn't work within our schools.

Bill Landis:

Sure. In February 2021, when administrators have that meeting and there's a memo about handling situations, and feedback was received, you weren't under the understanding then that that meant that is how to handle some of those situations at that time?

Rachel Damiano:

Yes, it's saying these are the procedures that we would like to follow, moving forward. Like I said, I had some concerns with it and I set up a meeting with HR to have that discussion.

Bill Landis:

You didn't have any discussion with teachers about situations that may have come up after that, as far as how to handle the situation?

Rachel Damiano:

Bill Landis:

Any other staff, employees, or other District 7 related persons?

Rachel Damiano:

No, it's just us two.

Bill Landis:

Okay. Have you used District 7 facilities, equipment, or supplies, email during the I Resolve, or for the I Resolve campaign?

Rachel Damiano:

Minimally, there was some crossover.

Bill Landis:

Tell me about that.

Rachel Damiano:

You can, obviously, see in my email chains... I can't recall all of them because I haven't been able to look at my email, so I wouldn't be able to tell you every time that its crossed over. At one point, there was a copy of the resolutions that was sent to me, in my district email. I had sent a couple of things to a district email for a staff member. The video, once it was recorded in order to be shared with us by this organization, it was sent to my district email. That's what they had on file. After that, moved it off my district email. I'd have to look back at my emails, or I know you have access to those too. If there are any specific questions you have, or any uses, then I can help answer that.

Bill Landis:

Okay. Any reason why you used the district email, which identified you as an assistant principal at North Middle School? Which, those emails have like a signature line, I guess, that shows your name, with your title, and the school you are associated with. Any reason why you used the district email as part of that?

Rachel Damiano:

For which part? Do you have a specific question?

Bill Landis:

For anything related to I Resolve?

Rachel Damiano:

Okay.

Bill Landis:

Specifically I Resolve type emails, video, reaching out to other persons regarding I Resolve. Things like that.

Rachel Damiano:

Specifically, with the video, like I said, the organization, that's the email they had on file for me. They know that the video and the work was personal work because of the conversation I had with them, outside. In terms of sending it, again, I'd have to look back and see if it came to my district email and I forward it, or if it came to me and I responded. I'd have to look, specifically. For the bulk of the work that I did, I was using my, in terms of I Resolve, I was use my personal email, or our I Resolve email.

Bill Landis:

With the email correspondence, on District 7 email, did you ever communicate with someone that, "Here's my personal email, I need to not use district email", or, "This is not something associated with the district", at any time. Did you do that?

Rachel Damiano:

Again, I'd have to go back and look and see if I put that into an email. I know that there are emails from my personal email that I either started a conversation, or I forwarded it to my personal email to then continue the conversation from my personal email. Again, I'd have to look back and see. I don't recall, off the top of my head, if I wrote it into an email and said disclaimer.

Bill Landis:

Okay. Were you using any equipment from District 7 as part of the I Resolve campaign? Computers? Other printers? Things of that nature to print?

Rachel Damiano:

I worked on my computer. That would be all I could recall. Yeah, that would be... Unless, potentially, if the resolution was printed off. Again, I'd have to go back and look.

Bill Landis:

Was there a discussion in the I Resolve video between you and Katie Medart, involving one of the North Middle School students, that was then posted on YouTube, and the I Resolve website. The video basically got uploaded to YouTube, which is where I observed it.

Rachel Damiano:

Mm-hmm (affirmative).

Bill Landis:

Then you had a personal I Resolve website. Is that correct?

Rachel Damiano:

Yes.

Bill Landis:

That was public?

Rachel Damiano:

Yeah.