some on, I think very little on the laptop, to be honest. I have my own personal computer at home too, a desktop and a Mac, but I cannot say for sure. So I would say there's a possibility also on that one, but that's not my go-to that I use.

Dan Huber-Kantola:

So the initial work on the resolution was done in the morning, like what time?

Katie Medart:

I get to campus at varying times. I don't know. I'd have to pull it up, but not during teaching.

Dan Huber-Kantola:

Anything after 7:30 in the morning?

Katie Medart:

Yes, I would say that there is a chance that there will be timestamps of that.

Dan Huber-Kantola:

Okay. And then during flex time and flex time is 12:30 to 3:30ish?

Speaker 1:

I guess, that we have a little bit of time in there that's set aside for office hours, but by and large it's after lunch.

Dan Huber-Kantola:

Okay. So some of the writing of the resolution was done during flex time as well.

Katie Medart:

Yes.

Dan Huber-Kantola:

So was it written on a Google Doc through the district Google, so you go to your email account, you've got your email that attaches to Google and then it goes to a Google Doc?

Katie Medart:

I think it was shared to my email but it was written on one through I Resolve, Gmail. The drive for the I Resolve.gp. That's where everything is at least right now. So that's where I believe that it was.

Dan Huber-Kantola:

But shared to you through your email address at school?

Katie Medart:

Yes.

**Dan Huber-Kantola:**
So did you send the resolution to anybody using school email?

**Katie Medart:**
I did.

**Dan Huber-Kantola:**
Who did you send it to?

**Katie Medart:**
I might miss someone.

**Dan Huber-Kantola:**
That's okay.

**Katie Medart:**
Okay. I can pull it up for reference if you like and be able to name that if you want really accurate.

**Dan Huber-Kantola:**
Sure. If you have it.

**Katie Medart:**
Okay. Jason Wright, Leanne Wageley, Jordan Kessler. And many of these, I went and talked to and then they said, send it to me. And then I used my work email to send and it's just titled, "policy" and then the link. Mason Mahaffey. I sent it to Dorothy Swain, she's at RCC, and I asked for her opinions and to edit and she helped edit it. I think all of the rest were me personally texting, but I'm not seeing any when I did a search, any additional show up.

**Dan Huber-Kantola:**
Okay. So a couple of names, Rachel Damiano.

**Katie Medart:**
Emailing her the site?

**Dan Huber-Kantola:**
Yeah.

**Katie Medart:**
Her and I had regular exchanges. I'm sorry. I was assuming that was a given.

**Dan Huber-Kantola:**
I thought so but it's just-

Katie Medart:

Yeah, to clarify, I understand. So yes is the answer.

Dan Huber-Kantola:

Okay.

Katie Medart:

It wasn't intentional to leave her name out.

Dan Huber-Kantola:

All right. What about Chris Jelderks?

Katie Medart:

Oh, yes, he is. It didn't pull up when I did it, but I did send it to him. And if you ask me, I will be honest. So if you already have the list you can be open and tell me, and I will confirm. I'm just in a search, you can see what I did. It says I Resolve and I'm scrolling through and looking for any that are there.

Dan Huber-Kantola:

I appreciate you being honest and-

Katie Medart:

I'm not trying to hide that.

Dan Huber-Kantola:

I promise you we had not after all the research.

Katie Medart:

Okay.

Dan Huber-Kantola:

I could do it after all the search.

Katie Medart:

Yeah.

Dan Huber-Kantola:

If you have some information I'm completely transparent with you. The reason that Chris came up for me is, I guess I would ask you about when students were there. Is it possible that you sent something regarding I Resolve to Rachel or Chris or something from Chris during school time when kids were there?

Katie Medart:

No, I do not... I have no recollection of any interaction like that.

Dan Huber-Kantola:

There were kids there at that time? So it's 9, 10, 9:00 in the morning, are kids in school?

Katie Medart:

At nine, they are. They had the potential they could have been in the classroom when I forwarded that email. Yes. There was no conversation. No talking about it. There was him giving me that and me forwarding it to her. Is there a chance that you're asking me if kids were sitting in the class? Are you asking me if I spoke about it with kids in the classroom?

Dan Huber-Kantola:

Is there a chance kids were there?

Katie Medart:

Okay. Then yes, there is a chance that kids are in by that time.

Dan Huber-Kantola:

But no speaking to kids, right?

Katie Medart:

No. Other than what I have disclosed to you with my interaction with Griffin Laskey.

Dan Huber-Kantola:

Great. So you did say you had conversations with some of the people, Jason Wright, Jordan Kessler, Mason Mahaffey, Leanne, and then forwarded to them. So when did those conversations take place? Was that during the school day?

Katie Medart:

At the end of the day.

Dan Huber-Kantola:

Like during the flex time or-

Katie Medart:

Like when your students were on campus? Yes. After office hours.

Dan Huber-Kantola:

Okay. So would that have been still during the workday? In some cases prior to 3:30 in the afternoon?

Katie Medart:

Some yes, some after but on property.

Dan Huber-Kantola:

Okay.

Katie Medart:

You're taking really good notes. I'm focusing on answering so I have not been able to record this.

Dan Huber-Kantola:

It's recorded, so we'll make sure you get a copy. So Katie, with those conversations, did you go to them to have those conversations?

Katie Medart:

I did, yes.

Dan Huber-Kantola:

Okay. So you initiated the conversations with them about the I Resolve or was it something that they asked you about, but something that you approached them about?

Katie Medart:

And honestly, I did mention this Jason Wright but Mitch Mooney was another one because they were together. And so you'll see one email sent to him. Now I'm thinking about, I've had people ask me but most of them, I will say, I went and said, "I want to share about policy that we are hoping to have you consider and get your opinion and talk about it."

Speaker 2:

Okay. Appreciate that honesty.

Katie Medart:

Mm-hmm (affirmative).

Dan Huber-Kantola:

So just bluntly, that would be a concern for me that that's violating the policy there. And also probably violating our contract. I think if we looked at article nine in our contract, it talks about all time is teaching time. It's supposed to be just for the educational purposes of school. Might be an exception in there for lunch, but using the internet, using the email and stuff would also likely be a violation of policy. But I won't think about it small, okay. But you can ask Mickey, I tend to be maybe too transparent sometimes.

Speaker 3:

Seems to work best.

Dan Huber-Kantola:

Yeah.

Katie Medart:

I am trying to be very transparent.

Dan Huber-Kantola:

Mickey:

So then, just to clarify that last piece.

Dan Huber-Kantola:

Yeah.

Mickey:

I just want to make sure I'm going to help versus hinder, or compound. So the reason that you are in the I Resolve movement that you created or co-created or participated in, the I Resolve movement is not to push your religious belief.

Katie Medart:

No. It is to write fair policies for all students. That was the intent.

Mickey:

What policy that exists is... or the understanding of the policy.

Katie Medart:

I said, we're going to put it this way. My-

Mickey:

Or the confusion in the policy.

Katie Medart:

Yeah. One, the confusion in the policy, the understanding of what I thought was coming. Our video even makes that clear that this is coming, not that... Our video says that. Not that it's here, not that this is our current policy. It says this is coming.

Mickey:

Thanks. Okay.

Dan Huber-Kantola:

Just to clarify that. The video does talk about the equity at the federal level. And the video does talk about Senate Bill 52? I believe, and so yeah, those are things that are coming.

Katie Medart:

That are open for public comment.

Dan Huber-Kantola:

Yes. But the district guidance, in the ODE guidance, has been there since 2016. And I guess I would ask you, have you seen the ODE guidance document?

Katie Medart:

Dan Huber-Kantola:

And so first one we have to look at was the GCAB violated with the social media posts? Did it cause a disruption? Is it significant or any disruption at school? So did it violate that particular policy? If so, then what? Same with the JOICBAR, the student confidentiality, did the post violate that? And if so, then what? The policy, GBG, about designating viewpoints and that kind of stuff, did that violate that or not? And if so, so forth. Did you violate the user agreement, the internet user agreement, and policy GBG about using school time and school equipment to do political action stuff?

Dan Huber-Kantola:

And if you did violate that, then are there consequences to that? I'm saying with that group of things that Tommy read there, with the ones that are in the complaint about the students and the students feeling welcoming and all of those types of different things. And then just down the line, trying to identify were things violated and that kind of stuff? And I heard what you said, that there was a part of this that you felt like people knew.

Katie Medart:

We really thought we were being respectful and honorable in how we were doing it before just going onto social media. I recognize, just as there's a process that we are going through with this, that there is a process and a respectful way to go about it, and before you go and launch something. And so we really thought that. I believe that, and I believe Rachel will say she believed that. We were not trying to be sneaky, we were not trying to do behind the district's back. It is why we approached people in the district.

Dan Huber-Kantola:

A lot of time, it seems like there was a significant amount of time spent on this, district time, with reaching out to people, with emailing people, with getting revisions to the policy or to the resolution, to those [inaudible 01:56:26], scratched loop policy to the resolution.

Katie Medart:

But do you feel like I didn't do my job?

Dan Huber-Kantola:

I would have a hard time saying that that's within policy to do, to do those things during district time, to use district equipment to do those things.

Katie Medart:

I understand, and I hear what you're saying. And I have obviously confessed to the fact that I did that. I also know that there is so many other staff members that have done the same thing. Should I disclose the one that I sent a screenshot or should we wait?

Mickey:

You... I don't know that I could advise you rightly or wrongly here.

Katie Medart:

Who put those sites up or maintains them?

Katie Medart:

Rachel.

Mickey:

Okay.

Katie Medart:

I get screenshots every once in a while about a message. I'm not on there. I don't go check it. I don't... I'm not-

Mickey:

So Rachel Damiano would be the person to ask about that.

Katie Medart:

Yes. That's who you should ask.

Dan Huber-Kantola:

Okay. I could do that. Did Rachel know that you were spending this much time working on these things, talking to people during the school day?

Katie Medart:

Yes. I went and told her that I talked to so-and-so.

Dan Huber-Kantola:

So when you talked to Jason Wright and Mason Mahaffie and Jordan Kasler, Rachel knew that you'd talked to all those different people. She knew that you talked to them during flex hours?

Katie Medart:

Yes. She has reiterated to me over and over, this is not political issue. This is education policy. Over and over and over. And I believe she will do a much better job explaining the reason, being an administrator, than me trying to articulate. And I hear you clearly telling me that your views are, that is political policy, it's politics, anything to do with any policy is politics, is what I heard you say when I asked you for the definition of it.

Dan Huber-Kantola:

Yeah. Yeah. So she knew you were talking to people to try to gather support for the resolution during the flex time?

Katie Medart:

Yes. I believe she will say that she was aware of that. I would tell her after I did it, "Today, I went and talked to...," "I shared this information. I sent them the link." "This person said they would check it out," "This person said, 'Thank you. They're excited,'" "This person said, 'I signed it.'"