


IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
MEDFORD DIVISION

RACHEL G. DAMIANO and KATIE S. MEDART

    Plaintiffs,

vs.                                   Civil No. 1:21-cv-00859-CL

GRANTS PASS SCHOOL DISTRICT 7,
an Oregon public body, et al.,

    Defendants.
_____

**DEPOSITION OF**

**KIRK KOLB**

**TAKEN ON
TUESDAY, JUNE SEVENTH, 2022
9:01 A.M.**

**GRANTS PASS SCHOOL DISTRICT
725 NORTHEAST DEAN DRIVE
GRANTS PASS, OREGON 97526**

Vickers Declaration
Exhibit 5 Page 1 of 17

```
 1  gender identity, does the Grants Pass School
 2  District require that teachers conceal the gender
 3  identity of a transgender student from his or her
 4  parents or guardians unless the student gives
 5  permission to reveal it?
 6          MS. VICKERS:  Object to form.
 7          THE WITNESS:  Yeah.  So, yeah, what I do
 8  know is if a student requests that parents don't
 9  know, we ask the counselors to work with the student
10  to work with their parents, and in the meantime,
11  honor that student's request.
12  BY MR. HACKE:
13      Q.   The request for secrecy?
14      A.   To withheld it -- withhold that from the
15  parent, yeah.
16      Q.   Okay.  So if a teacher needs to have a
17  parent-teacher conference for some reason with the
18  parent or teacher of a transgender student, what
19  name and pronouns does the district require the
20  teacher to use?
21      A.   We -- we don't have a procedure
22  established for parent-teacher conferences, and each
23  one of those situations is incredibly unique and
24  depending on the welfare of the student.
25      Q.   Okay.  Does the Grants Pass School
```



```
 1   District permit transgender students to use the
 2   bathrooms, locker rooms, and other quasi-private
 3   facilities associated with their adopted gender
 4   identify rather than their biological sex?
 5        A.    By law, yes.
 6        Q.    To the best of your knowledge, what is the
 7   rationale behind this policy?
 8        A.    The law.
 9        Q.    Okay.  Are you aware that in various
10   settings, prisons, clothing retailer dressing rooms,
11   even public schools, biological males have asserted
12   transgender status to gain access to women's
13   dressing spaces?
14             MS. VICKERS:  Object to the form.
15             THE WITNESS:  I'm not.  I'm not aware of
16   what happens in other contexts or places
17   necessarily.
18   BY MR. HACKE:
19        Q.    Are you aware that biological males have
20   sometimes done that to film women or girls in
21   various states of undress?
22             MS. VICKERS:  Object to form.
23             THE WITNESS:  I'm not aware.
24   BY MR. HACKE:
25        Q.    Are you aware that biological males have
```



```
 1        Q.   Okay.  They were not on district property
 2   when they made the video, were they?
 3        A.   To my knowledge, no.
 4        Q.   They made the video at a local church, did
 5   they not?
 6        A.   To my knowledge, they did.
 7        Q.   Okay.
 8        A.   I don't know what editing they may or may
 9   not have done while on district property.  I know
10   they used district equipment and resources to do so,
11   to do part of their movement so I think it's called.
12        Q.   Okay.  So Ms. Sager and Ms. Medart used
13   equipment that was not owned or provided by the
14   district to make their I Resolve video; am I right?
15        A.   I'm sure some of what they used was not
16   district equipment.
17        Q.   Okay.  They used a camera that was owned
18   by the church where they shot the video, correct?
19        A.   I don't know who owned the camera.
20        Q.   They also used their own personal
21   computers to edit and upload the video to the
22   Internet; am I right?
23        A.   I -- I don't know whose computer they used
24   for editing the video.
25        Q.   In the video -- they also used their own
```



```
 1   computers to type out their scripts and their
 2   proposals, did they not?
 3        A.    I do know that their scripts and
 4   proposals, there was some that involved the
 5   communication over the district -- the district
 6   network and district accounts regarding the sharing
 7   and soliciting feedback.
 8        Q.    Okay.  In the video, they did not mention
 9   that they were employees of the Grants Pass School
10   District, did they?
11        A.    I'd have to watch it again.  To the best
12   of my recollection, they did not indicate Grants
13   Pass School District.
14        Q.    In fact, they did not even mention that
15   they live and work in Grants pass; am I right?
16        A.    No.  I think they said Southern Oregon.
17        Q.    Okay.  Southern Oregon's a pretty big
18   place, isn't it?
19        A.    Yeah.
20        Q.    Okay.  Stretches from the Pacific Ocean on
21   its west side on the Idaho border on the east?
22        A.    That would be Eastern Oregon.  I don't
23   know. I don't know what the -- I don't know where
24   the cutoff is for Southern Oregon.
25        Q.    But Southern Oregon could include any
```



Kirk Kolb   June 7, 2022   NDT Assgn # 57963   Page 57

```
 1  multiple students who might match the illustrative
 2  scenario in the I Resolve video?
 3      A.   I'm sure there is.
 4      Q.   Okay.  Did Ms. Sager say anything in the I
 5  Resolve video that disparaged transgender students?
 6      A.   Not to my knowledge.
 7      Q.   What about Ms. Medart?
 8      A.   Not to my knowledge.
 9      Q.   Okay.  Now, on or about March 31, 2021,
10  you started receiving informal concerns from
11  district staff about the I Resolve video; would you
12  say that's accurate?
13      A.   Staff and community.
14      Q.   Okay.  To the best of your recollection,
15  about how many concerns did you receive?
16      A.   Over the course of when, on March 31?
17      Q.   Starting on March 31.
18      A.   Over the course of the whole thing?  I
19  would have to go back and look, but I would say I
20  personally, I would say, oh, man, that's hard to put
21  a number on it, but it's probably more than 75,
22  fewer than 150.
23      Q.   Okay.
24      A.   That's rough estimates.
25      Q.   Okay.  So to the -- to the best of your --
```



Kirk Kolb   June 7, 2022   NDT Assgn # 57963   Page 58

1  what exactly were the GPSD staff members you heard
2  from complaining about?
3      A.   I'd have to go back and look at specifics.
4  I believe there were concerns of discriminatory or
5  promoting discriminatory practices has the general
6  flavor of most of what the concerns, I would say.
7      Q.   All right.  In response to the negative
8  reactions to the I Resolve video, did you or did you
9  not tell Ms. Medart and Ms. Sager to take it down?
10     A.   I never told them to take it down.
11     Q.   In response to complaints about the I
12 Resolve video, did you or did you not prohibit Ms.
13 Medart from attending a meeting -- a meeting of
14 North Middle School's LGBTQ Plus student club on
15 March 31, 2021?
16     A.   I denied her request based on the
17 significant disruption and perceived harm that was
18 caused by their actions.
19     Q.   This was despite the fact that the
20 students in the club voted to allow her to attend?
21     A.   Yeah.  I didn't know that at the time, but
22 I guess, yeah.
23     Q.   In response to complaints about the I
24 Resolve video, did you or did you not threaten to
25 pursue disciplinary action against Ms. Sager and Ms.



```
 1  and thoroughly investigated.  Thank you.
 2       Q.   Okay.  So via this email, did you or did
 3  you not solicit complaints from GPSD students and
 4  their parents?
 5            MS. VICKERS:  Object to form.
 6            THE WITNESS:  It does not appear that I
 7  asked them to contact me.
 8            MR. HACKE:  Okay.  At this point, I would
 9  like to enter Exhibits K and L into the Record.
10            (WHEREUPON, Landis Report Information on
11  Katie Medart was marked as Exhibit K and Landis
12  Report Information on Rachel Sager was marked as
13  Exhibit L for identification.)
14  BY MR. HACKE:
15       Q.   Okay.  So while Ms. Medart and Ms. Sager
16  were on administrative leave, the district hired a
17  gentleman named Bill Landis to conduct an
18  investigation into their conduct; am I right?
19       A.   Yes.
20       Q.   Okay.  And so exhibit -- Exhibit K, is
21  Exhibit K a true and accurate reflection of a list
22  of exhibits from Mr. Landis' report concerning their
23  conduct?
24       A.   It appears to be something out of one of
25  his reports.
```



1  A.  Outside of school hours opposing -- if
2  they are exercising their First Amendment rights,
3  they are entitled to that outside of their
4  responsibilities as teachers.
5      Q.  Okay.  All right.  So now going back to
6  Mr. Landis' investigation, among the things that Mr.
7  Landis investigated or that his investigation found
8  was that Ms. Sager and Ms. Landis -- or Ms. Medart
9  used GPSD facilities, equipment, and supplies for
10 political campaigning efforts; am I right?
11     A.  I believe that was the term he used.
12     Q.  Okay.  Are you familiar with Section
13 260.432 of the Oregon Revised Statutes?
14     A.  No.
15         MR. HACKE:  Okay.  At this point, I would
16 like to enter into the Record Exhibit S.
17         (WHEREUPON, ORS 260.432 was marked as
18 Exhibit S for identification.)
19         THE WITNESS:  I have it.
20 BY MR. HACKE:
21     Q.  Okay.  Did Plaintiffs use school
22 facilities, equipment, or supplies to solicit money
23 during school hours?
24     A.  Not that I'm aware of.
25     Q.  Did the plaintiffs use school facilities,



```
 1   equipment, or supplies to solicit influence during
 2   school hours?
 3        A.   Yes, influence.
 4        Q.   How so?
 5        A.   They were seeking the influence of their
 6   peers and colleagues to support their movement and
 7   related proposals.
 8        Q.   Did Plaintiffs use school facilities,
 9   equipment, or supplies to solicit -- solicit
10   services during school hours?
11        A.   I believe they asked for other school
12   employees to review their video and/or resolution
13   and/or other documents.
14        Q.   Okay.
15        A.   So if those are services, I guess that's
16   -- they want other people to review and advise.
17        Q.   Okay.  Did the school use -- did
18   Plaintiffs use school facilities, equipment, or
19   supplies to solicit any other thing of value during
20   school hours?
21        A.   Anything of value.  Nothing of monetary
22   value that I'm aware of.
23        Q.   Okay.  Did Plaintiffs use school
24   facilities, equipment, or supplies to promote or
25   oppose a political committee during school hours?
```



```
 1  the speech is consistent with district policy and
 2  resolutions.
 3          It's deemed that it's consistent with our
 4  Policy ACB and the board resolution on equity,
 5  diversity, and inclusion.  Further questions,
 6  contact HR director, your building administrator, HR
 7  director, or myself.
 8          Carefully consider when choosing items to
 9  display in our classrooms.  Our school should not be
10  a place of controversy nor a place of promoting one
11  side of a political or civil issue.  Items should
12  have an inherent educational purpose tied directly
13  to the education we provide.
14      Q.   Okay.  So how would you describe Ms.
15  Medart's and Ms. Sager's employment records prior to
16  April 2021?
17      A.   I think as stated earlier both were
18  employees in good standing.
19      Q.   Okay.  So -- so please describe why you
20  recommended the firing of the plaintiffs.
21      A.   I recommended the firing of the
22  individuals for utilizing, in summary, utilizing
23  district resources to promote what have been viewed
24  as discriminatory actions or policy causing a
25  substantial disruption to the educational
```



```
 1  environment.
 2      Q.   Okay.  Did you submit a complaint to the
 3  -- to Oregon's Teacher's Standards and Practices
 4  committee -- or Teacher's Standards and Practices
 5  Commission anticipating, and in essence requesting,
 6  that Ms. Medart's license be suspended or revoked?
 7      A.   I did not.  I'd have to look, but I
 8  anticipated there was a potential consequence.  It
 9  wasn't a request, it was an anticipated consequence
10  of their actions.  So I did submit a report to TSPC
11  as I'm required to by law.
12          MR. HACKE:  Okay.  All right.  I'd like to
13  enter Exhibit U into the Record.
14          (WHEREUPON, a Report to the Teacher
15  Standards and Practices Commission was marked as
16  Exhibit U for identification.)
17  BY MR. HACKE:
18      Q.   Can you tell me what Exhibit U is, please?
19      A.   It is the form used to, and this
20  particular document was a report to Teacher
21  Standards and Practices Commission for Katie Sue
22  Medart.
23      Q.   Okay.  All right.  Did you submit -- did
24  you also submit a similar report for Ms. Sager?
25      A.   I did.
```



```
 1      Q.    Okay.  So you say in that email that the
 2   resolution was discriminatory in nature.  What was
 3   your basis for making that claim?
 4      A.    To -- their proposal was to not allow
 5   transgender students the -- to use the restroom by
 6   which they identify --
 7      Q.    Okay.
 8      A.    -- which is discriminatory.
 9      Q.    Was this claim investigated by Mr. Landis,
10   the third-party investigator?
11      A.    I do not believe that was part of his
12   investigation as to whether or not it was
13   discriminatory.
14      Q.    Okay.  Would you say that your comment
15   that it was -- that the I Resolve video was
16   discriminatory in nature was your personal opinion?
17            MS. VICKERS:  Object to the form.
18            THE WITNESS:  It was my understanding of
19   the law at the time so not necessarily my personal
20   opinion, but my interpretation of the law.
21   BY MR. HACKE:
22      Q.    Did your email include the required
23   disclaimer regarding your opinion or were you
24   speaking on behalf the district?
25      A.    Again, it was my interpretation of the law
```



```
 1  and not a personal viewpoint.
 2       Q.    Did the board vote to reverse the
 3  plaintiffs' July -- July 15, 2020 decision to
 4  terminate, thereby reinstating the plaintiffs?
 5       A.    Four of the board members voted in favor;
 6  hence, a majority.
 7       Q.    Okay.  So that would be the board did --
 8  did reinstate, correct?
 9       A.    Correct.
10       Q.    Okay.  Have there been -- have there been
11  student demonstrations arising from the I Resolve
12  video or the employment status of the plaintiffs?
13       A.    Yes.
14       Q.    How have those been handled by the
15  district office?
16       A.    How we handled it, how we handled student
17  demonstrations, try to meet with students, try to
18  maintain civility, try to the best of our ability
19  not to disrupt the educational environment and
20  processes.
21       Q.    Have there been any other student
22  demonstrations this school year that were not
23  related to I Resolve or the plaintiffs?
24       A.    Yes.
25       Q.    Tell me about those.
```



```
 1      A.   We had a demonstration opposing the
 2  potential overturning of Roe v. Wade that took place
 3  during class time on Grants Pass High School's
 4  football field.
 5      Q.   Okay.
 6      A.   We also had one, a sit-in -- well, sit-in,
 7  demonstration during lunch to memorialize George
 8  Floyd, expressing concern over excessive police
 9  force.
10      Q.   How were those handled differently from
11  the demonstrations concerning I Resolve and the
12  plaintiffs?
13      A.   We learned a lot, how can we help students
14  be safe.  The demonstration over the I Resolve and
15  LGBTQ support resulted in a lot of -- in a lot of --
16  in outside entities antagonizing students who were
17  demonstrating, inciting -- inciting a lot of
18  misbehavior by students.
19           I believe there was one nonstudent adult
20  who was arrested for their behavior, police
21  ultimately trying to maintain order.  We ultimately
22  became a target of some of the behavior.
23           So it was outside of our campus secure
24  walls and so in an effort to -- in an effort to try
25  to maintain students' safety, we worked with
```



```
 1  students to keep the demonstration in an area which
 2  we could guarantee their safety at a much higher
 3  level.  So that was the significance there.
 4      Q.   In the last demonstration, were students
 5  given discipline for interrupting school time in
 6  accordance with state law?
 7      A.   Yes.  We -- prior -- so we've had
 8  demonstrations over the years, and we've monitored
 9  and allowed them to happen.  They've all happened
10  off campus on the streets around the district.
11           They've all been relatively peaceful until
12  the one happened after the I Resolve, which got very
13  incited.  Other participants, uninvited, non -- non-
14  District 7 participants showed up.  We've never had
15  that issue before.  The -- what are they called, the
16  Rogue Valley Salt Shakers showed up and were
17  inciting all kinds of, yeah, awful stuff.
18           And so previously, all demonstrations had
19  been peaceful and then we had this one and it got
20  out of hand and which we said, you know what, we've
21  got to get this under control.
22           Previously, there was never discipline.
23  Going back all the years that I've been a district
24  office employee; so 12 years we had never done
25  discipline.
```



```
 1                        CERTIFICATE

 2

 3        I, Lee Anne McAdam, do hereby certify that I

 4   reported all proceedings adduced in the foregoing

 5   matter and that the foregoing transcript pages

 6   constitutes a full, true and accurate record of said

 7   proceedings to the best of my ability.

 8

 9        I further certify that I am neither related

10   to counsel or any party to the proceedings nor have any

11   interest in the outcome of the proceedings.

12

13        IN WITNESS HEREOF, I have hereunto set my hand this

14   21st day of June, 2022.

15

16

17

18   _____

19                Lee Anne McAdam

20

21

22

23

24

25
```