**Pacific Consulting and Investigations**
PO Box 3506 Ashland, Or. 97520
**Tel:** 541-441-2209
cbinvserv@gmail.com
www.pci-oregon.com
PI-ID: #73728

# GRANTS PASS SCHOOL DISTRICT 7

## CONFIDENTIAL REPORT PART II

## JUNE 2021

Prepared by Bill Landis PI-ID #73728



# TABLE OF CONTENTS

## Contents

Request by _____ 1

Summary: Mentioned Persons, Allegatons, List of Exhibits _____ 2-4

Details _____ 5-64

Findings_____ 65-69

Exhibits_____ 70

**GPSD 422**

## GRANTS PASS SCHOOL DISTRICT 7

### Request by:

Sherry Ely: Dist. 7 Director of Business Services

Grants Pass School District 7

725 NE Dean Dr.

Grants Pass, Or. 97526

541-474-5700

### Request Date:

04/15/2021

### Report Submitted:

06/08/2021

### Assigned Investigator:

Bill Landis (PI-ID #73728)

Pacific Consulting and Investigations

P.O. Box 3506 Ashland, Or. 97520

541-441-2209

### PCI Incident Reference Number:

21-1011/ Part II

**GPSD 423**
**Vickers Declaration**
**Exhibit 8 Page 3 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

## <u>Named Employee:</u>

Rachel Damiano: Assistant Principal North Middle School

## <u>Mentioned Persons:</u>

Kirk Kolb: Grants Pass Dist. 7 School Superintendent

Dan Huber-Kantola: Grants Pass Dist. 7 Director of Human Resources

Tommy Blanchard: North Middle School Principal

Katie Medart: North Middle School Teacher

███████: District 7 employee (Formal Complaint)

███████: District 7 employee (Formal Complaint)

███████: District 7 employee (Formal Complaint)

███████████: District 7 employee (Formal Complaint)

████████: District 7 employee (Formal Complaint)

███████: District 7 employee (Formal Complaint)

## <u>Allegations:</u>

#1: In March/April of 2021, it is alleged that Assistant North Middle School Principal Rachel Damiano was involved in a campaign/movement of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Damiano.

    A.  Used District facilities, equipment or supplies in connection with the political campaign

    B.  Used time during her working day for political campaign purposes

    C.  Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7

    D.  Used social media and public websites in such a manner that it disrupted the school environment

    E.  Posted confidential information about a student on social media and a public website

    F.  Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and directed at those persons and or students "sexual orientation"

If these allegations are found to be true, Ms. Damiano may have failed to meet the standards of her Grants Pass School Dist. 7 Job Description for her position as well as violated the following policies:

- ACB – All Students Belong
- GBG – Staff Participation in Political Activities
- AC – Nondiscrimination
- GCAB – Personal Electronic Devices and Social Media – Staff
- IIBGA-AR – Electronic Communication System Acceptable Use Regulation

**GPSD 424**

**Vickers Declaration**

**Exhibit 8 Page 4 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

## List of Exhibits:

1. Complaints (formal) from Grants Pass Dist. 7 Staff members:
   - A. ▆
   - B. ▆
   - C. ▆
   - D. ▆
   - E. ▆
   - F. ▆

2. Email complaints from citizens
   - A. ▆
   - B. ▆
   - C. ▆
   - D. ▆
   - E. ▆
   - F. ▆
   - G. ▆
   - H. ▆

3. Email complaints from students (past and present)
   - A. ▆
   - B. ▆
   - C. ▆
   - D. ▆
   - E. ▆
   - F. ▆

4. Email sent and received by Rachel Damiano on Dist. 7 Email account
   - A. ▆
   - B. ▆
   - C. Medart ▆
   - D. Medart
   - E. Medart
   - F. ▆
   - G. Medart
   - H. ▆
   - I. ▆
   - J. ▆
   - K. ▆

**GPSD 425**
**Vickers Declaration**
**Exhibit 8 Page 5 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

5. Media Coverage
   A. Screenshot from KOBI 5
   B. KOBI 5 news article dated April 7th, 2021
   C. KTVL 10 news article dated April 8th, 2021
   D. KOBI 5 news article dated April 14th, 2021
   E. KTVL 10 news article dated April 15th, 2021

6. Grants Pass District 7 Policies, Guidance, and job description
   A. Grants Pass School District 7 policy "AC" – Nondiscrimination
   B. Grants Pass School District 7 policy "ACB" – All Students Belong
   C. Grants Pass School District 7 policy "GCAB" – Personal Electronic Devices and Social Media – Staff
   D. Grants Pass School District 7 policy "GBG" – Staff Participation in Political Activities
   E. Grants Pass School District 7 policy "IIBGA-AR" - Electronic Communications System Acceptable Use Regulation
   F. Grants Pass School District 7 – "Job Description"
   G. Grants Pass School District 7 – Administrative Memorandum dated February 5th, 2021

7. Thumb drive containing digital files of audio recordings, transcripts, Garrity Rights, notice of investigation, and copy of this report narrative report

**GPSD 426**
**Vickers Declaration**
**Exhibit 8 Page 6 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

## <u>Details:</u>

On April 12th, 2021, I was contacted by Willard Ransom attorney for Grants Pass School District 7 to see if I was available regarding an investigation involving alleged employee misconduct. I advised him that I was, and I was recontacted on April 14th, 2021 by Mr. Ransom who stated the District 7 School Board had approved the go ahead for me to provide services for an investigation. On April 15th, 2021, I did enter into a Letter of Engagement with Sherry Ely, Grants Pass School District 7 Director of Business Services. I was advised she would be my point of contact during my investigation.

I was informed that District 7 had received several formal complaints from District 7 employees regarding the alleged discriminatory conduct of North Middle School Assistant Principal Rachel Damiano related to the "I Resolve" movement/campaign. Additionally, the School District received emails from citizens who complained about Ms. Damiano in response to the "I Resolve" movement and video that Ms. Damiano had been involved in, along with North Middle School Teacher Katie Medart. On April 20th, I did meet with Sherry Ely to discuss the investigation and scope. Ms. Ely stated that "I Resolve" was not something supported nor affiliated with District 7 and many of the calls and emails received believed that the School District had been involved with "I Resolve" which they were not. I was provided an email where Superintendent Kirk Kolb did notify the School Board on April 5th, 2021 where he said that two employees were promoting a resolution which had been posted on YouTube and Facebook with links for the board to see (Exhibit 7). He also stated: "This has created a significant disturbance that is impacting the entire district" and also said that "we are VERY seriously dealing with this."

Ms. Ely advised that North Middle School Principal Tommy Blanchard and HR Director Dan Huber-Kantola had conducted an interview over the complaints with Ms. Damiano. A complaint was received during their investigation involving administration, so they were recused, and the investigation suspended by District 7. I was advised that all of the documentation including emails, potential involved policies, audio files, documents, and other associated information would be put onto a thumb drive which I could pick up at a later date. Ms. Ely advised that Ms. Damiano had been placed on paid administrative leave as of April 5th, 2021 which was eleven days after the "I Resolve" video appeared to have been released to social media.

On April 23rd, 2021, I did contact Ms. Ely at the District 7 office and received the thumb drive containing the aforementioned documentation including the listed complaints (contents contained in Exhibit 7). After reviewing all the documentation, I found it necessary to divide my instigation into four parts. Part I is dedicated to the allegations regarding Ms. Medart and her alleged violation of District 7 policies. Part II is dedicated to the allegations regarding North Middle School Assistant Principal Rachel Damiano and her alleged policy violations. Part III is dedicated to Counselor Selena Alderson and her alleged policy violations. Part IV was dedicated to Ms. Medart's allegations against school administration for alleged policy violations. I later was informed by Ms. Ely on May 7th, 2021 that Ms. Medart had withdrawn her complaint and therefore Part IV would not be part of the investigation. For purposes of this report, I will be addressing only the allegations made against Ms. Damiano with regards to alleged District 7 policy violations and identified as Part II of the overall investigation.

## GRANTS PASS SCHOOL DISTRICT 7

In reviewing the "I Resolve" video and campaign referred to as "I Resolve", I found it necessary to watch the video which I did (Exhibit 7). I also went to the "I Resolve" website which I found by using an internet search engine to understand what is referred to in the complaints. On the website, it defines the "I Resolve" title as *"Reasonable, loving, and tolerant solutions for education policies that respect everyone's rights." "Proposed Solutions for Education Systems." "Honoring All Students, Staff and Community Members."* It further states: *"I Resolve is a grassroots movement intended to protect the hearts and minds of our youth and stand up for truth in our society. We believe that resolutions that are reasonable and fair in both form and operation, are beneficial in helping to safeguard the mental, emotional and physical sell-being of all public-school students. We need communities to band together, through individual and corporate commitment, to protect our youth and make their voice heard to local, state and national leaders and policy makers."* Under the title "Current Proposal" it states: *"We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved. The resolution statements regarding bathroom and locker room shared space use are suggestions for current structures, until such a time that individual gender neutral bathrooms are required and fully funded for education and youth facilities. The last two resolutions are proposed as a caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey."*

The website has a link which states: "Sign the Resolution." The resolution is listed as "Resolution 2021-01 and says the following:

### Resolution 2021-01

Therefore, be it resolved that we urge our local, state and federal leaders to adopt the

following principles and policies:

Premise
**Point 1**
We recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female;

Resolution 1a
**Point 2**
Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designations) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built;

Resolution 1b
**Point 3**
For any person who is not comfortable using their anatomically-correct space, they may request access to a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available**;

**GPSD 428**
**Vickers Declaration**
**Exhibit 8 Page 8 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Resolution 2

**Point 4**
A student may, with parent permission, request to be called by a derivative of their legal name but it will not be mandated that students or staff be required to call the student by their preferred name; and

Resolution 3

**Point 5**
A student may, with parent permission, request to be referred to with preferred pronouns, but it will not be mandated that students or staff be required to use the preferred pronouns.

Footnote

**Note**
**Please note that although not specified in the resolutions, individual gender neutral bathrooms are endorsed by I Resolve and encouraged to be fully funded by the state to be implemented in education facilities.

The website has several "Did you know" blocks with information as well as T-Shirts for sale. One of the "Did you know?" blocks is a reference to a recent 6th Circuit Federal Court of Appeals ruling.

## 1ST AMMENDMENT RIGHTS FOR EDUCATORS

A recent court ruling by the 6th Circuit Federal Court of Appeals ruled that Dr. Nicholas Meriwether, a university professor, had grounds to sue the school because they had punished him for not using a student's preferred pronouns. The professor had asked to accommodate by using the student's last name rather than use pronouns and the school refused to allow this. The court held that this punishment by the school was a violation of the professor's First Amendment rights.

In the margin of this particular "Did you know?" is the statement: "*This ruling is a reason why our resolutions include that staff and students will not be mandated to use preferred names and preferred pronouns.*" "If it is mandated, it is a violation of First Amendment Rights." There is also a link to the "I Resolve" video. At the bottom of the website, is the statement: "*The views expressed on this site and any related video(s) produced by I Resolve are the expression of the individuals, as private citizens and do not necessarily represent the views or opinions of any specific education entity.*" This website was viewed by me after the complaints and after my investigation began and it is not known if the website was modified, or language changed or added from the time that the website was first published which appears to be about the same time as the YouTube video upload of March 25th, 2021. The original site now has a message that says: "This site has moved" and a link to click on to the new site.

**GPSD 429**
**Vickers Declaration**
**Exhibit 8 Page 9 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

I watched the video called "I Resolve" and had it transcribed. I had been advised that the speakers in the video were Katie Medart (North Middle School Teacher) and Rachel Damiano (North Middle School Asst. Principal). I noted that when I watched the "I Resolve" video, they gave only their first names, however they did give information about their professions and introduced themselves as follows:

Rachel Damiano:

I resolve.

Katie Medart:

I resolve.

Rachel Damiano:

We resolve.

Katie Medart:

We resolve. We hope that you will resolve with us. We just want to say a thank you for taking the time to click play on this video, to hear what we have to share with you about policies related to gender identity for our youth. We hope by the end of this viewing, that you are willing to take action to have your voice heard with us. So you might be wondering who are these people? *My name is Katie. And my experience with youth is that I have been teaching for the last 10 years. I am currently teaching at a middle school in Southern Oregon, and prior to that for eight years, I was a science instructor for college and then some high school science teaching experience as well. I've been a coach, multiple sports. And then probably my greatest honor of working with youth is that I have two of my own sons.* Let me introduce, this is Rachel.

Rachel Damiano:

*Hi, I'm Rachel and I am an administrator assistant principal in Southern Oregon at the middle school level. I've also worked at the high school level, was previously a math teacher, and I've been working with youth for over a decade now in various roles in education. And then in as a coach as well. I do not have any children of my own yet, but I do work with youth and that has been a passion of mine for a very long time now.*

Ms. Medart asks Ms. Damiano to explain what is bringing them here (the video) and why.

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Why don't you explain what's bringing us here today and why?

Rachel Damiano:

Absolutely. So it's a multifaceted issue right now. So right now at the federal level, there's the Equality Act. It's currently already passed the House and is in filibuster actually right now at the senate level. The Equality Act talks about gender identity and as well, it reverts back to the Civil Rights Act of 1964. And it's adding to that and we'll talk more about the specific aspects of the Equality Act as we kind of move through, but there are parts of the Equality Act that are very specific and very polarizing we think in the way that it's written in terms of some policies.

Rachel Damiano:

And then at the state level for Oregon specifically, there's Senate Bill 52, which would create a state of emergency as it's written for students or for youth specifically that identify as transgender, but it's all about gender identity. And that state of emergency would give a lot of leeway to policymakers without having to go through legislation. So that's Senate Bill 52, along with that is there's an advisory committee that specifically speaks to gender identity and it's called the LGBTQ2SIA+ Student Success Plan. And if Senate Bill 52 is enacted, then that success plan would automatically go, not just as guidance, but would be mandated to public schools as well as really any organization that works with youth.

Rachel Damiano:

And then at the local level, there has been guidance ODE back in 2016, that was about gender identity and best practices. It's not law, but it is when a guidance is given from ODE, it is taken as things that need to be implemented just because of the way that they're written, and they become requirements for schools. So our districts, local districts and districts across the state have taken that guidance and they've had to implement it in various ways that isn't always consistent because they do have some leeway and pulling from the guidance, but they are tied into the guidance and what verbiage is used in the guidance. And I know that you've had some experience specifically at the local level. Can you tell us about what it was like coming back into public education and what that guidance has meant for you as a teacher?

**GPSD 431**
**Vickers Declaration**
**Exhibit 8 Page 11 of 71**

Katie Medart:

Yeah. So before we go to that, let's just recap that because this is going to be really important for the end. The end, when we ask you to take action and understanding why that is so important right now. So we have at the federal level, legislation coming in, that's at the Senate, already passed the house and that will impact every business, every entity. Where so if I asked you what about private schools?

Rachel Damiano:

Yeah. So it'll affect private schools, it'll affect youth organizations. Ultimately, it'll actually affect churches as well and religious organizations. And it's not just K-12. The Equality Act at the federal level actually reaches from infancy to beyond. And any business, basically any business that's outside of your home and it's not just you and your house as an individual, it will affect.

Katie Medart:

So would you also say that it's true that even though we're from Oregon and we're more familiar with what's happening specifically in Oregon, that there's good odds that the issues that we're having in our state are also occurring in other states right now?

Rachel Damiano:

They are. Yeah. And the way that the States have had to reach through legislation and had to create their own gender identity policies is different across the states. The Equality Act would make it mandated across all states.

Katie Medart:

So that's going to be important because we're going to ask you to not just if you're Oregonian, but we're really looking nationwide, feeling that this is really impacting, going to impact you regardless of where you live.

*Ms. Damiano asked Ms. Medart how it has been for her coming back to public education from the teacher's side. Ms. Medart gives an answer that includes an incident that occurred within a month or two of Ms. Medart returning to public schools which was the previous year, she is approached by a transgender student of hers who makes a request.*

Rachel Damiano:

Well, how has it affected? You've come back into public education and you've seen it from the teacher side. How has that been for you?

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Yeah, so I was in K-12 education and then I left for 8 years, going to teach at a college and then coming back, I came back last year. So the last 2 years I've been back in K-12 and I could not believe the changes that have occurred. One of the biggest ones was within a month of teaching, I was presented with a very foreign circumstance to me. I had a female student. She then was on a journey of exploring what is her gender identity. She had made a request to identify as a male. Then the request came for to go by he and him and to change the name. And so I was sending an email by staff member saying the student is making this request. I've let the student know that we are in support, that we will support this. And I didn't know what to do.

Katie Medart:

So I went to my administration and I asked do parents know? Do we have parent permission? What is our policy? How am I supposed to handle this? And what I found was that, well, there was reference to the ODE guidelines that you mentioned earlier, but that they are guidance's. And so as different scenarios have come up, there hasn't been a consistent response. There isn't consistency because those are guidance's and not required about what I find different schools are doing and what they're implementing, depending on what school you're at and what part that district is wanting to implement it from those guidance's.

After the story told by Ms. Medart, there is more dialogue about what they are asking and "what we're hoping with the policies or the resolutions that we've written and giving some consistency and also giving leaders, local leaders, state leaders, federal leaders, an option." Ms. Damiano then states what policies and resolutions that they've created.

Rachel Damiano:

That makes sense. And I think that that really rolls into what we're asking and what we're hoping with the policies or the resolutions that we've written and giving some consistency and also giving leaders, local leaders, state leaders, federal leaders, an option. An option that I don't think has really been put on the table yet. So we want to read them directly for you so that you know what those resolutions are and what you're speaking to.

Rachel Damiano:

So this first one really just speaks to us all getting on the same page. So it says it is recognized that accepting very rare, scientifically demonstrable medical conditions, there are two anatomical gender presentations: male and female. So that's specifically talking about in layman's terms, that's

**GPSD 433**
**Vickers Declaration**
**Exhibit 8 Page 13 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

specifically talking about the genitalia that students and humans are born with. And that would roll right into, instead of it being a gender identity issue when it comes to bathrooms and locker rooms, making it about anatomy ultimately. And so the second one is shared public school restrooms and locker rooms, especially as they pertain to spaces predominantly used by student and youth, previously designated by gender could then be re-designated as anatomically male and anatomically female spaces to only be utilized by persons matching the anatomical designation of the spaces as consistent with historically and scientifically demonstrable anatomically correct utilization of those spaces.

Ms. Medart then explains the intentions of anatomical use of facilities.

Katie Medart:

Okay. Let's pause. So if you're like what? Let's help you imagine this. So like for example, at the middle school, typically you would go, and you would see, okay, here is rather, it's a restroom or locker room. It says boys, and this one says girls on it. So instead of it saying that it would then read anatomical male, anatomical female, and what that then is referencing is what, in essence, what genitalia do you have because they're designed in form and function, both of facilities for anatomical anatomy.

Ms. Damiano and Ms. Medart continue with clarification of what someone who is not anatomically male or female yet identifies as such would have as options and also discuss the choice as to use of names or pronouns.

Rachel Damiano:

So Katie, for this next bullet in talking about, we want to be fair and equitable to all sides. This next bullet, if a student is still uncomfortable using the bathroom or the locker room that matches their anatomy, it says for any person who is not comfortable using their anatomically correct space, they may request access to a private restroom or locker room space, including such spaces that are designated for use by public school staff, to the extent that these spaces are available and exist. So I think just in the end we want, again, we want to give voice and honor all sides involved. And we feel like that point and that resolution really does that. These last couple are really more speaking to the gender identity journey that these students are going through.

Katie Medart:

What it says is a public student seeking to be known by a name other than the name designated on their legal documentation, may at their discretion with parent permission, use a derivative of their

**GPSD 434**
**Vickers Declaration**
**Exhibit 8 Page 14 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

legal name for the purposes of requesting that the public school staff identify the student by such name. It should be reasonably accommodated by public school staff provided however that any such policy shall not be mandated upon or required of the public school staff, nor shall any such policy be enacted that infringes upon the public school staff, civil and constitutional liberties, including their freedoms of speech and expression. And further provided that such derivative of the student's legal name shall not be honored if it is otherwise crude or offensive, as determined by acceptable societal normative, respectful speech.

Rachel Damiano:

Another lots of words and we know that some of these are a lot of words. Part of that is because this is proposed policy. So we want to make sure that we are speaking to the way legislation speaks in the way that policies are written. This one is basically saying in essence, that a student walking through this journey can ask for a preferred name with parents in the know, and with parent permission and that that be about gender identity, that the discussion is centered around gender identity. And so that it is a derivative of one's legal name. And I think you had an example for what would that look like?

Katie Medart:

I do have an example for that, and I want to bring up one other important, bringing us back to that in our state, the ODE guidance of it does encourage parent involvement, but it does not require it. So that was one of the things that I have personally experienced when going and getting clarification is that it is up to the school to determine if they would like to involve the parent or not. So you would find scenarios where the parents are not in the know at all about what is going on with their child as they are going through that journey. And as a parent, that was disturbing for me as I want to be able to offer love and support, especially as they would embark on that journey. So an example would be for the name, if a student's name was Jessica Smith, then Jessica, if was struggling or on the journey of their gender identity, they wanted to, instead of identify, if they were female as male, they can then change their name to Jess.

Rachel Damiano:

Jess, Jesse Smith.

Katie Medart:

Go by Smith.

# GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Anything that's that derivative. And again, that's to focus on the gender identity piece of it in that journey, not necessarily on name because I think that that can be a rabbit trail. And then also moving into just this last bullet point as well, or the last resolution is really speaking to the pronouns.

Katie Medart:

Yes. And so it really is the same thing, but it is instead of the name, it's saying the same thing for pronoun usage.

Rachel Damiano:

And with that focus on allowing we want to give voice to all sides. We want to be respectful always. And that's something that our nation has been built on. It's a basic action that we should be taking towards others. We should be respectful. And so that's always this underlying, but at the same time also giving freedom to staff and to students without mandating the use of the pronouns or the use of the preferred name.

Katie Medart:

And requiring that we work together with the family. So it's us working with the family or whoever is in that guardian role, the child and with the school and it's bringing us all together.

Ms. Damiano then directs those watching to the "I Resolve" website. This infers by the language for the viewer to lobby political leaders by adding their name and saying they support the resolution. There is the mentioned pending legislation which they list as Oregon's Senate Bill 52, LGBTQ2SIA+ Student Success Plan which is potentially being put into motion, as well as a reference to an upcoming ODE state board meeting on April 15th where your voice can be heard. There is also the mention of the Equality Act which they state has passed in the House, but Senators can be contacted as the video tells viewers that prior to a vote in the Senate: "It doesn't have to be just the way the Equality Act is written." "So it's written in a way that's more fair to all sides and honors all parties involved in this decision."

Rachel Damiano:

Absolutely. And I think that really pulls it all together as well as it takes a community, not just to raise up our youth, but it takes a community to be a healthy society. And so all of these are speaking to parents involved, students involved, community involved, and we need you involved as well. So one of the ways that you can speak out, and one of the things that we need you to do is if this resonates with you as, yeah, this seems fair in how it's written and how it would be implemented. We need you

to tell us that, and we need you to tell our leaders that. And you can do that by going to iresolvemovement.com and on iresolvemovement.com, there is a place where you can read the full resolution, our reasoning behind it, as well as the resolutions in there, all of their legalese glory. And agree and say yes, I can put my name behind this. I can say I agree. And there's a button on there that you push. And then you just fill in your name and you say that you agree.

Katie Medart:

So number one.

Rachel Damiano:

Number one.

Katie Medart:

Go to iresolvemovement.com and digitally sign. And then number two is what about your state?

Rachel Damiano:

Exactly. Yep. So here specifically in Oregon, with the Senate Bill 52 and as well as the LGBTQ2SIA+ Student Success Plan, potentially being put into motion. So the next ODE or state board meeting is April 15th. And I know that's coming up really soon, but in order to have your voice heard, you can speak out directly to the State Board of Education. There is a template on our site, as well as the resolution. You can send it in as public comment at any time before the April 15th meeting and have your voice be heard in that way as well. And then that last one.

Rachel Damiano:

We need you to speak out to your senators and that's not just in Oregon, that is across our nation. It has not been voted upon yet. The Equality Act has not been voted on yet. It has passed the House, but speak out to your senators and say, hey, we have another option for you. It doesn't have to be just the way the Equality Act is written. And that could even mean that you could have a voice in changing what the Equality Act says and how it's written. So it's written in a way that's more fair to all sides and honors all parties involved in this discussion.

Ms. Medart states that "love is action" and if what they presented resonates with the listener, go to the website, and fill out the form, email legislators, and contact your state Senator that is representing your state, and have your voice heard.

---

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

If we spoke to you, if you choose to take action, which I love this saying, love is action. So if that's resonating with you, you can one, go to iresolvemovement.com. Number two, for those of you who are here in Oregon, we have a template there, fill that out, email our legislators, letting them know what is your stance and have your voice be heard. And then finally we need everyone, we need to contact your state Senator that is representing your state and be able to have your voice heard at that level.

Ms. Damiano concludes with an end note which is agreed with by Ms. Medart.

Rachel Damiano:

So thank you again for taking the time to watch and to hear us out. And I know for me, I resolve for the students of our community, for the youth of our community and ultimately for the youth of our nation, and I know that sounds big and lofty, but that's why I got into education. I am here to raise up our youth and to safeguard their mental, emotional, physical wellbeing. And we feel that these resolutions do that.

Katie Medart:

Absolutely. Thank you.

(See transcript or listen and watch video for further details Exhibit 7).

**GPSD 438**
**Vickers Declaration**
**Exhibit 8 Page 18 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

### Allegation #1

**#1**: In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School
Assistant Principal Rachel Damiano was involved in a campaign of a political nature non-
sanctioned by Grants Pass School District 7 where Ms. Damiano is alleged to have:

A.  Used District facilities, equipment or supplies in connection with the political campaign
B.  Used time during her working day for political campaign purposes
C.  Failed to designate that the viewpoints she represented on the issues involved in the
political campaign, were her personal viewpoints and not that of District 7
D.  Used social media and public websites in such a manner that it disrupted the school
environment
E.  Posted confidential information about a student on social media and a public website
F.  Created a "bias incident" where her actions as a District employee with regards to the
political campaign/movement involved behavior or language which was derogatory
and directed at those persons and or students "sexual orientation"

The scope of this investigation is strictly regarding District 7 policies and whether the conduct of
Rachel Damiano that is alleged by District 7 employees ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮ (Exhibits 1A-1F) violated the listed School Dist. 7
policies (Exhibit 6A-6E) and if Ms. Damiano failed to meet the standards of her job description
(Exhibit 6F). At the center of the complaints is the "I Resolve" campaign and video which are about
gender identity policies as stated in the video: *"We just want to say a thank you for taking the time to
click play on this video, to hear what we have to share with you about policies related to gender identity for
our youth."*

Exhibits 1A, 1B, 1C, 1D, 1E, and1H were formal complaints filed by District 7 staff/employees
essentially asserting that Ms. Damiano was involved in a campaign/movement of a political nature
believed to be non-sanctioned by Grants Pass School District 7 and alleged to have violated several
District 7 policies. Numerous emails were identified by District 7 related to the "I Resolve" campaign
and contained in a folder in (Exhibit 7) some of which I have listed in various parts of this report.
Those emails used the address @grantspass.k12.or.us which I confirmed to be the School District 7
official email domain.

Exhibits 2A, 2B, 2C, 2D, 2E, 2F, 2G, and 2H are only some of the complaints from citizens sent to
District 7 email accounts between April 6th and April 7th, 2021 that included Ms. Medart, Kirk Kolb,
Tommy Blanchard, and Rachel Damiano. The complaints called Ms. Damiano transphobic, disturbing,
discriminating, and harmful to students. Exhibit 2A included information and a screenshot from the
since removed Facebook page which read: *"Our Resolutions: *Bathroom/Locker room use by anatomy,
not gender. *Required parent involvement in student's gender journey. *Staff/student freedom to
respectfully use or not use a person's preferred name/pronouns."* Exhibit 2B was sent to Ms. Damiano
but includes statements regarding Ms. Medart and the campaign. Exhibit 2E and 2F are addressed to
Ms. Medart while others are inclusive of both Ms. Damiano and Ms. Medart. Exhibit 2G was one of

**GPSD 439**
**Vickers Declaration**
**Exhibit 8 Page 19 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

several emails sent to Superintendent Kirk Kolb alleging the School District was actively trying to pass resolutions restricting the rights of trans and gender non-conforming students in his schools. These emails as stated were dated April 6th through April 7th, 2021 and are noteworthy as they show Ms. Damiano is being identified within several days of the video posting to social media as a North Middle School Assistant Principal and associated with the "I Resolve" campaign.

Exhibit 3A, 3B, 3C, 3D, 3E, and 3F are complaints received by email from students and or prior students between April 6th, 2021 and April 8th, 2021. All of the emails are on Grants Pass District 7 email accounts that include Ms. Damiano, and District 7 administrators Kirk Kolb, Tommy Blanchard, and Katie Medart. The emails accuse Ms. Damiano of being prejudiced, disrespectful, and discriminatory as well as referring to the campaign as a disgusting proposal. These emails as stated were dated April 6th through April 8th, 2021 which is noteworthy as they show Ms. Damiano is being identified within several days of the video posting to social media as a North Middle School Assistant Principal and associated with the "I Resolve" campaign.

Exhibits 5A, 5B, 5C, 5D, and 5E are of media coverage surrounding the "I Resolve" campaign between April 7th, 2021 and April 15th, 2021. Exhibit 5A was a screenshot of News Channel KOBI 5 who did a story on April 7th, 2021 and depicts a statement identifying Ms. Damiano as "Assistant Principal of North Middle School." Exhibit 5C is a similar story from News Channel KTVL on April 8th, 2021, identifying both Rachel Damiano and Katie Medart as an Assistant Principal and teacher at North Middle School in Grants Pass. Exhibit 5D is a news story by News Channel KOBI 5 regarding a North Middle School 8th grade student who is protesting the conduct of Ms. Medart and Ms. Damiano related to the "I Resolve" campaign specific to the anatomical bathrooms and the belief that the policies are transphobic. Exhibit 5E is a News Channel KTVL story dated April 15th, 2021 in which students at North Middle School have started a petition to have Ms. Medart and Ms. Damiano fired. The news stories have over 50 comments regarding the stories and many of the comments are adversarial and hostile in support or against the campaign or persons commenting or associated with the stories.

Exhibits 4A, 4B, 4C, 4D, 4E, 4F, and 4G are emails on Ms. Damiano's Grants Pass District 7 account that Ms. Damiano either sent, received, or part of the email conversation related to the "I Resolve" campaign. Numerous emails appear to be during the school workday, associated with the "I Resolve" campaign, and not associated with school business. Exhibit 4A is an email to an outside person regarding the "I Resolve" design and a color reference. Exhibit 4B is an email conversation between District 7 employee ▇▇▇▇▇▇ and Ms. Damiano regarding "I Resolve" T-shirts. Exhibit 4C is an email conversation between District 7 employee ▇▇▇▇▇▇ and Ms. Medart dated March 15th, 2021 with one at 4:04 PM and another at 4:11PM, followed by one at 4:26 PM. That conversation is forwarded on to Ms. Damiano by Ms. Medart on March 16th, 2021 at 9:10 AM and Ms. Damiano responds back to Ms. Medart the same day at 9:46 AM. The subject line of those emails is "Copy of Resolution 2021-01 – Invitation to edit." The same resolution of the "I Resolve" campaign. The emails contain a link to a document for editing via Google Docs. In ▇▇▇▇ email to Ms. Medart,�__ asks the question: *"Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?"*

Ms. Medart responds to __ with a web address and a copied portion of the article as I found when I conducted a search of the article referenced. https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift. *"While the EO does not specifically rescind any*

---

## GRANTS PASS SCHOOL DISTRICT 7

*specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.*

*What should schools do now?*

*The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."*

Exhibit 4D is an email from Ms. Damiano to Ms. Medart including a Google Docs link titled "Copy of Resolution 2021-01" which is part of the "I Resolve" campaign. The subject line is "Copy of Resolution 2021-01." This email is dated March 18th, 2021 at 1:49 PM which was a school day.

Exhibit 4E is another email from Ms. Damiano to Ms. Medart including a Google Docs link titled "I Resolve." The subject line is "I Resolve – Invitation to edit." This email is dated March 19th, 2021 at 4:17 PM which was a school day and is an invitation to edit the document.

Exhibit 4F is an email conversation between Rachel Damiano and ▇▇▇▇▇▇ who identifies as someone from Edgewater fellowship by ▇▇ email address. The subject is listed as: "Re: i resolve video." There are several emails between them from March 24th, 2021at 7:32 PM, 8:34 PM, and another at 9:29 PM where Ms. Damiano used District 7 email to communicate. Ms. Damiano has a signature block at the end of her emails with her name and title as Assistant Principal, North Middle School. An additional Edgewater Fellowship person named ▇▇ is copied and the email conversation mentions Ms. Medart as having added some comments next to the video as if referring to edits to the "I Resolve" website. There is a question about YouTube and how best to post it on the site and another comment that Ms. Damiano will forward it to Katie to look at.

Exhibit 4G is an email conversation containing several emails between Ms. Damiano, Ms. Medart, and ▇▇▇▇▇▇ from Edgewater Church dated March 24th, 2021 at 7:32 PM, 7:58 PM, and March 25th, 2021 at 7:29 AM between mentioned persons and another identified by email on a Hotmail account. There is a dropbox link titled "I Resolve" edit in the subject line of the link with conversations about changes to the video and if they are necessary.

Exhibit 4H is an email on District 7 email from Ms. Damiano to Ben Shapiro of the Daily Wire dated March 26th, 2021 at 2:41 PM. Ms. Medart is copied in on the email at her District 7 email. I conducted an internet search and found the Daily Wire organization which reports: "We're one of America's fastest-growing conservative media companies and counter-cultural outlets for news, opinion, and entertainment. We're opinionated, noisy, and having a good time." Ms. Damiano opens the email with: "We appreciate the work that you and the Daily Wire team do to bring common sense to the American people and for your daily fight to safeguard our individual freedoms." The email references the Equality Act, as well as Oregon state proposed legislation and mentions the negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement

# GRANTS PASS SCHOOL DISTRICT 7

in the process, have been shown to be damaging to the mental, physical, and emotional health of youth. Ms. Damiano writes that "We" are requesting that you and your team review our proposed resolution and, if you agree with it, to speak out in support of this angle on the gender identity and related policy issues. There is a link to the "I Resolve" website and a link to the YouTube video. The email also posts the resolution from the website in its entirety. The email is signed: "*Sincerely, Rachel Damiano and Katie Medart Southern Oregon Assistant Principal and Southern Oregon Science Teacher.*" The irony is in the signature where although the name of the School and School District are left off of the email other than identifying Southern Oregon Assistant Principal and Science Teacher, it is sent on District 7 email with an email address identifying Grants Pass District 7.

Exhibit 4I is an email on District 7 email from Ms. Damiano to Dr. Reynolds of the American Legislative Exchange Council (ALEC) dated March 26th, 2021 at 2:31 PM. Ms. Medart is copied in on the email to her District 7 email account. The email references the Equality Act, as well as Oregon state proposed legislation and mentions the negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement in the process, have been shown to be damaging to the mental, physical, and emotional health of youth. The email requests that ALEC review their proposed resolution and adopt the policy points to then be put forth at the state and federal levels by legislators. There is a link to the "I Resolve" website and a copy of the "I Resolve" Resolution regarding bathroom use, name and pronoun choices, and the previous mentioned parental consent. The email is signed: "*Sincerely, Rachel Damiano and Katie Medart Southern Oregon Assistant Principal and Southern Oregon Science Teacher.*" The same irony exists in this signature as in Exhibit 4J as the name of the School and District are left off of the email other than identifying Southern Oregon Assistant Principal and Science Teacher. However, it is sent on District 7 email with an email address identifying Grants Pass District 7.

Exhibit 4J is an email from ███████████ identified as a District 7 employee who sent Ms. Damiano an email on District 7 email to discuss the email made by Ms. Damiano dated April 1st, 2021 and showing the association of the "I Resolve" campaign and Ms. Damiano as a District 7 employee.

Exhibit 4K is an email from Katie Streit of News Channel KOBI 5 dated April 7th, 2021 at 11:02 AM and sent to Ms. Damiano's District 7 email account. The subject line of the email states: "Media Request." The body of the email states: "*Good morning, I am doing a story about Oregon SB 52, I ran across your organization "I Resolve." I was wondering what your availability was today for a quick interview about your perspective on the proposed legislation. I look forward to hearing back from you!*" Ms. Damiano or someone with access to Ms. Damiano's email at 11:50 AM forwards the email to a personal email account which is Rachel.g.damiano@gmail.com. This email, as did others, shows that Ms. Damiano and Ms. Medart were identified as being North Middle School employees associated with the "I Resolve" campaign that involved pending legislation as stated by the reporter. This was within days of the posting of the website and YouTube video.

Because I was aware that District 7 had conducted an interview with Ms. Damiano, I reviewed the audio recording dated April 9th, 2021 (Contained in Exhibit 7). In reviewing the audio recording, I noted information relevant to Allegation #1. According to the recording, Tommy Blanchard, Dan

# GRANTS PASS SCHOOL DISTRICT 7

Huber-Kantola, Ms. Damiano, and ████████ with the Association of American Educators is also present. There are two parts to the interview. Ms. Damiano explains in the interview that several complaints have been received. Mr. Blanchard although not mentioning the campaign, asks Ms. Damiano what social media outlets or media in general have been used and what is open to the general public.

Rachel Damiano:

Yeah, so Facebook has been used, and Instagram are the two social media platforms. And then there was a website. Facebook and the original Instagram were both taken down last week, and there is a new Instagram picture.

Tommy Blanchard:

So you said both of them were taken down and the new Instagram is up?

Rachel Damiano:

Yes.

Tommy Blanchard:

And there's not currently a Facebook one?

Rachel Damiano:

There's not currently Facebook.

Tommy Blanchard:

Okay.

Dan Huber-Kantola:

So the second part of that Rachel, is are all those open to the public?

Rachel Damiano:

Yes.

## GRANTS PASS SCHOOL DISTRICT 7

Ms. Damiano did not mention YouTube where I found the "I Resolve" video uploaded on March 25th, 2021. Mr. Blanchard asks Ms. Damiano about what changes have been made to the social media sites and the rationale for the changes made.

Tommy Blanchard:

Okay, so second question you've answered a little bit, but what changes have been made in addition to Facebook coming down? So in terms of the resolution, videos, changes on Instagram. What changes have been made, and what were the rationale for the changes?

Rachel Damiano:

Yeah, so the original Facebook and Instagram were taken down after the office's superintendent sent out an email last week at around 4:30. And around that time both Facebook and Instagram, but mostly Facebook blew up with a lot of hate speech to the point where trying to keep up with reporting the comments to Facebook and mitigating the amount of, like I said, hate speech that was coming our way was overwhelming, so we ended up taking it down.

Rachel Damiano:

We did save a copy of the whole page and, per Facebook's policy, you can actually re-open it if necessary, to find any comments or anything like that. Same with the Instagram. It was to the point where the comments coming towards us were not respectful, they weren't tolerant, they weren't conversation starters, so we felt that it wasn't safe to keep them up.

Rachel Damiano:

So we took them down. And the new Instagram was put up with some more safeguards in place initially, and with one posting. So it has one posting on it.

Tommy Blanchard:

Are people allowed to make comments with [inaudible 00:05:11].

Rachel Damiano:

No.

Tommy Blanchard:

---

**GPSD 444**
**Vickers Declaration**
**Exhibit 8 Page 24 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

No.

Rachel Damiano:

Not on the Instagram page.

*Mr. Kantola asked Ms. Damiano if anyone from District 7 assigned her to work on the policy or campaign (referring to "I Resolve" although not stated).*

Dan Huber-Kantola:

And AR says that you can't use... Transmission material regarding political campaigns is strictly prohibited. I guess a couple of questions. I know I didn't assign you to work on the policy that you did. Did Principal Blanchard assign you to work on the policy?

Rachel Damiano:

No.

Dan Huber-Kantola:

Superintendent Kolb?

Rachel Damiano:

No.

Dan Huber-Kantola:

Okay. Any of the directors?

Rachel Damiano:

No.

Dan Huber-Kantola:

Okay, so this particular work was your work?

Rachel Damiano:

It was, yes. [inaudible 00:06:28] our [inaudible 00:06:29].

---

**GPSD 445**
**Vickers Declaration**
**Exhibit 8 Page 25 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Okay. But your personal work, not...

Rachel Damiano:

Yeah, personal work.

Dan Huber-Kantola:

Personal work, okay. Was any part of this resolution created or edited using a Google account associated with the district?

Rachel Damiano:

No. Not the resolution.

Mr. Kantola followed-up with a question regarding feedback on the website or logo using Ms. Damiano's school account or school email account.

Dan Huber-Kantola:

Did you receive any feedback about the resolution or the website or the logo or anything using your school account? Your email account?

Rachel Damiano:

Yes, probably throughout there somewhere. And you guys have access to that. Can find all those [inaudible 00:07:54]. And to clarify, the assertion is that this is political work, correct?

Dan Huber-Kantola:

Two. One, it's [inaudible 00:08:08] some political basis. And two, it wasn't something that was asked to be done during your job assignment.

Rachel Damiano:

Okay.

Mr. Kantola asked if Ms. Damiano received feedback regarding the resolution by email.

**GPSD 446**
**Vickers Declaration**
**Exhibit 8 Page 26 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Okay. Did receive some feedback regarding the resolution by email?

Rachel Damiano:

Yes.

Dan Huber-Kantola:

Did you receive feedback regarding the logo through your school email account?

Rachel Damiano:

Not through... As previously stated, I used Canva, which is an alternative, which the district doesn't pay for, but did use my district email as my login, yes. For Canva, but not through our Outlook account.

Ms. Damiano's statement seems to contradict the email evidence (Exhibit 4) showing numerous emails on her District 7 email account. Mr. Kantola asks her more specifically about District 7 email.

Dan Huber-Kantola:

Did you copy yourself when you had conversations? And did you copy a teacher's email account? That's a district email account?

Rachel Damiano:

Yes. Through some communication.

Dan Huber-Kantola:

Both on the resolution, on the website, and on the...

Rachel Damiano:

Probably in there somewhere, yeah.

Dan Huber-Kantola:

Okay.

**GPSD 447**
**Vickers Declaration**
**Exhibit 8 Page 27 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

How about editing the video? Were there copies of emails that went through the district, email stuff, editing the video?

Rachel Damiano:

Yes, it was sent to the district email, and then we moved it [inaudible 00:12:15] off because of previous work with this organization and the email they had on file.

This last statement would contradict emails discovered that included Edgewater church through email from ████████ (Exhibit 4F) were involved in the video and not an organization that Ms. Damiano was referring to that had her District email "on file." Additionally, there are numerous emails (4C, 4D, 4E, 4F, and 4G) between Ms. Damiano, ████████, Ms. Medart, and ████████ involving editing that continued between March 16th, 2021 and March 24th, 2021 which is the day before the video was uploaded to YouTube showing ongoing editing through the use of District 7 email.

Mr. Kantola asks Ms. Damiano about whether or not she talked with other teachers about the "I Resolve" work.

Dan Huber-Kantola:

Okay. Just checking. When you were at school during school time, did you talk to teachers about this particular work?

Rachel Damiano:

About I resolve? No. About the memorandum and the, well, let me clarify. With Katie, yes. The bulk of I resolve work, actual I resolve work was outside of school. I resolve was a reaction and public comment and feedback to a memorandum that was given to us on February 5th, from the district, and to education policies at the state level that are currently open for public comment as per state board agendas. Both the March agenda and the upcoming April agenda.

Dan Huber-Kantola:

Okay. So bulk of the I resolve work outside of school, some of the I resolve work inside the school.

Rachel Damiano:

While on school grounds, yes.

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

While on school time?

Rachel Damiano:

Depends on your definition for school time for-

Dan Huber-Kantola:

Your administrative role is on school time. Because you mentioned Katie. How about your work with Katie during the school day? And correspondence with Katie during the school day about I resolve.

Rachel Damiano:

Yes.

Dan Huber-Kantola:

Is Katie assigned, as a science teacher, to work on I resolve and policy work?

Rachel Damiano:

She is not.

Dan Huber-Kantola:

So Rachel, did you have any conversations with other teachers soliciting support for I resolve or showing them information about the website or any of that kind of thing during...

Rachel Damiano:

Not to my knowledge.

Dan Huber-Kantola:

... during school hours?

Rachel Damiano:

Not to my recollection.

**GPSD 449**
**Vickers Declaration**
**Exhibit 8 Page 29 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

So you personally did not do that?

Rachel Damiano:

Not to my recollection.

Mr. Kantola asked if Ms. Damiano was aware that any teacher was seeking solicitation for support of the campaign.

Dan Huber-Kantola:

Were you aware of any teacher seeking solicitation for support on showing information on the website or the video or any of that kind of stuff while the teacher was on school during the school day?

Rachel Damiano:

Not until after the fact.

Dan Huber-Kantola:

Can you elaborate on that?

Rachel Damiano:

I was made aware of one day that a teacher, during flex time, was discussing with staff members.

Mr. Kantola asked Ms. Damiano since she was an administrator, what steps she took regarding stopping and documenting the actions of the teacher.

Dan Huber-Kantola:

As an administrator, what steps did you take to stop that and document that stoppage?

Rachel Damiano:

Well, to my understanding, it wasn't political work and against policy, so I had a conversation with Tommy at some point. We have pretty informal conversations in the mornings, and so we've discussed my resolve, we've discussed the resolutions, we've discussed the teacher's reaction to the memorandum, and her concerns. So it was in there, in one of our discussions.

**GPSD 450**
**Vickers Declaration**
**Exhibit 8 Page 30 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Anything with the teachers that said you should be doing that for school time?

Rachel Damiano:

Her and I did have a conversation around, after the fact, some follow up that she had wanted to do, and I cautioned her not to do it, but that was written. Her follow up that she wanted to do was in written form and I cautioned her not to.

Rachel Damiano:

And she didn't. She did follow that caution.

Dan Huber-Kantola:

So that one day, was it one teacher that she reached out to? Was it multiple teachers that she reached out to? What was the scope of that solicitation?

Rachel Damiano:

She didn't specify with me, so you would have to ask her.

Dan Huber-Kantola:

So after any conversations that she had on a given day with a teacher, she did not come back to you and say, hey, I had this conversation with, just hypothetically here, ███████ or ██████████ or ██████████.

Rachel Damiano:

I was aware that she had conversations with them and others, but the timing of when she had them was never specified. So I could assume that she had talked to them during that flex time, or I could assume that she talked to them after hours. As the specifics of who she talked to during that flex time, I couldn't give you exact names of who she talked to.

Dan Huber-Kantola:

But did she relay that she had talked to those people to you?

**GPSD 451**
**Vickers Declaration**
**Exhibit 8 Page 31 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

At some point, yes.

Ms. Damiano stated she did not have a conversation with any students about the campaign and to the best of her knowledge neither did any other teachers. Mr. Kantola asked Ms. Damiano about circulation and editing of the "I Resolve" resolution.

Dan Huber-Kantola:

On the 16th did you circulate or be part of the circulation of the document that was editing the I resolve resolution between you and Katie and an outside source and ██████████?

Rachel Damiano:

Was I CC'd on it?

Dan Huber-Kantola:

Were you... Yes.

Rachel Damiano:

I'd have to look back. I know there was a copy made and people looked at it.

Dan Huber-Kantola:

Are you aware that people used school time to look at that?

Rachel Damiano:

I was asked to look at their computer work and see if they used school time to look at it.

Dan Huber-Kantola:

Are you aware that teachers forwarded that information, including forwarding it to you while students were present in their classrooms or potentially present in their classrooms?

Rachel Damiano:

I'd have to look at a timestamp.

                    CONFIDENTIAL                    PCI #21-1011/ Part II

**GPSD 452**
**Vickers Declaration**
**Exhibit 8 Page 32 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

So if I gave you a timestamp of 9:15, would you expect students to be present in classrooms on a Tuesday morning?

Rachel Damiano:

Yes, if we had school in session. So, yes.

Ms. Damiano does not answer the question but infers that she might have been copied in on editing email regarding the resolution and "I Resolve" campaign. Exhibits 4C-4G actually shows she was actively emailing or responding to email regarding the campaign and resolution.

Mr. Kantola asked Ms. Damiano if she shared that the "I Resolve" video was her personal viewpoint.

Dan Huber-Kantola:

So in your communications with other staff, parents, community members, students, about this particular I resolve, and everything that's associated with it, the video... Did you share that this was your personal viewpoint?

Rachel Damiano:

Originally did I use those words? No. In the video, we don't say "this is our personal opinion". We never say we're from district seven. We never identify even our last names, so you would have to do digging to find even where we're from. Per guidance and understanding and reflection, we've added it all over the website. It's in every communication and response that we've sent from here on out as well.

Rachel Damiano:

But we never claimed to be speaking for the district by saying even where we were. There is one Instagram post where a community member, in a string of messages, states at one point... And this is after we've been identified. After everyone knows who we are, where we were. State asks if we took the video down in a statement because we used district seven time and resources to create the video specifically.

Rachel Damiano:

As a social media post, I posted, fact check, no district seven time or resources were used in the creation or promotion of this video, which is true. And that's not saying that I speak for district seven.

---

## GRANTS PASS SCHOOL DISTRICT 7

It is a response to a factual question. If she had said Rogue River School District time and resources, it would have been a thing. No Rogue River time or resources were used for this.

The listed Exhibits in this report which included numerous District 7 emails with dates and times would indicate it was part of Ms. Damiano's workday and therefore not a truthful statement she made as she stated that "no district seven time or resources were used in the creation or promotion of this video." Mr. Kantola asks if Ms. Damiano is making a factual statement if actually school email and equipment was used.

Dan Huber-Kantola:

Is that an actual and factual statement if actually school email was used to have the video go out to be checked?

Rachel Damiano:

[inaudible 00:25:59]. Video, because it was originally sent to ours, I could see how you could tie it there.

Dan Huber-Kantola:

So is that a factual statement that no district seven equipment was used?

Rachel Damiano:

In creation or promotion.

Rachel Damiano:

I think if you worked on semantics, then...no

Dan Huber-Kantola:

[inaudible 00:26:31] semantics it's that there's a video that's been edited and sent to Katie's district email. Sent to your district email. There's responses about it that says this is good and this isn't good. That's not a semantic thing. It's district seven email that's used to review the video.

Rachel Damiano:

Okay.

**CONFIDENTIAL**

**GPSD 454**
**Vickers Declaration**
**Exhibit 8 Page 34 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Mr. Kantola speaks to Ms. Damiano about District Guidelines specific to handling gender identity students and speaks to what she is trying to promote in opposition to pending laws that will force her and others to use certain pronouns that they currently do not have to do. Ms. Damiano makes a statement about decisions at the State and Federal levels would make things required and states: "That is what we were proactively working to make sure does not happen."

Dan Huber-Kantola:

Rachel, yes, sorry. I apologize. I'm not agreeing that it's not a political issue, but let's say, for hypothetical purposes, that it's not a political issue. Is it still an appropriate use of time for a district seven administrator to use district seven time and knowingly have a district seven teacher use district seven time to promote things that are in opposition to district seven operational guidelines and policy?

Rachel Damiano:

As feedback, as educators, it is part of our discussion, often around policy, feedback on policy, concerns around policy. We don't see all of this as direct opposition to the memorandum, but the memorandum is not policy as per board policy, so it's never gone through the board policy...

Dan Huber-Kantola:

It is a guideline.

Rachel Damiano:

[inaudible 00:28:00]. It's a guideline.

Dan Huber-Kantola:

So I guess I would as you that. Is it appropriate to spend... If you have a teacher that's struggling to follow the operational guidelines of the district, is it appropriate to help that teacher work through the guidelines to be able to follow them as they are written, or is it... Or is it more appropriate to do that, or do you feel like, in the district seven administrative role, it's more important to work with the teacher to try to change them rather than work with the ones that have already been established a month earlier.

**GPSD 455**
**Vickers Declaration**
**Exhibit 8 Page 35 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

So Katie does work within the memorandum. The memorandum says recommended. It's not required. When we brought the concerns to you, it was stated that, if things are going to change, they have to change at the high level because you're operating under the ODE guidelines, and that has been the push for what has been the focus. The resolution is a response to what is coming down from the state, and if it comes down from the state, the memorandum will no longer be guidance, and it will actually no longer be accurate.

Rachel Damiano:

Because of what's coming down from the state and the federal government, it's not going to be recommended anymore for teachers to use or not use pronouns. It will be required. And that is a proactive so that she can continue to follow within guidelines, and other educators can still continue to follow within guidelines, because if it comes down from the state, we have several teachers that will not be able to follow the upcoming, not the current, the upcoming. What's coming down from the federal government.

Dan Huber-Kantola:

I guess I'm confused, Rachel, because I presented the guidelines and the guidance to all of our administrators, and that is our practice. It's not an "if" thing. It is our practice that teachers are expected to use the pronouns that are associated with the gender change. It's not something that's an optional thing. It is something that we try to work with kids on the front end, but at the end of the equation, and even in the guidelines, if a student tells us, and they're going through a gender process change, and they want to use the pronouns "he" and "his", we would follow that.

Dan Huber-Kantola:

And we would help teachers follow that as administrators. Am I missing something?

Rachel Damiano:

Yes. So the memorandum says "recommended", and there's current... So the six circuit federal court of appeals in Ohio-

Dan Huber-Kantola:

[crosstalk 00:30:40].

**GPSD 456**
**Vickers Declaration**
**Exhibit 8 Page 36 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

I know.

Dan Huber-Kantola:

The district guidelines that you got.

Rachel Damiano:

Says recommended. It does not say required.

Dan Huber-Kantola:

All right. So you really thought that teachers could do whatever they wanted to do?

Rachel Damiano:

If they are respectful... If it is recommended and not required... If we're talking about Katie specifically-

Dan Huber-Kantola:

Any teacher.

Rachel Damiano:

Has a fantastic relationship with her students. I would have every expectation that teachers are respectful to students. That they treat them in a kind and respectful, honoring manner, and if a teacher, because of whatever reason... Freedom of speech or freedom of religion, they have a concern about calling a student by their pronoun or their preferred name, as per the recent ruling that just came out as well, we cannot force them to do that.

Rachel Damiano:

And again, the guidance coming down potentially from the state level, and potentially the federal level, which would be in opposition to the federal court of appeals, [inaudible 00:31:51] decision that was just made, would be that it is required. And that is what we were proactively working to make sure does not happen.

---

**GPSD 457**
**Vickers Declaration**
**Exhibit 8 Page 37 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Mr. Blanchard asked Ms. Damiano if she felt that the video and resolution is supportive of District 7 policy ACD – "All Students Belong."

Tommy Blanchard:

There's one question that refers back to board policy ACD, which is all students belong, and the board resolution 2021- Code three, equity, diversity, and inclusion. Do you feel that the video and resolution is supportive of this policy and the board resolution?

Rachel Damiano:

I do. I feel like the resolution is inclusive of all students. It honors all students, all voices. It doesn't give any less treatment to any specific group of students. It gives equal access to all students based on a standard across all students.

Tommy Blanchard:

So, based on your most recent response to Mr. Kantola about teachers not being required to do that, I find that contrary to your most recent response to this question. If a teacher is not willing to honor that, how can we state that all student belong?

Rachel Damiano:

That's the definition of tolerance. Right? Tolerance is the ability to understand that someone else has a different viewpoint, and still be respectful about it. It doesn't mean that you have to agree on everything. It comes down to relationship and respect. If a teacher such as Katie can have conversations with students that are respectful and kind and can give value to the student as a human, then that is accepting of all students.

Rachel Damiano:

If a staff member, any staff member, doesn't feel comfortable calling them by their preferred name or by their preferred pronoun, having a conversation with a student in a very respectful way, that says either, I'm sorry, I cannot honor that. Is there another way? Can I call you by your last name? Can I call you... And then not using, in a derogatory or disrespectful way, if pronouns are slipped, or if there is an attempt not to use pronouns.

**GPSD 458**
**Vickers Declaration**
**Exhibit 8 Page 38 of 71**

Rachel Damiano:

But again, guidance coming down would require it, and if it was a slip at all, or if they didn't feel comfortable, there would be cause for harassment charges being brought, and discrimination charges being brought. If the guidance coming down... Or not guidance. If the legislation coming down is approved.

Rachel Damiano:

Would I have an expectation, if a teacher didn't feel comfortable? For example, if there was a biologically male student in a classroom, and the biological male student identifies as a female in gender identity, would I have an expectation that the teacher didn't, on purpose, say any disrespectful derogatory name, sir, can I help you? Sir. Right? That's disrespectful, that's derogatory, and that would be...

Rachel Damiano:

Even if the biological male identified as a male but had an issue with being called sir. That's derogatory. That's disrespectful. So that expectations around being respectful, it's not around the use or not use of pronouns.

Mr. Blanchard then asks Ms. Damiano about ███████ complaint (Exhibit 1F).

Tommy Blanchard:

In ███████ complaint, ███ makes mention of... I'm just going to read that [inaudible 00:35:49] part in the statement. Separation of church and state [inaudible 00:35:52] public employee cannot discuss their religious beliefs onto others in a manner that impacts their ability to do their job. So the question is, is this an attempt to promote your religious beliefs [crosstalk 00:36:04] school?

Rachel Damiano:

It is not. It's why we honor all sides. All beliefs and viewpoints on this have a voice. It's not forcing any agenda. It is a, again, tolerant, respectful, kind, and loving conversation around the different opinions. It includes all students, and it is a conversation that includes all students and staff members because they are a part of this equation as well.

Mr. Blanchard asks Ms. Damiano if she is aware of any disruption the circulation of the video or similar material has caused at North Middle School.

# GRANTS PASS SCHOOL DISTRICT 7

Tommy Blanchard:

Okay. Are you aware of any disruption the circulation of the video, or similar material, has caused at North?

Rachel Damiano:

Yes. I don't know if you want me to elaborate on that, but I feel like not... Yes, the circulation, but more the reaction from the community, really, as a whole. And obviously, the staff members that were concerned about it. If we went back to that, my hope even in that time would be that the staff members, if they had concerns, I don't feel like Katie and I have ever, ever in our time in the district not created a safe space for students or staff. And so, yeah. Again, the desire would be that we are having the same expectation for staff as we do, hopefully, for our students, that we can have conversation around disagreeing without jumping to, "This is hateful, this is discriminatory, this is going to create a Nazi space for our kids." Because that's not true, so.

Tommy Blanchard:

So, knowing that there has been some disruption and discomfort, how would you anticipate coming back and handling the current situation?

Rachel Damiano:

Yeah. I think it would have to be a partnership with the district, because I think that the district has some responsibility of how they've reacted, as well. And emails that have been sent out. And yeah, so I think it would have to be a partnership and a conversation. It would have to come from both, because no matter how much Katie and I try to reach out or have conversations because of the reactions from, not just the district, but from community members. That all would have to be repaired and the actual truth would have to get out because right now it's not, and you can see that in media coverage right now, you can see it in comments on Facebook. So it would have to be partnership on all grounds with an understanding and a true desire to be tolerant in conversation. I don't know how much I can press on this.

Rachel Damiano:

But, again, to have a tolerant society, you have to have an ability to have respectful conversations. And, I know it's a current term, but the cancel culture that is happening right now, and as a reaction to what we believe is fair and middle-of-the-road conversation around policy is appalling in a lot of

**GPSD 460**
**Vickers Declaration**
**Exhibit 8 Page 40 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

ways. Not specifically the district's reaction, although that has made us feel very unsupported. But... Yeah.

There were other discussions throughout the interview not relevant to my investigation as I had learned what I needed to continue my investigation (See audio recording for more details contained in Exhibit 7).

On May 13th, 2021 at 9:05 AM, I did meet with Rachel Damiano for an interview at the Grants Pass School District 7 offices in a conference room. I did advise her our conversation was being recorded. Additionally, Attorneys Ray Hacke who was present in the room, Mathew Hoffman, and Tyson Langhofer who joined via Zoom conferencing, and Sharon Nelson who is the Director of Legal Services for the Association of American Educators via Zoom were all there representing Ms. Damiano. District 7 attorney Willard Ransom was present as well. I advised Ms. Damiano of the allegations and potential policies violated. I did direct her on behalf of the Grants Pass School District 7 to answer any and all questions truthfully. Ground rules regarding persons present were read into the record and no one objected to the ground rules. I advised her the investigation was that of an administrative fact finding and not a criminal matter.

I also provided a "Garrity Rights" form which I read to her she signed acknowledging the notice (Exhibit 7). Ms. Damiano confirmed she was noticed regarding the investigation and today's interview. I asked how long she had been employed with the School District and she told me since August 2020. She stated her title was that of an Assistant Principal for North Middle School. I asked Ms. Damiano what her duties and responsibilities were in a typical week.

Bill Landis:

What are your duties and responsibilities, let's say, in a typical week, like?

Rachel Damiano:

Right now, for the school district, I have multiple hats. I'm an assistant principal at North Middle School. I run Canvas support for the district, and I also am the lead administrator for Grants Pass online at the middle school level. A typical week, a typical Corona week, or what it really should look like... A typical week could include anything from instructional practices, to working with students, to doing technical support, to working and looking at policies, to doing student discipline, some very wide range of responsibilities.

I asked Ms. Damiano what was considered her workday and schedule for a week.

Bill Landis:

Okay. What is considered your workday and/or work schedule for a week?

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

We, as administrators, don't have anything specific, or in writing, for what our work schedule, or work time looks like. I think it depends on who you ask, but, official duties for when students are present, right now during corona, students show up at 8:30, and they leave a little afternoon. Teachers show up and they're on campus from 7:30 to 3:30. Typically, I am on campus any time before 7:30 until any time after 4.

Bill Landis:

Okay, and that's not something that's written, that's just, pretty much, a known practice?

Rachel Damiano:

Yeah.

This established that Ms. Damiano perceived her workday to be from 7:30 AM until sometime after 4:00 PM. I asked her if she was familiar with District 7 policies and she said "yes." I asked Ms. Damiano to tell me about the "I Resolve" campaign.

Bill Landis:

Tell me about the I Resolve campaign, what it's about, and when did it start?

Rachel Damiano:

I Resolve, they're just ideas for solutions for some current legislation that is coming down from the state and federal level. There is no specific law, right now, or even policy in the Grants Pass School District, regarding students who, either want to go by a different name, no matter if they identify as transgender or not, want to go by a different name, or different pronouns, as well as bathroom use. There is no specific policy, that's gone through the board.

Rachel Damiano:

We were given a memorandum, as administrators, back in February. We have had several teachers that have been concerned about how do they react in certain situations with students, and there is no guidance, there's no written down guidance for those teachers, staff members. We were given a memorandum in February and that memorandum was... I had some concerns initially when I saw them, or saw it. If you go back and grab the zoom meetings, we had the zoom meeting for that administrative meeting. I expressed some concerns, privately, to the HR director in that meeting. I

**GPSD 462**
**Vickers Declaration**
**Exhibit 8 Page 42 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

had some concerns from there and wanted to voice those and wanted to voice those, so set up a meeting with HR.

Rachel Damiano:

There were also teachers, a teacher in particular, that had some concerns, because that memorandum, not specifically, but the general contents of the memorandum was shared with that teacher. I gathered feedback regarding concerns, brought them to human resources, and brought some solutions with me, because that's how we operate in Grants Pass. As leaders, right, you want to bring solutions. Brought some solutions, was told that this comes from an ODE guidance, and that if the memorandum, or the items within the memorandum, need to change, then things need to change at the state or federal level. I said, "Okay, I'll come back to you with some more solutions". From there, the resolution was written, and discussed, and then we came back to HR and met with HR again-

Bill Landis:

When you say, "the resolution", are you talking about the campaign that you're involved in, the I Resolve movement?

Rachel Damiano:

If you mean campaign, as in a political campaign, we don't believe it's a political campaign. A resolution as in the solutions and ideas for solutions for guidance's, yes.

Bill Landis:

Okay. As I looked and reviewed the video, this is about legislation that you're wanting something applied regarding transgender or transforming students, or individuals? Is that correct?

Rachel Damiano:

As its reaction to policy, or its reaction to legislation that might be coming down, but if you read the resolution itself, it doesn't ever specifically say transgender students.

Bill Landis:

When you say "the resolution", is that something as part of I Resolve, and what you're involved in? That's separate from the school district and your duties?

**GPSD 463**
**Vickers Declaration**
**Exhibit 8 Page 43 of 71**

Rachel Damiano:

Yes. I Resolve, as in... The resolution was verbiage as potential solutions and ideas to bring to the district as, "Hey, this can be an option," because this legislation is possibly coming down. This could be a proactive solution. Again, just ideas, but that I Resolve, the bulk of the I Resolve work, in terms of getting that out to the public, and having the public know, and reaching out to leaders and reaching out to legislators, that's done separately. The resolutions are ideas for solutions.

Bill Landis:

When you talk about the guidance that you received, was it a staff meeting in February, you were talking about something like that?

Rachel Damiano:

It was an administration meeting.

Bill Landis:

Administration meeting?

Rachel Damiano:

Yeah.

Bill Landis:

Was there a memorandum that actually laid out that guidance, and it was adopted, as you said, from the Oregon Department of Education, is that correct?

Rachel Damiano:

I don't know if I'd use the word adopted. There's a 2016 ODE guidance, and it's a very long document with a lot of best practices, that is not legally binding. It says it on page two, I believe, of the guidance. It says this is not legal advice. These are best practices only. From there, districts, right now, have a broad spectrum of best practices that they can choose from. Our district had never written those down. They have kind of picked and chosen. You can probably see, because I know you have review of emails. That guidance has changed, depending on who you talk to and when you talk to them. The memorandum was a way to solidify from when it was told to us, from district leadership, solidify some... These are some of the best practices we're going to pull from that guidance.

GPSD 464
Vickers Declaration
Exhibit 8 Page 44 of 71

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

That was what you received in February of 2021?

Rachel Damiano:

Yes, February 9th, I believe, was the day we got it. It was drafted on February 5th.

Bill Landis:

When the district gives guidance to staff administrators and teachers, how do you receive that guidance? What does that mean?

Rachel Damiano:

That guidance was never given to teachers, just to clarify.

Bill Landis:

Okay.

Rachel Damiano:

And it still has not been given to teachers. That guidance, as given to use, was given as, "Hey, these are, if these situations come up, this is how we want to react, or this is how we want to handle these procedures".

Bill Landis:

Fair to say then, since you received it as an administrator, if a teacher at a school that you're an assistant principal at had an issue, that guidance was for you then to share with that particular teacher on how to handle something?

Rachel Damiano:

We were specifically told not to share with staff. Yes, so in that instance, if a teacher were to come, then I would ask and say, "Can I share this document?", and receive permission or not receive permission, or I'd go to the principal and ask, "Can I share this document?". That's how we would handle it.

**GPSD 465**
**Vickers Declaration**
**Exhibit 8 Page 45 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

In the I Resolve video that I watched, there's a part where, I believe, Katie Medart is talking to you about the laws and some of the changes prescribed. In that, there's a discussion about ODE guidance, and what that means, and at some point, you make a comment that that means at some point the district is required to follow those. Is that correct or not correct?

Rachel Damiano:

If Senate Bill 52 passes, which is what we were discussing, if Senate Bill 52 passes and creates a state of emergency, and not the ODE 2016 guidance would become what we're required to, it would be the LGBTQ2SA+ Student Success Plan that is in correlation to the Senate Bill 52. That would become no longer guidance, it would become practices that we're required to follow, because it's tied to legislation. Right now, the 2016 guidance is not tied to legislation.

Bill Landis:

The 2016 guidance that you're referring to, you believe that's not something that you have to follow or required to follow?

Rachel Damiano:

It says best practices. It says, specifically, in there that it's not legal advice, and it's up to districts to choose what they... If it were something that we had to practice, then our district would be out of compliance for the majority of that document.

Bill Landis:

If the superintendent came out and said we're not going to follow something and gave that to you as an administrator, would that be, then, something that you would then follow?

Rachel Damiano:

I think that's a very broad hypothetical. If we're talking about this case specifically, we as administrators, when things are given to us, we are often asked for feedback. It's a practice of our district that we give feedback. If it was something that was said this is required, then I'd have a conversation and say, "Is this becoming policy?". That's the point of being in leadership is to give feedback and to be able to discuss what would work and what wouldn't work within our schools.

**GPSD 466**
**Vickers Declaration**
**Exhibit 8 Page 46 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Sure. In February 2021, when administrators have that meeting and there's a memo about handling situations, and feedback was received, you weren't under the understanding then that that meant that is how to handle some of those situations at that time?

Rachel Damiano:

Yes, it's saying these are the procedures that we would like to follow, moving forward. Like I said, I had some concerns with it, and I set up a meeting with HR to have that discussion.

*I asked Ms. Damiano if she had any discussion with teachers as to how to handle situations outlined in the guidance document (Exhibit 6G).*

Bill Landis:

You didn't have any discussion with teachers about situations that may have come up after that, as far as how to handle the situation?

Rachel Damiano:

If the situation came up... I'd have to look back on if a situation came up within that time. I can say that, confidently, that if a situation did come up within that time, it was handled according to the memorandum.

*I asked Ms. Damiano about "I Resolve" and its affiliation with District 7.*

Bill Landis:

Again, just for clarification, I Resolve, that is not something that was sanctioned by District 7, nor was District 7 authorizing you to work on that as far as part of a school project? Correct?

Rachel Damiano:

Yeah, I Resolve, under what you would code as I Resolve, no. They were aware that it was happening, and were aware before it went public, but in terms of being told to go work on I Resolve and go create a movement or ideas, no. Sharing responses and potential ideas and solutions for the resolution is a practice in our district.

**GPSD 467**
**Vickers Declaration**
**Exhibit 8 Page 47 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Even though you're sharing, that isn't something that the district or the superintendent said, "Yes, we agree and want to embrace those things", is that correct? You were sharing things that I Resolve, and you felt, as far as some of those legislative proposals that were happening, at any time did you feel that, as you gave feedback about some of the solutions you felt you were offering, was that something that District 7 said they would be embracing and moving with?

Rachel Damiano:

In my first meeting with HR, when I brought the solution about the bathrooms, as part of the memorandum, I gave a potential solution at the time that said, well could we think about xx bathrooms and xy bathrooms, and I was told by the HR director, that's an interesting or creative solution. I could potentially bring that to the team. That's not saying no. Later, when I brought the resolution to the HR director, and then also to the superintendent, the superintendent in our meeting discussed and said, "Okay, I can look this over. I will have legal look it over and make sure that we aren't in violation of any laws, and I could potentially bring this to the school board". That's what I was told before we went public.

Bill Landis:

Essentially, they were saying they would look at it. No one said, "Yes, we're aligned with that and wanting to move forward with that", is that correct?

Rachel Damiano:

Not with those words, but, "I could potentially bring this to the school board", isn't also a no. It's in a process of looking at solutions, and looking at ideas, and discussion. Did they say at the time, "I'm going to adopt this, and we're going to move forward this"? No, but they also didn't say no.

Bill Landis:

Okay. Again, one more clarification. Would you consider I Resolve to be a non-affiliated District 7 campaign movement, or whatever word you want to describe it?

Rachel Damiano:

The movement aspect of it is not part of the district, it's on my personal time.

**GPSD 468**
**Vickers Declaration**
**Exhibit 8 Page 48 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

I asked Ms. Damiano to describe what she felt "I Resolve" was since she disagreed that it was a political campaign.

Bill Landis:

Okay. With the I Resolve... What word would you like to describe... I know you said, campaign you didn't feel it was. What would you describe that, I Resolve is the title of it, in the video it's clear.

Rachel Damiano:

Yeah, they're ideas, they're for solutions. It's an idea for solutions that is a discussion, it's a public discussion. It's a matter of public concern.

Bill Landis:

As I watched it, is it opposition to propose legislation that is before the legislative body, currently?

Rachel Damiano:

It is a proposal for different verbiage. If SB 52, or the Equality Act, passes in the way that they are currently written, then once they pass, it would be opposition, I suppose. It's proposal for potential solutions.

Bill Landis:

But opposition to the way it is currently proposed?

Rachel Damiano:

Yes.

I asked Ms. Damiano what her involvement with "I Resolve" has been.

Bill Landis:

Okay. With the I Resolve, what has been your involvement, as far as that program? Did you author it? Are you just a part of something... What has been your involvement?

# GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Yeah, I am one of the authors of the resolution, and the website, and social media. I'm involved in all of that.

Bill Landis:

Any other district employees involved with you in that program?

Rachel Damiano:

Yes. There is one teacher involved in it.

Bill Landis:

Would that be Katie Medart?

Rachel Damiano:

It would be, yes.

Bill Landis:

Any other staff, employees, or other District 7 related persons?

Rachel Damiano:

No, it's just us two.

I asked Ms. Damiano if she had used District 7 facilities, equipment, or supplies and email during the "I Resolve" campaign.

Bill Landis:

Okay. Have you used District 7 facilities, equipment, or supplies, email during the I Resolve, or for the I Resolve campaign?

Rachel Damiano:

Minimally, there was some crossover.

Bill Landis:

**GPSD 470**
**Vickers Declaration**
**Exhibit 8 Page 50 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Tell me about that.

Rachel Damiano:

You can, obviously, see in my email chains... I can't recall all of them because I haven't been able to look at my email, so I wouldn't be able to tell you every time that its crossed over. At one point, there was a copy of the resolutions that was sent to me, in my district email. I had sent a couple of things to a district email for a staff member. The video, once it was recorded in order to be shared with us by this organization, it was sent to my district email. That's what they had on file. After that, moved it off my district email. I'd have to look back at my emails, or I know you have access to those too. If there are any specific questions you have, or any uses, then I can help answer that.

Bill Landis:

Okay. Any reason why you used the district email, which identified you as an assistant principal at North Middle School? Which, those emails have like a signature line, I guess, that shows your name, with your title, and the school you are associated with. Any reason why you used the district email as part of that?

Rachel Damiano:

For which part? Do you have a specific question?

Bill Landis:

For anything related to I Resolve?

Rachel Damiano:

Okay.

Bill Landis:

Specifically I Resolve type emails, video, reaching out to other persons regarding I Resolve. Things like that.

Rachel Damiano:

Specifically, with the video, like I said, the organization, that's the email they had on file for me. They know that the video and the work was personal work because of the conversation I had with them,

## GRANTS PASS SCHOOL DISTRICT 7

outside. In terms of sending it, again, I'd have to look back and see if it came to my district email and I forward it, or if it came to me and I responded. I'd have to look, specifically. For the bulk of the work that I did, I was using my, in terms of I Resolve, I was using my personal email, or our I Resolve email.

Bill Landis:

With the email correspondence, on District 7 email, did you ever communicate with someone that, "Here's my personal email, I need to not use district email", or, "This is not something associated with the district", at any time. Did you do that?

Rachel Damiano:

Again, I'd have to go back and look and see if I put that into an email. I know that there are emails from my personal email that I either started a conversation, or I forwarded it to my personal email to then continue the conversation from my personal email. Again, I'd have to look back and see. I don't recall, off the top of my head, if I wrote it into an email and said disclaimer.

*I asked Ms. Damiano if she used District 7 equipment as part of the "I Resolve" campaign including computers and printers or things of that nature.*

Bill Landis:

Okay. Were you using any equipment from District 7 as part of the I Resolve campaign? Computers? Other printers? Things of that nature to print?

Rachel Damiano:

I worked on my computer. That would be all I could recall. Yeah, that would be... Unless, potentially, if the resolution was printed off. Again, I'd have to go back and look.

*I asked Ms. Damiano about the discussion of a student in the "I Resolve" video.*

Bill Landis:

Was there a discussion in the I Resolve video between you and Katie Medart, involving one of the North Middle School students, that was then posted on YouTube, and the I Resolve website. The video basically got uploaded to YouTube, which is where I observed it.

Rachel Damiano:

Mm-hmm (affirmative).

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Then you had a personal I Resolve website. Is that correct?

Rachel Damiano:

Yes.

Bill Landis:

That was public?

Rachel Damiano:

Yeah.

Bill Landis:

You recall a discussion in the video, where you discuss a North Middle School student, or Katie does with you?

Rachel Damiano:

She discusses a situation, but the details of that situation actually don't describe any one student. It's a compilation of multiple students and the actual situation that happened, didn't even happen that way.

Bill Landis:

As I recall, what she was discussing in the video was, right after she came, about a year ago, to the district, back to work for the district, she had a student approach her about wanting to be referred to as a male, currently a female going through a change. In the video, it appeared to me, that she was talking about a specific person and incident.

Rachel Damiano:

Yes, I believe, that is how the situation is that she talked about. Since reflecting on that, as part of the video, she and I have determined that wasn't either a situation that happened right away, or it was different specifics to that student, and so that student is not identifiable through that story.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

So that story was not truthful?

Rachel Damiano:

That story had elements that were truthful. Situations similar that happened when she was recalling it and when... If you look at the situation, specifically, that happened that would identify a student, there were elements that were mixes of multiple situations that happened in that recollection.

Bill Landis:

I guess my question... I'm a little confused. The accounting that she gave, and you discussed with her, she was telling you about, was something that you discussed with her later that was not accurate.

Rachel Damiano:

Yes, would be the short answer to that.

Bill Landis:

I guess my follow-up question would be, would one of your students at North Middle School, including the student that was referred to, be able to identify, who she and you were speaking about in the video?

Rachel Damiano:

No.

Bill Landis:

That's because the story isn't really accurate to a particular situation?

Rachel Damiano:

Yes. I know this is all confidential, so can I give you more details as to what that actual situation was?

Bill Landis:

Sure, possibly, maybe, without mentioning a name.

---

**CONFIDENTIAL**                    PCI #21-1011/ Part II

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Yes. I don't even know who this student is. I couldn't give you a name because, first of all, I wasn't there during that time. ███████████████████████████████ ██ ████████
███████████ ████████████████████████████████████████████
████████████████████████ .

I asked Ms. Damiano if she discussed the handling of matters involving transgender students and the District in the "I Resolve" video that was posted on social media.

Bill Landis:

Okay. Did you discuss the handling of matters involving transgender students and the district in the I Resolve video, which was posted on YouTube, and the I Resolve public website?

Rachel Damiano:

Grants Pass, specifically?

Bill Landis:

Yes.

Rachel Damiano:

No.

Bill Landis:

But you referred to the district that you worked for?

Rachel Damiano:

No, I never referred to Grants Pants school district.

Bill Landis:

Okay, was there a conversation that occurred about the handling of situations involving transgender student or students at all?

**GPSD 475**
**Vickers Declaration**
**Exhibit 8 Page 55 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

In the video, we say, "districts", and then we say, "and districts across Oregon". That's how schools are run, is in districts.

*I asked Ms. Damiano if she worked on the "I Resolve" campaign during her workday.*

Bill Landis:

Okay. When we talked about the emails and the I Resolve program, or movement, what word do you use to describe it?

Rachel Damiano:

Movement is fine.

Bill Landis:

Okay. Did you work on that during your school work day?

Rachel Damiano:

I think that goes back to your original question about defining school work day. There were minimal aspects of I Resolve that were worked on while I was on campus.

Bill Landis:

Do you have any idea how much and how often?

Rachel Damiano:

No. I know that it never interfered with my other work as an assistant principal, Canvas support for the district, or as my GP online administrator hat.

Bill Landis:

When abouts did the I Resolve campaign start that you would have used some time to work on that movement?

Rachel Damiano:

I met with HR late February, so March. Sometime early in March.

**GPSD 476**
**Vickers Declaration**
**Exhibit 8 Page 56 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

That was basically when you initiated the program, and the title was picked, and moving forward?

Rachel Damiano:

I Resolve, as a movement, or as a matter of public concern, or making it a matter of public concern, would have come mid to late March. In terms of publicizing it, it didn't come until late March, right before Spring Break. Then Spring Break happened, and the bulk of it happened during Spring Break, is when we posted.

Bill Landis:

The earliest you would have been working on that program on school time would have been towards the end of February, some time?

Rachel Damiano:

No, mid-March. Actual I Resolve work.

I asked Ms. Damiano if she promoted the campaign with other staff during the workday, including emailing with others, discussing the "I Resolve" campaign, using District 7 email.

Bill Landis:

Okay. Did you promote the campaign with other staff during the workday, including emailing with others, discussing the I Resolve campaign, using District 7 email?

Rachel Damiano:

Again, I'm going to shift it off of being campaign, because we don't believe its campaign, or political work. Was there minimal discussion with staff members via email? Yes.

Bill Landis:

When you say you don't believe it's political work, isn't what you said, the I Resolve movement is opposing legislation that's currently either in committee, or before the legislative body, with titles, and that you're wanting some modification or change to what is being proposed, or going to be, possibly, moving forward. Would that not be considered political?

**GPSD 477**
**Vickers Declaration**
**Exhibit 8 Page 57 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Political, according to Oregon revised states statutes? No. Political campaigning, in terms of... When you call it a political campaign, it's specifically referencing ORS 260.432, for public employees, and for political campaigning. Which gives, very specifically, on page nine, I think it's page nine... For instances, that political campaigning, as the verbiage used, political campaigning, is applicable and we don't fall under any of those four. In terms of being tied to something that is political, or being tied to a bad legislation, in common terms, or in the public's terms, would you probably use political? Yes, but it's a matter of public concern and it's just ideas for solutions. If you are talking about legally political campaigning and what public employees are tied to, we don't believe it's public campaigning.

Bill Landis:

I'm talking about the school policy, not Oregon revised statute.

Rachel Damiano:

Yes, tied to GBG, which references, and is tied to ORS 260.432. It's my understanding that's why this board policy exists is because of ORS 260.432 and how its applied to public employees.

Bill Landis:

So, you're understanding is you don't feel that opposing legislation, or discussing with other staff members, what you're proposing with the I Resolve movement, had anything to do with politics or being political?

Rachel Damiano:

Yeah, so what we ask for in I Resolve, right in the video, and outside, is that the public, because it's a matter of public concern, that the public, if they are concerned or if they agree, to reach out to their leaders on their own. In terms of discussion with staff members about the resolution, that, again, is just ideas for solutions for something that's not even for policy. It wasn't an opposition to anything because according to our school district, and according to our policies that currently exists, there is no opposition because there is no policy on how to deal with, or how to interact with students in situations that are specifically about gender identity. The memorandum has not been given publicly.

---

**GPSD 478**
**Vickers Declaration**
**Exhibit 8 Page 58 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

But fair to say, you're opposing what is proposed then, before the legislatures and those bills you referred to in the video, that are moving forward?

Rachel Damiano:

In terms of the current verbiage, are we giving alternative ideas? Yes. It's not passed. Yes, we say, "Please don't vote for it, as currently written", but we say, even in the video, we're giving ideas for possible solutions on how to change verbiage.

Bill Landis:

In the videos, you make it clear that your position is that you believe that those need to be changed as they are written.

Rachel Damiano:

As they are currently written, yes.

Bill Landis:

So, it's not just an idea. It's your belief of what needs to happen that you're proposing?

Rachel Damiano:

My belief about current... Yes, and we say it's our belief, and ours, not the districts.

I asked Ms. Damiano about receiving emails related to the "I Resolve" campaign on her District 7 email account regarding outside entities and or other staff members.

Bill Landis:

Did you receive emails related to the I Resolve campaign on your District 7 email account, from outside entities or other staff members?

Rachel Damiano:

Yes.

Bill Landis:

---

## GRANTS PASS SCHOOL DISTRICT 7

Do you think that that, then, had identified yourself as a District 7 employee, related to the I Resolve video?

Rachel Damiano:

Yes. In terms of who I work for, yes, but we never claimed that its District 7's ideas, or that its District 7's... We aren't speaking for District 7.

I asked Ms. Damiano if and where she expressed that the views of "I Resolve" were her own and not the views of District 7.

Bill Landis:

Where did you express that this was not District 7, and your own personal views?

Rachel Damiano:

In terms of conversations with organizations, or for outside entities, they are well aware that it is our personal beliefs, or our personal beliefs and opinions. In terms of in emails, again, I'd have to go back and look, specifically. I would say, where do we claim that is District 7? That we say that we're speaking for the district, or the district is in... We don't say that anywhere.

Bill Landis:

In the video, did you express that this was your personal view, and not that of the district, or districts?

Rachel Damiano:

We never even claim our last names in the video. We never say our last names, we never say what district we work for, we never say what middle school we work for. We don't even say we work at the same school. We say "we" over 20 times, and we say "I", I don't even how many times. We never say, "the district says this". In Southern Oregon, alone, there are over seven counties, that each have their own multiple school districts, multiple middle schools. We never say that we're speaking for them. It's not typical practice, even here in the district, for someone, at the beginning of a sentence, to out rightly say a disclaimer. This is my personal opinion. It is on our website. It's the footer on our website. It's the footer, if you open up the YouTube description. It says the resolution, and at the bottom it says, these are our personal viewpoints and not that of the district.

I asked Ms. Damiano when she recalled that the "I Resolve" video was published to YouTube and the public website.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Do you remember about when the I Resolve video was published to YouTube and/or to a public website, about?

Rachel Damiano:

Yeah, it was Spring Break, end of Spring Break.

Bill Landis:

You identified yourself as a Southern Oregon middle school assistant principal. Is that correct?

Rachel Damiano:

Yes. As experience, not as who I'm speaking for.

Bill Landis:

Did you receive email from outside the district from persons, including the media, who had identified you as from the I Resolve campaign?

Rachel Damiano:

Media on my email? I'd have to go back and look. I can't recall if it would have come to my school email. I haven't been able to access since I was put leave. If it's come after April 5th, I wouldn't know.

Ms. Damiano stating "I wouldn't know" regarding email from the media was questionable as the email sent to her District 7 account requesting an interview on April 7th (Exhibit 4K) had been forwarded to "Rachel.g.damiano@gmail.com approximately 48 minutes after being sent to her District 7 account.

I asked Ms. Damiano why she would identify herself as a Southern Oregon Middle School Assistant Principal over just identifying herself as a citizen.

Bill Landis:

I guess my question is, why identify as a Southern Oregon middle school assistant principal, which kind of narrowed the field, versus, "Hey, I'm Rachel and I'm a concerned citizen about these issues"?

# GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

When said in the video... Again, we aren't speaking for my position as an administrator. We're giving credibility to the experiences, or I'm giving credibility to my experience and where knowledge comes from and why I have this knowledge and the experiences that I do.

Bill Landis:

Does District 7 policy require you to state that it's a personal viewpoint, or expressed viewpoint, when dealing with controversial issues in the public?

Rachel Damiano:

It does, in policy GBG.

Bill Landis:

In the video, did you do that?

Rachel Damiano:

Do we out rightly claim and say a disclaimer at the beginning that says this is our personal opinion and not that of the district? No. We also never claim the district that we work for. We say multiple times, its inferred throughout the entire video, that says "we, I, we believe", in terms of I Resolve. At the beginning, we even say, "I resolve, I resolve, we resolve", as in the two of us, not the district we work for.

Bill Landis:

But you said, not at the beginning, but at any time in the video, did you, as the policy requires, make an overt statement that this is a personal viewpoint and nothing to do with an employer?

Rachel Damiano:

Do I say disclaimer as one would write, legally? No, but again, I say, "I", and "we", and we in that way say that it's our own opinion, without personally saying... At the end of the video, I say, "I personally resolve for the students of the community and for students across the nation", but I do say, "I resolve".

---

**CONFIDENTIAL**                    PCI #21-1011/ Part II

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Would you agree that I resolve doesn't necessarily separate you from the district?

Rachel Damiano:

I wouldn't say it ties me to the district. Again, I never even say what district I work for, so to be tied to an entity that's never identified anyways, no matter if someone else identifies me for that district; In the video I never even say my last name. It's hard to be tied to something that is anonymity.

I asked Ms. Damiano if she emailed a national podcast host, Ben Shapiro of the Daily Wire, to promote the "I Resolve" campaign to garner support using District 7 email.

Bill Landis:

In speaking about tying yourself to the district, did you email a national podcast host, Ben Shapiro, of The Daily Wire, to promote the I Resolve campaign, or movement, and try to garner support using your District 7 email?

Rachel Damiano:

I'd have to look if it was from my District 7 email. It sounds like that I did, if it's from there.

Bill Landis:

Would that not be identifying you as part of the district?

Rachel Damiano:

It would if I did it from my district email and don't say in there that it's my personal.

Bill Landis:

Okay, and you don't recall if you did that?

Rachel Damiano:

No, not from my district email.

I asked Ms. Damiano if she emailed the American Legislative Exchange Council (ALEC) which is a legislative organization to garner support for "I Resolve" using District 7 email.

**GPSD 483**
**Vickers Declaration**
**Exhibit 8 Page 63 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Did you email the ALEC organization, which is a legislative organization, to garner support for the I Resolve campaign, using your District 7 email?

Rachel Damiano:

Again, I'd have to look and see if it was from my District 7 email. I know that flipping from Gmail accounts, I'd have to look and see if I did it from my personal or my district.

Bill Landis:

If you did that, would that be, again, not separating yourself from the district since you're representing yourself with your signing the bottom as Assistant Principal, North Middle School, and verbiage.

Rachel Damiano:

It depends on what I wrote in the body of the email, and what the disclaimer says on I Resolve work.

Bill Landis:

Do you recall doing that or not?

Rachel Damiano:

No.

I asked Ms. Damiano if she solicited support, gave feedback, or initiated conversations regarding the "I Resolve" resolutions while she was responsible for kids at school.

Bill Landis:

Did you solicit support, give feedback, or initiate any conversations regarding the resolutions, the I Resolve resolution, while you were responsible for kids at the school?

Rachel Damiano:

While students were on campus? That would be the time. Did I solicit support, as in, have a conversation, or solicit as in go out and seek out people coming in?

**GPSD 484**
**Vickers Declaration**
**Exhibit 8 Page 64 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Any of that.

Rachel Damiano:

While students were on campus? Again, I'd have to look at time stamps of either when an email was sent or if a conversation happened. I don't recall ever having a conversation, while students were on campus. In terms of email, students were on campus for several hours, and I'm not always out doing supervision or in charge of them, in front of me, like a teacher would be.

Bill Landis:

Did you have any direct conversations with students about the resolution?

Rachel Damiano:

No, not with students.

I asked Ms. Damiano if she would agree that transgender issues can be controversial with regards to legislation.

Bill Landis:

Would you agree that transgender issues can be controversial, with regards to legislation?

Rachel Damiano:

Yes.

I asked Ms. Damiano since she identified herself as an Assistant Principal at a Middle School in Southern Oregon in the "I Resolve" campaign, what would she say her message was for all the students in this campaign since it has been brought into the school.

Bill Landis:

Since you identify yourself as a middle school assistant principal, from Southern Oregon, in the I Resolve campaign, and you've gone a step further with District 7 email use involved in the I Resolve campaign, which identified you as a North Middle School administrator, what would you say is your message for all the students in this campaign, since it's been brought into the school?

---

## GRANTS PASS SCHOOL DISTRICT 7

Rachel Damiano:

Separating those, by the resolution or by the movement in general, what do you feel like this is saying to the students?

Bill Landis:

In the news media, there have been students, as well as emails, who have responded about the I Resolve movement and issues. Since you are one of the founders, and/or author involved in the video, and a North Middle School administrator as identified, what is the message for the students in this campaign, since it was brought into the school and students are aware?

Rachel Damiano:

The message as our purpose, and the heart behind it, is to be reasonable, tolerant, loving, solutions for issues that have many sides. This is in terms of tolerance, being able to have a conversation, and to care for our students, all of our students, including our transgender students. In subsequent messaging that we put out on social media, we talk very specifically, we are for all students. We love all of our students, we care about all of students, and we want all of our students to feel like they belong. We feel that these solutions do that and that the conversation, the true conversation out of the resolution, not what the media spun, not what the public or certain people decided to spin it in a different way; What our heart behind it was to be a tolerant and loving solution for all of our students.

I asked Ms. Damiano if she had been truthful in her answers and she stated she had been. I asked if she or anyone else wished to add or clarify anything and they stated they did not. Having no further questions I concluded my interview with her (see transcript for further details Exhibit 7).

**GPSD 486**
**Vickers Declaration**
**Exhibit 8 Page 66 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

### <u>Findings</u>:

Allegations in an investigation have the potential to fall into four specific categories.

- <u>Sustained</u>:  My investigation resulted in sufficient evidence from one or more sources to conclude the incident occurred.
- <u>Not Sustained</u>:  I did not have enough evidence to prove or disprove the allegation.  It does not mean that I do not believe it happened, only that I do not have enough evidence to sustain that particular complaint.
- <u>Exonerated</u>:  Means the activity or action did occur, but it was appropriate (per policy, or lawful, etc.) given the circumstances.
- <u>Unfounded</u>:  Means no evidence existed to support the claim.

**ALLEGATION #1:** In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School Assistant Principal Rachel Damiano was involved in a campaign of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Damiano is alleged to have:

A.  Used District facilities, equipment or supplies in connection with the political campaign.
    **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that *"No employee will use district facilities, equipment or supplies in connection with political campaigning, nor will any employee use any time during the working day for campaign purposes."* Grants Pass School District 7 policy IIBGA-AR "Electronic Communications System Acceptable Use Regulation" (Exhibit 6E) states that ***"Attempts to use the District network for Transmission of any materials regarding political campaigns is strictly prohibited."*** The stated purpose of the "I Resolve" campaign was to address gender identity policies as was stated in their video and message. The "I Resolve" campaign stated in the video that it was specifically targeting the Equality Act, Oregon Senate Bill 52, and other legislation that was in the process of being voted on, developed, or proposed in legislative bodies at the Federal, State, and local levels as the "I Resolve" video explains. In the video, Ms. Damiano and Ms. Medart ask that viewers reach out to contact Senators where the next vote is scheduled and attend an ODE meeting that was scheduled for April 15th, 2021 in order to have their voices heard lobbying for support of the "I Resolve" resolutions that would modify or change the pending legislation as it had been written.

Ms. Damiano admits to using District 7 resources to include email, computers, and possibly printers however she states she doesn't recall in many of her answers when asked for specifics. The numerous email Exhibits under Exhibit 4 which included Google Docs associated with "I Resolve" and the proposed resolution, shows that Ms. Damiano used District 7 computers, email, school property, and Google Docs to share or communicate regarding the "I Resolve" campaign with staff and persons inside and outside of School District 7. While Ms. Damiano did not like referring to "I Resolve" as a political campaign, her efforts both in the video regarding legislation and through the stated purpose of "I Resolve" showed it was a political campaign. This was specifically demonstrated in emails she sent to Daily Wire host Ben Shapiro (Exhibit 4H) and another to Mr. Reynolds of the American Legislative Exchange Council (Exhibit 4I) to gain support for the "I Resolve" resolutions using District

**GPSD 487**
**Vickers Declaration**
**Exhibit 8 Page 67 of 71**

## GRANTS PASS SCHOOL DISTRICT 7

7 School resources. The goal of "I Resolve" was to influence legislators regarding pending policies and legislation effecting gender identity issues with their own resolution that would define who could use what bathrooms based on one's anatomy, legislate the use of names and pronouns for gender identity students, and require parents be involved in a student's gender identity journey. It should be noted that this allegation would not have been sustained had Ms. Damiano have chosen to not use District 7 facilities, email, equipment, or supplies for her "I Resolve" campaign.

B.  Used time during her working day for political campaign purposes. **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that "*No employee will use district facilities, equipment or supplies in connection with political campaigning, **nor will any employee use any time during the working day for campaign purposes.**" As stated under Allegation 1A above, the "I Resolve" campaign was determined to be a political campaign. Date and time stamps on emails shown in Exhibit 4A through 4E as well as Ms. Damiano's uncertain recollection but admitted use of email during her workday to communicate regarding "I Resolve" supported this finding.  Exhibits 4A and 4B were emails sent to outside persons on March 11th, 2021 at 1:31 PM and 10:51 AM which was a school workday and were titled "file" and "Design" related to t-shirts and color choices for "I Resolve." Ms. Damiano also admitted using District 7 computers to work on "I Resolve" although unable to recall if she used District 7 printers.  Without a forensic computer analysis there is no way to quantify the actual time spent during her workday on the "I Resolve" campaign. The policy does not require a certain amount of time in order to be a violation. It states: "*nor will any employee use **any time** during the working day for campaign purposes*" which did occur on more than one occasion. Had Ms. Damiano not utilized time during her workday for the "I Resolve" campaign this would not have been a violation.

C.  Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7. **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 6D) states that "*On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.*" As stated under Allegation 1A, the "I Resolve" campaign was determined to be a political campaign. In the "I Resolve" video, Ms. Damiano identifies herself by stating: "***Hi, I'm Rachel and I am an administrator assistant principal in Southern Oregon at the middle school level. I've also worked at the high school level, was previously a math teacher, and I've been working with youth for over a decade now in various roles in education. And then in as a coach as well. I do not have any children of my own yet, but I do work with youth and that has been a passion of mine for a very long time now.***"

Ms. Damiano doesn't introduce herself as a private citizen but rather a Southern Oregon Middle School Teacher giving her first name. While she did not say Grants Pass District 7, She at no time in the video states that the views expressed are that of her own and not that of District 7 or any similar type of statement.  A simple internet search using "Rachel southern Oregon middle school assistant principal" finds an article identifying Rachel Damiano and her full name, North Middle School, District 7, when she was hired in August of 2020 https://spotonoregon.com/southern-oregon/517035/gp-district-7-welcomes-damiano-as-new-vice.html. Additionally, Ms. Damiano used District 7 email for communications for "I Resolve" to both persons inside of District 7 and outside the District which

**GPSD 488**
**Vickers Declaration**
**Exhibit 8 Page 68 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

identified herself as associated with School District 7 with no disclaimer. The media coverage (Exhibits 5A-5E) shows how District 7 was intertwined with Ms. Damiano and the "I Resolve" campaign. The media coverage had no statements by Ms. Medart or Ms. Damiano that made it clear that the "I Resolve" campaign was not affiliated with District 7.

Ms. Medart did tell me in my interview with her on May 13th, 2021 that there was a disclaimer on the video associated with YouTube. I did find a disclaimer on the YouTube site that, if a viewer used a drop-down box prior to playing the video, it could be seen. This however was not initially with the video as Ms. Medart admitted in her interview with Dan Huber-Kantola on April 6th, 2021 when she told him that it had been added later. The "I Resolve" video itself has no information where a viewer would know the campaign isn't associated with the District as nothing is stated. In the opening statements of the video, Ms. Damiano can be heard saying: "I Resolve" and "We Resolve." This was described in one of Ms. Damiano's statements which she felt showed it was made clear.

The word "We" however, could have been construed by a viewer as inclusive of the District. The amount of email complaints, complaints from District 7 employees, and publicity associated shortly after the video and website were published to social media and the internet were representative of how controversial the "I Resolve" proposals and campaign were. Had Ms. Damiano been clear that the expressed views in the "I Resolve" video and campaign were not those of District 7 then this would not have been a violation of District 7 policy.

D.  Used social media and public websites in such a manner that it disrupted the school environment. **"SUSTAINED" –** Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 6C) states that ***"Staff members, while on duty and off duty, will treat fellow employees, students and the public with respect while posting on social media websites, etc., in order to prevent substantial disruption in school."*** It is clear from the complaints received that the "I Resolve" video posted on YouTube and Facebook, as well as the "I Resolve" website, that a substantial disruption in school occurred. This included student protests (Exhibit 5E), staff complaints, citizen complaints, division among the staff, and was interpreted by some who would be affected by the "I Resolve" resolution as disrespectful.

E.  Posted confidential information about a student on social media and a public website. **"NOT SUSTAINED"-** Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 6C) states that ***"Staff members, while on duty and off duty, will utilize social media websites, public websites, and blogs: in a professional manner by not posting confidential information about students, staff or district business."*** In the "I Resolve" video which was posted on social media and a public website, Ms. Medart speaking to Ms. Damiano, disclosed an incident which occurred approximately one year prior within a month or two of returning to teaching at the K-12 level,



**GPSD 489**
**Vickers Declaration**
**Exhibit 8 Page 69 of 71**

# GRANTS PASS SCHOOL DISTRICT 7

████████████████████████████████████. This was corroborated by Principal Tommy Blanchard ████████████████████████████████████████.

Ms. Medart in my interview recanted the story as being truthful and gave unclear responses to my questions stating that in looking back it was hypothetical although she seemed to indicate she initially believed the story as truthful. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████. Ms. Damiano was not employed by District 7 during the previous school year when this occurred. Ms. Damiano reported that her understanding was that Ms. Medart's story regarding the student in the "I Resolve" video was hypothetical and not based upon an actual student. There is nothing to sustain this allegation as it is unknown what Ms. Damiano knew and when she knew it to determine if this policy was violated.

F.  Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and directed at those persons and or students "sexual orientation." **"NOT SUSTAINED"** – Grants Pass School District 7 policy "ACB" (Exhibit 6B) states that ***"Bias Incident" means a person's hostile expression of animus toward another person or group of person's, relating to the other person's or group's distinguished, or perceived to be distinguished, race, color, religion, sex, gender identity, sexual orientation, disability or national origin"*** It is not clear if Ms. Damiano's "I Resolve" campaign was "a hostile expression of animus toward those who use a different gender identity. The "I Resolve" campaign is an attempt to change legislation and policies affecting gender identity. Individuals may perceive her actions as biased which is understandable. However, it is not clear based upon the language of the listed policy that her actions constituted a "bias incident" as there weren't enough facts to positively conclude if the allegation was unfounded or in fact was sustained and did occur.

In reviewing Ms. Damiano's job classification (Exhibit 6F), based upon the facts including conduct, I find she failed to meet the standards in her job description under essential duties and responsibilities which included:

- **Establish and maintain effective relationships with students, parents, and staff to promote quality instruction and a healthy school climate**
- **Communicate and collaborate with students, parents, teachers, staff, community, and when appropriate, other agencies to promote an open and participatory school environment**
- **Be knowledgeable of the building's philosophy and establish effective human relationships among students, parents, and teachers, such that results in positive school climate and quality instruction**

<u>**Commentary:**</u> - The allegations listed were investigated and based upon the facts received, District 7 policies, and Ms. Medart's job description, the "Findings" were determined based upon those factors.

---

# GRANTS PASS SCHOOL DISTRICT 7

**END of REPORT**

Pacific Consulting and Investigations
PO Box 3506 Ashland, Or. 97520
**Tel** 541-441-2209
cbinvserv@gmail.com
www.pci-oregon.com

**GPSD 491**
**Vickers Declaration**
**Exhibit 8 Page 71 of 71**