**Pacific Consulting and Investigations**
PO Box 3506 Ashland, Or. 97520
**Tel:** 541-441-2209
cbinvserv@gmail.com
www.pci-oregon.com
PI-ID: #73728

# GRANTS PASS SCHOOL DISTRICT 7

## CONFIDENTIAL REPORT PART I

## JUNE 2021

Prepared by Bill Landis PI-ID #73728



**GPSD 285**

**Vickers Declaration**
**Exhibit 9 Page 1 of 136**

# TABLE OF CONTENTS

## Contents

Request by _____ 1

Summary: Mentioned Persons, Allegatons, List of Exhibits _____ 2-4

Details _____ 5-128

Findings_____ 129-134

Exhibits_____135

**GPSD 286**

# GRANTS PASS SCHOOL DISTRICT 7

## Request by:

Sherry Ely: Dist. 7 Director of Business Services

Grants Pass School District 7

725 NE Dean Dr.

Grants Pass, Or. 97526

541-474-5700

## Request Date:

04/15/2021

## Report Submitted:

06/03/2021

## Assigned Investigator:

Bill Landis (PI-ID #73728)

Pacific Consulting and Investigations

P.O. Box 3506 Ashland, Or. 97520

541-441-2209

## PCI Incident Reference Number:

21-1011/ Part I

**GPSD 287**
**Vickers Declaration**
**Exhibit 9 Page 3 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

## Named Employee:

Katie Medart: North Middle School Teacher

## Mentioned Persons:

Kirk Kolb: Grants Pass Dist. 7 School Superintendent
Dan Huber-Kantola: Grants Pass Dist. 7 Director of Human Resources
Tommy Blanchard: North Middle School Principal
Rachel Damiano: North Middle Assistant Principal
██████████: District 7 employee (Formal Complaint)
██████████: District 7 employee (Formal Complaint)
██████████: District 7 employee (Formal Complaint)
████████████: District 7 employee (Formal Complaint)
████████████: District 7 employee (Formal Complaint)
████████████: District 7 employee (Formal Complaint)
███████████: District 7 SPED Teaching Assistant
██████████: District 7 Librarian

## Allegations:

**#1**: In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School
Teacher Katie Medart was involved in a campaign of a political nature non-sanctioned
by Grants Pass School District 7 where Ms. Medart is alleged to have:

  A.  Used District facilities, equipment or supplies in connection with the political campaign
  B.  Used time during her working day for political campaign purposes
  C.  Failed to designate that the viewpoints she represented on the issues involved in the
      political campaign, were her personal viewpoints and not that of District 7
  D.  Used social media and public websites in such a manner that it disrupted the school
      environment
  E.  Posted confidential information about a student on social media and a public website
  F.  Created a "bias incident" where her actions as a District employee with regards to the
      political campaign/movement involved behavior or language which was derogatory
      and directed at those persons and or students "sexual orientation"

**#2**: Between October 2020 and March 2021, Katie Medart discriminated against ███████████
███████████████████████████

**#3**: On or about March 2021, Ms. Medart created a hostile work environment for ███████████
█████████████████

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

If these allegations are found to be true, Ms. Medart may have failed to meet the standards of her Grants Pass School Dist. 7 Job Description for her position as well as violated the following policies:

- ACB – All Students Belong
- GBG – Staff Participation in Political Activities
- AC – Nondiscrimination
- GCAB – Personal Electronic Devices and Social Media – Staff
- IIBGA-AR – Electronic Communication System Acceptable Use Regulation

## List of Exhibits:

1.  Complaints (formal) from Grants Pass Dist. 7 Staff members:
    A.  ███████ :
    B.  ███████
    C.  ███████
    D.  ███████
    E.  ███████
    F.  ███████
    G.  ███
    H.  ███

2.  Email complaints from citizens
    A.  ███████ : dated April 7th, 2021
    B.  ███████ : dated April 7th, 2021
    C.  ███████ : dated April 7th, 2021
    D.  ███████ : dated April 7th, 2021
    E.  ███████ : dated April 7th, 2021
    F.  ███████ : dated April 6th, 2021
    G.  ███████ : dated April 6th, 2021
    H.  ███████ : dated April 7th, 2021

3.  Email complaints from students (past and present)
    A.  ███████ : dated April 6th, 2021
    B.  ███████ : dated April 8th, 2021
    C.  ███████ : dated April 7th, 2021
    D.  ███████ : dated April 7th, 2021

4.  Email regarding "I Resolve" sent and received on Dist. 7 Email account
    A.  Emails to and from ███████ : March 15th, 2021 4:04 PM
    B.  Emails to and from Damiano and ███████ : March 26th, 2021 2:41 PM
    C.  Email to ███████ : March 17th, 2021 5:13 PM
    D.  Email Rachel Damiano from ███████ : March 24th, 2021 7:32 PM
    E.  Email to ███████ signed by Medart and Damiano: March 26th, 2021 2:31 PM

---

# GRANTS PASS SCHOOL DISTRICT 7

    F.   Email to Ben Shapiro signed by Medart and Damiano: March 26th, 2021 2:41 PM
    G.   News media to Rachel Damiano: April 7th, 2021 11:02 AM

5.   Media Coverage
    A.   Screenshot from KOBI 5
    B.   KOBI 5 news article dated April 7th, 2021
    C.   KTVL 10 news article dated April 8th, 2021
    D.   KOBI 5 news article dated April 14th, 2021
    E.   KTVL 10 news article dated April 15th, 2021

6.   Emails between Katie Medart and ████████ between October 6, 2020 and April 2, 2021

7.   Grants Pass District 7 Policies, Guidance, and job description
    A.   Grants Pass School District 7 policy "AC" – Nondiscrimination
    B.   Grants Pass School District 7 policy "ACB" – All Students Belong
    C.   Grants Pass School District 7 policy "GCAB" – Personal Electronic Devices and Social Media – Staff
    D.   Grants Pass School District 7 policy "GBG" – Staff Participation in Political Activities
    E.   Grants Pass School District 7 policy "IIBGA-AR" - Electronic Communications System Acceptable Use Regulation
    F.   Grants Pass School District 7 – "Job Description"
    G.   Grants Pass School District 7 – Administrative Memorandum dated February 5th, 2021

8.   Thumb drive containing information including documents, emails, photos, memos, videos, and other information as the foundation for this investigation received from District 7

9.   Thumb drive containing digital files of audio recordings, transcripts, notices of investigation, Garrity Rights form, and items related to this investigation as well as a copy of this narrative report

**GPSD 290**
**Vickers Declaration**
**Exhibit 9 Page 6 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

## <u>Details:</u>

On April 12th, 2021, I was contacted by Willard Ransom attorney for Grants Pass School District 7 to see if I was available regarding an investigation involving alleged employee misconduct. I advised him that I was, and I was recontacted on April 14th, 2021 by Mr. Ransom who stated the District 7 School Board had approved the go ahead for me to provide services for an investigation. On April 15th, 2021, I did enter into a Letter of Engagement with Sherry Ely, Grants Pass School District 7 Director of Business Services. I was advised she would be my point of contact during my investigation.

I was informed that District 7 had received several formal complaints from District 7 employees regarding the alleged discriminatory conduct of North Middle School teacher Katie Medart related to the "I Resolve" movement/campaign. Additionally, the School District received emails from citizens who complained about Katie Medart in response to the "I Resolve" movement and video that Ms. Medart had been involved in along with North Middle School Assistant Principal Rachel Damiano. On April 20th, I did meet with Sherry Ely to discuss the investigation and scope. Ms. Ely stated that "I Resolve" was not something supported nor affiliated with District 7 and many of the calls and emails received believed that the School District had been involved with "I Resolve" which they were not. I was provided an email where Superintendent Kirk Kolb did notify the School Board on April 5th, 2021 where he said that two employees were promoting a resolution which had been posted on YouTube and Facebook with links for the board to see (Exhibit 8). He also stated: "This has created a significant disturbance that is impacting the entire district" and also said that "we are VERY seriously dealing with this."

Ms. Ely advised that North Middle School Principal Tommy Blanchard and HR Director Dan Huber-Kantola had conducted an interview over the complaints with Ms. Medart. Ms. Medart had filed a discrimination complaint involving them and so they were recused, and the investigation suspended by them. Additionally, ████████████████████████ filed a formal complaint with the School District alleging Ms. Medart discriminated against ████ because ██ is transgender. Lastly, a formal complaint was received by ████████████████ who alleged Ms. Medart had created a hostile work environment related to ████████ role as North Middle School ████████████████████ I was advised that all of the documentation including emails, potential involved policies, audio files, documents, and other associated information would be put onto a thumb drive which I could pick up at a later date. Ms. Ely advised that Ms. Medart had been placed on paid administrative leave as of April 5th, 2021 which was eleven days after the "I Resolve" appeared to have been released.

On April 23rd, 2021, I did contact Ms. Ely at the District 7 office and received the thumb drive containing the aforementioned documentation including the listed complaints (Exhibit 8). After reviewing all the documentation, I found it necessary to divide my instigation into four parts. Part I is dedicated to the allegations regarding Ms. Medart and her alleged violation of District 7 policies. Part II is dedicated to the allegations regarding North Middle School Assistant Principal Rachel Damiano and her alleged policy violations. Part III is dedicated to Counselor Selena Alderson and her alleged policy violations. Part IV was dedicated to Ms. Medart's allegations against school administration for alleged policy violations, but I was informed by Ms. Ely on May 7th, 2021 that Ms. Medart had

withdrawn her complaint. For purposes of this report, I will be addressing only the allegations made against Ms. Medart with regards to alleged District 7 policy violations and identified as Part I of the overall investigation.

In reviewing the "I Resolve" video and campaign referred to as "I Resolve", I found it necessary to watch the video which I did (Exhibit 8). I also went to the "I Resolve" website which I found by using an internet search engine to understand what is referred to in the complaints. On the website, it defines the "I Resolve" title as *"Reasonable, loving, and tolerant solutions for education policies that respect everyone's rights." "Proposed Solutions for Education Systems." "Honoring All Students, Staff and Community Members."* It further states: *"I Resolve is a grassroots movement intended to protect the hearts and minds of our youth and stand up for truth in our society. We believe that resolutions that are reasonable and fair in both form and operation, are beneficial in helping to safeguard the mental, emotional and physical sell-being of all public-school students. We need communities to band together, through individual and corporate commitment, to protect our youth and make their voice heard to local, state and national leaders and policy makers."* Under the title "Current Proposal" it states: *"We aim to propose policy standards that are fair, reasonable and that safeguard liberties and freedoms of all parties involved. The resolution statements regarding bathroom and locker room shared space use are suggestions for current structures, until such a time that individual gender neutral bathrooms are required and fully funded for education and youth facilities. The last two resolutions are proposed as a caring, neutral, pragmatic, and unbiased support of students and staff as a student navigates their own gender identity journey."*

The website has a link which states: "Sign the Resolution." The resolution is listed as "Resolution 2021-01 and says the following:

**Resolution 2021-01**

Therefore, be it resolved that we urge our local, state and federal leaders to adopt the

following principles and policies:

Premise
**Point 1**
We recognize that, excepting very rare scientifically-demonstrable medical conditions, there are two anatomical gender presentations, male and female;

Resolution 1a
**Point 2**
Shared public-school restrooms and locker rooms, previously designated by "gender" (e.g. "boys" and "girls" designations) could be re-designated as "anatomically-male" or "anatomically-female" spaces to only be used by persons matching the anatomical designation of the spaces as consistent with the purpose for which the spaces are built;

# GRANTS PASS SCHOOL DISTRICT 7

Resolution 1b

**Point 3**

For any person who is not comfortable using their anatomically-correct space, they may request access to a private restroom or locker room space, including designated staff spaces, to the extent that such spaces exist and are available**;

Resolution 2

**Point 4**

A student may, with parent permission, request to be called by a derivative of their legal name but it will not be mandated that students or staff be required to call the student by their preferred name; and

Resolution 3

**Point 5**

A student may, with parent permission, request to be referred to with preferred pronouns, but it will not be mandated that students or staff be required to use the preferred pronouns.

Footnote

**Note**

**Please note that although not specified in the resolutions, individual gender neutral bathrooms are endorsed by I Resolve and encouraged to be fully funded by the state to be implemented in education facilities.

The website has several "Did you know" blocks with information as well as T-Shirts for sale. One of the "Did you know?" blocks is a reference to a recent 6th Circuit Federal Court of Appeals ruling.

**1ST AMMENDMENT RIGHTS FOR EDUCATORS**

A recent court ruling by the 6th Circuit Federal Court of Appeals ruled that Dr. Nicholas Meriwether, a university professor, had grounds to sue the school because they had punished him for not using a student's preferred pronouns. The professor had asked to accommodate by using the student's last name rather than use pronouns and the school refused to allow this. The court held that this punishment by the school was a violation of the professor's First Amendment rights.

In the margin of this particular "Did you know?" is the statement: "*This ruling is a reason why our resolutions include that staff and students will not be mandated to use preferred names and preferred pronouns.*" "If it is mandated, it is a violation of First Amendment Rights." There is also a link to the "I Resolve" video. At the bottom of the website, is the statement: "*The views expressed on this site*

# GRANTS PASS SCHOOL DISTRICT 7

*and any related video(s) produced by I Resolve are the expression of the individuals, as private citizens and do not necessarily represent the views or opinions of any specific education entity."* This website was viewed by me after the complaints and after my investigation began and it is not known if the website was modified, or language changed or added from the time that the website was first published which appears to be about the same time as the YouTube video upload of March 25th, 2021. The original site now has a message that says: "This site has moved" and a link to click on to the new site.

I watched the video called "I Resolve" and had it transcribed. I was advised that the speakers in the video were Katie Medart and Rachel Damiano (North Middle School Asst. Principal) although they gave only their first names, however they did give information about their professions. Ms. Medart in the video introduced herself as follows:

Rachel Damiano:

I resolve.

Katie Medart:

I resolve.

Rachel Damiano:

We resolve.

Katie Medart:

We resolve. We hope that you will resolve with us. We just want to say a thank you for taking the time to click play on this video, to hear what we have to share with you about policies related to gender identity for our youth. We hope by the end of this viewing, that you are willing to take action to have your voice heard with us. So you might be wondering who are these people? ***My name is Katie. And my experience with youth is that I have been teaching for the last 10 years. I am currently teaching at a middle school in Southern Oregon, and prior to that for eight years, I was a science instructor for college and then some high school science teaching experience as well. I've been a coach, multiple sports. And then probably my greatest honor of working with youth is that I have two of my own sons.***

Ms. Medart asks Ms. Damiano to explain what is bringing them here (the video) and why.

Katie Medart:

Why don't you explain what's bringing us here today and why?

**GPSD 294**
**Vickers Declaration**
**Exhibit 9 Page 10 of 136**

Rachel Damiano:

Absolutely. So it's a multifaceted issue right now. So right now at the federal level, there's the Equality Act. It's currently already passed the House and is in filibuster actually right now at the senate level. The Equality Act talks about gender identity and as well, it reverts back to the Civil Rights Act of 1964. And it's adding to that and we'll talk more about the specific aspects of the Equality Act as we kind of move through, but there are parts of the Equality Act that are very specific and very polarizing we think in the way that it's written in terms of some policies.

Rachel Damiano:

And then at the state level for Oregon specifically, there's Senate Bill 52, which would create a state of emergency as it's written for students or for youth specifically that identify as transgender, but it's all about gender identity. And that state of emergency would give a lot of leeway to policymakers without having to go through legislation. So that's Senate Bill 52, along with that is there's an advisory committee that specifically speaks to gender identity and it's called the LGBTQ2SIA+ Student Success Plan. And if Senate Bill 52 is enacted, then that success plan would automatically go, not just as guidance, but would be mandated to public schools as well as really any organization that works with youth.

Rachel Damiano:

And then at the local level, there has been guidance ODE back in 2016, that was about gender identity and best practices. It's not law, but it is when a guidance is given from ODE, it is taken as things that need to be implemented just because of the way that they're written, and they become requirements for schools. So our districts, local districts and districts across the state have taken that guidance and they've had to implement it in various ways that isn't always consistent because they do have some leeway and pulling from the guidance, but they are tied into the guidance and what verbiage is used in the guidance. And I know that you've had some experience specifically at the local level. Can you tell us about what it was like coming back into public education and what that guidance has meant for you as a teacher?

*Ms. Medart in the video asks Ms. Damiano for a recap of what was just said specifically about the legislation at the Senate level and the effects on private schools, youth organizations, churches, religious organizations, and not just K-12.*

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Yeah. So before we go to that, let's just recap that because this is going to be really important for the end. The end, when we ask you to take action and understanding why that is so important right now. So we have at the federal level, legislation coming in, that's at the Senate, already passed the house and that will impact every business, every entity. Where so if I asked you what about private schools?

Rachel Damiano:

Yeah. So it'll affect private schools, it'll affect youth organizations. Ultimately it'll actually affect churches as well and religious organizations. And it's not just K-12. The Equality Act at the federal level actually reaches from infancy to beyond. And any business, basically any business that's outside of your home and it's not just you and your house as an individual, it will affect.

Katie Medart:

So would you also say that it's true that even though we're from Oregon and we're more familiar with what's happening specifically in Oregon, that there's good odds that the issues that we're having in our state are also occurring in other states right now?

Rachel Damiano:

They are. Yeah. And the way that the States have had to reach through legislation and had to create their own gender identity policies is different across the states. The Equality Act would make it mandated across all states.

Katie Medart:

So that's going to be important because we're going to ask you to not just if you're Oregonian, but we're really looking nationwide, feeling that this is really impacting, going to impact you regardless of where you live.

*Ms. Damiano asked Ms. Medart how it has been for her coming back to public education from the teacher's side. Ms. Medart gives an answer that includes an incident that occurred within a month of Ms. Medart returning to public schools which was the previous year, she is approached by a transgender student of hers who makes a request.*

Rachel Damiano:

Well, how has it affected? You've come back into public education and you've seen it from the teacher side. How has that been for you?

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Yeah, so I was in K-12 education and then I left for 8 years, going to teach at a college and then coming back, I came back last year. So the last 2 years I've been back in K-12 and I could not believe the changes that have occurred. One of the biggest ones was within a month of teaching, I was presented with a very foreign circumstance to me. I had a female student. She then was on a journey of exploring what is her gender identity. She had made a request to identify as a male. Then the request came for to go by he and him and to change the name. And so I was sending an email by staff member saying the student is making this request. I've let the student know that we are in support, that we will support this. And I didn't know what to do.

Katie Medart:

So I went to my administration and I asked do parents know? Do we have parent permission? What is our policy? How am I supposed to handle this? And what I found was that, well, there was reference to the ODE guidelines that you mentioned earlier, but that they are guidance's. And so as different scenarios have come up, there hasn't been a consistent response. There isn't consistency because those are guidance's and not required about what I find different schools are doing and what they're implementing, depending on what school you're at and what part that district is wanting to implement it from those guidance's.

*After the story told by Ms. Medart, there is more dialogue about what they are asking and "what we're hoping with the policies or the resolutions that we've written and giving some consistency and also giving leaders, local leaders, state leaders, federal leaders, an option." Ms. Damiano then states what policies and resolutions that they've created.*

Rachel Damiano:

That makes sense. And I think that that really rolls into what we're asking and what we're hoping with the policies or the resolutions that we've written and giving some consistency and also giving leaders, local leaders, state leaders, federal leaders, an option. An option that I don't think has really been put on the table yet. So we want to read them directly for you so that you know what those resolutions are and what you're speaking to.

Rachel Damiano:

So this first one really just speaks to us all getting on the same page. So it says it is recognized that accepting very rare, scientifically demonstrable medical conditions, there are two anatomical gender presentations: male and female. So that's specifically talking about in layman's terms, that's

**GPSD 297**
**Vickers Declaration**
**Exhibit 9 Page 13 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

specifically talking about the genitalia that students and humans are born with. And that would roll right into, instead of it being a gender identity issue when it comes to bathrooms and locker rooms, making it about anatomy ultimately. And so the second one is shared public school restrooms and locker rooms, especially as they pertain to spaces predominantly used by student and youth, previously designated by gender could then be re-designated as anatomically male and anatomically female spaces to only be utilized by persons matching the anatomical designation of the spaces as consistent with historically and scientifically demonstrable anatomically correct utilization of those spaces.

Ms. Medart then explains the intentions of anatomical use of facilities.

Katie Medart:

Okay. Let's pause. So if you're like what? Let's help you imagine this. So like for example, at the middle school, typically you would go, and you would see, okay, here is rather, it's a restroom or locker room. It says boys, and this one says girls on it. So instead of it saying that it would then read anatomical male, anatomical female, and what that then is referencing is what, in essence, what genitalia do you have because they're designed in form and function, both of facilities for anatomical anatomy.

Ms. Damiano and Ms. Medart continue with clarification of what someone who is not anatomically male or female yet identifies as such would have as options and also discuss the choice as to use of names or pronouns.

Rachel Damiano:

So Katie, for this next bullet in talking about, we want to be fair and equitable to all sides. This next bullet, if a student is still uncomfortable using the bathroom or the locker room that matches their anatomy, it says for any person who is not comfortable using their anatomically correct space, they may request access to a private restroom or locker room space, including such spaces that are designated for use by public school staff, to the extent that these spaces are available and exist. So I think just in the end we want, again, we want to give voice and honor all sides involved. And we feel like that point and that resolution really does that. These last couple are really more speaking to the gender identity journey that these students are going through.

Katie Medart:

What it says is a public student seeking to be known by a name other than the name designated on their legal documentation, may at their discretion with parent permission, use a derivative of their

# GRANTS PASS SCHOOL DISTRICT 7

legal name for the purposes of requesting that the public school staff identify the student by such name. It should be reasonably accommodated by public school staff provided however that any such policy shall not be mandated upon or required of the public school staff, nor shall any such policy be enacted that infringes upon the public school staff, civil and constitutional liberties, including their freedoms of speech and expression. And further provided that such derivative of the student's legal name shall not be honored if it is otherwise crude or offensive, as determined by acceptable societal normative, respectful speech.

Rachel Damiano:

Another lots of words and we know that some of these are a lot of words. Part of that is because this is proposed policy. So we want to make sure that we are speaking to the way legislation speaks in the way that policies are written. This one is basically saying in essence, that a student walking through this journey can ask for a preferred name with parents in the know, and with parent permission and that that be about gender identity, that the discussion is centered around gender identity. And so that it is a derivative of one's legal name. And I think you had an example for what would that look like?

Katie Medart:

I do have an example for that, and I want to bring up one other important, bringing us back to that in our state, the ODE guidance of it does encourage parent involvement, but it does not require it. So that was one of the things that I have personally experienced when going and getting clarification is that it is up to the school to determine if they would like to involve the parent or not. So you would find scenarios where the parents are not in the know at all about what is going on with their child as they are going through that journey. And as a parent, that was disturbing for me as I want to be able to offer love and support, especially as they would embark on that journey. So an example would be for the name, if a student's name was Jessica Smith, then Jessica, if was struggling or on the journey of their gender identity, they wanted to, instead of identify, if they were female as male, they can then change their name to Jess.

Rachel Damiano:

Jess, Jesse Smith.

Katie Medart:

Go by Smith.

Rachel Damiano:

Anything that's that derivative. And again, that's to focus on the gender identity piece of it in that journey, not necessarily on name because I think that that can be a rabbit trail. And then also moving into just this last bullet point as well, or the last resolution is really speaking to the pronouns.

Katie Medart:

Yes. And so it really is the same thing, but it is instead of the name, it's saying the same thing for pronoun usage.

Rachel Damiano:

And with that focus on allowing we want to give voice to all sides. We want to be respectful always. And that's something that our nation has been built on. It's a basic action that we should be taking towards others. We should be respectful. And so that's always this underlying, but at the same time also giving freedom to staff and to students without mandating the use of the pronouns or the use of the preferred name.

Katie Medart:

And requiring that we work together with the family. So it's us working with the family or whoever is in that guardian role, the child and with the school and it's bringing us all together.

Ms. Damiano then directs those watching to the "I Resolve" website. This infers by the language for the viewer to lobby political leaders by adding their name and saying they support the resolution. There is the mentioned pending legislation which they list as Oregon's Senate Bill 52, LGBTQ2SIA+ Student Success Plan which is potentially being put into motion, as well as a reference to an upcoming ODE state board meeting on April 15th where your voice can be heard. There is also the mention of the Equality Act which they state has passed the House, but Senators can be contacted as it tells viewers that prior to a vote in the Senate: "It doesn't have to be just the way the Equality Act is written. So it's written in a way that's more fair to all sides and honors all parties involved in this decision."

Rachel Damiano:

Absolutely. And I think that really pulls it all together as well as it takes a community, not just to raise up our youth, but it takes a community to be a healthy society. And so all of these are speaking to parents involved, students involved, community involved, and we need you involved as well. So one of the ways that you can speak out, and one of the things that we need you to do is if this resonates with you as, yeah, this seems fair in how it's written and how it would be implemented. We need you to tell us that, and we need you to tell our leaders that. And you can do that by going to

**GPSD 300**
**Vickers Declaration**
**Exhibit 9 Page 16 of 136**

iresolvemovement.com and on iresolvemovement.com, there is a place where you can read the full resolution, our reasoning behind it, as well as the resolutions in there, all of their legalese glory. And agree and say yes, I can put my name behind this. I can say I agree. And there's a button on there that you push. And then you just fill in your name and you say that you agree.

Katie Medart:

So number one.

Rachel Damiano:

Number one.

Katie Medart:

Go to iresolvemovement.com and digitally sign. And then number two is what about your state?

Rachel Damiano:

Exactly. Yep. So here specifically in Oregon, with the Senate Bill 52 and as well as the LGBTQ2SIA+ Student Success Plan, potentially being put into motion. So the next ODE or state board meeting is April 15th. And I know that's coming up really soon, but in order to have your voice heard, you can speak out directly to the State Board of Education. There is a template on our site, as well as the resolution. You can send it in as public comment at any time before the April 15th meeting and have your voice be heard in that way as well. And then that last one.

Rachel Damiano:

We need you to speak out to your senators and that's not just in Oregon, that is across our nation. It has not been voted upon yet. The Equality Act has not been voted on yet. It has passed the House, but speak out to your senators and say, hey, we have another option for you. It doesn't have to be just the way the Equality Act is written. And that could even mean that you could have a voice in changing what the Equality Act says and how it's written. So it's written in a way that's more fair to all sides and honors all parties involved in this discussion.

*Ms. Medart states that "love is action" and if what they presented resonates with the listener, go to the website, and fill out the form, email legislators, and contact your state Senator that is representing your state, and have your voice heard.*

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

If we spoke to you, if you choose to take action, which I love this saying, love is action. So if that's resonating with you, you can one, go to iresolvemovement.com. Number two, for those of you who are here in Oregon, we have a template there, fill that out, email our legislators, letting them know what is your stance and have your voice be heard. And then finally we need everyone, we need to contact your state Senator that is representing your state and be able to have your voice heard at that level.

Ms. Damiano concludes with an end note which is agreed with by Ms. Medart.

Rachel Damiano:

So thank you again for taking the time to watch and to hear us out. And I know for me, I resolve for the students of our community, for the youth of our community and ultimately for the youth of our nation, and I know that sounds big and lofty, but that's why I got into education. I am here to raise up our youth and to safeguard their mental, emotional, physical wellbeing. And we feel that these resolutions do that.

Katie Medart:

Absolutely. Thank you.

(See transcript or listen and watch video for further details Exhibit 8).

I was advised that the "I Resolve" video had been uploaded to YouTube a social media web linked site and that there was an "I Resolve" Facebook page. In searching YouTube, I did find the "I Resolve" video was uploaded to YouTube on March 25th, 2021 and as of May 2021 had over 5,500 views. Prior to clicking on the video to watch, there was a statement that read: "If you agree this is pragmatic and fair, please sign at: www.iresolvemovement.com This resolution is focused on gender identity policies. It is in response to the polarizing nature of adopted guidelines and proposed legislation." That is what is visible to someone prior to clicking on the video. There is a "Show More" hyperlink which when selected, shows the resolutions from the website and at the bottom states: "Please note that the views expressed in this video are the personal and 1st amendment protected opinions of the speakers and do not necessarily represent the views of any specific school entity. They are expressed in the speakers' capacity as private citizens." It is not known if those comments were there at the time of uploading the video to YouTube. Also, the site states that "comments" had been turned off so persons could not comment on the video. That too is unknown if that was changed from the original posting date. I did search Facebook and did not find the link and had been told the Facebook page was removed.

Since there are three allegations, I will complete the remainder of my report addressing each allegation separately.

---

# GRANTS PASS SCHOOL DISTRICT 7

### Allegation #1

**#1**: In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School
Teacher Katie Medart was involved in a campaign of a political nature non-sanctioned
by Grants Pass School District 7 where Ms. Medart is alleged to have:

   A.   Used District facilities, equipment or supplies in connection with the political campaign
   B.   Used time during her working day for political campaign purposes
   C.   Failed to designate that the viewpoints she represented on the issues involved in the
        political campaign, were her personal viewpoints and not that of District 7
   D.   Used social media and public websites in such a manner that it disrupted the school
        environment
   E.   Posted confidential information about a student on social media and a public website
   F.   Created a "bias incident" where her actions as a District employee with regards to the
        political campaign/movement involved behavior or language which was derogatory
        and directed at those persons and or students "sexual orientation"

The scope of this investigation is strictly regarding District 7 policies and whether the conduct of Katie
Medart that is alleged by District 7 employees ███████████████ (Exhibits 1A-1H) violated the listed School Dist. 7
policies (Exhibit 7A-7E) or if Ms. Medart failed to meet the standards of her job description (Exhibit
7F). At the center of the complaints is the "I Resolve" campaign and video which are about gender
identity policies as stated in the video: *"We just want to say a thank you for taking the time to click play
on this video, to hear what we have to share with you about policies related to gender identity for our
youth."*

Exhibits 1C, 1D, 1E, 1F, 1G, and 1H were formal complaints filed by District 7 staff/employees
essentially asserting that Ms. Medart was involved in a campaign/movement of a political nature
believed to be non-sanctioned by Grants Pass School Dist. 7 and alleged to have violated several
District 7 policies. Numerous emails were identified by District 7 related to the "I Resolve" campaign
and contained in a folder in (Exhibit 8) some of which I have listed in various parts of this report.
Those emails used the address @grantspass.k12.or.us which I confirmed to be the School District 7
official email domain.

Exhibits 2A, 2B, 2C, 2D, 2E, 2F, 2G, and 2H are only some of the complaints from citizens sent to
District 7 email accounts between April 6th and April 7th, 2021 that included Ms. Medart, Kirk Kolb,
Tommy Blanchard, and Rachel Damiano. The complaints called Ms. Medart transphobic, disturbing,
discriminating, and harmful to students. Exhibit 2B was sent to Ms. Damiano but talks about Ms.
Medart. Exhibit 2F was one of several emails sent to Superintendent Kirk Kolb alleging the School
District was actively trying to pass resolutions restricting the rights of trans and gender non-
conforming students in his schools. Exhibit 2H included information and a screenshot from the since
removed Facebook page which read: *"Our Resolutions: *Bathroom/Locker room use by anatomy, not
gender. *Required parent involvement in student's gender journey. *Staff/student freedom to respectfully*

# GRANTS PASS SCHOOL DISTRICT 7

*use or not use a person's preferred name/pronouns."* These emails as stated were dated April 6th through April 7th, 2021 and are noteworthy as they show Ms. Medart is being identified within several days of the video posting to social media as a North Middle School Teacher and associated with the "I Resolve" campaign.

Exhibit 3A, 3B, 3C, and 3D are complaints received by email from students and prior students between April 6th, 2021 and April 8th, 2021. All of the emails are on Grants Pass District 7 email accounts that include Ms. Medart, and District 7 administrators Kirk Kolb, Tommy Blanchard, and Rachel Damiano. The emails accuse Ms. Medart of being prejudiced, disrespectful, and discriminatory as well as referring to the campaign as a disgusting proposal. These emails as stated were dated April 6th through April 8th, 2021 and are noteworthy as they show Ms. Medart is being identified within several days of the video posting to social media as a North Middle School Teacher and associated with the "I Resolve" campaign.

Exhibits 5A, 5B, 5C, 5D, and 5E are of media coverage surrounding the "I Resolve" campaign between April 7th, 2021 and April 15th, 2021. Exhibit 5A was a screenshot of News Channel KOBI 5 who did a story on April 7th, 2021 and depicts a statement identifying Ms. Damiano as "Assistant Principal of North Middle School." Exhibit 5C is a similar story from News Channel KTVL on April 8th, 2021, identifying both Rachel Damiano and Katie Medart as an Assistant Principal and teacher at North Middle School in Grants Pass. Exhibit 5D is a news story by News Channel KOBI 5 regarding a North Middle School 8th grade student who is protesting the conduct of Ms. Medart and Ms. Damiano related to the "I Resolve" campaign specific to the anatomical bathrooms and the belief that the policies are transphobic. Exhibit 5E is a News Channel KTVL story dated April 15th, 2021 in which students at North Middle School have started a petition to have Ms. Medart and Ms. Damiano fired. The news stories have over 50 comments regarding the stories and many of the comments are adversarial and hostile in support or against the campaign or persons commenting or associated with the stories.

Exhibits 4A, 4B, 4C, 4D, 4E, 4F, and 4G are emails on Ms. Medart's Grants Pass District 7 account that Ms. Medart was either sent, received, or part of the email conversation related to the "I Resolve" campaign. Numerous emails appear to be during the school workday, associated with the "I Resolve" campaign, and not associated with school business. Exhibit 4A is an email conversation between District 7 employee ███████████ and Ms. Medart dated March 15th, 2021 with one at 4:04 PM and another at 4:11PM, followed by one at 4:26 PM. The subject line of those emails is "Copy of Resolution 2021-01 – Invitation to edit." The same resolution of the "I Resolve" campaign. The emails contain a link to a document for editing via Google Docs. In ███████ email to Ms. Medart, he asks the question: *"Didn't Biden just sign a big executive order allowing trans students to use what restroom they want?"*

Ms. Medart responds to him with a web address and a copied portion of the article as I found when I conducted a search of the article referenced. https://www.natlawreview.com/article/transgender-students-and-title-ix-biden-administration-signals-shift. *"While the EO does not specifically rescind any specific order or action, its broad mandate that agencies review existing programs and policies likely will lead to updated guidance, enforcement priorities, and rules implementing Title IX and other laws prohibiting sex discrimination.*

# GRANTS PASS SCHOOL DISTRICT 7

*What should schools do now?*

*The current administration will likely implement major changes related to discrimination on the basis of sexual orientation or transgender status. This may include requiring schools to allow students to use bathrooms and locker rooms that are consistent with their gender identity, and to play on athletic teams that are consistent with their gender identity. Additionally, schools can expect more robust federal agency investigation of complaints of discrimination based on gender identity and sexual orientation."*

Exhibit 4B is an email stream between March 15th, 2021 at 4:04 PM and March 16th, 2021 at 9:46 AM that begins with Exhibit 4A but includes ▮▮▮▮▮▮ sending feedback to Katie Medart related to the "I Resolve" resolution 2021-01 as is in the subject line of the email. On March 16th, 2021 at 9:05 AM, ▮▮▮▮▮▮ offers feedback on the resolution. Then on March 16th, 2021 at 9:10 AM, Ms. Medart forwards the mentioned email conversation to Ms. Damiano using District 7 email. On March 16th, 2021 at 9:46 AM, Ms. Damiano responds to Ms. Medart with a statement that a suggestion offered has been fixed stating she is glad they caught that and asks Ms. Medart an additional question.

Exhibit 4C is email dated March 17th, 2021 at 5:13 PM and March 22nd, 2021 at 4:46 PM on District 7 email between Ms. Medart and ▮▮▮▮▮▮▮▮▮▮ member as her email indicates. The subject line of the email is: "Copy of Resolution." In that email, a Google Document has been shared with ▮▮▮▮▮▮ by Ms. Medart and by statements such as "gender fluidity" in the body of the email it is clear it is in reference to the "I Resolve" campaign. Ms. Medart's response to Ms. Swain gives more information about the website under construction with a link to the "I Resolve" website.

Exhibit 4D is an email conversation between Rachel Damiano and ▮▮▮▮▮▮ who identifies as someone from Edgewater fellowship by his email address. There are several emails between them from March 24th, 2021at 7:32 PM and another at 9:29 PM where Ms. Damiano used District 7 email to communicate. Ms. Damiano has a signature block at the end of her emails with her name and title as Assistant Principal, North Middle School. An additional Edgewater Fellowship person named Josh is copied and the email conversation mentions Ms. Medart as having added some comments next to the video as if referring to edits to the "I Resolve" website. There is a question about YouTube and how best to post it on the site and another comment that Ms. Damiano will forward it to Katie to look at.

Exhibit 4E is an email on District 7 email from Ms. Damiano to Dr. Reynolds of the American Legislative Exchange Council (ALEC) dated March 26th, 2021 at 2:31 PM. Ms. Medart is copied in on the email to her District 7 email account. The email references the Equality Act, as well as Oregon state proposed legislation and mentions the negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement in the process, have been shown to be damaging to the mental, physical and emotional health of youth. The email requests that ALEC review their proposed resolution and adopt the policy points to then be put forth at the state and federal levels by legislators. There is a link to the "I Resolve" website and a copy of the "I Resolve" Resolution regarding bathroom use, name and pronoun choices, and the previous mentioned parental consent. The email is signed: *"Sincerely, Rachel Damiano and Katie Medart Southern Oregon Assistant Principal and Southern Oregon Science Teacher."* The irony of the signature is that although the name of the

# GRANTS PASS SCHOOL DISTRICT 7

School and District are left off of the email other than identifying Southern Oregon Assistant Principal and Science Teacher, the email is sent on District 7 email with an email address identifying Grants Pass District 7.

Exhibit 4F is an email on District 7 email from Ms. Damiano to Ben Shapiro of the Daily Wire dated March 26th, 2021 at 2:41 PM. Ms. Medart is copied in on the email at her District 7 email. I conducted an internet search and found the Daily Wire organization which reports: "We're one of America's fastest-growing conservative media companies and counter-cultural outlets for news, opinion, and entertainment. We're opinionated, noisy, and having a good time." Ms. Damiano opens the email with: "We appreciate the work that you and the Daily Wire team do to bring common sense to the American people and for your daily fight to safeguard our individual freedoms." The email references the Equality Act, as well as Oregon state proposed legislation and mentions the negative effects on our youth. Specifically, allowing the use of restrooms and locker rooms based on gender identity, mandating the use of preferred names and preferred pronouns, and not requiring parent involvement in the process, have been shown to be damaging to the mental, physical and emotional health of youth. Ms. Damiano writes that "We" are requesting that you and your team review our proposed resolution and, if you agree with it, to speak out in support of this angle on the gender identity and related policy issues. There is a link to the "I Resolve" website and a link to the YouTube video. The email also posts the resolution from the website in its entirety. The email is signed: "*Sincerely, Rachel Damiano and Katie Medart Southern Oregon Assistant Principal and Southern Oregon Science Teacher.*" The same irony exists in this signature as in Exhibit 4E as the name of the School and District are left off of the email other than identifying Southern Oregon Assistant Principal and Southern Oregon Science Teacher however, it is sent on District 7 email with an email address identifying Grants Pass District 7.

Exhibit 4G is an email from Katie Streit of News Channel KOBI 5 dated April 7th, 2021 at 11:02 AM and sent to Ms. Damiano's District 7 email account. The subject line of the email states: "Media Request." The body of the email states: "*Good morning, I am doing a story about Oregon SB 52, I ran across your organization "I Resolve." I was wondering what your availability was today for a quick interview about your perspective on the proposed legislation. I look forward to hearing back from you!*" Ms. Damiano or someone with access to Ms. Damiano's email at 11:50 AM forwards the email to a personal email account which is ███████████████. This email, as did others, shows that Ms. Damiano and Ms. Medart were identified as being North Middle School employees associated with the "I Resolve" campaign and that it involved pending legislation as stated by the reporter. This was within days of the posting of the website and YouTube video.

Because I was aware that District 7 had conducted an interview with Ms. Medart, I reviewed the audio recording (Exhibit 8). In reviewing the audio recording, I noted information relevant to Allegation #1. According to the recording, the interview takes place on April 6th, 2021 at 2:30 PM. Present in the interview are Dan Huber-Kantola, Tommy Blanchard, Katie Medart, and ███████████████ and advocate for Ms. Medart. Part I of the interview is about clarification and a break is taken. Part II of the interview begins with a question to Ms. Medart if she was aware of disruptions the "I Resolve" video and or campaign has caused North Middle School and the District.

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Can I actually ask? So when you said, "are you aware of any disruptions that it has caused at North Middle School or the district..."

Speaker 1:

Any possible.

Katie Medart:

Any possible. Can you give me examples of disruptions? Like what would be an example of possible disruption?

Speaker 1:

Conversation, time devoted to that divisiveness whether within the school or district, email communications, phone calls from district employees or the community.

Katie Medart:

And also you said caused, so specifically at North Middle School or at the district?

Speaker 1:

As a result of I Resolve.

Katie Medart:

So possible conversation, time spent on that divisiveness, email communication or phone calls from staff, student, or community?

Speaker 1:

Community, yeah.

Katie Medart:

That would be examples. Okay. There has been communication amongst staff, email communication and conversation none of... And are you asking about am I aware of others or just like my personal interactions?

# GRANTS PASS SCHOOL DISTRICT 7

Speaker 1:

Right now, just are you generally aware of possible disruption?

Katie Medart:

From my complaints alone, I think the answer to that is yes. And then also I had an interaction with a student and the time spent on that was about five to seven minutes, asking for clarification.

Speaker 1:

Are you saying you were asking for clarification?

Katie Medart:

No.

Speaker 1:

The student was asking for clarification?

Katie Medart:

The student.

Speaker 1:

Okay.

Speaker 2:

So when was that, Katie?

Katie Medart:

I'm sorry. I wrote about the interaction.

Speaker 1:

It's okay.

**GPSD 308**
**Vickers Declaration**
**Exhibit 9 Page 24 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

And I am not quite all organized yet.

Katie Medart:

It was on April 2nd, at approximately 11:25 AM. And I can confirm that they made it to their next class and that was by 11:32 AM because their teacher, I let them know "please excuse this student." And they said, got it. And confirmed that with me.

Speaker 2:

So what was the student asking about?

Katie Medart:

Do you want me to report what it was about?

Speaker 2:

Sure.

Katie Medart:

Okay. Do you want to know the student's name?

Speaker 2:

Sure.

Katie Medart:

Okay. So ███████, toward the end of class said, "Mrs. Medart, can I talk to you after class?" Me: "absolutely." Class ended. I walked to ████. I said, "did you still want to talk to me about something?" As ██ is packing up his backpack. ██ said, "yes." And while other students packed and walked out, I asked ██ if ██ wanted to come on to the back of the room. And ██ said, "sure, but I need my phone." I walked toward ██. All students had left, and ██ opened... I don't know what ██ opened. I think it was a text message, but I honestly can't confirm if it was or not. Scrolled to I Resolve video. ██ said, "have you seen, are you aware that you're in this video?" I said, "I am aware. That is me in that video."

**GPSD 309**
**Vickers Declaration**
**Exhibit 9 Page 25 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

**Katie Medart:**

Students were coming in for my third period. So I asked if we could talk outside. So this will all be on the North Middle School security cameras at that point. ███, "sure." ███ said, sure. I squatted down because ███ is like this big, he's very little, short, and asked if we could talk after school. ██ said ███ couldn't because ██ gets picked up. I said, "okay, what questions do you have?" ███: "my friend wants to know if you are homophobic." Me: "███, please look at me when I say this, absolutely not. I love all students. Do you feel that way? Have you watched the video?" ███: "no, I haven't, I like..." And you're going to hear me talk about ███. "I like you are one of my favorite teachers. So I'm talking to you." Me: "it is about policy for students that I want for all students." ███: "oh, okay."

**Katie Medart:**

Me: "do you want to tell me your friend's name so I can reach out to them?" And I could see he was thinking. Me: "how about you tell your friend that I do care about how they feel, and I would like to talk with them if they have questions, I would like to understand why my video made them feel that way. I don't want anyone to feel that way." ███: "yeah, okay." Me: "███, I just want to say thank you. That took courage and you were very respectful. Do you have any other questions?" ███: "yeah, for science, like as an atomic number gets bigger does it just get harder math? Because it's like easy." Me: "it gets more complicated with chemical equations and molecular formulas." ███: "cool." Me: "you like this stuff, huh? I could tell in class you caught on quick." ███: "yeah." Me: "okay, who is your teacher so I can send a message that I held you up?" ███: "Mr. Maxwell." Me: "okay, have a great weekend." ███: "thanks, you too."

*Ms. Medart was asked if she designated that the viewpoints expressed with regards to "I Resolve" were her personal viewpoints and not that of the School Districts.*

**Katie Medart:**

I didn't talk a lot about like legislation and stuff like that. I did say in there that I am concerned, as a parent I was concerned. I also know that we did not say that what school district we were part of, and that was so that it was not representative that we were speaking for school district 7. And when I read over and trying to hear the complaints, I felt like some if not everyone was just like... Some people even said it was made clear that it was ours and other people made the claim saying that that wasn't made clear to them. But other complainants said that it was made clear that that is our opinions and our beliefs.

**GPSD 310**
**Vickers Declaration**
**Exhibit 9 Page 26 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Okay. And no mention that these don't represent the views of the district that I'm where and work or anything like that, right?

Katie Medart:

Any what?

Dan Huber-Kantola:

Any reference to the district at all, like these views don't represent the district where we work or where I've worked specifically?

Katie Medart:

No, but since hearing that we have went and added a very clear statement to that, it says that now. So that it is on trying to hear other perspectives, we have went and added a statement so that there can be zero question of that.

Ms. Medart was asked if there was any time or equipment spent that was district time or district equipment creating that resolution.

Dan Huber-Kantola:

Okay, yeah. So I guess the question was, was there any time or equipment spent that was district time or district equipment creating that resolution?

Katie Medart:

Yes.

Dan Huber-Kantola:

Okay. What did you do? What time, what equipment was used to create it?

Katie Medart:

It was all done before. And never, ever were students ever. All done either early in the morning, some mornings. I mean, you'll be able to timestamp all, I'm pretty sure you guys have access to any time I'm

**GPSD 311**
**Vickers Declaration**
**Exhibit 9 Page 27 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

on a school computer and it will show I Resolve. So I would say in the mornings or it would be done in my flex time.

Dan Huber-Kantola:

During flex time?

Katie Medart:

Yeah. And when I say, like the writing of that. But as far as like, when we videoed all that, that was all during spring break. So lots of work went into it during spring break. That part that didn't was the initial first draft of the I Resolve. And when I say computer, so some at my desktop in my classroom, and then some on, I think very little on the laptop, to be honest. I have my own personal computer at home too, a desktop and a Mac, but I cannot say for sure. So I would say there's a possibility also on that one, but that's not my go-to that I use.

Dan Huber-Kantola:

So the initial work on the resolution was done in the morning, like what time?

Katie Medart:

I get to campus at varying times. I don't know. I'd have to pull it up, but not during teaching.

Dan Huber-Kantola:

Anything after 7:30 in the morning?

Katie Medart:

Yes, I would say that there is a chance that there will be timestamps of that.

Dan Huber-Kantola:

Okay. And then during flex time and flex time is 12:30 to 3:30ish?

Speaker 1:

I guess, that we have a little bit of time in there that's set aside for office hours, but by and large it's after lunch.

**GPSD 312**
**Vickers Declaration**
**Exhibit 9 Page 28 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Okay. So some of the writing of the resolution was done during flex time as well.

Katie Medart:

Yes.

Dan Huber-Kantola:

So was it written on a Google Doc through the district Google, so you go to your email account, you've got your email that attaches to Google and then it goes to a Google Doc?

Katie Medart:

I think it was shared to my email, but it was written on one through I Resolve, Gmail. The drive for the I Resolve.gp. That's where everything is at least right now. So that's where I believe that it was.

Dan Huber-Kantola:

But shared to you through your email address at school?

Katie Medart:

Yes.

Ms. Medart was asked if she sent the resolution to anybody using school email.

Dan Huber-Kantola:

So did you send the resolution to anybody using school email?

Katie Medart:

I did.

Dan Huber-Kantola:

Who did you send it to?

---

**GPSD 313**
**Vickers Declaration**
**Exhibit 9 Page 29 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

**Katie Medart:**

I might miss someone.

**Dan Huber-Kantola:**

That's okay.

**Katie Medart:**

Okay. I can pull it up for reference if you like and be able to name that if you want really accurate.

**Dan Huber-Kantola:**

Sure. If you have it.

**Katie Medart:**

Okay. ███████████████████████. And many of these, I went and talked to and then they said, send it to me. And then I used my work email to send and it's just titled, "policy" and then the link. ██████████ affey. I sent it to ███████████ in, she's at ████, and I asked for ██r opinions and to edit and ██ helped edit it. I think all of the rest were me personally texting, but I'm not seeing any when I did a search, any additional show up.

**Dan Huber-Kantola:**

Okay. So a couple of names, Rachel Damiano.

**Katie Medart:**

Emailing her the site?

**Dan Huber-Kantola:**

Yeah.

**Katie Medart:**

Her and I had regular exchanges. I'm sorry. I was assuming that was a given.

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

I thought so but it's just-

Katie Medart:

Yeah, to clarify, I understand. So yes is the answer.

Dan Huber-Kantola:

Okay.

Katie Medart:

It wasn't intentional to leave her name out.

Dan Huber-Kantola:

All right. What about ███████ ?

Katie Medart:

Oh, yes, he is. It didn't pull up when I did it, but I did send it to him. And if you ask me, I will be honest. So if you already have the list you can be open and tell me, and I will confirm. I'm just in a search, you can see what I did. It says I Resolve and I'm scrolling through and looking for any that are there.

Dan Huber-Kantola:

I appreciate you being honest and-

Katie Medart:

I'm not trying to hide that.

Dan Huber-Kantola:

I promise you we had not after all the research.

Katie Medart:

Okay.

## GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

I could do it after all the search.

Katie Medart:

Yeah.

Dan Huber-Kantola:

If you have some information I'm completely transparent with you. The reason that ███ came up for me is, I guess I would ask you about when students were there. Is it possible that you sent something regarding I Resolve to Rachel or ███ or something from ███ during school time when kids were there?

Katie Medart:

No, I do not... I have no recollection of any interaction like that.

Dan Huber-Kantola:

Okay. It would have been brief and it looks like it's the potentially that the resolution was shared on the evening of the 16th. That maybe ████████ sent it to you the morning of the 16th? And that maybe it was forwarded to Rachel on the morning of the 16th.

Katie Medart:

And I'm sorry, what is it? Can I look up what you're referencing?

Dan Huber-Kantola:

Yeah, it would have been the resolution. I believe it would've been... You mentioned maybe ████ had sent something to ███ or you had sent something to ██ ██ had forwarded that to you with some comments.

Katie Medart:

So you say, look up March 16th?

# GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Look up March 16th, the morning of March 16th.

Katie Medart:

And to ██████████?

Dan Huber-Kantola:

It might've been from ███████ and then forwarded to Rachel.

Katie Medart:

Okay. So there's one on March 15th. Is that what you're saying? That was received from ███████ and then March 16th, yep, that he highlighted a part on. Oh, he gave feedback, he read it. Is that what you're referencing?

Dan Huber-Kantola:

Yeah.

Katie Medart:

Okay. Yep. And then I forwarded it. Yeah, but there was no... It's just that FYI then I forwarded it to Rachel. Like are you asking me to confirm that I did that?

Dan Huber-Kantola:

Yeah.

Katie Medart:

Yeah, I did do that. I mean, it shows there. I did that. Yes.

Dan Huber-Kantola:

There were kids there at that time? So it's 9, 10, 9:00 in the morning, are kids in school?

**GPSD 317**
**Vickers Declaration**
**Exhibit 9 Page 33 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

At nine, they are. They had the potential they could have been in the classroom when I forwarded that email. Yes. There was no conversation. No talking about it. There was him giving me that and me forwarding it to her. Is there a chance that you're asking me if kids were sitting in the class? Are you asking me if I spoke about it with kids in the classroom?

Dan Huber-Kantola:

Is there a chance kids were there?

Katie Medart:

Okay. Then yes, there is a chance that kids are in by that time.

Dan Huber-Kantola:

But no speaking to kids, right?

Katie Medart:

No. Other than what I have disclosed to you with my interaction with ███████.

Dan Huber-Kantola:

Great. So you did say you had conversations with some of the people, ████████, ████████, ████████████, █████, and then forwarded to them. So when did those conversations take place? Was that during the school day?

Katie Medart:

At the end of the day.

Dan Huber-Kantola:

Like during the flex time or-

Katie Medart:

Like when your students were on campus? Yes. After office hours.

**GPSD 318**
**Vickers Declaration**
**Exhibit 9 Page 34 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Dan Huber-Kantola:

Okay. So would that have been still during the workday? In some cases prior to 3:30 in the afternoon?

Katie Medart:

Some yes, some after but on property.

Dan Huber-Kantola:

Okay.

*Ms. Medart is asked more specifically about the conversations with District 7 staff and "I Resolve."*

Dan Huber-Kantola:

Okay. So you initiated the conversations with them about the I Resolve or was it something that they asked you about, but something that you approached them about?

Katie Medart:

And honestly, I did mention this ███████, but ███████ was another one because they were together. And so you'll see one email sent to him. Now I'm thinking about, I've had people ask me but most of them, I will say, I went and said, "I want to share about policy that we are hoping to have you consider and get your opinion and talk about it."

Speaker 2:

Okay. Appreciate that honesty.

Katie Medart:

Mm-hmm (affirmative).

Dan Huber-Kantola:

So just bluntly, that would be a concern for me that that's violating the policy there. And also probably violating our contract. I think if we looked at article nine in our contract, it talks about all time is teaching time. It's supposed to be just for the educational purposes of school. Might be an exception in there for lunch, but using the internet, using the email and stuff would also likely be a violation of policy.

# GRANTS PASS SCHOOL DISTRICT 7

The interview went long however the aforementioned statements are what I found to be most relevant to Allegation #1 (Listen to audio from April 6th, 2021 interview for more details Exhibit 8).

On May 13th, 2021 at 12:50 PM, I did meet with Katie Medart for an interview at the Grants Pass School District 7 offices in a conference room. I did advise her our conversation was being recorded. Also present was ███████████████████████. Additionally, Attorneys Ray Hacke, Mathew Hoffman, Ralph Wiser, and Tyson Langhofer representing Ms. Medart joined in on the interview via Zoom video conferencing provided by District 7. District 7 Attorney Willard Ransom also was present. I advised Ms. Medart of the allegations and potential policies violated. I did direct her on behalf of the Grants Pass School District 7 to answer any and all questions truthfully. Ground rules regarding persons present were read into the record and no one objected to the ground rules. I advised her the investigation was that of an administrative fact finding and not a criminal matter.

I also provided a "Garrity Rights" form which I read to her she signed acknowledging the notice (Exhibit 9).  I asked how long she had been employed with the School District and she told me her contract began in July 2019. She stated her title was that of a foundational Science Teacher with health endorsement. Ms. Medart also stated she teaches 7th grade science. Ms. Medart said that her workday is from 7:30 – 3:30. I asked if she was familiar with District 7 policies and she stated: "yes, I believe that's safe to say." I advised Ms. Medart that I would be separating the questions to address the three areas of the investigation related to ███████████ complaint, ███████████ complaint, and grouping the remaining complaints which were regarding the "I Resolve" campaign.

For this part of the narrative report, I will cover the portion of the interview with Ms. Medart related to Allegation #1.

> Bill Landis:
>
> Okay. Moving along. Complaints regarding posting information to social media and public websites, causing a substantial disruption, posting confidential information about a student and district business, use of district facilities, equipment or supplies in connection with political campaigning, working on a personal campaign during your prescribed workday, failure to designate that the viewpoints expressed by you were your own and not to be interpreted as the district's official viewpoint on a controversial issue, discussion and correspondence with other district employees regarding a political campaign during the performance of your district duties, and failure to meet the responsibilities and duties of your job description, in this latest complaint.
>
> Bill Landis:
>
> So we spoke about the I Resolve campaign. When did that start? I'm sorry campaign, you want me to use...

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Ideas.

Bill Landis:

Ideas. I'm sorry. Forgot.

Katie Medart:

Proposed policy, resolution.

I asked Ms. Medart if "I Resolve" was a non-affiliated District 7 project.

Bill Landis:

Okay. And this was a non-affiliated District 7 project. Correct?

Katie Medart:

Correct.

I asked Ms. Medart about her involvement in the project.

Bill Landis:

So what has been your involvement in this?

Katie Medart:

My involvement?

Bill Landis:

So I saw you in the video. Were you part of the scripting of it? Were you part of the idea and concept? What's been-

Katie Medart:

Yeah, the video was actually impromptu. So I, obviously, was part of it, and then I helped... Rachel, you're aware?

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Yes.

Katie Medart:

I edited and helped write parts of the policy.

Bill Landis:

Because this is not a private-

Katie Medart:

Proposed policy.

Bill Landis:

... matter. Would you agree this is a public website, public social media postings on YouTube with yourself and Rachel in the video. Is that correct?

Katie Medart:

That it's out there for the public?

Bill Landis:

Yes.

Katie Medart:

Yes. Yeah.

I asked Ms. Medart about the use of District 7 facilities, equipment, supplies, and email regarding "I Resolve."

Bill Landis:

Have you used District 7 facilities, equipment or supplies, email, regarding the... I'm sorry the proposal, the project. I think project's probably a better word for me, because it's kind of confusing, for the I Resolve proposal project?

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I have used minimal district resources.

Bill Landis:

Okay, and explain that. What has been used?

Katie Medart:

Well, you can see my email was used for some of it.

Bill Landis:

Okay.

Katie Medart:

And as already stated in my first investigation, that some work was on my computer.

Bill Landis:

Your District 7 computer?

Katie Medart:

Yeah, my desktop.

I asked Ms. Medart about her choice to use District 7 email since "I Resolve" was a non-District 7 project.

Bill Landis:

Okay. So why District 7 email? Why use District 7 email?

Katie Medart:

I still don't believe we have violated any policy, and that I was in violation of anything that we were doing.

---

**GPSD 323**
**Vickers Declaration**
**Exhibit 9 Page 39 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

But I'm saying... Well, I get that you're saying you don't feel like you've violated policy, but was there ever a time that you felt like that this was needing to be separate from the district?

Katie Medart:

From my district email?

Bill Landis:

The I Resolve proposal project, was there a feeling that needed to be separate from the district?

Katie Medart:

We were open and transparent through the whole process.

Bill Landis:

So in the video I noticed you didn't identify yourself, though, as a North Middle School teacher.

Katie Medart:

Uh-huh (affirmative), because I was speaking as a private citizen.

Bill Landis:

So then why use district email for correspondence related to the I Resolve project?

Katie Medart:

Because I didn't believe it was... One, it was initiated to my district email. Rachel first sent me an email to my district email, and so it was initiated in that. I didn't think it was in violation of... I still don't. I don't believe it's in violation of any policies.

Bill Landis:

But there was a conscious effort you said to be a private citizen in the video, which was the crux of this proposal project. But yet-

# GRANTS PASS SCHOOL DISTRICT 7

**Katie Medart:**

Because I'm speaking of my opinion about a proposal for a matter of public concern. My opinion doesn't mean that I can go and speak on behalf of my school district.

**Bill Landis:**

So did you email person or persons at ████████████████, on District 7 email, about the I Resolve proposal project?

**Katie Medart:**

I did.

**Bill Landis:**

Okay. And when you use a district email, do you have a signature line at the bottom of your emails that says your name and title?

**Katie Medart:**

I actually don't think mine does.

**Bill Landis:**

Okay. So with the address-

**Katie Medart:**

Could be wrong, but I'm pretty sure I have not set up my signature. I might be wrong.

**Bill Landis:**

And so with the email address that uses the Grants Pass District 7 server, would you agree that people know that that's coming from the school district?

**Katie Medart:**

No. I believe, in all my communications, I've been very clear that these are my personal views.

---

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Did you receive email from the news media at your District 7 email requesting interviews or things of that nature?

Katie Medart:

I don't know. You'll have access. I don't recall. I thought you sent an email about media to me. Or not a email, but-

████████:

[inaudible 00:56:55]

Katie Medart:

... messages. I don't recall that.

Bill Landis:

Did you receive email from citizens outside of the district related to the I Resolve proposal project?

Katie Medart:

I'm sorry, repeat the question?

Bill Landis:

Did you receive email on your District 7 email related to the I Resolve proposal project from outside the district? Did-

Katie Medart:

Yes.

I asked if Ms. Medart was aware that the District 7 Superintendent was receiving emails regarding "I Resolve" inferring District participation.

Bill Landis:

Were you aware whether Superintendent Kolb was receiving emails, as if the district had participated, prior to be putting put on leave?

---

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

He called a meeting with Rachel and I on March 31st. I believe it's March 31st, and then he separated us. And he said that he didn't believe, this should be in writing, you can see this in the email, but he stated that he didn't believe that there would be any discipline in nature. Just wanted to share a concern. And then, he had ▮▮▮▮ and I meet with him.

Bill Landis:

And the March 31, 2021 date, how long was that after the video basically became public? Ballpark?

Katie Medart:

The video? When did it become public?

Bill Landis:

Yes.

Katie Medart:

It was public before that.

Bill Landis:

Yeah. I mean, do you remember how long before the March 31st meeting?

Katie Medart:

I thought it was a Wednesday. I don't remember what day it was posted on YouTube, but that was during spring break.

Bill Landis:

Was it within a few days that you were called to meet with Superintendent Kolb after the video was made public? Do you recall?

Katie Medart:

It may have been four days, four or five days after.

**GPSD 327**
**Vickers Declaration**
**Exhibit 9 Page 43 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

I asked Ms. Medart if she discusses in the "I Resolve" video one of her students which she can be seen doing in the video where she is telling a story of being approached by a student and regarding their gender identity transformation.

Bill Landis:

Did you discuss one of your students in a video, in the video that was then posted on YouTube, and the I Resolve website?

Katie Medart:

No.

Bill Landis:

Okay, so in the video, and watching the video, you talk about shortly after coming back to the district, approximately a year ago, that you were confronted with a situation where one of ███████ was basically wanting to ████████████ , I believe, to ████ .

Katie Medart:

I was giving a scenario. I, in considering, do not believe I gave any personal identifying information at all to a student, and was very mindful of that when speaking.

Bill Landis:

Right. So my question is that, did you discuss one of your students? I get that you don't feel that you did. I'm asking you a question about did you discuss one of your students in the video? Because there's a part where you start explaining about shortly after coming to work at the district, i.e., the district's not identified, i.e., but you became identified, about a student, and basically their journey from going from, I believe, it was female to male, and the circumstances surrounding that.

Katie Medart:

Yeah. And at the time. I believed, I thought, looking back at it, that was very accurate. But my intent was to give a hypothetical and it actually is a hypothetical situation.

Bill Landis:

So-

## GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Which is relevant, just being able to talk to parents and teachers about a hypothetical situation that is relevant.

Bill Landis:

So that situation never took place in your classroom.

Katie Medart:

No. The one that is on the video, and looking back at it, even though at the time, and knowing my intent was to give a scenario or hypothetical situation, and then, after looking back at it, it is truly a hypothetical situation.

Bill Landis:

But that wasn't given to... On the video, you stated as a circumstance that occurred to you.

Katie Medart:

Yes. My intent in doing that... And I would say, Have you ever misspoke? Looking back at it, I was talking about a hypothetical situation.

Bill Landis:

Okay. So, question for you since you know your students. Would one of your students be able to identify who you were speaking of in the video?

Katie Medart:

Well, I don't want to speculate on my students' behalf.

Bill Landis:

So none of the information you gave, as you said, was hypothetical.

Katie Medart:

I answered this before in my other interview with Mr. Blanchard. I told him absolutely not. And they didn't like that answer.

**GPSD 329**
**Vickers Declaration**
**Exhibit 9 Page 45 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. So you can bear with me.

Katie Medart:

Okay.

Bill Landis:

My interview is not based upon prior interviews, and to get it into the record, I have to ask you these questions, so that I can do my due diligence-

Katie Medart:

So their stuff isn't entered record?

Bill Landis:

Their stuff, I believe is entered record. But I'm not using what they did, I'm doing my own, because my scope, I want to make sure is my own scope of what I've been directed to do.

Katie Medart:

Okay. So you won't be using that recording?

Bill Landis:

That recording is in record and it is part of what I was given, and so accessible to whoever and stuff. So that will be reviewed and looked at. I don't understand your question. I'm just trying to to get things onto the record. I'm not sure what you were asked or not asked, but it is available, yes.

Katie Medart:

I will say, I assumed that you had that, you reviewed that, so you would know the answer to the question that you are asking me.

Bill Landis:

And even if I do know some of the answers to the questions I'm asking you, to get it onto the record, I need to hear it from you.

**GPSD 330**
**Vickers Declaration**
**Exhibit 9 Page 46 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Okay.

Bill Landis:

Did you in the video discuss the handling of matters involving transgender students and the district?

Katie Medart:

Can I just refer you to the video, as it states everything that you're asking. You're asking me to recall the details of a 17-minute-long video, almost, that I filmed six weeks ago.

Bill Landis:

Okay. And you haven't watched it since?

Katie Medart:

No, I have watched it since, but I haven't watched it to the point where I feel like an accurate answer to that would be to refer you to it, so that there wasn't a mistake and what is being recalled.

Bill Landis:

Okay. So after what I viewed, where you talk about the student, you mentioned that there are issues regarding guidance from the district. Do you recall that, and not getting proper guidance?

Katie Medart:

So in the video, does it mention that I expressed that I did not receive proper guidance?

Bill Landis:

Correct.

Katie Medart:

Yes. Or clear direction? I don't know exactly what it says in there.

I asked Ms. Medart if she worked on the "I Resolve" proposal project during her school workday.

---

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

So did you work on the I Resolve proposal project during your school work day?

Katie Medart:

I did minimal work using minimal resources from the school to work on I Resolve during my work day.

Bill Landis:

How much and how often?

Katie Medart:

How much and how often? Well, there's emails that would show any of the work that I did do.

Bill Landis:

So there's emails, certainly is some of this, but I'm asking... I don't what other work. You said you did some things on your computer, so I'm not sure what.

Katie Medart:

Well, that was in reference to the emails. Any of the actual time to look over or write the policies was done when I was at home in the evening.

Bill Landis:

Were some of the emails communication to you on your Grants Pass email regarding reviewing the video and making editing suggestions and things like that?

Katie Medart:

Yeah, that would have been at home.

Bill Landis:

Okay. So, any idea during, how long did you-

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I'm jammed when I'm on campus, teaching students. We only have five minute passing periods, and all the COVID safety protocols you go through, and not to mention delivering instruction. And just so you know for my subject, to engage our students, we did a lab every week that they came to campus. So you're up and you're going and you're totally captivated by what you're doing, and then that also takes tons of hours of planning and doing that, and I have always done my job duties.

I asked Ms. Medart if she had face to face conversations with persons about the "I Resolve" project.

Bill Landis:

Okay. And did you have face-to-face discussions with persons about I Resolve proposal project?

Katie Medart:

I notified some staff members about the ideas proposed, about what was potentially being proposed, and an idea that we were proposing.

Bill Landis:

Did you advocate for them to go on the website and see it and to understand it or things like that?

Katie Medart:

I shared the website with them.

Bill Landis:

And when you say staff, how many people are we talking about?

Katie Medart:

That would be in the emails, who I sent it to. Because after I talked to them, after I notified them that it was available, and to consider this, I sent an email, and it was typically policy, and then the website, www.iresolvemovement.com.

Bill Landis:

So my question to you is, do you have any idea how many staff members, ballpark, that you reached out to about the project proposal, and the website?

---

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Not off the top of my head, I don't. I'd have to go pull them up and then count how many that it was.

Bill Landis:

Do you think it's more than 10?

Katie Medart:

I think it could be right around 10.

Bill Landis:

Okay. Did you have any others where you were face to face and it's not email, as far as that conversation regarding that?

Katie Medart:

I do not recall that. I believe right after I sent people an email.

Bill Landis:

Did you have discussions with Rachel during school time regarding the proposal project?

Katie Medart:

Very minimum. Most of our meetings that we had, when we had meetings, were really about... The few that we had on campus were not related to the I Resolve. Most of that work was done during spring break.

*I asked Ms. Medart if she had made it clear that the viewpoints expressed in the "I Resolve" project and video were not to be interpreted as the District's official viewpoint on a controversial issue.*

Bill Landis:

Did you make it clear that the viewpoints expressed in the proposal project, I Resolve, and video were not your own, and not to be interpreted as the district's official viewpoint on a controversial issue?

Katie Medart:

Yes, I believe that I made it clear that those were my personal views.

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

And how did you make it clear?

Katie Medart:

Well, when you look at the video, it clearly states that this is my belief, I as a parent.

Bill Landis:

Okay.

Katie Medart:

I Resolve.

Bill Landis:

Just so I can be clear, because I watched the video, and I saw you introduce yourself as a southern Oregon middle school teacher, and at no point did you make a statement or clarify that that is not something to do with your position or what you're advocating for in the video.

Katie Medart:

I actually believe that's incorrect. I don't believe I introduced myself as a southern Oregon middle school teacher. I think I shared that I was my experience that I have working with youth, and I introduced myself as someone who has experience working with youth. And I talked about how I'm a coach and a mother, a parent, and that I have other experience also, as a teacher, and talked about the range of teaching experience that I have.

Bill Landis:

Okay. So that's how you introduced yourself, you recall.

Katie Medart:

Yes.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

So where did you then express that regarding this controversial issue that your views being expressed were not that of the Southern Oregon middle school that you worked for.

Katie Medart:

I think you clearly get that as you listen to all my statements that are given in there that say, "I believe," "In my opinion." I think those phrases come up over and over and over throughout that video. I probably... I don't know, I guess, more than, very, very often.

I asked if she felt she had clarified in the video that the viewpoint was not that of the School District's then why use District 7 email for correspondence related to "I Resolve."

Bill Landis:

I'm asking why if you were trying to not convolute the district's position and your own being a personal view would you not use personal email instead use district email, such as reaching out ▮, to look at and give input about the I Resolve project and proposal as you did to employees?

Katie Medart:

I believe, in everyday work, we come in and talk about opinions on different things, and you're not representing your district. I believe that literally happens every day at the workplace. In the way that you speak without every time, so I hear you saying... I almost feel like you're saying... The only way to make it clear is if I say every time before I give my opinions, "This is in no way District 7's views." Right?

Katie Medart:

But I don't think we do that. I think in our normal daily work, all the time when we give our opinions on different things, from context of speech when we say, "I believe," or "In my opinion," which we do over and over and over in that video. And in my communications with anyone, I have been very consistent in that these are my views, speaking on. And so, I don't think that sending it from an email says, that you're speaking on behalf of someone else's views.

I asked Ms. Medart if there was ever a time where she was entrusted with the supervision or teaching of students while working on the "I Resolve" project.

---

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

So basically what I'm trying to find out is, with the I Resolve proposal project, was there any time you were working on that, when you were entrusted with kids in your classrooms and teaching? Were there any times where you had a conversation with students about the I Resolve proposal project or things of that nature?

Katie Medart:

So I have never initiated any conversation with a student about I Resolve, and working on it, no. If you're specifically asking about Mr. Kantola brought up an email that was from a staff member that I forwarded. That staff member had given opinion, or feedback, and I forwarded that. And that was not when class started, and so I cannot say that I have even done anything ever when a student was present, or speak. I do not recall that as being there.

Bill Landis:

Okay. And you made a statement about you've never initiated a conversation with a student about the I Resolve proposal project, but have you had a conversation with a student or students about the I Resolve proposal project?

Katie Medart:

So, I had a student ask me about the I Resolve.

Bill Landis:

Tell me about that conversation.

Katie Medart:

I would honestly like to defer you to my first recording. And the only reason why is, because I went over in detail in that first recording, and I had immediately journaled about it, and then I submitted that in its full entirety during my first recording.

I asked Ms. Medart if Transgender issues can be controversial with regards to legislation.

---

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. And so the only thing, we use the term controversial before, but I want to try to tie that to what my question really is. But would you agree that transgender issues can be controversial with regards to legislation?

Katie Medart:

Can be controversial with regards to legislation?

Bill Landis:

Yes.

I asked Ms. Medart what her message was to the students since "I Resolve" had been brought into the school and affected students.

Bill Landis:

So I want to ask you, since you identify yourself as a teacher from Southern Oregon in the I Resolve proposal project, and you've gone a step further with District 7 email use supporting or use for the purpose of communicating about the I Resolve proposal project, what is your message for the students in the campaign, since it has been brought into the school?

Katie Medart:

So, what I hear you saying is, and then you keep taking that I spoke from all different perspectives as a youth and you're putting together... I did not speak as a teacher representing the school district. But if I focus on the second part of your question, it is, what do I believe... Are you asking what is my message to students?

Bill Landis:

Yes, now that it's into the school. Like you said, a student contacted you because they said they saw you in the video.

Katie Medart:

My message to students is that it's loving and tolerant and respecting the rights of all individuals.

---

# GRANTS PASS SCHOOL DISTRICT 7

I asked Ms. Medart if she had been honest and truthful in her answers to me and she said: "Yes." I asked if she or anyone else in the interview had anything they wished to add or clarify and all said they did not. (See transcript for further details regarding Allegation #1 Exhibit 9).

# GRANTS PASS SCHOOL DISTRICT 7

### Allegation #2

#2: Between October 2020 and March 2021, Katie Medart discriminated against ███████████
████████████████████████████

On April 6th, 2021, ████████████ filed a formal complaint against Katie Medart for discriminating against him based upon his sexual orientation as stated in his complaint (Exhibit 1A). In the complaint, ███████ writes: "████████████████████████████ *and I am assigned to work in Katie Medart's second period science class. Ms. Medart has discriminated against me in multiple ways because of my sexual orientation/gender identity.*

*I identify as* ████ *and the name I use is* █████. *Ms. Medart told me that she doesn't allow her students to use names other than their legal names, so she asked me not to refer to myself as* █████ *She also asked the students not to refer to me as* █████.

*At the beginning of the school year, Ms. Medart explained what I would be doing in the classroom and how I could help the students. In December, I had* █████ *as a step in my transition. In January, Ms. Medart asked a lot of questions about the nature of my* █████. *The conversation become very awkward. Prior to this conversation, I was working with the students in Ms. Medart's classroom every day. In mid-February, Ms. Medart asked me not to be in the classroom with the students and to only work with the students who are online, and to work with them outside of the classroom. I feel that Ms. Medart asked me to not be in the classroom with students because of my* ████████████ *and as a way to discriminate against me because of my gender identity.*

*Ms. Medart and Rachel Damiano, Assistant Principal at North Middle School, are leaders of the "I Resolve" movement that is actively trying to take rights away from the transgender community. During school and working hours, Ms. Medart has been talking to staff about a Resolution pertaining to gender identity policies and encouraging staff to sign it. This Resolution is anti-LGBTQ and attempts to remove rights from LGBTQ students. Promoting this Resolution during school and working hours violates Board Policy GBG – Staff Participation in Political Activities. It also does not align with the Grants Pass School District Equity, Diversity, and Inclusion Resolution."*

In his complaint, ███████ listed █████████ as a witness and referred to the "I Resolve" video with reference to Ms. Medart speaking about a student in her class.

On May 7th, 2021 I did meet with █████ at the Grants Pass District 7 offices in a conference room to interview him. I did advise █████ our conversation was being recorded. Also present was ████████████████. █████ was given a witness admonishment statement which included a directive on behalf of District 7 to answer all of my questions truthfully. I asked ████████ if ██ had been noticed regarding the investigation and today's interview and ██ confirmed that he had. I asked ██████ how long he had been employed by District 7 and he stated that he had been employed since October 2018 but had assumed his current position in September 2020. I asked what his new position was, and he stated that it was as a special education assistant. I asked ████████ about his duties.

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 340**
**Vickers Declaration**
**Exhibit 9 Page 56 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

As an assistant, tell me what that entails as far as your work duties in a typical week.

█████████ :

I work primarily at the resource room, students in special education. What I do is I go to various general education classrooms that have a high concentration of special education students in it so that I can make sure that they receive all the modifications and accommodations that are in their IEPs.

Bill Landis:

I understand as an example, in Ms. Medart's class, there are a diversity of students that include special ed students and non special ed students?

█████████ :

Yes.

Bill Landis:

Your job as an assistant is to assist the special ed students with curriculum and meeting the goals of the class?

█████████ :

Yes.

Bill Landis:

Okay. Is it safe to say that with your assistance to Ms. Medart at North Middle School, that you also do that for other classes and other teachers?

█████████ :

Yes, absolutely.

Bill Landis:

So you don't have one particular class that you work with?

## GRANTS PASS SCHOOL DISTRICT 7

███████ :

No, I have a full day of classes. Just like how a student goes from class to class.

I asked █████ about his work week when he assumed his new role in 2020.

Bill Landis:

When you assumed that role in 2020, and we're in the middle of a pandemic, what did 2020 look like for you as far as work week or work schedule?

███████ :

In the beginning, we were entirely distance learning so I primarily would be in the library or in a classroom with a computer, joining in on their online classes and providing assistance in that way, through breakout rooms and conferencing with students over Zoom during office hours.

Bill Landis:

Is that fair to say that you're talking about September 2020?

███████ :

Yes.

Bill Landis:

So new school year 2020, September, you're doing it through the internet and online because students are not back physically at school.

███████ :

Right.

Bill Landis:

Okay. How did the rest of 2020 play out?

**GPSD 342**
**Vickers Declaration**
**Exhibit 9 Page 58 of 136**

# GRANTS PASS SCHOOL DISTRICT 7



███████:

For the rest of 2020, I believe we were still in the distance learning. Only in February did we transition to hybrid learning. When that happened, then I would be in the classes physically assisting with the special education students that way.

████ recalled that February 24th, 2021 was when classes resumed on campus. I did show the complaint he filed and the copy I received which he confirmed was what he filed (Exhibit 1A). I asked if in February when classes resumed if that was the first time he was fulfilling his duties as a special ed assistant in person.

Bill Landis:

Okay. That was the first time you were in your new duties as a special ed in the classrooms?

███████:

Yeah, physically in the classroom.

Bill Landis:

You rotated among how many teachers would you say?

███████:

I had seven class periods, so seven teachers.

Bill Landis:

Okay, seven different teachers.

███████:

Or six, because the one period is lunch. Six teachers.

Bill Landis:

So you're not assigned to any one teacher?

███████:

No.

# GRANTS PASS SCHOOL DISTRICT 7

I asked ██████ about his gender transition which we had briefly discussed prior to going on the record for clarity.

Bill Landis:

Okay. As I read your complaint, I understand, and we talked a little bit before we went on the record, that you went through a transition, gender-wise.

████████:

Yes.

Bill Landis:

Can you tell me about that.

████████:

I've known for a very long time that I'm a transgender, female to male. I've been transitioning medically over the past two years, and recently had chest masculinization surgery in December.

Bill Landis:

When you were hired on with the district, your name was, what?

████████:

It was █████ still legally when I was first hired. It only recently changed legally to ██████.

Bill Landis:

Okay. At some point, you did make it known to the district and/or middle school that your name was something different?

████████:

Yes. We're currently still going through the logistics of getting it changed in the system. I've been in contact with ████ about that.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Tell me what you did to notify the school and when about that occurred.

████████████ :

When I notified the administration at North, it was less about changing it in the system because that's through the district office, and more about, more social of what I would be referred to at the school by staff members. I had a conversation with Tommy Blanchard and which he asked if I wanted to use █████ and he/him pronouns and I said yes. That was at the end of the 2020 school year, before we transitioned into distance learning.

█████ said that it was █████ responsibility to inform others of his name change.

Bill Landis:

Okay. You know what he did as a result of that? Did he notify your teachers, or did he let you approach them?

████████████ :

At the time, I was still in my Educational Assistant Supervision position, so there were no teachers to notify. But he communicated it with the office staff and at the beginning of 2020, this school year, in September, we did talk to some of the teachers. But it was my responsibility to let them know.

Bill Landis:

Who did you have conversations with to let them know that, "My name is now █████," and did you talk about the transition you were going through?

████████████ :

A little bit, yes. When I first started in this position, I initially met with each teacher individually or talked with them either in their conference or in person, depending on if they were distanced from home or if they were on campus. I told them that, "My name on the system right now is █████. I go by █████ now." I let them know that that was what I'm going by and that I use he/him pronouns. I did speak with each teacher individually about that. That was on my first time being in each of their classrooms so we're able to talk about it that way first.

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

When abouts did those conversations take place? In September, were you able to interact face to face with teachers even though school did not start back up?

:

Most of the staff was on campus, just in their classrooms. For certain teachers, I was able to go have that conversation face to face. With others, Katie included, she was working remotely from home. So I spoke with her over Zoom.

I asked about his conversation with Ms. Medart regarding his name change.

Bill Landis:

So you had a conversation with Teacher Katie Medart about the name change?

:

We discussed that right after my first class with her, because I introduced myself as ████ and then we spoke about it afterwards.

Bill Landis:

Tell me about that conversation.

:

She asked that, after the classes of the day were over, that I hop in to a Zoom meeting with her because she was working remotely from home. We discussed, she asked about the name and asked that not use a name that's different from the system because she doesn't allow students to use it, to use different names than in the system.

Bill Landis:

This conversation was some time in September 2020?

:

This would have been September, possibly early October at this time.

---

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. The purpose of the meeting was you asking to meet with her or her wanting to talk to you? How did that come about?

████████:

She asked to meet with me after the first time that I was in her class online. We were just discussing partially how I would be assisting with special education students in her class, and then the name issue came up after that.

Bill Landis:

Same conversation you were having with other teachers, you were having with her?

████████:

Yes.

Bill Landis:

The conversation was, "I'm going by ████ now." Did you talk about the reasons behind that? That you're transitioning?

████████:

Yes. Some of the teachers actually knew from when I went to middle school there so they were familiar with me as ██████. I was just letting them know, "I go by ██████. It's because I'm transitioning to male. I use he/him pronouns and please, Mister instead of Ms. in the classroom."

Bill Landis:

Is that the conversation you had with Katie Medart?

████████:

Yes.

Bill Landis:

Then she requested to have a Zoom meeting as a follow up to that?

---

**GPSD 347**
**Vickers Declaration**
**Exhibit 9 Page 63 of 136**

████████:

Yes, I've mentioned that I go by Mister and ██████ when I was introducing myself. She asked to connect with me later about that. So then we connected in a Zoom meeting after, at the end of the day.

Bill Landis:

So same day?

████████:

Yes, same day.

Bill Landis:

So you had a Zoom meeting, so you were at home and she was...

████████:

I was on campus and she was at home.

I asked ██████ how the Zoom meeting later that day went.

Bill Landis:

Okay. So tell me about the Zoom meeting.

████████:

I joined her Zoom conference in her personal meeting room. Initially we were just talking about how I would be assisting special education students in our classroom and how that would look online and later in person hopefully, and how we would work together and communicate through that. We talked about how I introduced myself as ██████ and as Mister ████. She asked that I please not do that and that Mister ████ is fine but she doesn't want me to use a name not in the system. So no ██████. Which at this point I said, "That's okay because I go by Mister ████ anyway, I don't use first name basis with the students." At this point she mentioned to me that when I introduced myself in her class, she had a student directly message her over Big Blue Button, which is where they do their class conferences. The student asked, "Can I go by a different name?" And she said, "No, and we're

**CONFIDENTIAL**    PCI #21-1011/ Part I

not using..." that's what she relayed to me in the Zoom meeting later. She told me that a student had messaged her and then she had told them no.

Bill Landis:

That was over the change from ███████ to ███████.

███████:

Yes.

Bill Landis:

But she said she was okay with Mister ██████ or referring to yourself as a male?

███████:

Yes.

Bill Landis:

Okay. Anything else in the Zoom interview remarkable about the conversation?

███████:

The only thing that struck me as odd is that she asked if I had a concern, that I not take it to the office or to Tommy Blanchard. She asked that if I had a concern, that I take it up with her and not tell essentially anyone else. That struck me as odd a bit at the time. She said that she doesn't want to cause unnecessary drama in the workplace and that she would prefer to work through it with her. It struck me as a bit odd saying, "Please don't talk to Tommy if there's an issue."

Bill Landis:

Did you understand what she meant by if there's an issue or what she was referring to?

███████:

She just meant in general I think. She didn't state any specifics. At the time I assumed maybe if there's an issue with a student or if there's an issue with modifications to a student's work. But she didn't specify.

# GRANTS PASS SCHOOL DISTRICT 7

I asked ▮▮▮▮▮▮ about when he started to feel there was a different treatment of him.

Bill Landis:

You felt that there was a different treatment of you and you felt it because of what you were going through. Correct?

▮▮▮▮▮▮:

Right.

Bill Landis:

So tell me about what led you to file the complaint feeling that you were being discriminated?

▮▮▮▮▮▮ig:

Right.

Bill Landis:

Is that a true characterization? Do you feel that's what this is about? You felt like you were being discriminated?

▮▮▮▮▮▮:

Yes, I do. After I had ▮▮▮▮▮▮ in December and I was gone for a week after ▮▮▮▮▮▮, before I could come back on campus... but at that point, I think winter break was in motion.

Bill Landis:

If we could get just a general... You had ▮▮▮▮ in December?

▮▮▮▮▮▮:

On December 1st.

Bill Landis:

Okay. Close to the Christmas break timeframe?

**GPSD 350**
**Vickers Declaration**
**Exhibit 9 Page 66 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

████████:

Yes. Right before the winter break happened.

Bill Landis:

And you were off work for how long?

████████:

I believe it was just a week. I believe there was time between that where I was back on campus but it was a very short amount of time.

Bill Landis:

And then Christmas break.

████████:

Yes.

Bill Landis:

Okay.

████████:

I had ██████ in December. In January I believe it was, Ms. Medart approached me in person and asked, "Why were you gone?" And I said, "I had my ██████" She said, "If you don't mind, what did you have ██████ regarding?" I was honest and I told her it was a part of my ██████ and that it was to ██████████████ in order to be more comfortable physically. After this became pretty awkward and it eventually just ended with her just walking away.

Bill Landis:

So the conversation became awkward as soon as you explained what you had done?

████████:

Yes. It was initially very friendly and then I explained and then it became, "Oh, okay." And the conversation ended. It had some awkwardness as we were trying to end it essentially.

---

**GPSD 351**
**Vickers Declaration**
**Exhibit 9 Page 67 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

**Bill Landis:**

Question, did you think it odd that she was asking specifically about ███████ Did you have that kind of relationship?

██████████:

I did find it a little odd. We did not have that kind of relationship. We have not had much personal contact at all over the time that I've been in her class beyond what's happening in the class and work related conversations. At the time, I did try and give the benefit of the doubt of maybe she's trying to be friendly. But after it became awkward, it felt a bit odd afterwards for sure.

**Bill Landis:**

Did you feel caught off guard about being asked about the specifics of the ██████?

██████████:

Yes. At the time I believe I was just walking down the hallway and she stopped me in the hallway and asked. It did catch me off guard that she would ask about that. Especially in that specific environment, just in the hallway.

**Bill Landis:**

Had you told her before going to have the ██████, you would be off ██████?

██████████:

Yes, all of my teachers knew that I was going to be gone for that week because of ██████.

**Bill Landis:**

So they knew you were having ██████...

██████████:

Just not what it was.

I asked ██████ about what else had occurred.

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

**[REDACTED]:**

After that, a new quarter started at some point at the school so that their campus pages for the classrooms had to be changed to the new quarter page. It was quarter two I believe and then quarter three had started. On the quarter three page, I noticed that I had lost my privileges as teacher's aide position. I was demoted down to student position so I lost a lot of my abilities in her class page.

**Bill Landis:**

Tell me about that because as a lay person, I don't understand how that... So as a special ed assistant in her classroom, you have certain access to things based on a stature position, is that fair to say?

**[REDACTED]:**

Yes.

**Bill Landis:**

And do you have that in every classroom?

**[REDACTED]:**

Yes.

**Bill Landis:**

In every other classroom, what is that stature that you would be on or in?

**[REDACTED]:**

The would be either TA or EA, depending on educational assistant or teacher's assistant. It just gives me the ability to check a student's grades, to private message a student, to set up a conference, to look at things that haven't been published yet and to create breakout rooms and meetings, things like that.

**Bill Landis:**

Prior to the new quarter and [REDACTED] Give me an idea. In January, you come back. When abouts does is the new quarter that you're referring to, ballpark?

**GPSD 353**
**Vickers Declaration**
**Exhibit 9 Page 69 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

█████████ :

I believe quarter three started in mid to late January. It was after a couple of weeks I believe.

Bill Landis:

Okay. A couple of weeks, fair to say, after the conversation with Ms. Medart in the hallway?

█████████ :

Yes.

Bill Landis:

Prior to ████████ and the conversation beginning in September, you had access in her class as a TA or EA?

█████████ :

Yes.

Bill Landis:

That gave you access to grades and messaging. Anything else?

█████████ :

Yes, it gave me access to essentially view all of the things as a teacher without having the ability to change things as a teacher.

Bill Landis:

And you have that access in the other six classes?

█████████ :

Yes.

Bill Landis:

Still have it?

**CONFIDENTIAL**                PCI #21-1011/ Part I

# GRANTS PASS SCHOOL DISTRICT 7

███████████ :

Yes.

Bill Landis:

At some point, the new quarter starts mid January-ish let's say. And you realize that your status is now, what?

███████████ :

Same as a student. When we are added into the new quarter classrooms, the teacher's aides don't get added automatically. We have to be manually added in. So every time we have to send an email to all the teachers saying, "Hey, please remember to add in your aides." I noticed that this time I was added in manually as a student.

Bill Landis:

The teachers manually add?

███████████ :

Yes, the teachers have to manually add the aides for their classes.

Bill Landis:

So in the first and second quarter in Ms. Medart's class, what did she add you as?

███████████ :

When I was first added, it was added by Tommy Blanchard. I was added as a TA. The second time, it was by Katie Medart and it was a TA. The third time I was added as a student.

Bill Landis:

How do you know that Principal Blanchard did it the first time and Katie Medart did it the second quarter?

# GRANTS PASS SCHOOL DISTRICT 7

 :

The first time was Tommy Blanchard just because I had started into the classes while they had already started so he just added me into all of them at once without having to go through the teachers. The second time was all the teachers have to add me manually.

Bill Landis:

The third quarter where you were entered in her class as a student, the other six teachers continued you on as a TA. Is that correct?

_____ :

Yes.

Bill Landis:

And so you felt a different treatment at that point?

_____ :

Yes. I have found it very odd.

Bill Landis:

Did you contact Ms. Medart to inquire about that?

_____ :

I did get it changed back to TA. I was able to go back and see grades and whatnot.

Bill Landis:

Tell me about how you got it changed.

_____ :

I believe I talked to, I think it was Tommy. It might have been an IT. I sent an email via... I asked one of my coworkers what I should do to get it changed and they recommended that I email IT I believe or talk to Tommy. So I did that. It did get changed. I don't believe it was through Katie herself.

**GPSD 356**
**Vickers Declaration**
**Exhibit 9 Page 72 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

My question to you is, did you contact Ms. Medart about the change?

 :

No. No, we didn't talk about that. I believe I mentioned it to her in her class and told her that it was at student level and that it was being changed so that I could assist her students. She didn't seem to have any issue with that at the time. She didn't say that she didn't want it to be changed.

So for clarification I asked if he did contact her and what he found out.

Bill Landis:

You do contact her? What do you recall that you... You noticed, "I'm a student, I can't do what I've been doing or how I need to do this." And so, do you say, "Hey, Katie or Ms. Medart, trying to figure this out"?

 :

I was able to get it changed fairly easily via my coworker who let me know who to contact. When I talked to Katie about it, it was already in the process of being changed I believe. I had already sent the email or talked to Tommy. I believe it was Tommy. I just let her know, "I think you may have added me as a student. I'm getting it changed to TA so that I can assist the students. Is that okay?" She didn't have an issue with it. At the time I assumed that maybe it was a mistake or who knows.

Leading to his complaint of April 6th, 2021, I asked what else had occurred.

 :

Right. So then when students became back on campus around February 24th I believe we said. I was in person in the classes. After the first couple of weeks... With our schedule, I'm only that class two days a week because they only have that class on campus two days a week.

Bill Landis:

What is the actual class title?

 :

It's 7th grade science.

**GPSD 357**
**Vickers Declaration**
**Exhibit 9 Page 73 of 136**

Bill Landis:

Okay.

████████████:

I'm in that class Mondays and Fridays. After the first I believe two weeks or possibly three, I believe it was just two, she asked me to not be in her classroom anymore. She asked me to work remotely from somewhere else on campus and that I can be in the online portion of the class assisting with just the online students and none of the students in campus.

Bill Landis:

So you come back in January, you have the teaching assistant/ student status change within a couple of weeks, middle of January. And then about what time is it that she asked you not to be present in the class?

████████████:

This would have been in March because it was a few weeks after we had been on campus which was the end of February. I would assume, mid to possibly late March.

Bill Landis:

This is during or after one of her classes?

████████████:

After her class, when I was physically in the classroom and as students were packing up, going out. She spoke to me and said, "Can you do remote and work with just the online students."

Bill Landis:

Would that leave some special ed students in her classroom without assistance?

████████████:

Yes, because there are special education students on... We have two groups of students. One that do half online, half in person. And then they switch. So that way they only have the amount of students

# GRANTS PASS SCHOOL DISTRICT 7

on campus while every student still gets the opportunity to be on campus. If I was doing just online, there would still be special education students in the classroom and vice versa.

Bill Landis:

So she says, "You can be online but I don't want you in my classroom." So where would you be or need to be?

████████:

From there, I would work in the library just on my little Chromebook.

Bill Landis:

Okay. How did you respond when that request came? What was the discussion?

████████:

At the time, it was right at the end of her class so I was about to go to another class. I told her, "All right, we'll see how that works. Okay, I guess I'll do that," because it's her class.

Bill Landis:

But did you feel that as a special education assistant, that that would leave some students not getting the assistance in the purpose that you're in the class or part of the class?

████████:

Yes, absolutely. I was concerned about that. I spoke to my coworkers about that, the other special education aides about that. Just to ask, "Do you think that's something that I should talk to with Tommy or with the special education teachers?" Essentially because everything has been so up in the air, no one knows about what protocols we should do. They said, "Maybe you should just try that out and see." So that's what I did. I started in the classrooms online. And then at that point I noticed that in Big Blue Button, I did not have TA status still. I had TA status on campus but not in Big Blue Button, which is where they do their actual conferences, where they have cameras on and typing. I realized I was not able to open breakout rooms myself still in Big Blue Button.

I asked  if he knew if anyone else was asked to do the same thing.

**GPSD 359**
**Vickers Declaration**
**Exhibit 9 Page 75 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. What was the feedback you got from your coworkers when you were... Were anybody else asked to do the same thing?

:

From who I spoke to, she said that she hadn't had that experience. But she didn't seem too concerned about it so I agreed to do that with Katie.

Bill Landis:

Does Ms. Medart have other teaching assistants in other classes?

:

I'm not certain about that. I was under the impression that she did at first but over time I'm not sure who would have been in there so I don't think so.

Bill Landis:

At the time you were asked to work remotely from the library and online with just the online students, was there a reasoning given or was there questions by you to change or?

:

Yes. I was a little bit confused at first about the reasoning. She explained that it was so that I could assist the online half of her class while she's assisting the inverse half while they're doing things like labs and experiments. So that way the online portion could get some assistance with their instruction.

Bill Landis:

But if you were in the class, would the online students be being neglected or would you still be addressing them as well being in the class?

:

When I was in the class, what I would do is I would have my Chromebook open so I would still be in the Big Blue Button meeting and able to respond to messages and questions and assist that way if I needed to. In general, what most of the classes have done is that the online portion has some

**GPSD 360**
**Vickers Declaration**
**Exhibit 9 Page 76 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

asynchronous work that they aren't necessarily doing with direct instruction. Usually what I would do is if a student had a question about their assignment, I would be able to message them on Big Blue Button while I was in the classroom.

Bill Landis:

So my question is by being removed into the library to just deal with the online students, was that something that wasn't happening when you were physically in the classroom?

:

I would say it was happening while I was physically in the classroom because I still had my Chromebook open in the class, able to assist in that way. But they would obviously get a lot less direct one on one time when they're just online.

Bill Landis:

Okay. Her explanation was then that you would just be focused on that particular group?

:

Yes.

Bill Landis:

What did you think about that as an explanation?

:

I was confused about that at first, which is why I did go to my coworker and ask if that was om that she experienced. With the explanation, I did think perhaps the students that are online, they do get less one on one time. Perhaps if she's focusing in the in-person half and I'm focusing on the online class, perhaps if that's the way she wants to do her classroom, then I suppose then that's fine.

explained that after that "I Resolve" came out he began to think about what was transpiring.

:

That went on for a fairly short amount of time before... and then although the I Resolve thing started coming up. I believe that that was all posted pretty... essentially while this thing was happening where

---

**GPSD 361**
**Vickers Declaration**
**Exhibit 9 Page 77 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

she was asking me to not be in the classroom. That led me to think perhaps this was related to that, maybe there's some ulterior motives behind what's been occurring which was then in turn... I was alerted of all that by the librarian at North. At this time was when I started to reflect on all the experiences through the school year. I think there's some ulterior motives and that's when I filed the complaint on April 6th.

I asked ██████ about his communication with Ms. Medart after he was asked to work remotely.

Bill Landis:

How is she able to know if you're assisting the students and interacting with them?

██████ :

In the Big Blue Button meeting online, she would be in it as well but she would be not on the computer while she would be helping the students on campus.

Bill Landis:

Did you and her have feedback about students and things?

██████ :

I would communicate with her about concerns I have with a student or things that needed to be modified for a student. But beyond that she would not be present while I was working with the online students.

Bill Landis:

Was that feedback what you consider to be normal as far as discussions about particular students?

██████ :

Yes.

I asked ██████ about how he became aware of the "I Resolve" campaign.

Bill Landis:

Tell me how you became aware of that and what you learned about it this campaign and what it is.

**CONFIDENTIAL** PCI #21-1011/ Part I

# GRANTS PASS SCHOOL DISTRICT 7

████████ :

I became aware of this when the librarian at North sent me the link to the video and said, "You might want to look at this."

Bill Landis:

Who is the ██████ ?

████████ :

██████ .

Bill Landis:

Okay.

████████ :

She sent me the link to the video and I watched it and I was a bit disturbed. From there...

Bill Landis:

Tell me about your perception of the video and what disturbed you.

████████ :

What disturbed me particularly was that she focused a lot on names in the video. After having that experience where she asked me to not use my preferred name even though at that point it was being legally changed. Seemed odd when it was paired with the desire to not let transgender students use their preferred names.

Bill Landis:

So that's what I want to hear about. You said the names part of the video I Resolve offended you.

████████ :

Right.

**GPSD 363**
**Vickers Declaration**
**Exhibit 9 Page 79 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

What was said or what was her statements that made you feel how you felt?

▮▮▮▮▮▮:

I believe what they said in the video was, I don't know word for word, but it was something along the lines of how they want students to only use a different name that's their legal name if it's a derivative of the legal name, if they have parental consent and then it should be a choice by teachers. I thought that that's inappropriate because, especially if you have parental consent, that it shouldn't be a choice for the teachers.

Bill Landis:

And so, you as an adult, felt that what she was wanting support for was to stay with your given name.

▮▮▮▮▮▮:

Right. And even though it was being legally changed. And then in the video, I also had a concern where she brought up a student that actively goes to North and used them as an example without naming names. But I and I think most other people that are familiar with that student knew exactly who she was talking about. I found that inappropriate.

That statement by ▮▮▮▮▮ meant he knew or believed he knew the student who actually existed that Ms. Medart was referring to when she described a situation with a student who was going through transitioning their gender identity. On June 2nd, 2021 at 9:35 AM, I had a follow-up phone conversation with ▮▮▮▮▮ to inquire more details about the student he believed Ms. Medart was referring to in the "I Resolve" video. This was as a result of Ms. Medart's denial that the person or situation was real when I interviewed her. For purposes of protecting the student, the name "Jane Doe" will be used in this narrative however, the students real name is available should that become an issue. ▮▮▮▮▮ told me that in February/March of 2020 and before the North Middle School campus was closed due to COVID, he was working as an Educational Assistant Supervisor referred to as a Campus Monitor. Each Wednesday during that time there were weekly meetings with other Campus Monitors to discuss issues and other business.

▮▮▮▮▮ reported that in one of those meetings in February/March 2020, then North Middle School ▮▮▮▮▮, brought up in the meeting as a "heads up" that a student named "Jane Doe" was contacting different staff around campus to report that she now wanted to be known as "John Doe" and wanted staff to refer to her as he and use male pronouns. This was reported to be supported by the mother but not the father. Guidance he received at that time was just to be aware. ▮▮▮▮▮ said he in fact was approached by "Jane Doe" and asked that he use the name "John Doe"

# GRANTS PASS SCHOOL DISTRICT 7

and use male pronouns which ███████ believed occurred before the meeting took place. ███████ stated others in attendance at that meeting were campus monitors ███████████, ███████████, and ███████████, ███████ told me that he absolutely believed that was who Ms. Medart was referring to in the "I Resolve" video and stated that others believed that as well including ███████ ███████ who shared the video with him.

After concluding my phone call with ███████, I contacted North Middle School Principal Tommy Blanchard on June 2nd, 2021 at 9:48 AM to corroborate what ███████ had just told me. I asked Mr. Blanchard about the student "Jane Doe" as told to me by ███████. Mr. Blanchard acknowledged that back during that time frame, that particular student was contacting staff around campus asking to be called by a male name and requested that they refer to them using male pronouns. Mr. Blanchard stated that the student was quite demonstrative around campus and that it was widely known around campus that the student wanted to identify differently. As Mr. Blanchard put it, it was common knowledge about the student and the student's request.

I asked ███████ about his six other classes he assists in.

> Bill Landis:
>
> And the other six classes that you have, you're still with the same challenges? So you have half students online, half students in class.
>
> ███████:
>
> Right.
>
> Bill Landis:
>
> And all other six, you're doing your job in the classroom with that?
>
> ███████:
>
> Right.

I asked about ███████ and his listing her as a witness.

> Bill Landis:
>
> Okay. Look at my questions here. When we talked about ███████, so you listed her as a witness in your complaint. Anything remarkable outside of what you talked about? She just happened to share the video with you about I Resolve and then also commented to you that she thought it was inappropriate?

---

# GRANTS PASS SCHOOL DISTRICT 7

███████:

Essentially, I have been in communication with her for quite a while because when we were working entirely distance learning, I worked in the library where she would be. She was pretty familiar with my routine essentially.

Bill Landis:

Okay. That will be what she is a witness to?

███████:

Yeah.

Bill Landis:

Just discussions with her and the I Resolve video that she forwarded, that kind of thing?

███████:

Yes.

Bill Landis:

Was she present for any discussions with Ms. Medart or anything?

███████:

No.

I asked ██████ if anyone else had been present for any of the mentioned discussions with Ms. Medart.

Bill Landis:

Anyone else you can think of that was present with any of the discussions with Ms. Medart?

███████:

The only thing I can think of is when she asked me to not be in her classroom anymore, there were still students packing up and going out. There were students that were privy to that.

---

# GRANTS PASS SCHOOL DISTRICT 7

I asked ▮▮▮▮▮ how he had been affected personally.

Bill Landis:

Okay. How has this affected you personally?

▮▮▮▮▮▮▮:

It's made me very uncomfortable personally. It has definitely caused a very large rift in the workplace at North. I feel like a lot of staff members, especially teachers that were close with Katie, they've not retaliated or anything but they've definitely treating me with some more distance and some more discomfort. It has made me feel a little bit uncomfortable just being there in the workplace. But there hasn't been any severe issues.

Bill Landis:

No overt comments or actions?

▮▮▮▮▮▮▮:

No.

I asked ▮▮▮▮▮ if there were any email interactions between he and Ms. Medart that he thought would be helpful.

Bill Landis:

Is there any email interactions between you and Ms. Medart that would be relevant do you think to this discussion about your feelings of discrimination?

▮▮▮▮▮▮▮:

Not that I think would be relevant, only discussions about students and concerns. I can check through and make sure there's nothing in those.

I asked ▮▮▮▮▮ if there was anything else that he wished to add or clarify and he said there was not. Having no further questions I concluded my interview with him (See transcript for further details Exhibit 9).

On May 7th, 2020 at 10:40 AM, I did interview ▮▮▮▮▮▮▮ regarding her complaint (Exhibit 1B) which will be covered under Allegation #3. However there were some questions asked of her because ▮▮▮▮ had listed her as a witness. I asked her about that.

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

There was an allegation made by ██████████, that teacher Katie Medart discriminated against him. Do you have any knowledge of discrimination against ██████████?

██████████:

Only what I was told by ██████████

Bill Landis:

And do you recall when you were told of discrimination? Was there more than one occasion?

██████████:

██████ told me early last month when all of this kind of began.

Bill Landis:

So early in April?

██████████:

Mm-hmm (affirmative).

Bill Landis:

Is that correct? So, and just give me verbal answers so the recording can get it.

██████████:

Yes.

I asked what ██████ recalled ██████ telling her.

Bill Landis:

That's okay. And what do you recall ██ telling you?

# GRANTS PASS SCHOOL DISTRICT 7

███████████:

That Katie, would refuse to call ██████ by ██████ and that after ██████ returned from having top ██████ that Katie began to make him sit outside of classroom.

Bill Landis:

███████████████

███████████:

████████████████████ ████████████████████████████
███████

Bill Landis:

████████ ██████████████████████████████████?

███████████:

Sometimes.

Bill Landis:

████████████████ ████████ ████████████████████

███████████:

████████████████████████████████████.

Bill Landis:

████████████████████████████

███████████:

██████████████████

Bill Landis:

████████ ████████████████████████████████
██████████████████

**GPSD 369**
**Vickers Declaration**
**Exhibit 9 Page 85 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

████████:

I have not personally witnessed anything.

Bill Landis:

So based on what ████ told you?

████████:

Right.

Bill Landis:

Do you know if other teaching assistants were treated differently during this time?

████████:

I do not know.████ is our only ████ employee.

Bill Landis:

Only ████ employee at North Middle School?

████████:

At North.

Bill Landis:

Okay. Is there anything you wish to add or clarify regarding ████ allegation?

████████:

No.

Having no further questions of ████ regarding ████, I concluded that portion of my interview with ██ (See transcript for further details Exhibit 9).

In my interview conducted with Ms. Medart on May 13th, 2021 where I covered part of the interview related to Allegation #1, I also asked her about ████ complaint under Allegation #2. I asked Ms.

# GRANTS PASS SCHOOL DISTRICT 7

Medart if she had seen the complaint and been noticed, and she acknowledged that she had. I asked about ▮▮▮▮▮ and his duties in Ms. Medart's classroom.

Bill Landis:

Okay. I get acronyms sometimes, and the school district uses them, but I don't necessarily know. And his duties in your classroom from the beginning of the school year, in September 2020, through the end of March 2021.

Katie Medart:

You'll have to ask ▮▮▮▮▮ about... That's asking me to speculate about ▮▮▮▮▮ duties in my classroom.

Bill Landis:

So ▮▮▮▮▮ is assigned to a classroom of yours to assist you with students in the classroom?

Katie Medart:

That is correct.

Bill Landis:

And who directs him as far as what he's to do in the classroom?

Katie Medart:

I don't know who ▮▮▮▮▮ reports to as far as who is the supervisor of ▮▮▮▮▮

Bill Landis:

So if ▮▮▮▮▮ comes into your classroom to help with students, you have no communication or things-

Katie Medart:

No, we collaborate. I collaborate with any assistant that is assigned to my class.

---

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. So what is your understanding of ██████ duties and responsibilities within your classroom?

Katie Medart:

I've never been given a list of what ██████ duties in that... So I-

Bill Landis:

I'm saying what is your understanding of what ██████ responsibilities or duties are in your classroom? How do you collaborate or communicate about students what you're doing, if you don't know what-

Katie Medart:

Okay, so you're asking me how do I collaborate or communicate with ██████? In my brain, that's a different question than, do I know all of ██████ job duties in my classroom? And I do not know what ██████ job duties specifically are for what ██████ was hired for.

Bill Landis:

Do you know any of them?

Katie Medart:

I don't. I know, typically, in my experience of working with any education assistant, we collaborate, we talk about ways that we can work to best serve our students in the classroom.

Bill Landis:

So if I'm understanding you, ██████ is independent of what you do, but he works within your classroom?

Katie Medart:

Yes.

I asked Ms. Medart about when she met ██████.

**GPSD 372**
**Vickers Declaration**
**Exhibit 9 Page 88 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

**Bill Landis:**

Okay. And did you just meet ██████████ at the beginning of the school year, September 2020?

**Katie Medart:**

No. It was not at the beginning. I don't remember when the meet date was, but ████████ came in after... It wasn't at the beginning. I was well into the school year.

**Bill Landis:**

Okay. And at some point, he was brought into your classroom, or directed to your classroom, to work as a special ed assistant?

**Katie Medart:**

Yes, that is correct.

**Bill Landis:**

Okay. And was that the first time you met him?

**Katie Medart:**

Yes. I actually met ████████ for the first time with all my students.

**Bill Landis:**

And do you remember about when that was? Was it in 2020?

**Katie Medart:**

Oh, 2020? Well, it was this school year, but I don't know if it was '19 or '20. I'd have to go and... There'll be record, email record, that would state when we met.

**Bill Landis:**

I mean, this school year is 2020-21, correct?

**Katie Medart:**

Yes. Oh yeah, so 2020. But what I'm trying to say is, I don't know, I believe it was in 2020 then.

**GPSD 373**
**Vickers Declaration**
**Exhibit 9 Page 89 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

When students-

Katie Medart:

But it wasn't at the very beginning of the school year. That is what I'm recalling.

Bill Landis:

Okay.

Katie Medart:

Yes. We were still in CDL. But if you're asking me was that in October? But I believe it was in 2020. And again, this could be verified just by looking at email, because there will be a email that-

Bill Landis:

Right. Well, I'm just trying to get your recollection, as far as verification. So even what you recall or what you think is fine.

Katie Medart:

Okay. So I think it was in 2020.

I asked Ms. Medart to tell me about her introduction to ██████████

Bill Landis:

Okay. Tell me about your introduction to him.

Katie Medart:

I did not introduce ██████████  ██████████  introduced ██████████

Bill Landis:

Okay. Tell me about that.

GPSD 374
Vickers Declaration
Exhibit 9 Page 90 of 136

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

█████ joined our class, and I told the students we have a new education assistant joining our class, because we are at that time in CDL, so entirely virtual. And █████ said, "You can call me █████, █████ or █████."

I asked Ms. Medart if she had a conversation with █████ about his transformation and his disclosure he was identifying as █████ and male and no longer █████.

Bill Landis:

Okay. Did you have a conversation with him about his transformation and his disclosure that he was identifying as █████, and male and no longer █████?

Katie Medart:

No.

Bill Landis:

That never occurred?

Katie Medart:

To make sure I'm understanding your question, did I have a conversation about █████ transitioning and changing █████ gender or name, preferred name, from █████ to █████ We never ever talked about █████ transitioning.

Bill Landis:

Okay. So █████ didn't come to you and explain that he was in the system as █████, but was now going through a transformation and was now identifying as male, with male pronouns, and that his name was █████ and not █████?

Katie Medart:

I never, ever was notified that █████ was transitioning. I asked █████ what █████ preferred after █████ introduced all four names as an option. I've honored what █████ asked in all email communication.

---

**GPSD 375**
**Vickers Declaration**
**Exhibit 9 Page 91 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. So you never asked ██████████ not to use the word, or name ███████ in your classroom?

Katie Medart:

No.

Bill Landis:

Okay.

Katie Medart:

I asked ████████ what █████████ preferred to go by and then have honored what ████████ had requested.

Bill Landis:

So ████████ recalls a conversation with you that day that he explained about his transformation, and that you later asked to Zoom conference with him or talk about it in more detail. Do you recall that?

Katie Medart:

Absolutely not.

I asked Ms. Medart if she had asked students not to refer to ████████ as █████████

Bill Landis:

Okay. Did you ask students not to refer to █████████ as █████████?

Katie Medart:

No.

I asked Ms. Medart if she received guidance from the District on situations such as this.

Bill Landis:

So had you received guidance from the district on situations such as this?

---

# GRANTS PASS SCHOOL DISTRICT 7

**Katie Medart:**

Such as what?

**Bill Landis:**

Such as someone coming to you and saying, "Hey, I'm no longer ███. I'm in a transformation into male and I want to go by this name now?"

**Katie Medart:**

No, because that didn't happen. There was no mention that ███ was transitioning.

**Bill Landis:**

So did you see in the system that ███ name was ███e?

**Katie Medart:**

Yes, I did see that.

**Bill Landis:**

And he came to you and said, "My name is now ███"?

**Katie Medart:**

No. He... ███ in our Big Blue Button conference, as stated earlier, introduced ███ as willing to go by ███, ███, or ███ in a Big Blue... And then in a conference following, that was already set up before that, ███ requested, when I asked, "What would you prefer?" I then honored ███ request. And you'll see that from my email communications.

**Bill Landis:**

And so how did you refer to ███ in your communications either in person or by email?

**Katie Medart:**

███

---

**GPSD 377**
**Vickers Declaration**
**Exhibit 9 Page 93 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

**Bill Landis:**

Okay.

**Katie Medart:**

And that's in all my email communication.

After some discussion about "I Resolve" and its proposals and resolution which would affect ███, I asked if Ms. Medart recalled a conversation she had with ███ about ███ he was having or had.

**Bill Landis:**

Did ███ have a conversation with you about ███ that he was having, or had?

**Katie Medart:**

No. No, I had a interaction, walking to the, I think as we're going to the staff room or the restroom, and I saw ███ on campus, I saw ███ I said, "Oh, I'm glad you're back." And that was the nature of our interaction.

**Bill Landis:**

Did you ask him about the ███ and what he had done?

**Katie Medart:**

No.

**Bill Landis:**

Did you find out about what the ███ was or what he had done?

**Katie Medart:**

No. Not until I was served my complaint. Which is one of my questions, if ███ felt I discriminated against ███, why was this not brought up any time before I Resolve? And even as of April 2nd, which I was put on leave, on April 5th, I sent one, saying, "Hi ███ We missed you in period two. I actually looked for you all week in the monitoring, because I remember you helped with the check-in process but haven't seen you. I was going to ask if we could discuss what you're observing for the

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 378**
**Vickers Declaration**
**Exhibit 9 Page 94 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

students online during period two, and if we could come up with a plan to further help students this next week before the quarter ends. Please let me know if there's a time that works for you Monday morning. Hope you are well. Katie."

Bill Landis:

And when's that dated?

Katie Medart:

April 2, 2021 at 1:06.

I asked Ms. Medart if she made a change regarding ███ ████ presence in her classroom.

Bill Landis:

Did you make a change regarding ██████ presence in your classroom?

Katie Medart:

No, I did not.

Bill Landis:

So ██████ reports that he was asked to remotely work with the special ed students online and not inside the classroom, sometime in, I want to say February or somewhere in there?

Katie Medart:

Yes, but I didn't... What you just brought up, I have a second EA in the class, ████████ ████████. It's actually her idea to help a student online and not report to class. I shared that with ██████ and ██████ thought that was a good idea, and offered to do the same thing. Because how our current class is structured, is half the students come to campus, half of the students are online. And so ██████ offered to best help meet the needs of our students to do the same thing.

Bill Landis:

So both of your assistants work remotely.

**GPSD 379**
**Vickers Declaration**
**Exhibit 9 Page 95 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Yes.

Bill Landis:

Okay. And this was a change to the norm sometime in February, based upon what your other assistant had offered and thought was a good idea.

Katie Medart:

Yes.

Bill Landis:

Okay.

Katie Medart:

It was shared, and ███████ thought it was a good idea how to best help students.

Bill Landis:

And you said he received that as a good idea, you said?

Katie Medart:

Yeah.

Ms. Medart's assertion that ███████ thought it was a good idea was not what ███████ thought or felt. I later contacted ███████ who contradicted Ms. Medart's statement that it was ███████ idea, and she too did not feel it was a good idea (See interview with ███████ below).

I asked Ms. Medart about ███████ status change in the School virtual classroom system.

Bill Landis:

So regarding the quarter three page, and bear with me as I try to walk through your system, because I don't know as an outsider, but where students, staff and teaching assistants have access online, is that correct?

**GPSD 380**
**Vickers Declaration**
**Exhibit 9 Page 96 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I'm sorry, what was the question?

Bill Landis:

So there's a system that you have where yourselves, staff, teaching assistants, have access to students and students online in a virtual system?

Katie Medart:

Yeah.

Bill Landis:

And is my understanding that ▇▇▇▇▇ status was changed to that of a student, rather than an EA a TA, which limited his ability to check grades, private message students, and set up conferences with students, or create breakout rooms when the quarter changed from two to three.

Katie Medart:

I have no recollection of that.

Bill Landis:

Okay. In those statuses, and when those are set up each quarter, is that something you as a teacher set up?

Katie Medart:

Well, I think Mr. Blanchard did ▇▇▇▇▇ And I think ▇▇▇▇▇, because they joined not at the beginning. If I recall, there will be an email for this. All of the EAs, because our learning management system is new, were left out because we didn't know that you had to re-enroll them every single quarter. And there will be an email that verifies that.

Bill Landis:

Okay. So that's nothing you specifically did to change status.

---

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

Absolutely not.

Bill Landis:

Okay.

Katie Medart:

That would be wrong, and I would not do that.

Ms. Medart sent an email to North Middle School Principal Tommy Blanchard on February 24th, 2021. In that email she stated:

*Good morning, Tommy,*

*I was processing your comments about not knowing what it is to be transgender and not to judge and that some have views against it because of religious beliefs. Tommy, the core reason for me is that I believe I am protecting kids. That I should take action and speak up when we love someone and we believe they are going down a path that will hurt them and lead to heartache. I do not believe minors are competent to understand and make such a life impacting decision. Out of loving them I want to try to help prevent them from going down a road they may never be able to recover from. I haven't checked most recent statistics, but in past years when I have looked, transgender population have disproportionately high rates of illness and death. I also think individuals that identify as transgender make up roughly 0.7 percent of the American population and I don't understand why we change bathrooms or procedures without giving more weight to the hurt that may come for 99% of the us population that does not identify as transgender.*

*Thanks for hearing my perspective. Please let me know if you have any questions or concerns. Have a great day,*

*Katie*

I asked Ms. Medart about that email specific to what she meant by several comments made within.

Bill Landis:

Okay. So in a District 7 email to Principal Tommy Blanchard discussing the topic of transgender, dated February 24, 2021, you wrote, and I quote, "I believe I am protecting kids that I should take action and speak up when we love someone, and we believe they're going down a path that will hurt them and lead to heartache. I do not believe minors are competent to understand and make such a life-impacting decision. Out of loving them, I want to try to help prevent them from going down a road they may never be able to recover from.

**GPSD 382**
**Vickers Declaration**
**Exhibit 9 Page 98 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

"I haven't checked most recent statistics, but in the past years when I have looked, transgender population have disproportionately high rates of illness and death. I also think individuals that identify as transgender make up roughly .7% of the American population, and I don't understand why we change bathrooms or procedures without giving more weight to the hurt that may come from the 99% of the US population that does not identify as transgender."

Bill Landis:

You state in that email that, I quote, "I believe I am protecting kids..." Do you believe the district is protecting them? Is this something you feel like you need to do differently than what the district is doing?

Katie Medart:

I don't want to speculate on behalf of the district. You can ask the members of the district what they believe.

Bill Landis:

Okay. So what do you mean by, "I believe I'm protecting the kids"?

Katie Medart:

I believe personally in creating... Just what it says there.

Bill Landis:

I know. But how do you believe you're protecting the kids? I don't understand.

Katie Medart:

By advocating, considering all students who make up our population, the diversity of all of our students.

Bill Landis:

Okay. And what path were you referring to in your email that leads to hurt and heartache?

---

**GPSD 383**
**Vickers Declaration**
**Exhibit 9 Page 99 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I'm sorry. I need context for it.

Bill Landis:

Okay. So I just read you the email and basically it says, "... and we believe they're going down a path that will hurt them and lead to heartache." They being who, and what hurt and heartache are you referring to? Because this is about transgender, so that's why I'm asking.

Katie Medart:

And so why is this relevant to my complaint that I discriminated against ██████

Bill Landis:

Why is that relevant?

Katie Medart:

Yes.

Bill Landis:

Because it's a foundation for me to understand if he's being discriminated or not based on this email that you sent that was about transgender. So I'm using that to try to understand.

Katie Medart:

But it's not. Because ██████ an adult.

Bill Landis:

Okay, so I don't argue. I'm asking you to answer a question.

Katie Medart:

But ██████ is an adult and that is about kids.

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. You're welcome to object to the question, but I'm directing you to answer the question. So I'm asking you a question. What did you mean by that "... they are going down a path that will hurt them and lead to heartache." They, being who and what did you mean by that?

Katie Medart:

As specified in there, referring to kids, and not having their prefrontal cortex of their brain, it's in the beginning of maturation stages. And in considering that, that they're not of development and of age to be able to make competent, life-changing decisions, and that is my opinion and my belief.

Bill Landis:

And they being those who would want to identify differently than their given gender?

Katie Medart:

Yeah.

Bill Landis:

What did you mean when you said-

Katie Medart:

And not just they... I mean, it doesn't just apply to transgender students. I feel that about the brain of all minors.

Bill Landis:

But this email is about transgender.

Katie Medart:

It is.

Bill Landis:

Okay. And so what did you mean when you said, "I want to try to help prevent them from going down a road they may never be able to recover from."

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I mean that I do not take it, the responsibility, lightly the fact that we are talking about life-changing decisions regarding minors.

Bill Landis:

Regarding gender changes or transformation?

Katie Medart:

In that email specifically talking about that.

Bill Landis:

So that's correct?

Katie Medart:

Yeah. It's talking about that specific... You're asking about that email?

I asked about who makes up the "99%" that she was referring to regarding the changes to bathrooms.

Bill Landis:

Yeah. So who makes up the 99% that you're talking about when you question why things need to be changed regarding bathrooms and things? Are you talking about yourself? Who are you referring to?

Katie Medart:

Anyone else in that case wasn't... Because I gave a statistic regarding identifying as transgender, specifically. So then it would be anyone who didn't identify as transgender.

I asked Ms. Medart if there was anything else she wished to add or clarify regarding this specific complaint (Allegation #2).

Bill Landis:

Okay. Is there anything you wish to add or clarify regarding this complaint?

Katie Medart:

I did not discriminate against ███████ I have treated ███████, respectful, professional, and fair.

**GPSD 386**
**Vickers Declaration**
**Exhibit 9 Page 102 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

I then asked if anyone else present had anything they wished to add or clarify and they stated they did not. Having no further questions, I concluded that portion of my interview with Ms. Medart regarding Allegation #2 (See transcript for further details Exhibit 9).

On May 27th, 2021, I spoke with Grants Pass District 7 Teaching Assistant ██████████ by telephone. ██████████ was mentioned by Ms. Medart of having offered an idea to assist her class remotely and Ms. Medart thought it to be a good idea so she had █████████ do the same. I advised ███████ our conversation was being tape recorded. I did advise █████████ that she was a potential witness and advised her that I was contracted to investigate allegations of workplace discrimination by North Middle School Teacher Katie Medart. ███████ was advised that I was directed on behalf of District 7 her employer to answer questions truthfully which she stated she understood. █████ said █████ came to work at North Middle School in January of 2021 transferring from ████████████████████ where she worked for two months. █████ said █████ had worked at ████████████████████████ for two years and left for a short time to go to ████████ with ████████ before returning to ██████████████ ██████████ I asked about her duties and responsibilities since January of 2021 when ████ arrived at North Middle School.

Okay. So tell me about your duties and responsibilities since January of 2021.

:

So, I am a special needs instructional aid. So, I'm a little bit different than some of the aids because I work one-on-one with one particular student, he's still just online and not in person right now. And then I do work with small groups of students in life skills, study skills-like classes. So that's what I do, and some of them I go class to class with.

Bill Landis:

So do you do that with different teachers in different classes at North Middle School?

:

Yes, sort of. I work with some of the study skill teachers. And at first, I was mainly like in their rooms, and then I went to science with my one-on-one student, but since we've turned in person, I go to another gen-ed class, another gen-ed science class as well.

I asked about her duties specific to Ms. Medart's class.

Bill Landis:

So tell me about your duties in Katie Medart's class since January, 2021.

**GPSD 387**
**Vickers Declaration**
**Exhibit 9 Page 103 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

██████████ :

Well, I worked one-on-one with one of the ████████ , and I would go, because ██ online only, to class with ██ and join their classroom via ██ [inaudible 00:05:09] and help ██ one-on-one. When we returned to campus, I was just one-on-one, I never joined in and sat in class because Katie didn't allow me in her classroom, and I don't think she allowed our other aid in that class, ██████ , in her room either. ██ sat somewhere else on campus [crosstalk 00:05:27] participated in class.

Bill Landis:

So I understand the acronym. So ████ , you said? ██████████ ?

██████████ :

Yeah, I'm ██████ .

Bill Landis:

And that stands for ██████████ ?

██████████ :

Yes, yeah, I'm a ██████████ .

Bill Landis:

And in Katie Medart's class, your responsibility is for ██████████ , but also ██████████ ██████████ as well?

██████████ :

Yeah, if my student was absent that day, then I would hop in and help our other... We have another EA in that class, ██████████ . And I'd hop in and help ██████ with the rest of the ██ students who are in that class. I remember we did it remotely because even when we turned into being partially in person, Katie didn't allow us in her classroom.

I asked ██████ to tell me about what she meant by not being allowed in the classroom.

Bill Landis:

And so tell me about what do you mean by not allowing you in the classroom?

---

# GRANTS PASS SCHOOL DISTRICT 7

███████:

I mean she didn't really give us a specific reason other than that she didn't really feel like we were needed to be in that classroom, which I don't know. I felt like it was odd considering we help sped students, so I pretty much just rolled with teaching myself stuff off of YouTube that I didn't understand because some of it's hard to grasp if we're not sitting in class.

Bill Landis:

Did you bring that to her attention, or have a discussion with her about the ability to help?

███████:

Yeah, a little bit. I told her it made it a little more difficult not being there in class sometimes, to grasp some materials. But I also try not to overstep my boundaries because it's up to whether the teachers think that those kids can be okay in those classes, and whether we're a distraction or not. We haven't really worked in person with the... Well, we have worked in person with some of those students because we're [inaudible 00:07:21] classes with them. We haven't worked in person with those students since Katie's leave, now that we have the stuff in there. Me and ████████ have been in and out of that room. If I don't have a one-on-one student, I try to go down and help out.

Bill Landis:

So in January of 2021, you go to North, changing schools. And as far as Katie Medart's class, she informs you that she doesn't want you physically in the class, that she wants you to remotely assist the student.

███████:

Yeah. When we turned to being in person, I can't even remember what month that was because it's all blurry, to be honest, with all the changes that keep happening. So when we moved to in-person, I didn't get to join everybody else in class, I still worked remotely somewhere else on campus and joined in via conference.

Bill Landis:

And you said you thought that was odd and kind of tried to ask-

# GRANTS PASS SCHOOL DISTRICT 7

:

Yeah, I thought it was odd that we weren't allowed to sit in her room with our students. It was just weird. I don't know. And I don't really have a reason behind it, it was just weird not getting to be a part of class and even if I was working with a student who wasn't in person, it would have been helpful to sit in class.

Bill Landis:

Okay. And you don't have any idea why she was asking that?

:

Not really. I just tried to respect teachers wishes like we're supposed to and I always ask how I can best assist supporting our students and working in their classrooms. And that's what she wanted me to do, so I continued to work one-on-one with my students and kept going on like we were a normal CDL and just kept doing my best.

I asked  if she had an idea of why since she thought it was odd.

Bill Landis:

Yeah. So you said you thought it was odd and then you said, and no, not really understanding, but did you have some idea or something to indicate what you thought?

:

I'm not really sure if it was just she was worried about it being a distraction or, it had to do with my student in particular because he's a tougher sped student with bigger behaviors. I don't know. She just didn't want us participating with everybody else because of that, I don't really know. I mean, I can take guesses, but I don't know that that's particularly fair, and I didn't really want to dig into why because that's what she tells me is best to support her classroom. I don't feel like I have any grounds to sit there and argue with her because I'm not the one in charge.

Bill Landis:

So when you were doing that remotely after she made the request, the ▇▇▇▇ student you're assigned to is with you then, and not in the classroom?

**GPSD 390**
**Vickers Declaration**
**Exhibit 9 Page 106 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

███████████:

Yeah, ██ is still at home, but if ██ didn't attend, it was silly for me not to be able to go into the class and help everybody else out.

*I asked about her prior experience prior to COVID was in the classroom as a* ██████████ ███████.

Bill Landis:

Right. Okay. And you had never been at, during COVID and before you transferred in January prior to school basically being not in person, I would guess March of 2020 when COVID hit strongly and school's probably suspended in class teaching. Was it safe to say that your experience prior to that was in classroom assistance as a special ed teaching assistant?

███████████:

Yeah. When COVID hit and everything like that, I was in ████████ still, and my prior experience in school was what we call normal functioning. So when I hopped in over at ████████ in November, it was everybody had some experience dealing with this already since the prior Spring, so I was new to that all because I hadn't been working at the school when COVID hit.

*I asked ████████ if she had anything else she wished to add or clarify. ████████ offered that she hadn't seen Ms. Medart discriminate against ████████ but did talk about how Ms. Medart and the "I Resolve" video negatively impacted students on campus.*

Bill Landis:

And you said you heard from your students about what had gone on because you're not on social media much?

███████████:

Yeah, they all are very active on social media and I'm not. So I've definitely heard students talking about it all over campus and stuff like that. And got to observe some of them silently protesting it all with clothing they wore, or body paint. [inaudible 00:13:17] I did get to see how it affected and made some students uncomfortable because they are... I don't know. I don't even like to use the word... Or different from other students. They're part of that community. I don't know. I know that it did get affect our students and a lot of them found it shocking and were quite upset about it.

**GPSD 391**
**Vickers Declaration**
**Exhibit 9 Page 107 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Do you recall if what you saw and observed or heard from your students occurred while Katie was still there at the school before being suspended or placed on admin leave?

:

No. I didn't really hear anything till after she had been suspended. And I don't know, I think it was probably like the first week after she was gone it really started to leak all over social media and students started finding out and being like, "Hey, did you see this?" And stuff like that.

Bill Landis:

And when you say-

:

It was probably like a-

Bill Landis:

When you say, "Did you see this..." meaning you're referring to the video that she made with Rachel Damiano?

:

Mm-hmm (affirmative), yeah. A lot of students were talking about how they saw it on social media and they were asking their friends. I just heard students talking in small groups about like, "Hey, did you watch this? How do you feel about this?" Stuff like that.

Bill Landis:

Right, okay. Anything else you wish to add or clarify?

:

No, I think that's pretty much all I know about the situation and really all that I've observed considering I have really limited contact with her classroom, and I didn't have very much interaction with her during all of my time at north.

# GRANTS PASS SCHOOL DISTRICT 7

Having no further questions I concluded my interview with ███████ (See transcript for further details Exhibit 9).

Because Ms. Medart had stated that she had been communicating with ███████ and using his requested name of ███████ in her communications, I did request District 7 email between Ms. Medart and ███████ between the beginning of the school year and the end of March 2021 from Ms. Ely. I did receive nine emails and or email conversations between she and ███████ (Exhibit 9) dated between October 6th, 2020 and April 2nd, 2021. In those emails, it is clear that Ms. Medart had used the name ███████ when communicating with ███████ as I observed in several of the emails.

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 393**
**Vickers Declaration**
**Exhibit 9 Page 109 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

### Allegation #3

**#3**: On or about March 2021, Ms. Medart created a hostile work environment for North Middle School ██████████████████

After reviewing ████████ complaint (Exhibit 1B), I did meet with her to interview her regarding her complaint. On May 6th, 2021 at 10:40 AM, I did meet with ████████ at the Grants Pass Dist. 7 offices in Grants Pass. I did advise her I was recording our conversation. Also present was ████ ██████████████████ I did advise ████████ that I had been contracted by District 7 to conduct an investigation into ████████ allegation that Ms. Medart had created a hostile work environment. I did confirm that she had been noticed by District 7 of the interview and I did direct her to answer all of my questions truthfully on behalf of District 7 which she indicated she understood. ████████ told me she had been employed with District 7 for six years. She told me she is the ████████ at North Middle School. She also stated she is the ████████ on campus and the advisor for the ████████████████ which are both voluntary positions. I asked ████████ to tell me about her complaint.

████████:

So all of this began mid-March, the week before spring break, March 16th. Katie had reached out to ████ asking if she could attend our meetings for the club.

Bill Landis:

And this is the LGBTQ club and ████ being ████████?

████████:

Right.

Bill Landis:

Another advisor. And ████ told you that she had reached out to him?

████████:

Yes. ████ told me and ████ also made Tommy aware. And ████ seemed a little concerned because ████ wasn't quite sure why she wanted to join. So ████ let me know that ████ had concerns. And so I had to deliver a note that day to a student in her class. And so I took the opportunity to speak with her about it. I asked her twice, I said, "Hey ████, let me know that you were interested in attending our meetings. And I just wanted to know why." And she told me that she wanted to get to know these students better.

---

**CONFIDENTIAL**

# GRANTS PASS SCHOOL DISTRICT 7

**████████**:

And that she was coming from a place of love. She also told me that her ████████ and that she still allowed him over when [inaudible 00:10:57] return home. I thought the use of "still" was awkward. So after our conversation... Do you want me to go into detail about the conversation?

Bill Landis:

Yeah, sure.

**████████**:

She asked if you had to be gay to be in the club, before I could answer the question, she said, "███████████████████." And she goes, "You're not gay." Which I had never said yes or no to. So I really don't know why she thought she had the right to speak on my sexuality. And I said, "No, you don't have to be gay to be in the club, but we do need to have people who support the support group." So I asked her if she was supportive, she told me that she was not, which led me further to think, okay, what do you want? If you're not trying to come there to be supportive of these kids. So conversation concluded. I told her that I would send her the link to our next meeting. This happened on a Tuesday, our next meeting would have been the next day.

Bill Landis:

Do you remember what day, approximately?

**████████**:

March 16th.

Bill Landis:

Okay. 2021?

**████████**:

Yes. We have weekly zoom meetings every Wednesday at 9:00 AM.

Bill Landis:

And this is the club?

---

# GRANTS PASS SCHOOL DISTRICT 7

**██████:**

The ████████, that is our meeting time. So our next meeting would have been the next day. I told her that I would send her a zoom link to it. And then I left her class, went back to the library. That is when the principal, Tommy Blanchard approached me and said that he had been in contact with the District and District lawyers regarding club operations. And he had told me because the students in the club had never created their bylaws or any rules regarding visitors, to the club that, they would need to do that prior to her coming and sitting in. So I informed him that I had already told her that I will send her a link to it. He said, "Don't worry, I'll have a talk with her. I'll let her know that it can't be done this week." I said, "Okay." The next day, Wednesday, I had a meeting with the kids. We created-

**Bill Landis:**

Your kids being the club?

**██████:**

Right. We had our meeting, I told the kids that they need develop their rules around visitors to the club. We did that, typed it out, we sent it off to the principal. Tommy had informed me that he did speak with Katie. He did tell her that because the kids needed to create their bylaws and stuff, that she would not be able to attend the meeting on Wednesday. Apparently, she was very upset about this. She let him know that she was very upset about it.

**Bill Landis:**

How do you know she was upset?

**██████:**

He told me.

**Bill Landis:**

Tommy Blanchard?

**██████:**

Yes.

# GRANTS PASS SCHOOL DISTRICT 7

Mr. Blanchard advises ████████ to reach out to Ms. Medart in an email letting Ms. Medart know she can attend the following week.

████████:

So he said that it would be nice if I reached out to her with an email, letting her know that she could attend the next week, which would be the week we returned from spring break.

Bill Landis:

In my understanding, the bylaws that were voted on by the students in the club, was that a vote would be taken to determine if someone could come to the meeting. Is that correct?

████████:

No. They determined that they would allow visitors, but that they would prefer that the visitors were supportive. Also, they determined that they wanted to use visiting time in order to just share their stories.

Bill Landis:

Okay. So visitors would be permitted to attend?

████████:

Right.

Bill Landis:

Okay.

████████:

So we go on spring break-

Bill Landis:

Spring breaks approximately third week of March?

**GPSD 397**
**Vickers Declaration**
**Exhibit 9 Page 113 of 136**

## GRANTS PASS SCHOOL DISTRICT 7

█████████:

Right. So then our next meeting would have been on March 31st. When we got back after our spring break, I received an email from her, I guess she sent the email on March 19th, but, I didn't actually read the email until the Sunday prior to starting back, because I don't check my emails on a break.

█████████:

And her email was, "Hi ████, thank you for informing me that I will get to attend the next meeting. I would like to share that. I do not think the decision to exclude me this week was fair. I felt judged and screened by both you and ████. And I asked to attend to learn about the club and hear student perspectives. I believe I was very open and accommodating to both of your questions and comments to put your concerns at rest. By the end of my conversations with each of you, you both shared, I could attend and was welcome. So you can imagine how disheartening it was. When Tommy told me I was not allowed to attend after you and ████ both advocated against it."

█████████ said she felt the email from Ms. Medart was hostile.

█████████:

So when I'm reading this, Sunday night, I immediately felt that it was hostile because of this part that says I was not allowed to attend after you and ████ advocated against it. So I highlighted that part and I forwarded the email to Tommy and I told him, "I don't know how to respond to this. What does she mean?"

Bill Landis:

Because the way you explained it to me was that, Tommy Blanchard, the principal, was approached by yourself and ████ as to how to proceed with her request to attend. And he said after legal counsel that you needed to adopt student bylaws. And that's what prohibited her from attending the meeting.

█████████ included the email from Ms. Medart dated March 19th (Exhibit 1B) where she writes to ████ █████ that she felt the decision to exclude her was fair. She also made a statement in the email that stated: "you can imagine how disheartening it was when Tommy told me I was not allowed to attend after you and ████ both advocated against it." Ms. Medart ends the email with the statement: "I hope you have a wonderful Spring break, Katie." Also included in █████████ complaint were several email interactions regarding the requested attendance by Ms. Medart of the ████████ club meetings. I asked

**CONFIDENTIAL**                    PCI #21-1011/ Part I

**GPSD 398**
**Vickers Declaration**
**Exhibit 9 Page 114 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

████████     if she felt that Ms. Medart had assumed wrongly that ████████ and ████████ had discouraged Tommy Blanchard.

**Bill Landis:**

But you think then, that Ms. Medart assumed wrongly that you and/or ████████ had discouraged Tommy Blanchard?

████████:

Yes. So I came into work Monday morning. I still felt uneasy about this email. I went to Tommy's office to just kind of talk to him about it again, especially when he let me know that she was frustrated about it. And I said, "I really don't need somebody out there thinking that I've done something to them that I haven't, are you sure this person is okay?" He said that she was probably just speaking out of anger and that it was probably nothing. So I said, "Okay." So the next day-

**Bill Landis:**

And what day about was this, in March?

████████:

Yeah. So this would've been the 29th, Tuesday. No, the 30th, because Wednesday was the 31st. So, coming to school Tuesday, I go and I speak with ████████, because whenever I'm stressed out or just need a friend to talk to, I talked to ██.

**Bill Landis:**

Who is ███den?

████████:

He is the ████████ (unintelligible).

**Bill Landis:**

Okay.

# GRANTS PASS SCHOOL DISTRICT 7

██████████ :

So we were just talking and he informed me that another one of our colleagues was saying that I discriminated against Katie, by not allowing her into the club. And basically that this was something going around. So-

Bill Landis:

So ████████ tells you that another staff teacher, or other, at North Middle School, was making statements that they had heard that you had something to do with Ms. Medart not being able to attend?

██████████ :

Yes.

Bill Landis:

Okay. And who was that member?

██████████ :
████████████ .

Bill Landis:

And ████████████ had spoken with ████████, saying that he had heard that you had discouraged Tommy Blanchard from allowing Ms. Medart to attend?

██████████ :

I don't know if the conversation went that deep but, the main statements was that I discriminated against her by not letting her in there.

I asked if that was why ████████ felt that things were being said.

Bill Landis:

Okay. And that's where you started to feel that things were being said?

**GPSD 400**
**Vickers Declaration**
**Exhibit 9 Page 116 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

██████ :

Right. If she's telling him that, she's probably telling other people that it's not right to spread lies about people, especially in their place of work.

██████ offered no other names of persons who may have been spoken to by Ms. Medart regarding the allegations she was spreading false information about ████████, ████████ did offer that ████ ████, ██████████, and ████████ knew of Ms. Medart talking with them about "I Resolve" stuff. I clarified that ██████ was now speaking about the "I Resolve" campaign.

Bill Landis:

Okay. But that's separate from what you're feeling, as far as that she spread statements and rumors that weren't accurate about you and her ability to attend the club meeting?

██████ :

Right. So, the district becomes aware of this video that her and Rachel produced and this movement. I get an email from ██████████, the ██████████, she sent out email to basically all higher ups in the District. She sent it to me, because I'm the advisor of the ████████ at North. And she sent it to the ████████ at the high school as well. Just to make us aware.

I found the email ██████ was referring to which ██████ sent out on March 30th, 2021 (Exhibit 1B). I asked ████████ if this was to make her aware of the "I Resolve" video.

Bill Landis:

To make you aware that there was a video called 'I resolve?' Okay.

██████ :

And once I saw it and I saw who was in it, I then stated on this email chain with everyone that I didn't think that it was a good idea for her to attend our club. Considering that she's clearly a part of a movement that is advocating against those children.

Bill Landis:

Okay. And you stated that to who?

## GRANTS PASS SCHOOL DISTRICT 7

███████ :

It's in the... Do you have that?

███████ :

It's in the email exchange. [crosstalk 00:28:10].

Bill Landis:

And if that's going to be something, I'll get that?

███████ :

Yeah, I'll scan it to you, for sure.

Bill Landis:

So at some point later, you express because of the 'I resolve' video, which has issues related to transgender students, that you felt not good for her to attend the club?

███████ :

Right.

Bill Landis:

And this was after the decision by Tommy Blanchard?

███████ :

Right.

Bill Landis:

Not to allow her, and after you had heard that she had thought you and ███████ were responsible for not allowing her to attend?

███████ :

Right.

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay.

██████████:

And so she was still set up to attend our meeting, on Wednesday, 31st. But once all of this stuff hit and came out, Tommy had to, again, let her know that she would not be allowed to attend this meeting.

Bill Landis:

So after she was going to be allowed because of the bylaws, he then informed her of that because of the 'I resolve' video, she won't be able to attend?

██████████:

Right.

Bill Landis:

Okay. And this is the end of March?

██████████:

Yes.

Bill Landis:

Okay.

██████████:

This is March 31st.

I asked again about ██████ complaint and about Ms. Medart spreading rumors.

Bill Landis:

And I read in your complaint that spreading rumors, the rumors you heard via ██████ that ██████ ██████ had shared with him, and so that's what you know about the rumors?

---

**GPSD 403**
**Vickers Declaration**
**Exhibit 9 Page 119 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

███████ :

Mm-hmm (affirmative).

I asked if that is what created the hostile work environment.

Bill Landis:

And that that helps create the hostile work environment you're feeling. Is that correct?

███████ :

Right. Well, not only that, but because they've done this, it has completely divided our staff.

Bill Landis:

So I want to get to that. So, because they've done this meaning, Katie Medart and Rachel Damiano and the video 'I resolve'?

███████ :

Right.

███████ spoke of incidents she was aware of where Ms. Medart

Bill Landis:

So let me ask you, because you talk in your complaint, submitted to Tommy Blanchard, about creating factions within North Middle School, and has pitted staff against each other by encouraging staff to sign her anti LGBTQ resolution during school and working hours. How are you aware of that? Or what information do you have that that was occurring?

███████ :

She was going around to people's classrooms and talking to them about this. And-

Bill Landis:

So what's your account of that? Is that something you were told or do you have firsthand knowledge of that occurring?

---

# GRANTS PASS SCHOOL DISTRICT 7



████████:

Well, obviously she didn't come to me, so it was very directed, I think at people who she felt would be supportive to this.

Bill Landis:

And how did you become aware that that was occurring if you weren't present?

████████:

A teacher that she had approached.

Bill Landis:

And who was that?

████████:

████████.

Bill Landis:

And, ████████ is listed on your complaint?

Tanika Cooks:

Yes.

Bill Landis:

Okay. And so ████████ shared with you that, Katie Medart or Rachel Damiano, had approached her to support the 'I resolve' campaign is that accurate?

████████:

Campaign, movement. But yes, ██ was very disturbed by it all and ██ really didn't know-

Bill Landis:

"She," being ████████?

CONFIDENTIAL

**GPSD 405**
**Vickers Declaration**
**Exhibit 9 Page 121 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

███████:

Yes. ███ was very disturbed by it at all. She didn't understand why or how they were able to do this. ███ understood that this was a violation of school policy.

Bill Landis:

And what part, violation of school policy are you referring to?

███████:

The part where you're not allowed to push political agendas during work hours.

I asked ██████ if she was aware other incidents regarding the "I Resolve" movement/campaign on campus.

Bill Landis:

Are you aware if there was any other means of communication during school hours in support of 'I resolve' by Katie or Rachel Damiano, like emails or other communications or is ██████ pretty much what you're aware of that you felt was happening with others?

███████:

No one else has explicitly told me that that's what happened, but I do believe that she spoke to others.

Bill Landis:

Okay. And that's just a feeling you have.

I asked about ████████ complaint where she states she feels North Middle School is no longer a safe place to work.

Bill Landis:

So the other thing you list, is that you feel North Middle School is no longer a safe place to work. And what makes you feel that way? Or what are you referring to?

**GPSD 406**
**Vickers Declaration**
**Exhibit 9 Page 122 of 136**

# GRANTS PASS SCHOOL DISTRICT 7



███████:

I'm referring to the emotional toll that this has all taken on me. I am no longer happy to be on my campus. It gives me extreme anxiety every day that I have to go work.

Bill Landis:

Is it specific to Ms. Medart or Ms. Damiano or is it specific to other things?

███████:

It is because of the division they have, and it is because those on campus, who are in support of this, and because of that they have a negative opinion of me because they support her and they believe that I actually discriminated against her.

Bill Landis:

When you say they, you're talking about those that you feel are in support of 'I resolve' and Katie and Rachel's movement?

███████:

Yes.

Bill Landis:

And is that a feeling or are there things that you articulate where that makes you feel that way?

███████:

Well, the lies being spread and it is a feeling. It's a very strong uneasy feeling.

Bill Landis:

And anything that anyone else has done or changed with you, relationship wise, that makes you feel that way?

███████:

I just try and keep my distance from everybody.

**GPSD 407**
**Vickers Declaration**
**Exhibit 9 Page 123 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

I asked ██████ if she had anything ██ wished to add or clarify. I wasn't sure I had all of the documentation ██████ was referring to and ██████ later emailed me the documents which I confirmed and are part of Exhibit 1B. Having no further questions I concluded my interview with ██ (See transcript for further details Exhibit 9).

As part of my interview which I conducted on May 13th, 2021 with Ms. Medart, with parts I included in Allegations #1 and #2, I did also ask her about ██████ complaint in that interview. I began by summarizing ██████ complaint.

Bill Landis:

Okay. All right. So move on to the next formal complaint that was received by ██████ related to hostile work environment. ██████ alleges that in March of this year, you requested the ability to attend the ██████ meeting. Principal Blanchard was consulted, which delayed that opportunity. Two days later you sent an email to ██████ alleging that she and ██████, another advisor, had advocated against your attendance, and you voice your displeasure telling her how you felt, including that it was unfair. Does that sound about right? I'm summarizing what her complaint is.

Katie Medart:

You're summarizing what she said. Do you want me to comment if I agree with what she said or not?

Bill Landis:

Yeah, we can stop there and just say without more details, that's her summary of what she believes, sometime mid March.

Katie Medart:

Yeah. So I did try to attend. I asked ██████ if I could attend the ██████ meeting. And then... You want my recounts of why I recall?

Bill Landis:

Yeah, sure, if you want to add that. Sure.

Katie Medart:

I'll just listen. I'm sorry, I shouldn't interrupted you.

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

No, that's fine. Anything you want to clarify? Because this is a summary she's stating, and I'm trying to paraphrase that. So that's why I was just adding that. We can go on, and then, if there's something you want to add that's more or you disagree with, you can add that.

Bill Landis:

Principal Blanchard received legal guidance after the request, according to her, and it was determined that the students in the club could decide their own bylaws regarding attendance. You were then invited by the students for the March 31st club meeting. Does that part sound about right, too?

Katie Medart:

No. You said the bylaws. Is that what you just read?

Bill Landis:

Yes.

Katie Medart:

Yeah. No. I actually believe it was April 7th, I saw an email about a meeting, so that is not true. And that was requesting to meet for the club to do bylaws.

Bill Landis:

Okay. At some point, though, the club did, basically, I guess, construct some bylaws and at some point, you were notified that you could attend a club meeting. Is that correct?

Katie Medart:

Okay. So yes, I tried to attend. I was denied the first time. I was given the reason that concerns were brought by ███ and ███, and that then the District Council...

Bill Landis:

And so you said that-

---

**GPSD 409**
**Vickers Declaration**
**Exhibit 9 Page 125 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

HR were involved, and I was told when there is no club policies, that it defaults to the vote of the members of the club. So I was not allowed to attend, and then it went to the members of the club. My name was given specifically, Mrs. Medart, would like to attend, and the students voted, with excitement, saying yes, we would like Mrs. Medart to attend. And then I tried to, I was approved to attend a second meeting, and I was told right before that I could not attend because of my work with I Resolve.

Bill Landis:

Okay. So basically, you made the request. I think there was some communications between you and ██████ about getting a Zoom invite, and then, that didn't occur, and it got referred to Principal Blanchard. I'm summarizing again. And it was delayed until the students took a vote after guidance that Principal Blanchard received. Somewhere in there you said that you felt that you were not advocated for attending by ██████ and ██████. Is that correct?

Katie Medart:

Yeah, I believe they both discriminated against me.

*I asked Ms. Medart to tell me why she believed that.*

Bill Landis:

So tell me how you come to believe that.

Katie Medart:

Well, I believe you have a copy of my discrimination complaint.

Bill Landis:

Sure, but I-

Katie Medart:

Where I outline all of that and put direct quotes. And the only reason why I reference that to you is that, so I don't misrecall any of the things that I put in there.

---

**CONFIDENTIAL**                    PCI #21-1011/ Part I

## GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

And just to be clear, I was notified that that complaint has been withdrawn, is that correct?

Katie Medart:

That's correct.

Bill Landis:

So for this, so I can get it on the record, what I want to know is, you made a statement, I believe, and I want to make sure that I don't put words in your mouth, that you believe that ██████████ and ███ ███ did not want you to attend the club meeting.

Katie Medart:

Yes.

Bill Landis:

And how do you believe or how did you come to know that that occurred?

Katie Medart:

Couple of reasons. First, they both told me I could not. And then after listening to a line of hostile and discriminatory comments, which I immediately reported to my supervisor, Tommy Blanchard. He informed me that they had already been to him and expressed concerns about me being able to attend.

Bill Landis:

Okay. And did you send an email to ██████ regarding your displeasure or fact that you felt unfair treatment for her not advocating, or for-

Katie Medart:

Would you like me to read it?

Bill Landis:

Sure.

**GPSD 411**
**Vickers Declaration**
**Exhibit 9 Page 127 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

I brought it in, because I saw the one that is submitted in my complaint looks like a ransom letter. Which I don't know why. I have nothing to do with that. Mine does not look like that, that I sent.

Bill Landis:

Sure.

Katie Medart:

"Hi, ██ . Thank you for informing me that I will get to attend the next meeting. I would like to share that I do not think the decision to exclude me this week was fair. I felt judged and screened by both you and ██ , as I asked it and to learn about the club and hear student perspectives. I believe I was very open and accommodating to both of your questions and comments to put your concerns at rest. By the end of my conversations with each of you, you both shared I cannot attend, or I could attend and was welcome. So you can imagine how disheartening it was when Tommy told me I was not allowed to attend after you and ██ both advocated against it. Looking forward, I am thankful students approved of my presence. I hope you have a wonderful spring break Katie.

Bill Landis:

Okay. And so that's what you recall sending or did send to ████████ regarding that.

Katie Medart:

Yes.

Katie Medart:

And even... This is important, so I will share this. I even said good morning to her the morning of the second meeting. I saw her walking into ██████ and I said "Good morning." You will see email documentation of all this. Because I had to report her treating me hostile, because I said, "Good morning," and she ignored. I assumed she didn't hear me. So as I got closer, I said, "Good morning" again. She stopped, looked at me, rolled her eyes and walked into ████ . I just walked away. The reason why we even crossed path is because I was going to use the restroom. And then I went and reported it immediately to Tommy the interaction that had happened.

I asked Ms. Medart about ████████ allegation regarding Ms. Medart telling other staff that ████████ and ██████ had advocated against her.

**GPSD 412**
**Vickers Declaration**
**Exhibit 9 Page 128 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Bill Landis:

Okay. So ██████ alleges that you then told other staff that ██████ and ██████ advocated against your attendance at the club, creating hostility felt by her from other employees. ██████ denies requesting that Principal Blanchard not allow you to attend, and that the decision was his. Did you have a conversation with other teachers and staff telling them ██████ and ██████ had advocated against you attending the ██████ meetings?

Katie Medart:

I had a conversation where I stated the facts of what happened to me.

Bill Landis:

And who did you have that conversation with?

Katie Medart:

Who?

Bill Landis:

Was it other staff-

Katie Medart:

Another teacher.

Bill Landis:

Okay, and who was that?

Katie Medart:

██████.

Bill Landis:

Did you also have a conversation with ██████ about that?

---

**CONFIDENTIAL**              PCI #21-1011/ Part I

**GPSD 413**
**Vickers Declaration**
**Exhibit 9 Page 129 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

Katie Medart:

No I did not.

*I asked Ms. Medart about the reason for having the conversation with another teacher and she told me that she went to talk to the teacher about "I Resolve."*

Bill Landis:

Okay. And what was the reason for having a conversation with the other teacher?

Katie Medart:

I went in to share about the ideas for I Resolve, and I think it was just, I was getting ready... I don't even know why it came up. It was on that day, though. I think it was just a normal... I don't know if he had heard something. I don't know. I don't recall why it came up to be honest.

Bill Landis:

Okay. Is there anything else you wish to add or clarify regarding this complaint?

Katie Medart:

I do not believe I have created a hostile work environment, as ███████ has claimed in her complaint. And I actually believe the opposite is true, that she has created one for me.

*Having no further questions, I concluded my conversation with Ms. Medart regarding that portion of the investigation (See transcript for further details Exhibit 9).*

# GRANTS PASS SCHOOL DISTRICT 7

## <u>Findings</u>:

Allegations in an investigation have the potential to fall into four specific categories.

- <u>**Sustained**</u>:  My investigation resulted in sufficient evidence from one or more sources to conclude the incident occurred.
- <u>**Not Sustained**</u>:  I did not have enough evidence to prove or disprove the allegation.  It does not mean that I do not believe it happened, only that I do not have enough evidence to sustain that particular complaint.
- <u>**Exonerated**</u>:  Means the activity or action did occur, but it was appropriate (per policy, or lawful, etc.) given the circumstances.
- <u>**Unfounded**</u>:  Means no evidence existed to support the claim.

**ALLEGATION #1:** In March/April of 2021, it is alleged that Grants Pass School District 7 North Middle School Teacher Katie Medart was involved in a campaign of a political nature non-sanctioned by Grants Pass School District 7 where Ms. Medart is alleged to have:

A.  Used District facilities, equipment or supplies in connection with the political campaign. **"SUSTAINED"-** Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 7D) states that "***No employee will use district facilities, equipment or supplies in connection with political campaigning,*** *nor will any employee use any time during the working day for campaign purposes."* Grants Pass School District 7 policy IIBGA-AR "Electronic Communications System Acceptable Use Regulation" (Exhibit 7E) states that ***"Attempts to use the District network for Transmission of any materials regarding political campaigns is strictly prohibited."*** The stated purpose of the "I Resolve" campaign was to address gender identity policies as was stated in their video and message. The "I Resolve" campaign stated in the video that it was specifically targeting the Equality Act, Oregon Senate Bill 52, and other legislation that was in the process of being voted on, developed, or proposed in legislative bodies at the Federal, State, and local levels as the "I Resolve" video explains. In the video, Ms. Medart and Ms. Damiano ask that viewers reach out to contact Senators where the next vote is scheduled and attend an ODE meeting that was scheduled for April 15th, 2021 in order to have their voices heard lobbying for support of the "I Resolve" resolutions that would modify or change the pending legislation as it had been written.

Ms. Medart by her own admission used District 7 computers, email, school property, and Google Docs to share or communicate regarding the "I Resolve campaign with colleagues, staff, and persons inside and outside of School District 7. This was supported by Exhibits provided regarding email use under Exhibit 4 which were some of the emails provided by the District 7 IT Department. While Ms. Medart did not like referring to "I Resolve" as a political campaign, her efforts both in the video regarding legislation and through the use of District 7 email and face to face contacts on campus to gain support for the "I Resolve" resolutions were determined to be political campaigning which occurred on District 7 School grounds. The goal of "I Resolve" was to influence legislators regarding pending policies and legislation with their own resolution that would define who could use what bathrooms based on one's anatomy, legislate the use of names and pronouns for gender identity students, and require parents be

---

**CONFIDENTIAL**

involved in a student's gender identity journey. It should be noted that this allegation would not have been sustained had Ms. Medart have chosen to not use District 7 facilities, email, equipment, or supplies for her "I Resolve" campaign.

B.   Used time during her working day for political campaign purposes. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 7D) states that "*No employee will use district facilities, equipment or supplies in connection with political campaigning, **nor will any employee use any time during the working day for campaign purposes.**"* As stated under Allegation 1A above, the "I Resolve" campaign was determined to be a political campaign. Time stamps on emails shown in Exhibit 4 as well as Ms. Medart's admission that she used time during her workday to communicate regarding "I Resolve" both in emails and face to face communications with other District 7 staff and persons outside of District 7. Ms. Medart stated that the time was minimal however besides email and face to face communications, she also admitted using District 7 computers to work on "I Resolve." Without a forensic computer analysis there is no way to quantify the actual time. The policy does not require a certain amount of time in order to violate it, it states: "nor will any employee use any time during the working day for campaign purposes" which did occur on more than one occasion. Had Ms. Medart not utilized time during her workday for the "I Resolve" campaign this would not have been a violation.

C.   Failed to designate that the viewpoints she represented on the issues involved in the political campaign, were her personal viewpoints and not that of District 7. **"SUSTAINED"**- Grants Pass School District 7 policy GBG "Staff Participation in Political Activities" (Exhibit 7D) states that "*On all controversial issues, employees must designate that the viewpoints they represent on the issues are personal viewpoints and are not to be interpreted as the district's official viewpoint.*" As stated under Allegation 1A, the "I Resolve" campaign was determined to be a political campaign. In the "I Resolve" video, Ms. Medart identifies herself by stating: "*My name is Katie. And my experience with youth is that I have been teaching for the last 10 years. I am currently teaching at a middle school in Southern Oregon, and prior to that for eight years, I was a science instructor for college and then some high school science teaching experience as well. I've been a coach, multiple sports. And then probably my greatest honor of working with youth is that I have two of my own sons.*"

Ms. Medart doesn't introduce herself as a private citizen but rather a Southern Oregon Middle School Teacher giving her first name. While she did not say Grants Pass District 7, She at no time in the video states that the views expressed are that of her own and not that of District 7 or any similar type of statement. Ms. Damiano identified herself similarly by saying: *Hi, I'm Rachel and I am an administrator assistant principal in Southern Oregon at the middle school level. I've also worked at the high school level, was previously a math teacher, and I've been working with youth for over a decade now in various roles in education. And then in... as a coach as well.* A simple internet search using "Rachel southern Oregon middle school assistant principal" finds an article identifying Rachel Damiano and her full name, North Middle School, District 7, when she was hired in August of 2020. https://spotonoregon.com/southern-oregon/517035/gp-district-7-welcomes-damiano-as-new-vice.html. This would have then also led someone to easily determine Ms. Medart's identity again since she identified herself by her title. Additionally, Ms. Medart used District 7 email for communications for "I Resolve" to persons inside of District 7 and outside identifying herself as

# GRANTS PASS SCHOOL DISTRICT 7

associated with School District 7 with no disclaimer. The media coverage (Exhibits 5A-5E) shows how District 7 was intertwined with Ms. Medart and the "I Resolve" campaign. There media coverage had no statements by Ms. Medart or Ms. Damiano that made it clear that the "I Resolve" campaign was not affiliated with District 7.

Ms. Medart did tell me in my interview with her on May 13th, 2021 that there was a disclaimer on the video associated with YouTube. I did find a disclaimer if a viewer used a drop-down box prior to playing the video. This however was not initially with the video as she admitted in her interview with Dan Huber-Kantola on April 6th, 2021 when she told him that it had been added later and the video itself has nothing a viewer would know isn't just Ms. Medart's view. In the opening statements of the video, Ms. Medart can be heard saying: "I Resolve" and "We Resolve." The fact that there is no differentiation of whether the views or resolution expressed is only hers can be complicated by the word "We" and who else she is referring to. Ms. Medart's story of one of her students coming forward within a few days of the "I Resolve" video being published to ask about the video and wondering if she was homophobic also showed how "I Resolve" was associated with her position as a District 7 teacher. The amount of email complaints, complaints form District 7 employees, and publicity associated shorty after the video and website were published to social media and the internet was representative of how controversial the "I Resolve" proposals and campaign were based upon the responses of many. Had Ms. Medart been clear that the expressed views in the "I Resolve" video and campaign were not those of District 7 then this would not have been a violation of District 7 policy.

D.  Used social media and public websites in such a manner that it disrupted the school environment. **"SUSTAINED" –** Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 7C) states that ***"Staff members, while on duty and off duty, will treat fellow employees, students and the public with respect while posting on social media websites, etc., in order to prevent substantial disruption in school."*** It is clear from the complaints received that the "I Resolve" video posted on YouTube and Facebook, and "I Resolve website created a substantial disruption in school which included student protests, staff complaints, citizen complaints, division among the staff, and was interpreted by some who would be affected by the "I Resolve" resolution as disrespectful.

E.  Posted confidential information about a student on social media and a public website. **"SUSTAINED"-** Grants Pass School District 7 policy GCAB "Personal Electronic Devices and Social Media-Staff (Exhibit 7C) states that ***"Staff members, while on duty and off duty, will utilize social media websites, public websites, and blogs: in a professional manner by not posting confidential information about students, staff or district business."*** In the "I Resolve" video which was posted on social media and a public website, Ms. Medart disclosed an incident which occurred approximately one year prior within a month of returning to teaching at the K-12 level, she was presented with a ██████████ ███████████████████████████████████████████████ stated he absolutely knew who Ms. Medart was speaking of and disclosed the name of the student to me and circumstances regarding details. His information matched Ms. Medart's disclosure in the "I Resolve" video where the █████████████████████████████████ This was corroborated by Principal Tommy Blanchard regarding the student ████████████████████████████████████. Ms. Medart in my

# GRANTS PASS SCHOOL DISTRICT 7

interview recanted the story as truthful and gave unclear responses to my questions stating that in looking back it was hypothetical although she seemed to indicate she believed the story as well. It is clear that a North Middle School student did exactly what Ms. Medart said occurred regarding gender identity transformation to numerous staff members at the school at the approximate time that Ms. Medart said it had occurred. That student or others viewing the "I Resolve" video as did happen with █████ ████ would have identified the specific student who Ms. Medart spoke of even if she now claimed it was hypothetical.

F.  Created a "bias incident" where her actions as a District employee with regards to the political campaign/movement involved behavior or language which was derogatory and directed at those persons and or students "sexual orientation." **"NOT SUSTAINED" –** Grants Pass School District 7 policy "ACB" (Exhibit 7B) states that *"Bias Incident" means a person's hostile expression of animus toward another person or group of person's, relating to the other person's or group's distinguished, or perceived to be distinguished, race, color, religion, sex, gender identity, sexual orientation, disability or national origin"* It is not clear if Ms. Medart's "I Resolve" campaign was "a hostile expression of animus toward those who use a different gender identity. The "I Resolve" campaign is an attempt to change legislation and policies affecting gender identity. Individuals may perceive her actions as biased which is understandable. However, it is not clear based upon the language of the listed policy that her actions constituted a "bias incident" as there weren't enough facts to positively conclude if the allegation was unfounded or in fact was sustained and did occur.

**Allegation #2**: Between October 2020 and March 2021, Katie Medart discriminated against ███ ████████████████████████ who is transgender **"NOT SUSTAINED" –** Grants Pass School District 7 policy "ACB" Nondiscrimination (Exhibit 7A) states that the district prohibits discrimination and harassment on any basis protected by law, including sexual orientation which the policy defines as including an individual's actual or perceived gender identity, appearance, expression or behavior differs from that traditionally associated with the individual's sex at birth. ████████ alleges that ███ was discriminated against by Ms. Medart when she refused to use ██ new name and asked ███ not to use █ name with her class, had ███ work remotely rather than in her class as a SPED assistant making it difficult to do ██ job, and removed his status in the school network as a SPED assistant which reduced his ability to access information to help students. The emails I located where he and Ms. Medart communicated between October 2020 and April 2021 (Exhibit 9) show that she did call him ████████ in several of those emails making it difficult to prove that she didn't want him using that name.

Ms. Medart had another teaching assistant ████████████) who also was also working remotely. Ms. Medart told me that it was █████████ idea to work remotely which she thought was a good idea. When I interviewed ██████████, she stated that was not correct and thought it was odd Ms. Medart did not want her assisting students in her classroom. Although ███████████ thought this was discriminatory, I was unable to determine if it was due to ███ being transgender since ████████ also was asked to work remotely. █████ belief that Ms. Medart had ██ status changed regarding the school network was not substantiated as █ was able to have Mr. Blanchard change his status back and Ms. Medart denied she had changed ██ status. Ms. Medart's involvement in the "I Resolve" campaign which proposed changes to legislation and

**GPSD 418**
**Vickers Declaration**
**Exhibit 9 Page 134 of 136**

# GRANTS PASS SCHOOL DISTRICT 7

policies although offensive to him and others, were not discriminatory as there were no defined discriminatory conduct identified as described by District 7 policy.

**Allegation #3**: On or about March 2021, Ms. Medart created a hostile work environment for North Middle School ████████████. **"UNFOUNDED" –** ████████ alleged that Ms. Medarts created a hostile work environment when she spread rumors that ████ and another teacher had discouraged Principal Tommy Blanchard from allowing Ms. Medarts to attend the student ████████ meeting on campus. ████████████ stated that she knew Ms. Medarts told another teacher that and believed she had told others. ████████ said ██ felt that others may have thought ██ had done as Ms. Medart claimed and had something to do with her not being able to attend the ████████ meetings. When I interviewed Ms. Medart, she admitted telling a teacher who was a friend ██ her frustration however she said she had received information from Tommy Blanchard that ████████ and another teacher had suggested she not be able to attend. ████████ could offer no further information or actions related to her feelings of the hostile work environment although ██ did state she felt the "I Resolve" campaign had made the school campus divisive as a result. Having no other facts to include I was unable to substantiate ████████ allegation.

In reviewing Ms. Medart's job classification (Exhibit 7F), based upon the facts including conduct, I find she failed to meet the standards in her job description in the overview, her essential responsibilities, and qualifications which included:

- **Performs instruction and related duties in accordance with District Policies and terms of the teacher contract**
- **The ability to effectively work and communicate with students, parents, and school personnel from diverse cultures and/or backgrounds**
- **The ability to work harmoniously with others**
- **Maintain the integrity of confidential information relating to students, staff, and district patrons**
- **Cultivate and model a respectful working and learning environment**
- **Model personal behaviors of honesty, fairness, courtesy and consideration**
- **Maintain a cooperative relationship with administration, staff, students and parents**
- **Demonstrate competency in equity, diversity, and inclusion**

**Commentary:** - The allegations were investigated and based upon the facts received, District 7 policies and Ms. Medart's job description were used to determine if any violations occurred.

## GRANTS PASS SCHOOL DISTRICT 7

**END of REPORT**

Pacific Consulting and Investigations
PO Box 3506 Ashland, Or. 97520
**Tel** 541-441-2209
cbinvserv@gmail.com
www.pci-oregon.com