Ray D. Hacke, OSB #173647
PACIFIC JUSTICE INSTITUTE
317 Court St. NE, Suite 202
Salem, OR 97301
Phone: (503) 917-4409
Fax: (916) 857-6902
E-mail: rhacke@pji.org

Attorneys for Plaintiffs
RACHEL DAMIANO and
KATIE MEDART

## UNITED STATES DISTRICT COURT IN AND FOR
## THE DISTRICT OF OREGON
## MEDFORD DIVISION

| | |
|---|---|
| RACHEL G. DAMIANO and KATIE S. MEDART, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> GRANTS PASS SCHOOL DISTRICT NO. 7, an Oregon public body, *et al.*, <br><br> *Defendants.* | Case No.: 1-21-CV-00859-CL <br><br> **DECLARATION OF RACHEL SAGER (FORMERLY DAMIANO) IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

### DECLARATION OF RACHEL SAGER (FORMERLY DAMIANO)

I, RACHEL G SAGER, declare as follows:

1.     I am a citizen of the United States of America and am over the age of eighteen.

2.     I am a resident of the state of Oregon.

3.     I know the following facts to be true from my own personal knowledge, except those facts which are stated on information and belief, and as to those facts I believe them to be true.  I could and would competently testify under

oath to the truthfulness of the following facts.

4.     At the time of the filing of this case, I was employed as an assistant principal with the Defendant, Grants Pass School District No. 7.

**New Guidance**

5.  On February 9, 2021, I attended an all administrators meeting via Zoom for the Grants Pass School District 7.

6.  In this meeting, Danny Huber-Kantola, the Human Resources Director at the time, presented a draft of guidance regarding gender identity, name and pronoun use for the district because the district did not have a guidance, procedure, or district policy in place for these situations. The guidance appears in Plaintiff's Exhibit S1.

7.  During the meeting, I was surprised that the district was providing guidance that transgender youth were to be allowed to use the bathroom they prefer because, until this time, we had offered to students to use the private single stall bathrooms for their comfort. I was concerned about this guidance.

8.  I private messaged Mr. Huber-Kantola and asked if the district had considered relabeling bathrooms as "XY" and "XX" to eliminate any concerns regarding bathroom use by students of the opposite biological sex. My message went unanswered by Mr. Huber-Kantola in the meeting.

9.  We were told by officials of the Defendant, Grants Pass School District, that the memo was not to be shared with staff yet because the board had not been informed of the new guidance nor had they approved of the guidance.

**Preparing Feedback for Defendant District**

10. On February 24, 2021 I set up a meeting for March 4, 202, through the human resources clerk, with Huber-Kantola to discuss my concerns and possible solutions regarding the guidance document.

11. Feedback from staff on draft, potential and even established policies and procedures is encouraged and sought by the Defendant District. This is apparent in Board Policy GBB- Plaintiff's Exhibit S2.

12. When talking to Defendant Blanchard in the course of our duties, it was shared with me that Plaintiff Medart had shared concerns with Blanchard regarding

unclear procedures pertaining to students walking through a gender identity crisis. He also shared that she had concerns regarding the proposed new guidance, although he had not shared the memo document with her.

13. In preparation for my meeting with Huber-Kantola, I chose to meet with Medart to understand her concerns and to properly address them at my meeting with Huber-Kantola, along with addressing my own concerns.

14. My concerns, as well as Medart's concerns, stem from our religious beliefs that God created only male and female. Additionally, I also believe it is ungodly to lie to a youth by calling the student a pronoun that is not the student's biological pronoun, as well as ungodly not to honor parents.

15. In addition to my religious beliefs regarding male and female, I was also concerned that the District would put themselves in an unconstitutional position if we required staff to use certain speech, rather than give them the option to not use pronouns. Meriwether vs. Shawnee State had just been decided and part of my concern for the district stemmed from that decision.

### Feedback Given to Defendant District

16. On March 4, 2021, I met with Huber-Kantola to share my concerns about the memo and to give solutions that I believe to be tolerant and fair for all staff and students.

17. I shared with Huber-Kantola the idea that bathrooms could be redesignated as "XX" and "XY" bathrooms, to which he replied that the idea was "intriguing" and that he "could take it to the team" to discuss. The "team" he was referring to was the team of district directors and superintendent.

18. Huber-Kantola stated that the memo stemmed from the 2016 Oregon Department of Education guidance regarding students who identify as transgender. I replied that the guidance is not legal counsel, but merely suggestions for best practice and that this is stated in the document itself. See Plaintiff's Exhibit S3.

19. Huber-Kantola stated that in order for district guidance to change, the ODE guidance, state policy, or federal policy would need to be affected. This statement was a deciding factor in my taking our next steps.

20. Prior to the March 4, 2021 meeting with Huber-Kantola, the I Resolve resolutions document had not yet been created.

### Creation of I Resolve

21. On March 6, 2021, the initial draft of our resolution was created on my private device and private time. It was modeled after *Grants Pass School Dist 7 Resolution No. 2021-11 Regarding State Metrics and Requirements for Reopening Schools* in which the Defendant District lobbied against a governor's executive order in order to advocate for a change for district students. The format of our resolution was made to mimic the example our district had set forth in that recent resolution.

22. On March 6, 2021, the logo for I Resolve was created on my own time, on my own device, and not on school property.

23. The Defendant District claims we used district time and resources for the creation of our "campaign". This is a disputed fact by school board member Richardson. See Richardson's comments to the board in Plaintiff's Exhibit S4.

24. I Resolve is not a "political campaign" as referenced in Board Policy GBG, 2004 revised edition. I dispute the District's assertion that it is.

25. I Resolve is not a "political campaign" as defined by ORS 260.432. The law disputes the District's assertion that it is.  See Plaintiff's Exhibit S5.

26. I Resolve is not a political campaign. Board Member Gary Richardson disputes the District's assertion that it is in Exhibit S4.

27. Chief Financial Officer Sherry Ely's testimony in an administrative law proceeding in which Ely states, "Is it a political campaign as defined by… GBG, no, it would not be. I would agree with you on that," demonstrates that Shery Ely also disputes the District's assertion at labeling I Resolve as a political campaign. See unemployment hearing recording beginning at minute 1:33:38- Plaintiff's Exhibit S6.

### Second Meeting with HR

28. As discussed with Huber-Kantola in my initial meeting with him, I set up another meeting to give him an update on the direction Medart and I were choosing to take regarding proposed solutions. This meeting was set for March

17, 2021.

29. In the meeting with Huber-Kantola, I brought him two packets each containing: SB 52, the Equality Act, a copy of our resolution. One copy was for Huber-Kantola and the other was for Defendant Kolb.

30. Also discussed in the meeting was Medart and my intent to create a video, that we had a website, and that we planned to do social media posts. Huber-Kantola admits to knowing these facts prior to their postings. His admission can be found on page 84 of Plaintiff's Exhibit S7.

31. Huber-Kantola gave no caution to me that anything I was doing could be violating district policies, even when he knew that Medart and I had discussed the resolution as a solution during school time.

32. Huber-Kantola suggested I have a meeting with Defendant Kolb to inform him of our plan as well. Upon completion of my meeting with Huber-Kantola, I stepped out of the conference room and spoke with Defendant Kolb's secretary to establish a meeting time before Spring Break.

33. On March 18, 2021, I had a follow up meeting with Plaintiff Medart to inform her of how the meeting went and about the meeting set up with Defendant Kolb.

**Meeting with Defendant Kolb**

34. On March 19, 2021, I met with Defendant Kolb to inform him of Plaintiff Medart and my plan to create a video, social media posts and publish a website to inform the public on this matter of public concern and to lobby legislators regarding our proposed solution.

35. Defendant Kolb stated that he had received the packet from Huber-Kantola. A second copy of the resolution was given to Kolb during the meeting.

36. Defendant Kolb stated that he had seen the resolution and would consider taking it to the board in order to gain their support and to potentially implement the solution. He also stated he would bring it to legal counsel to review.

37. He stated it would not be the upcoming board meeting because it was a budget meeting, but possibly the meeting following.

38. Upon the conclusion of the meeting, I called Medart to share with her the hopeful news that Kolb was considering bringing the resolution to the Defendant

Board.

39. I also followed up with an email to Defendant Kolb sharing the link to the website and that "I appreciate your leadership and willingness to consider this resolution as being one put forward to the board!" This email is page 5 of Plaintiff's Exhibit S8.

### Spring Break

40. During Spring Break, Plaintiff Medart and I met with Edgewater Christian Fellowship regarding their willingness to film a video for us to inform the public about SB52, the Equality Act, and our proposed solution.

41. The video team was available that same day in the afternoon, so Plaintiff Medart and I went to her house to prepare points to discuss during the video. We did not write a formal script, but rather wrote down bullet points to discuss.

42. Upon returning to Edgewater Christian Fellowship, the video production team had set up a seating area for Medart and I to sit and create the video as if having a conversation with one another. We did one take of the video.

43. The Defendant District claims that the email sent to me by Edgewater Christian Fellowship during Spring Break, and my subsequent response, were violations of district policy; however, de minimus use of the district's email is allowable under Board Policy IIBGA-AR and all email correspondence with Edgewater occurred during spring break. Board Policy IIBGA-AR is Plaintiff's Exhibit S9.

44. While also on Spring Break, we published the finished, edited, version of the video to our Youtube account and put a link to it on our website. The video was published on March 25, 2021. The Youtube video link is Plaintiff's Exhibit S10.

### Return From Spring Break

45. Plaintiff Medart and I returned to work after Spring Break on Monday, March 29, 2021, with no incident or mention to us of any potential disruption caused by the I Resolve video, website, or social media.

46. On Tuesday, March 30, 2021, Grants Pass School District employee Kate Weber sent an email to Defendant Blanchard, Huber-Kantola, the Secondary Director (Trisha Evens), the principal of the high school (Ryan Thompson), and four other district employees: Fawn Perry, Rachelle Watson, Jennifer Tyrrell, and Tanika

Cooks. This email was sent during school time, on district property, using the district network, and using her work email address.

47. Of the four other staff members listed in her email, three of them submitted formal complaints to the District only after Weber brought the matter to their attention. Therefore, of the 4 formal complaints that were received prior to April 5, 2021 that I was placed on leave for, all 4 of them were either the sender or receiver of this email from Weber.

48. In this email, Kate Weber labels I Resolve a "political movement" and "anti trans". A full copy of this email, with emphasis added, is seen as Plaintiff's Exhibit S11.

49. In this email, Weber states that she wanted to give everyone a heads up and that she did not think she had a place to do anything about the movement.

50. On Wednesday, March 31, 2021, Defendant Kolb initially called a meeting with Plaintiff Medart and I to discuss some concerns brought to their attention regarding the I Resolve website. The initial meeting was titled "Sharing Concerns". See Plaintiff's Exhibit S8.

51. Soon afterwards, Kolb modified the meeting name to be "Sharing Concerns-Possible Complaint" and asked that Medart and I have separate meetings.

52. I was not given the option to have a representative or third party present in the meeting, but Defendant Kolb brought Trish Evens with him to the meeting.

53. Evens stated her personal opinion regarding the content of the video several times in the meeting and said she was "personally offended" by it. I took written notes during the meeting and followed up by typing them up that same day. These are Plaintiff's Exhibit S12.

54. The meeting focused on the content of the video and misperceptions and mischaracterizations some staff members had regarding the video being "anti trans".

55. It was shared that approximately 5 people had concerns about the video and that no formal complaints had been filed.

56. Defendant Kolb suggested that we take down the video and website.

57. Upon returning home from work that day, I made the video private to only those

with the link, rather than searchable on Youtube.

58. Although unnecessary in my view, I added a clear disclaimer on the video and website because the concern had been shared that people thought that, although we did not say where we worked or mention our last names, we were not clear enough that our views may not be those of our school district.

59. Between April 1, 2021 and April 3, 2021, four formal complaints were submitted to the district by Weber, Waton, Perry and Cauble.

60. Three of these complaints looked identical in template. Weber, Watson, and Perry all had similar complaints.

61. Perry and Watson had been recipients of Kate Weber's initial email on March 30, 2021, thus showing that Weber was the cause of any alleged disruption to the district.

62. Weber, by her own admission, encouraged others to file complaints to the District and contact them regarding their concerns. See Plaintiff's Exhibit S26.

### Placed on Administrative Leave

63. The morning of April 5, 2021, I attended work as normal and performed my Covid check in responsibilities with students and families in the car drop off line without incident or disruption.

64. I was then called into Defendant Blanchard's office where he then placed me on administrative leave for alleged "inappropriate conduct". The letter from Blanchard is Plaintiff's Exhibit S13.

65. Defendant Blanchard did not provide the complaints against me in the meeting therefore I was forced to ask Defendant Blanchard and Huber-Kantola for the complaints in an email from my personal account. I was not allowed to access my work email. The interaction regarding requesting the documentation is Plaintiff's Exhibit S14.

### Soliciting Complaints

66. On April 5, 2021, Defendant Kolb sent an email to the Defendant Board claiming that we had caused a "significant disturbance that is impacting the entire district" and yet according to all documentation in the final Landis report and all documents submitted to us by the Defendant District, only four email complaints

had come in at that time. See Plaintiff's Exhibit S15 for Kolb's full email.

67. On April 6, 2021, Defendant Kolb sent out an email to all staff in the district addressing I Resolve and stating "to be very clear, we do not support or endorse this message." No where in the email did it claim there were possible policy violations, but instead the email only addressed the content of our speech. Kolb's full email can be read in Plaintiff's Exhibit S16.

68. Defendant Kolb solicited complaints from staff in his email. It reads, "Please contact me or our Human Resources Director, Danny Huber-Kantola, with any additional concerns or needed support."

69. Shortly after Defendant Kolb's email went out to staff, a photo of the email was seen on Facebook and a group called "Rise and Resist Oregon" posted information regarding I Resolve, soliciting complaints to be sent to district officials directly. These district official's emails were posted on the Rise and Resist Oregon Instagram post which is Plaintiff's Exhibit S17.

70. Following Defendant Kolb's email to staff, our social media pages began to receive hate speech, physical threats and threats to take our job. We chose to delete our Facebook page because of these hateful comments and to "turn off commenting" on our Instagram and Youtube pages to stem the flow of threatening messages.

71. On April 7, 2021, Kolb sent out an email to all staff, students and parents addressing I Resolve and implying that the ideas expressed in I Resolve were dangerous to students. This email is Plaintiff's Exhibit 18.

72. The two other complaints from staff members listed in the final report from Bill Landis are dated after Kolb's email.

73. The 14 other complaints listed in the report from citizens, including current and past students, are all dated after Kolb's email.

### District Investigation

74. The Defendant District began investigating the complaints from the staff members but recused themselves after a request from union president Mickey Jarvis.

75. The District hired Bill Landis as the new investigator for the allegations.

76. Bill Landis' final report was delivered to Sherry Ely, Chief Financial Officer, June 2021, claiming five "sustained" allegations against me.

77. Sherry Ely met with Defendant District attorney Nancy Hungerford regarding the outcome. Ely then sent the findings to Defendant Kolb suggesting firing as the suitable outcome for the alleged offenses.

78. Prior to this investigation, I had a stellar employment record.

79. Prior to this investigation, my supervisor at the time, Defendant Blanchard, wrote me a glowing letter of reference for an open principal position in the District. This letter is Plaintiff's Exhibit S18.

80. Bill Landis' report has multiple substantial errors. These errors include: attributing quotes to me from a meeting transcript at which I was not even present, claiming 11 emails violated the use of the district network and yet 4 were not from my work email and the other 7 were allowable under policy, using Medart and my name interchangeably to describe events not attributed to the other person, failure to submit evidence into record provided to him by the district, failure to request additional documents, as needed.

81. On June 21, 2021, Defendant Kolb recommended my termination for four allegations stemming from alleged violation of policy GBG and one allegation of violating policy GCAB. The letter from Defendant Kolb is Plaintiff's Exhibit S19.

82. I appealed the decision and was granted an appeal hearing in front of the Defendant Board set for July 15, 2021.

83. In the board meeting, Defendant Brownell states that she made the decision to terminate based on the efficacy of Landis' report, even after multiple errors were pointed out to her in the meeting.

84. Errors in Landis' report were pointed out by Board Member Richardson during our July 15, 2021 hearing. The hearing is open to the public to view on Youtube titled "2021-07-15 Damiano Pre Termination Hearing". Board Member Richardson's comments begin at 1:01:50.

85. Defendant Delagrange claimed he made the decision to terminate my employment because, "It's hard for me to see how allowing this administrator to stay will not make some group of our students feel less safe in our schools,

whether that is real, or their feeling." This was about the content of our video, not violation of policy. His comments begin at 1:16:05 in the Youtube video.

86. Defendant Scott Nelson asked questions in the hearing regarding the content of the speech of the video, not the allegations of violation of policy. His comments begin at minute 0:50:05.

87. Following Defendant Nelson's comments and question, Defendant District's lawyer, Nancy Hungerford, claimed to be speaking on behalf of the administration when she discussed the concern about whether or not I am willing to call students by their preferred name and pronouns as being of high concern for any consideration of my return to work.

88. Defendant Delagrange claimed he made the decision to terminate my employment because, "It's hard for me to see how allowing this administrator to stay will not make some group of our students feel less safe in our schools, whether that is real, or their feeling." This was about the content of our video, not violation of policy. His comments begin at 1:16:05 in the Youtube video.

89. The Defendant Board voted to terminate my employment on July 15, 2021 with a 4-3 vote to uphold the superintendent's recommendation for termination.

## It Was About the Content of Our Speech

90. Kate Weber's initial email focused on the content of our speech and even stated that "political" work on one's own time is allowable and she does it often.

91. Defendant Kolb sent four questions to me after meeting with me to share the initial concerns on March 31, 2021. The four questions all centered around the content of the speech in the video. Plaintiff's Exhibit S8.

92. These questions were asked of me by Defendant Board Chair Nelson during my initial appeal hearing on July 15, 2021.

93. These similar questions were asked of Medart and I to answer prior to the Defendant Board vote in November for our reinstatement.

94. The two emails Defendant Kolb sent out to the community regarding I Resolve centered around the content of the I Resolve postings, not any alleged violation of policy.

95. In Defendant Kolb's own deposition, he states the following, "I recommended the

firing of the individuals for utilizing district resources to promote what have been viewed as discriminatory actions or policies causing a substantial disruption to the educational environment." This indicates that he fired us because of the content of the video, not claims that it was 'political campaiging' but that it was discriminatory in nature. This statement is found in Defendant's Exhibit 53-5, page 11-12.

## Speech Policy Enacted

96. On April 27, 2021, while on Plaintiff's were on administrative leave, Defendant Board passed a revision to Board Policy GBG that immediately chilled Plaintiff Medart and my speech regarding I Resolve. The revised policy GBG is Plaintiff's Exhibit S20.

97. Until our termination, Plaintiff Medart and I were unable to post social media posts or new items on our website due to restrictions put in place by policy GBG.

98. Upon reinstatement to our employment on November 15, 2021, policy GBG was once again applicable to Medart and myself, to which the effect was the chilling of our speech.

## In The Months While Terminated

99. I was denied unemployment by the Defendant District effective the week of July 11, 2021.

100.    I appealed the denial and my case was heard in front of an administrative law judge.

101.    I won the unemployment benefits appeal with the opinion from the administrative law judge reading, "she was discharged, but not for misconduct."

102.    The Defendant Board sought an appeal for the unemployment benefits opinion and lost the appeal.

103.    Directly following the July 15, 2021 vote for termination, Plaintiff Medart and I appealed the initial decision by the Defendant Board and were denied the appeal by Defendant District lawyers.

104.    On September 28, 2021, Board Member Richardson moved to have our appeal placed on the Board of Education meeting agenda to be voted on by the Board. The agenda item was approved and the request for an appeal was approved by a

vote of 4-3. The appeal was to be in written form only.

105.    Plaintiff Medart and I were given questions to answer from the Defendant Board that were focused on the content of our speech, not the alleged violations of policy.

### Genuine Issues of Fact

106.    The Defendants claim that I was fired for violating district policies. And yet, in my appeal hearing to an administrative law judge for my unemployment, the judge found that I was "discharged, but not for misconduct". The full opinion from the judge can be found in Plaintiff's Exhibit S21.

107.    The Defendant District appealed the opinion of the administrative law judge and lost the appeal. The appeal board, made up of three administrative law judges, upheld the previous ruling and ruled that I was "discharged, but not for misconduct."

108.    Defendant Kolb submitted a report to the Teachers Standards and Practices Commission (TSPC) alleging that I violated district policies and that warranted discipline from the TSPC as well.

109.    TSPC Investigator and former DEA agent John Lafollete investigated the claims for nearly a year and presented his thirty-plus page document to a, in essence, jury of our peers, the Commission. The Commission is made up of teachers, administrators, and education professionals from across the state of Oregon.

110.    The Commission found no fault and chose to take no further action regarding the allegations. Choosing to take no further action is the equivalent of an acquittal for the Commission. The investigation decision is Plaintiff's Exhibit S22.

111.    The Defendant District claims that I used more than de minimis time on the network to work on I Resolve and yet edit time stamps on the resolution document show that  work on the resolution was done by the "I Resolve" google account and that all time was either before/ after school, or during allowable break time. Screenshots of the edit timestamps are apparent in Plaintiff's Exhibit S23.

112.    The Defendant District claims that there was a "substantial disruption" caused and that almost 100 complaints came in to the district and yet only four appear to have come in prior to Defendant Kolb's April 6, 2021 email to staff.

113.    All fourteen complaints from citizens and former/current students listed in Bill Landis' report are dated after Defendant Kolb's email to staff, students, and families soliciting complaints.

114.    Additionally, the Defendant District has only produced 23 documents total to Plaintiffs classified as complaints.

115.    The District failed to produce a call log to give evidence for any disruption allegedly caused by an increase in call volume.

116.    Defendant Delagrange perjured himself under oath when he claimed that he was not at the protest against Medart and my reinstatement and was not supportive of the protest. DeLagrange was present at the protest and was wearing purple, the color designated for supporters to wear. Photo evidence of Defendant DeLagrange is attached as Plaintiff's Exhibit S24. Defendant DeLagrange's deposition quote is found in Plaintiff's Exhibit S25.

**Personal Impact of Defendant's Actions and Accusations**

117.    I was surprised by the seemingly 180 degree turn from District officials upon receiving four complaints about my efforts on I Resolve. I was personally hurt by the change in demeanor from Defendant Kolb, as he had been supportive of taking the tolerant solution to the Board before loud voices began telling him to make a different decision.

118.    I was horrified to learn that Defendant Kolb had branded Medart and I as "directly opposed to district values." This was a community I moved into several years ago and quickly fell in love with. To be branded as such to my community was heartbreaking in its divisiveness and untrue nature.

119.    My level of stress and anxiety was very high in the months I was on leave and subsequently the months I was terminated.

120.    My speech was chilled by an unconstitutional policy that the Defendant District approved while I was on leave.

121.    Each time our local newspaper came out with a new article covering our

story, there was another quote from a District official branding Medart and I as policy violators and rebel rousers.

122.    I lost friends and connections in my community because of the District's untrue claims and their branding of me as "anti-trans".

123.    I was branded as "anti trans" to future employers and as an employee who willfully violates district policies.

124.    I was placed on administrative leave. I will have to report this on any future job application and application for renewal of my license for the rest of my career.

125.    I was terminated from employment. I will also have to report this on future job applications for the remainder of my career.

126.    I lost pay, PERs accrual, and benefits for 4 months.

127.    I sought counseling support from my pastors because of the trauma the ordeal caused in my personal life.

128.    I was denied unemployment benefits and had to fight to have them approved.

129.    After being approved, the District desired to deny my benefits again by appealing the initial unemployment benefits decision.

130.    After being terminated, I was retaliated against by the Defendant District when they denied an appeal several times and had to fight for the right of my appeal to the board for reversal of their previous decision. I was finally given an appeal, 7 months after being placed on leave and 4 months after being terminated.

131.    When I did return to work, I was retaliated against again when I was placed at a school at which interaction with students was minimal and my job responsibilities were highly constricted. My previous job was being filled by an administrator who had retired the year prior.

132.    I was discriminated against when I was not invited to grade level administrator meetings for any level, even though I worked for a K-12 school. I was also not initially invited to all administrator meetings.

133.    I was retaliated against when the District denied resources given to other schools and staff members in similar positions.

134.    Within two months of returning, Defendant Kolb appointed two District directors to evaluate me, rather than my principal, as was the case with all other assistant principals. The directors retaliated against my speech in I Resolve and found me deficient in all six administrative standards. I have never been found deficient on any standard in my career as a teacher or as an administrator and was shocked that the directors would retaliate against me in such a manner.

135.    The directors never formally observed me before coming to their retaliatory conclusion that I was deficient as an administrator.

136.    I was told that in order for my employment to be considered for renewal for the 2022-2023 school year, I would have to agree to a Plan of Assistance. This Plan of Assistance included references to alleged deficiencies from the previous school year, 2020-2021, and yet these alleged deficiencies had never been shared with me prior to being placed on leave. This was further retaliation.

137.    The Plan of Assistance had a contingency in place that if I did not meet the outlined goals by June, my employment could still be terminated by District officials.

138.    If I had signed the Plan of Assistance, I would have had to write on all future job applications that I had been placed on a Plan of Assistance in a previous job.

139.    I chose not to renew my contract with that contingency in place. When I was applying for alternative jobs, I received no interviews for public school district jobs I applied for. I was hired by a public charter school at a pay cut of over 25%.

**Declaration Under Penalty of Perjury**

I, RACHEL GIANINA SAGER, a citizen of the United States and a resident of the State of Oregon, hereby declare under penalty of perjury pursuant to 28 USC § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this 22nd of August, 2022.

_____

Rachel G. Sager