Ray D. Hacke, OSB #173647
PACIFIC JUSTICE INSTITUTE
317 Court St. NE, Suite 202
Salem, OR 97301
(503) 917-4409 Phone
(916) 857-6902   Facsimile

Attorneys for Plaintiffs
RACHEL G. DAMIANO &
KATIE S. MEDART

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| RACHEL G. DAMIANO & KATIE S. MEDART, <br><br> Plaintiffs, <br><br> v. <br><br> GRANTS PASS SCHOOL DISTRICT NO. 7, A public body, *et al.*, <br><br> Defendants | Case No. 1-21-CV-00859-CL <br><br> **AMENDED NOTICE OF NEW AUTHORITY** |

I, RAY D. HACKE, hereby declare as follows:

1. I am the attorney of record for Plaintiffs RACHEL G. SAGER (formerly Damiano) and KATIE S. MEDART in the above-captioned action. I am fully qualified to practice and in good standing in this jurisdiction. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2. I hereby submit this Notice of New Authority in opposition to Defendants' Motion for Summary Judgment (the "MSJ"), filed on August 1, 2022. *See* Dkt. Rpt. No. 52.

1

3. On December 29, 2022, nearly one month after oral argument took place concerning Defendants' MSJ on November 30, 2022, the U.S. Court of Appeals for the Ninth Circuit (the "Ninth Circuit") issued its decision in *Dodge v. Evergreen Sch. Dist. No. 114*, 2022 U.S. App. LEXIS 35868 (9th Cir. Dec. 29, 2022). A copy of that decision is attached hereto as **Exhibit "A."**

4. The *Dodge* decision affirms once again that for a school district "to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than the mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at *38 [quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969)]. Specifically, the Ninth Circuit declares the following in *Dodge*: "That some may not like the political message being conveyed is par for the course and cannot be a basis for finding disruption of a kind that outweighs the speaker's First Amendment rights." *Dodge*, 2022 U.S. App. LEXIS 35868 at *30. In other words, Defendants are not entitled to judgment as a matter of law based on concerns about disruption to the school environment, substantial or otherwise.

5. The Ninth Circuit also held in *Dodge* that a violation of a public-school employee's First Amendment rights occurs "is clearly established where long-standing precedent has held that concern over the reaction to controversial or disfavored speech itself does not justify restricting such speech." *Id.* at *42. Such is the case here: Supreme Court precedents dating back more than half a century – including and especially *Tinker*, cited *supra*, and *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), whose balancing test this Court is tasked with applying – make clear that neither "***teachers*** or students shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 509 (emphasis added); *see also Pickering*, 391 U.S. at 574 [declaring that generally, "absent proof of false statements knowingly or recklessly made by

him, a teacher's exercise of his right to speak on issues of public importance ***may not furnish the basis for his dismissal from public employment***" (emphasis added)].

6. *Dodge*, the Court should note, involved teacher speech, just as this case does.

7. To some degree, *Dodge* is distinguishable from this case: *Dodge* concerned a teacher's decision to wear a MAGA hat to in-house trainings where only fellow school employees, not students and parents, were present. *Dodge*, 2022 U.S. App. 35868 at *29. This case, by contrast, involves off-campus speech broadcast to a general audience via two educators' personal website. Decl. of Rachel Sager in Opposition to Defs.' Mot. for Summary Judm., ¶¶ 40-44 (August 22, 2022).

8. Still, *Dodge* has some striking similarities to this case, including the fact that very few people present at the trainings the teacher attended took issue with the presence of the hat, and two of them were people who did not work directly with the teacher. *Dodge*, 2022 U.S. App. 35868 at *29. Here, Plaintiffs can show that most of the complaints Defendant GRANTS PASS SCHOOL DISTRICT NO. 7 ("GPSD") received about their speech came in after Defendant KIRK T. KOLB ("Superintendent Kolb"), GPSD's former superintendent, sent out e-mails to GPSD staff and the Grants Pass community inviting people to sound off about Plaintiffs' speech. Pls.' Opposition to Defs.' Mot. for Summary Judm. 1, 16 (August 22, 2022).

9. More importantly, the Ninth Circuit found in *Dodge* found that the presence of the teacher's hat caused no disruption to the school environment. *Dodge*, 2022 U.S. App. 35868 at *29. At most, whether Plaintiffs' speech caused a substantial disruption is a disputed fact in this case – especially given that at least two of the Defendants in this case, Superintendent Kolb and THOMAS BLANCHARD ("Principal Blanchard"), the principal at North Middle School, have given sworn deposition testimony that learning still took place on GPSD campuses in the days

and weeks after Plaintiffs published their "I Resolve" video. Kolb Depo. 59:9-60:2; Blanchard Depo. 65:23-66:13.

10. Speaking of Superintendent Kolb and Principal Blanchard, the Ninth Circuit held in *Dodge* that the middle school principal who took an adverse employment action in the teacher in that case was not entitled to qualified immunity. *Dodge*, 2022 U.S. App. LEXIS 35868 at **40-41. The Ninth Circuit declared in *Dodge* that "based on the long-established precedent of this court and the Supreme Court, a reasonable school administrator at the time of the events in this case would have known" that censoring a plaintiff's speech based on the viewpoint expressed "was improper and ***the perceived unpopularity of a political view is not itself justification to prohibit protected expression***." *Id.* at *40 (emphasis added) [citing *Tinker*, 393 U.S. at 506]. Superintendent Kolb and Principal Blanchard likewise should have known that Plaintiffs' "right to express political views, even as a public-school teacher, is clearly established." *Id.* Still, they took adverse employment actions against Plaintiffs anyway. Superintendent Kolb and Principal Blanchard are thus not entitled to judgment as a matter of law on the ground of qualified immunity.

11. Based on the foregoing, in light of the Ninth Circuit's decision in *Dodge*, I hereby ask the Court to deny summary judgment to Defendants on Plaintiffs' claims under 42 U.S.C. § 1983, Title VII, and Or. Const. art. I, § 8.

I declare under penalty of perjury of the laws of the United States of America and the State of Oregon that the foregoing is true and correct, and that this declaration was executed on January 3, 2023, in Salem, Oregon.

                                  ___/s/ RAY D. HACKE_
                                      Ray D. Hacke

## **PROOF OF SERVICE**

I am employed in the County of Marion, State of Oregon. I am over the age of eighteen and not a party to the within action; my business address is 317 Court St. NE, Suite 202, Salem, OR 97301.

On or about January 3, 2023, I served the following documents on the interested parties by the methods indicated below:

**AMENDED NOTICE OF NEW AUTHORITY**

### **PLEASE SEE ATTACHED SERVICE LIST**

_____BY MAIL: I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice, it would be deposited with either the U.S. postal service or another carrier on approximately that same date with postage thereon fully prepaid at Salem, Oregon in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_____BY PERSONAL SERVICE: I caused such envelope to be delivered by hand to the office of the addressee(s).

\_\_\_X\_\_\_BY ELECTRONIC MAIL: I caused such documents to be served on the interested parties via electronic mail.

_____(State) I declare under penalty of perjury under the laws of the State of Oregon that the above is true and correct.

\_\_X\_\_\_\_(Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on January 3, 2023, at Salem, Oregon.

*/s/ LAUREN PEFFERLE*
Lauren Pefferle

# **SERVICE LIST**

- Karen Vickers and Beth Plass
  Vickers Plass, LLC.
  5200 SW Meadows Road, Suite 150
  Lake Oswego, OR 97035
  Attorneys for Defendants
  E-mail: kvickers@vickersplass.com
  bplass@vickersplass.com

# EXHIBIT "A"

No *Shepard's* Signal™
As of: January 3, 2023 10:48 PM Z

# *Dodge v. Evergreen Sch. Dist. #114*

United States Court of Appeals for the Ninth Circuit

April 15, 2022, Argued and Submitted, Seattle, Washington; December 29, 2022, Filed

No. 21-35400

**Reporter**
2022 U.S. App. LEXIS 35868 *; __ F.4th __

ERIC DODGE, Plaintiff-Appellant, v. EVERGREEN SCHOOL DISTRICT #114, a public corporation; CAROLINE GARRETT; JANAE GOMES, Defendants-Appellees.

**Prior History: [*1]** Appeal from the United States District Court for the Western District of Washington. D.C. No. 3:20-cv-05224-JLR. James L. Robart, District Judge, Presiding.

**Disposition:** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

## Core Terms

hat, training, disruption, teacher, wearing, school board, message, retaliation, adverse employment action, rights, summary judgment, protected speech, matter of public concern, engaging, wore, qualified immunity, district court, viewpoint, political speech, discipline, retaliation claim, conversation, restricting, outweighed, workplace, schools, symbol, deter, individual defendant, balancing test

**Summary:**

SUMMARY[**]

**Civil Rights**

The panel affirmed in part and reversed in part the district court's summary judgment in favor of defendants in an action brought pursuant to *42 U.S.C. § 1983* by a teacher who alleged retaliation in violation of the *First Amendment* when a school principal told him that he could not bring his Make America Great Again (MAGA) hat with him to teacher-only trainings on threat of disciplinary action and when the school board affirmed the denial of plaintiff's harassment complaint filed against the principal.

The panel first concluded that plaintiff was engaged in speech protected by the *First Amendment* because the undisputed facts demonstrated that his MAGA hat conveyed a message of public concern, and he was acting as a private citizen in expressing that message.

Addressing the claims against Principal Caroline Garret, the panel next held that viewing the facts in the light most favorable to plaintiff, at a minimum, there were triable issues of fact regarding whether Principal Garrett, who had authority over plaintiff's **[*2]** employment, took adverse employment action against him when she stated that the next time plaintiff had his MAGA hat, they would have a meeting in which he would need his union representative. Because it was undisputed that plaintiff's MAGA hat motivated Principal Garret's action, plaintiff submitted sufficient evidence of a prima facie *First Amendment* retaliation claim against her for purposes of summary judgment. The record failed to establish, however, that defendant Jenae Gomes, the school district's Chief Human Resource Officer, took any adverse employment action against plaintiff, and for this reason, plaintiff's *First Amendment* retaliation claim against Gomes failed as a matter of law.

Analyzing whether Principal Garrett had a legitimate administrative interest in preventing plaintiff's speech that outweighed his *First Amendment* rights, the panel determined that while some of the training attendees may have been outraged or offended by plaintiff's political expression, no evidence of actual or tangible disruption to school operations had been presented. That some may not like the political message being conveyed is par for the course and cannot itself be a

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

basis for finding disruption of a kind that outweighs the speaker's **[\*3]** *First Amendment* rights. Therefore, Principal Garrett's asserted administrative interest in preventing disruption among staff did not outweigh plaintiff's right to free speech. Moreover, any violation of plaintiff's *First Amendment* rights by Principal Garrett was clearly established where longstanding precedent held that concern over the reaction to controversial or disfavored speech itself does not justify restricting such speech. For these reasons, the panel reversed the district court's grant of summary judgment in favor of Principal Garrett.

Addressing plaintiff's claim against the Evergreen School District, the panel held that the school board's dismissal of plaintiff's administrative complaint on the grounds that Principal Garrett did not violate any District "policy or procedure," was not an approval of her conduct or the basis for it. Plaintiff failed to establish that a material dispute of fact existed regarding whether the District ratified any unconstitutional conduct by Principal Garrett. The panel therefore affirmed the district court's grant of summary judgment in favor of the District.

**Counsel:** Gary W. Manca (argued), Talmadge/Fitzpatrick, Seattle, Washington, for Plaintiff-Appellant.

Michael E. McFarland Jr. **[\*4]** (argued), Evans Craven & Lackie P.S., Spokane, Washington; Amber L. Pearce (argued), Francis S. Floyd, and Brittany C. Ward, Floyd Pflueger & Ringer P.S., Seattle, Washington; for Defendant-Appellee.

**Judges:** Before: Michael Daly Hawkins and Danielle J. Forrest, Circuit Judges, and Jane A. Restani,[*] Judge. Opinion by Judge Forrest.

**Opinion by:** Danielle J. Forrest

# Opinion

FORREST, Circuit Judge:

The question in this case is whether the *First Amendment* was violated when a principal told a teacher he could not bring his Make America Great Again (MAGA) hat with him to teacher-only trainings on threat of disciplinary action and when the school board

---

[*] The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

affirmed the denial of the teacher's harassment complaint filed against the principal. Plaintiff Eric Dodge was a long-time teacher in the Evergreen School District #114 (District) in Vancouver, Washington. Before the 2019-2020 school year began, he attended two days of teacher training and brought with him a MAGA hat. His principal, Caroline Garrett, considered the hat inappropriate. After consulting with the District's Chief Human Resource Officer Jenae Gomes, Principal Garrett told Dodge at the end of the first day that he needed to exercise "better judgment." When Principal Garrett learned **[\*5]** that Dodge brought his hat with him again the second day, she called him a racist and a homophobe, among other things, and said that he would need to have his union representative present if she had to talk to him about the hat again.

Dodge sued Principal Garrett, HR Officer Gomes, and the District under *42 U.S.C. § 1983* for retaliating against him for engaging in protected political speech in violation of the *First Amendment*. The district court held that the individual defendants were entitled to qualified immunity and granted summary judgment in their favor. The district court also granted summary judgment for the District, concluding that Dodge failed to show a genuine issue of material fact that the District was liable. Dodge appealed. We have jurisdiction under *28 U.S.C. § 1291*, and we affirm the district court's grant of summary judgment for HR Officer Gomes and the District, but we reverse and remand as to Principal Garrett.

## I. BACKGROUND

Because this case was resolved on defendants' motions for summary judgment, we view the facts in the light most favorable to Dodge, the nonmovant. *Rice v. Morehouse, 989 F.3d 1112, 1120 (9th Cir. 2021)*.

### A. Dodge's Interactions with Principal Garrett

Dodge worked as a teacher for the District for over 17 years. For the 2019-2020 school year, he **[\*6]** was assigned to teach at Wy'east Middle School (Wy'east) for the first time, and his class was sixth grade science. The week before school started, Dodge attended a cultural sensitivity and racial bias training held at Wy'east presented by a professor from Washington State University. There were approximately 60 attendees at the training. Dodge wore his MAGA hat up to the front doors of the school and then took it off when

he entered the building. During the training, Dodge sat near the back of the room and placed his hat either on the table in front of him or on top of his backpack; he did not wear his hat during the training.

The professor leading the training saw Dodge's hat and complained to Principal Garrett after the training that she felt intimidated and traumatized. Principal Garrett also learned that Dodge's hat upset a few teachers who attended the training. One teacher had cried, and another found the hat "threatening." There is no allegation that Dodge did anything with his hat during the training other than place it near him with his other things, nor is there any allegation that he did anything to interfere with or disrupt the training.

Principal Garrett called HR Officer **[*7]** Gomes to discuss what could be done "without infringing or disrespecting anyone"; they agreed that the "best option was to talk to [Dodge] directly," explain the "reaction" that the hat had elicited, and "give him a heads-up that he was most likely inadvertently causing distress and give him an opportunity to respond to that."

Later that afternoon, Principal Garrett spoke to Dodge in his classroom. She asked Dodge why he wore the hat, and he stated that he wore it to protect sunspots on his head. He also explained that he "like[s] the message" behind the hat because it "speaks to everybody" by saying "let's all do it the best that we can and be the best that we can be at whatever it is that we do." Principal Garrett responded that "some people take [the hat] as a symbol of hate and bigotry" and that while she could not ask him to stop wearing it, he should use "better judgment" in the future. Dodge tried to explain that he wore the hat to show that "[m]aybe they're not all bad," but by the end of the conversation he understood that Principal Garrett was effectively asking him not to wear his MAGA hat at Wy'east. For her part, Principal Garrett said that Dodge denied trying to "engender **[*8]** some kind of response with the hat" by bringing it to a racial equity training. She also stated that Dodge attempted to talk politics during their conversation but that she "shut it down."

The next day, Dodge attended another teacher training that was held at Evergreen High School. He again wore his MAGA hat before entering the building and then took it off while he was inside. A teacher who was present at the first day's training saw the hat and texted Principal Garrett. Principal Garrett again called HR Officer Gomes. This time they agreed that Principal Garrett needed to "set a clear directive with [Dodge]" to "not hav[e] the hat in the training where it was causing the disruption to staff."

When the training at Evergreen High School was over, Dodge drove back to Wy'east for a third training that was later that same day. This time, he left his MAGA hat in his truck and did not bring it into the Wy'east building. When the training was over, Dodge stayed behind to talk to Principal Garrett about teaching classes other than science. The parties disagree about what happened during this conversation. Dodge alleges that when he approached Principal Garrett she stated: "What is the fucking **[*9]** deal with your hat?" She also called Dodge a "homophobe and a racist and a bigot and hateful." And when he denied wearing his hat at Wy'east the second day, she called him a "liar" and specified that she did not want him wearing the hat "period." Finally, Principal Garrett said: "[N]ext time I see you with that hat, you need to have your union rep. Bring your rep because I'll have mine." Principal Garrett disputes that she mistreated Dodge, including by using profanity or raising her voice, but she admits that she was frustrated and viewed Dodge continuing to have his hat with him as "insubordination."

Later that night, Dodge emailed Principal Garrett stating that he was "taken back by our conversation today when you told me if I wear that hat again, that I better have a representative with me." He stated that her "unprovoked attack" made him "sick to [his] stomach" and nervous, but that he was "sorry for offending [her]." Principal Garrett responded two days later recounting that he admitted to wearing "the hat to purposefully provoke a reaction or response from [his] colleagues." She explained that her reference to union representation only meant that "if we needed to discuss [the **[*10]** MAGA hat] again, I would have another administrator with me to take notes and you would be invited to bring a representative." Principal Garrett forwarded Dodge's email and her response to HR Officer Gomes, who praised it as an "[e]xcellent response!"

**B. The District's Investigations of Principal Garrett**

Dodge asked his union representative for advice after his second encounter with Principal Garrett, and the representative contacted the District. The representative was informed that the District was not going to take any action against Principal Garrett, and Dodge filed a harassment, intimidation, and bullying (HIB) complaint against Principal Garrett through the District's online reporting system. Dodge also requested a transfer to a different school. Dodge's HIB complaint was sent to HR

Officer Gomes, who initiated an investigation as required by District policy. HR Officer Gomes contracted third-party liability investigator Clear Risk Solutions (CRS) to perform the investigation and determine whether Principal Garrett violated District policies in her treatment of Dodge.

At some point during the investigation, HR Officer Gomes received a public records request from a local news agency **[\*11]** related to Dodge's HIB complaint. She told Dodge that responding to the request may require her to disclose information from his personnel file but that she would not have to disclose the information if he withdrew his HIB complaint. She also advised him that the investigation into his allegations would proceed even if he withdrew his HIB complaint. Dodge declined to withdraw his complaint.

CRS completed its investigation and prepared a preliminary investigative report. The preliminary report concluded that "Dodge was singled out because he wore a 'Make America Great Again' hat" and was "subjected to negative treatment and denied his freedom of expression . . . because of perceived stereotypes or political differences of opinion." The preliminary report also found that Dodge had not violated any school policy by having his MAGA hat, that Principal Garrett had allowed other types of political messaging around the school, and that her reference to union representation was "reasonably perceived by Mr. Dodge as a threat of discipline." Nonetheless, CRS's preliminary report also determined that Principal Garrett had not technically violated any school policy because the District's antidiscrimination **[\*12]** policy did not ban discrimination based on political beliefs and the encounters between Dodge and Principal Garrett did not rise to the level of harassment, intimidation, or bullying.

HR Officer Gomes reviewed the preliminary report and asked CRS to change some of the language before issuing its final report. She was concerned that CRS's conclusions about violation of Dodge's "freedom of expression" and him being singled out for his political beliefs were outside the scope of CRS's task—to investigate whether Principal Garrett had violated District policy. CRS removed the language that HR Officer Gomes had concerns about.

Relying on the final report, HR Officer Gomes determined that no policy violation had occurred, and she wrote a letter to Dodge explaining that no further action would be taken on his HIB complaint. But she also stated that the District would transfer Dodge to a different school, as he requested, and that the District would educate all employees about engaging in political discourse without violating constitutional rights. She further assured Dodge that he would not be retaliated against for filing his HIB complaint. Dodge appealed HR Officer Gomes's denial of his HIB **[\*13]** complaint to the school board, and the school board affirmed. However, aware of other complaints about Principal Garrett lodged by school parents, the school board ordered further investigation into whether Principal Garrett had acted professionally in her interactions with Dodge. During this second investigation, the school board informed Principal Garrett that it had a "strong belief" that her conversations with Dodge were not as she had represented in addition to concerns about her "professionalism which bring credibility into question." Ultimately, the school board gave Principal Garrett the choice of resigning as principal and accepting a demotion or facing disciplinary proceedings. She resigned at the end of the school year.

**C. District Court Proceedings**

Dodge sued under *42 U.S.C. § 1983*, claiming that Principal Garrett and HR Officer Gomes retaliated against him for having his MAGA hat in violation of his *First Amendment* right to free speech. He also sued the District, claiming that the school board ratified the unconstitutional actions of the individual defendants by affirming the denial of his HIB complaint.[1] The district court granted summary judgment against all of Dodge's claims. It concluded that Principal **[\*14]** Garrett and HR Officer Gomes were protected by qualified immunity because it was not clearly established that their actions violated the Constitution. It also concluded that Dodge failed to present evidence that the school board ratified any unconstitutional actions by Principal Garrett or HR Officer Gomez and, even if it had, there was not a sufficient causal connection between the school board's decision to affirm the denial of Dodge's HIB complaint and Dodge's injury. Dodge timely appealed.

**II. DISCUSSION**

We review de novo the district court's summary judgment rulings, including its determinations regarding

---

[1] Dodge sues Principal Garrett and HR Officer Gomes in their individual capacities and the District under a municipal theory of liability set forth in *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*.

qualified immunity. *Hughes v. Rodriguez, 31 F.4th 1211, 1218 (9th Cir. 2022)*.

### A. Individual Defendants

The district court granted the individual defendants summary judgment, concluding that they were protected by qualified immunity. In reviewing this decision, we must analyze whether the individual defendants violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Horton by Horton v. City of Santa Maria, 915 F.3d 592, 599 (9th Cir. 2019)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*). This is a well-known, two-part analysis: (1) whether a protected right was violated, and (2) whether that right was clearly established at the time of the violation. *See, e.g., Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*. Courts have discretion to **[*15]** determine in which order to address these inquiries "in light of the circumstances in the particular case at hand." *Id. at 236*. Although the district court analyzed only the second part of this test, whether any constitutional violation was clearly established, we address both inquiries.

### 1. *First Amendment* Violation

To establish a prima facie *First Amendment* retaliation claim, the plaintiff must prove that "(1) []he engaged in protected speech; (2) the defendants took an 'adverse employment action' against h[im]; and (3) h[is] speech was a 'substantial or motivating' factor for the adverse employment action." *Howard v. City of Coos Bay, 871 F.3d 1032, 1044 (9th Cir. 2017)* (quoting *Thomas v. City of Beaverton, 379 F.3d 802, 808 (9th Cir. 2004)*). If the plaintiff establishes a prima facie case, "the burdens of evidence and persuasion . . . shift to the Defendants to show that the balance of interests justified their adverse employment decision." *Eng v. Cooley, 552 F.3d 1062, 1074 (9th Cir. 2009)*. That is, a defendant can avoid liability for retaliation by showing that it had a legitimate administrative interest in suppressing the speech that outweighed the plaintiff's *First Amendment* rights. *Pickering v. Bd. of Ed., 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)*.[2]

#### a. Protected Speech

Whether a public employee like Dodge has engaged in speech protected by the *First Amendment* breaks down to two inquiries: (1) whether he "spoke on a matter of public concern," and (2) whether he "spoke as a private **[*16]** citizen or public employee." *Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 961 (9th Cir. 2011)* (quoting *Eng, 552 F.3d at 1070*).

#### i. Matter of Public Concern

Speech addresses an issue of public concern "when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest.'" *Lane v. Franks, 573 U.S. 228, 241, 134 S. Ct. 2369, 189 L. Ed. 2d 312 (2014)* (quoting *Snyder v. Phelps, 562 U.S. 443, 453, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011)*). What constitutes public concern is "defined broadly," *Ulrich v. City & County of San Francisco, 308 F.3d 968, 978 (9th Cir. 2002)*, based on the "content, form, and context of a given statement, as revealed by the whole record," *Johnson v. Multnomah County, 48 F.3d 420, 422 (9th Cir. 1995)* (quoting *Connick v. Myers, 461 U.S. 138, 147-48, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)*). While no single factor is dispositive, "content is the most important." *Thomas, 379 F.3d at 810*.

Here, Dodge's speech was his display of Donald Trump's presidential campaign slogan on a red hat. The content of this speech is quintessentially a matter of public concern. The messages of candidates for public office are not only newsworthy; they inherently relate to the "political, social, or other concern to the community." *Lane, 573 U.S. at 241* (internal quotation marks and citation omitted); *cf. Rankin v. McPherson, 483 U.S. 378, 386, 107 S. Ct. 2891, 97 L. Ed. 2d 315 (1987)* ("addressing the policies of the President's administration" "plainly deal[s] with a matter of public concern."). Indeed, Principal Garrett and others viewed Dodge's hat as a comment on issues such as immigration, racism, and bigotry, which are all matters of public concern.

The **[*17]** defendants' suggestion that Dodge was not

---

[2] An employer also is not liable for *First Amendment* retaliation if it proves that it would have taken the adverse employment action absent the protected speech. *See Howard, 871 F.3d at 1046-48*. This rule is not at issue here, however, because neither Principal Garrett nor HR Officer Gomes dispute that any adverse employment action that occurred was related to Dodge's MAGA hat.

conveying a political message because he wore his hat to protect his skin ignores the reality that both can be true—he wore his hat as protection, *and* he chose this hat because of the message that it conveyed. The suggestion that Dodge did not intend to communicate a message with his hat is also belied by his statements that he used the hat to "show people who [he was]," he liked the message behind "Make America Great Again" because it was "kind of who [he is]," and he owned the hat because he "show[s] support for Donald Trump." And regardless of Dodge's intent, the MAGA hat has an obvious political nature. *See Alpha Energy Savers, Inc. v. Hansen, 381 F.3d 917, 925 (9th Cir. 2004)*.

Defendants also suggest that the context of Dodge's speech—a teacher-only training with a limited audience—undermines the conclusion that any message Dodge was conveying was a matter of public concern. However, a government employee does not lose the right to speak out about issues of public concern in forums closed to the general public. *Connick, 461 U.S. at 148 n.8*; *Thomas, 379 F.3d at 810* ("Because content is the most important factor, we have concluded that speech about a matter of public concern may be protected even when made in a private context."). Considering the content, form, **[*18]** and context of Dodge's speech, we conclude that it was a matter of public concern. *Johnson, 48 F.3d at 422*.

**ii. Public vs. Private Speech**

The second inquiry—whether Dodge was speaking as a private citizen or a public employee—depends on the "scope and content of [his] job responsibilities." *Poway Unified Sch. Dist., 658 F.3d at 966* (quoting *Eng, 552 F.3d at 1071*). A person speaks in a personal capacity if he "'had no official duty' to make the questioned statements, or if the speech was not the product of 'perform[ing] the tasks [he] was paid to perform.'" *Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)* (citations omitted).

Here, Dodge had no official duty to wear the MAGA hat, and it was not required to perform his job. Nor did he wear the hat in school with students. That distinguishes this case from other cases involving speech in schools where the speech was reasonably viewed by students and parents as officially promoted by the school. *See Poway Unified Sch. Dist., 658 F.3d at 967-68* (large religious banners hung up in classroom); *Peloza v. Capistrano Unified Sch. Dist., 37 F.3d 517, 519-20 (9th Cir. 1994)* (teaching creationism over evolutionism).

Where Dodge was not taking "advantage of his position to press his particular views upon the impressionable and 'captive' minds before him," *Poway Unified Sch. Dist., 658 F.3d at 968*, but rather was displaying a message on a personal item while attending a teacher-only training, we have little trouble concluding that he was **[*19]** engaging in expression as a private citizen, not a public employee.

Because the undisputed facts demonstrate that Dodge's MAGA hat conveyed a message of public concern and he was acting as a private citizen in expressing that message, we conclude that Dodge was engaged in speech protected by the *First Amendment*.

**b. Adverse Employment Action**

The second element of a prima facie *First Amendment* retaliation claim is an adverse employment action.[3] To determine if an adverse employment action occurred for purposes of *First Amendment* retaliation, we apply the "reasonably likely to deter" test. *Greisen v. Hanken, 925 F.3d 1097, 1113 (9th Cir. 2019)*. Under this test, the plaintiff must prove that the employer's action was "reasonably likely to deter [them] from engaging in constitutionally protected speech." *Id.* (quoting *Coszalter v. City of Salem, 320 F.3d 968, 970 (9th Cir. 2003)*). The plaintiff need not have suffered a tangible loss. *See Brodheim v. Cry, 584 F.3d 1262, 1269-70 (9th Cir. 2009)*. The purpose of protection against retaliation for engaging in protected speech is to stop "actions by a government employer that 'chill the exercise of protected' *First Amendment* rights." *Dahlia v. Rodriguez, 735 F.3d 1060, 1078 (9th Cir. 2013)* (en banc) (quoting *Coszalter, 320 F.3d at 974-75*). Thus, the key question is whether the retaliatory activity "would 'chill or silence a person of ordinary firmness' from continuing to speak out." *Blair v. Bethel Sch. Dist., 608 F.3d 540, 543 n.1 (9th Cir. 2010)* (quoting *Mendocino Env't Ctr. v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999)*). The "precise nature of the retaliation is not

---

[3] Principal Garrett and HR Officer Gomes assert that Dodge's appeal fails because he did not argue that he suffered an adverse employment action in his opening brief. We reject this argument because the district court did not address whether Dodge suffered an adverse employment action in granting summary judgment. Dodge did not waive the ability to oppose defendants' argument that he suffered no adverse employment action by failing to proactively anticipate this argument in his opening brief. *Warmenhoven v. NetApp, Inc., 13 F.4th 717, 729 (9th Cir. 2021)*.

critical to the **[*20]** inquiry." *Coszalter, 320 F.3d at 974*.

Under this test we have recognized that "[v]arious kinds of employment actions may have an impermissible chilling effect," including "minor acts of retaliation," *Dahlia, 735 F.3d at 1079* (citing *Coszalter, 320 F.3d at 975*), and "[i]nformal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation.'" *Mulligan v. Nichols, 835 F.3d 983, 989 n.5 (9th Cir. 2016)* (citation omitted). We have also recognized that the insinuation or threat that "some form of punishment or adverse regulatory action" may follow can also chill a person from speaking and violate the *First Amendment*. *Greisen, 925 F.3d at 1114* (quoting *Brodheim, 584 F.3d at 1270*); *Coszalter, 320 F.3d at 976-77* (even a "threat of disciplinary action" may constitute adverse employment action for purposes of *First Amendment* retaliation).

Because Dodge has alleged that Principal Garrett and HR Officer Gomes took separate retaliatory actions against him, we address the allegations against them individually.

### i. Principal Garrett

Dodge contends that Principal Garrett's entire course of conduct related to his MAGA hat was an adverse employment action because her actions were reasonably likely to deter him (indeed, her goal was to deter him) from engaging in protected speech. Viewing the facts in the light most favorable to Dodge, we agree that, at a minimum, there are triable issues of **[*21]** fact regarding whether Principal Garrett took adverse employment action against him.

The first day, Principal Garrett, who was Dodge's supervisor, told him that he needed to use "better judgment" and not have his MAGA hat at Wy'east. The second day, she called him a racist, a bigot, a homophobe, and a liar, and swore at him for having his MAGA hat with him again. By itself, such criticism or "bad-mouthing" does not constitute an adverse employment action sufficient for a *First Amendment* retaliation claim. *See, e.g., Nunez v. City of Los Angeles, 147 F.3d 867, 875 (9th Cir. 1998)*. Principal Garrett also has *First Amendment* rights after all. *See id.* ("It would be the height of irony, indeed, if mere speech, in response to speech, could constitute a *First Amendment* violation."). But Principal Garrett went beyond criticizing Dodge's political views. She suggested that disciplinary action could occur if she saw Dodge with his hat again by referencing the need for union representation: "The next time I see you with that hat, you need to have your union rep. Bring your rep because I'll have my own." It is hardly controversial that threatening a subordinate's employment if they do not stop engaging in protected speech is reasonably likely to deter that person from speaking. *See Brodheim, 584 F.3d at 1270*; *Dahlia, 735 F.3d at 1079*.

Principal Garrett **[*22]** claims that she was "[s]imply advising Mr. Dodge of his right to have a representative at any future conversations about the hat," which is his right under his collective bargaining agreement. This characterization undersells the import and implications that a reasonable employee would attribute to such a statement. "The power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat." *Brodheim, 584 F.3d at 1271*. For example, we have held that a prison official's statement "to be careful what you write, req[u]est on this form," written on a grievance denial form returned to a prisoner created a genuine issue of fact regarding whether that statement was an adverse action where there "were a number of things that [the prison official] could have done if [the prisoner] failed to comply with his warning that would have had a negative effect." *Id. at 1265-66, 1270*. Although there was no "explicit, specific threat of discipline or transfer," we reasoned that "a statement that 'warns' a person to stop doing something carries the implication of some consequence of a failure to heed that warning." *Id. at 1270*.

Here, Dodge's principal, who had authority over his employment, stated **[*23]** that the next time he had his MAGA hat, they would have a meeting in which he would *need* his union representative. The purpose of summary judgment is to determine if there are material factual disputes, not to resolve them. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. At a minimum, there is a genuine issue of fact regarding whether Dodge reasonably interpreted Principal Garrett's statement as a threat against his employment. While Principal Garrett also had *First Amendment* rights, she may not use her position of authority over Dodge "as a means to retaliate for [his] expression." *Coszalter, 320 F.3d at 974*.

### ii. HR Officer Gomes

Dodge argues that HR Officer Gomes took adverse action against him by counseling Principal Garrett on

how to respond to his MAGA hat and in her subsequent investigation and dismissal of his HIB complaint against Principal Garrett. Regarding HR Officer Gomes's advice to Principal Garrett, the record does not reflect that she "cause[d]" or otherwise "set[] in motion a series of acts by others which [she] kn[ew] or reasonably should know would cause others to inflict the constitutional injury." *Dahlia, 735 F.3d at 1078 n.22* (quoting *Gilbrook v. City of Westminster, 177 F.3d 839, 854 (9th Cir. 1999)*). The record does not indicate that HR Officer Gomes counselled Principal Garrett to yell or swear at Dodge or accuse him of having discriminatory [*24] beliefs. But even if she had, that also would have been insufficient "bad-mouthing." *See Coszalter, 320 F.3d at 975-76*. Dodge similarly has not put forth evidence establishing that HR Officer Gomes counseled Principal Garrett to tell Dodge that he would need a union representative if his MAGA hat came up again or to make any reference to involving union representation.

Dodge points to a laundry-list of HR Officer Gomes's separate conduct that he contends qualify as adverse employment actions, including (1) handling the investigation of his HIB complaint and failing to recuse herself as a potential witness, (2) meeting with Principal Garrett during this investigation, (3) requesting CRS to remove discussion of Dodge's "freedom of expression" from its final report, (4) presenting CRS's findings to the school board, (5) trying to induce Dodge to drop his HIB complaint when she informed him about the media's public records request, (6) denying his request to remain on paid administrative leave while he appealed her denial of his HIB complaint to the school board, and (7) refusing to recuse herself from other leave and benefits requests that he made.

It is understandable why Dodge was concerned about HR Officer Gomes [*25] being involved in the investigation of his HIB complaint against Principal Garrett given HR Officer Gomes's involvement in the events leading up to his complaint. But the flaw in his adverse-employment-action argument against HR Officer Gomes is that he does not explain how her actions were reasonably likely to deter him from engaging in protected speech. At least some of her conduct may have *encouraged* a reasonable employee to continue to engage in protected speech. The investigation that she oversaw and presented to the school board determined that Dodge did not violate school policy by having his MAGA hat. And while she told Dodge that he could drop his HIB complaint to avoid having to respond to the public records request, she also stated that the investigation of his allegations against Principal Garrett would continue even if he dropped his complaint. The record does not indicate that her statements about the public records request insinuated any threat against him or his employment. It is also worth noting that HR Officer Gomes approved Dodge's request to be transferred to a different school and committed to having District employees trained on freedom of expression.

In sum, [*26] the record fails to establish that HR Officer Gomes took any adverse employment action against Dodge, and for this reason, his *First Amendment* retaliation claim against her fails as a matter of law.

**c. Substantial or Motivating Factor**

The last element that Dodge must prove to establish a *First Amendment* retaliation claim is that his protected speech motivated any adverse employment action taken against him. *Howard, 871 F.3d at 1044-45*. We do not address HR Officer Gomes as relates to this issue because she did not take any adverse employment actions against Dodge.[4] As for Principal Garrett, it is undisputed that Dodge's MAGA hat motivated her actions. Thus, Dodge has submitted sufficient evidence of a prima facie *First Amendment* retaliation claim against Principal Garrett for purposes of summary judgment.

**d. *Pickering* Balancing**

Next, we must analyze whether Principal Garrett established that she had a legitimate administrative interest in preventing Dodge's speech that outweighed Dodge's *First Amendment* rights. *Pickering, 391 U.S. at 568*. In *Pickering*, the Supreme Court instructed that courts must conduct "'a fact-sensitive and deferential weighing of the government's legitimate interests' as employer against the *First Amendment* rights of the

---

[4] Even if we were to analyze this element as to HR Officer Gomes, the record reflects that she did not depart from District policies in overseeing the investigation of Dodge's HIB complaint or in handling Dodge's complicated medical and administrative leave benefits requests. This weighs against a finding of retaliatory animus. *See, e.g., Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)* (compliance with preestablished policies weighs against a finding of retaliatory intent).

employee." *Riley's Am. Heritage Farms v. Elsasser, 32 F.4th 707, 720 (9th Cir. 2022)* (citation omitted). "[P]romoting workplace efficiency and **[*27]** avoiding workplace disruption" is a valid government interest that can justify speech restrictions. *Hufford v. McEnaney, 249 F.3d 1142, 1148 (9th Cir. 2001)*.

Whether speech disrupted the workplace is fact-specific and depends on "'the manner, time, and place in which' the employee's speech took place." *Clairmont, 632 F.3d at 1107* (citation omitted). Speech is disruptive only when there is an "'actual, material and substantial disruption,' or [there are] 'reasonable predictions of disruption' in the workplace." *Robinson v. York, 566 F.3d 817, 824 (9th Cir. 2009)* (citations omitted); *see also Keyser v. Sacramento City Unified Sch. Dist., 265 F.3d 741, 749 n.2 (9th Cir. 2001)*. Disruption "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Nunez v. Davis, 169 F.3d 1222, 1228 (9th Cir. 1999)* (quoting *Rankin, 483 U.S. at 388*). Speech that outrages or upsets co-workers without evidence of "any actual injury" to school operations does not constitute a disruption. *Settlegoode v. Portland Pub. Schs., 371 F.3d 503, 514 (9th Cir. 2004)*. Other relevant considerations in the school context are whether "students and parents have expressed concern that the plaintiff's conduct has disrupted the school's normal operations, or has eroded the public trust between the school and members of its community." *Riley's Am. Heritage Farms, 32 F.4th at 725*.

The government's burden **[*28]** in proving disruption "varies with the content of the speech." *Hyland v. Wonder, 972 F.2d 1129, 1139 (9th Cir. 1992)*. "The more tightly the *First Amendment* embraces the speech the more vigorous a showing of disruption must be made." *Id.*; *see also Connick, 461 U.S. at 150-52*. Speech about matters of public concern "occupies the 'highest rung of the hierarchy of *[F]irst [A]mendment* values.'" *Allen v. Scribner, 812 F.2d 426, 430 (9th Cir. 1987)* (quoting *NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982)*). Thus, employers must make a "'stronger showing' of disruption when the speech deal[s] . . . directly with issues of public concern." *Robinson, 566 F.3d at 826* (quoting *McKinley v. City of Eloy, 705 F.2d 1110, 1115 (9th Cir. 1983)*). Moreover, "[t]he *First Amendment* affords the broadest protection to . . . political expression," *Buckley v. Valeo, 424 U.S. 1, 14, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)*, and "a ban on wearing any 'political badge, political button, or other political insignia' plainly restricts a form of expression within the protection of the *First Amendment*," *Minn. Voters All. v. Mansky, 138 S. Ct. 1876, 1885, 201 L. Ed. 2d 201 (2018)*; *see also Ariz. Free Enter. Club's Freedom Club PAC v. Bennett, 564 U.S. 721, 734, 131 S. Ct. 2806, 180 L. Ed. 2d 664 (2011)* (the *First Amendment* "'has its fullest and most urgent application' to speech uttered during a campaign for political office." (quoting *Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 223, 109 S. Ct. 1013, 103 L. Ed. 2d 271 (1989)*)).

Here, Principal Garrett contends that her interest in preventing disruption among the staff at Wy'east outweighed Dodge's right to free speech. Given the nature of Dodge's speech, she has a particularly heavy burden under the *Pickering* test. Principal Garrett points to evidence that teachers and staff felt "'intimidated,' 'shock[ed],' 'upset,' 'angry,' 'scared,' 'frustrated,' **[*29]** and 'didn't feel safe'" after learning about Dodge's MAGA hat. But there is no evidence that Dodge's hat "interfered with h[is] ability to perform h[is] job or the regular operation" of the school, *Nunez, 169 F.3d at 1229*, or that its presence injured any of the school's legitimate interests "beyond the 'disruption that necessarily accompanies' [controversial] speech," *Keyser, 265 F.3d at 749* (quoting *Johnson, 48 F.3d at 427*).

There is no evidence that Dodge or his hat interfered with the teacher training sessions. Dodge sat in the back of the room quietly during both trainings with the hat either on his table or on his backpack beside him. From the approximately 60 attendees present, fewer than five people complained, including the first presenter who was not a District employee and a teacher who did not work at Wy'east. And regardless, both trainings were completed without incident. Nor did Dodge's expression cause any disruption *to school*. He had his hat at teachers-only trainings where students and parents were not present, and he told Principal Garrett that he would not wear it "in class, around parents, or in front of kids." *See Riley's Am. Heritage Farms, 32 F.4th at 726* ("[W]e give less weight to the government's concerns about the disruptive impact of speech outside the workplace context."). **[*30]** No students or parents ever complained about Dodge's MAGA hat.

In sum, while some of the training attendees may have been outraged or offended by Dodge's political

Ray Hacke

expression, no evidence of actual or tangible disruption to school operations has been presented.[5] Political speech is the quintessential example of protected speech, and it is inherently controversial. *See Nat'l Ass'n for Gun Rights, Inc., v. Mangan, 933 F.3d 1102, 1111-12 (9th Cir. 2019)*; *McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347, 115 S. Ct. 1511, 131 L. Ed. 2d 426 (1995)*. That some may not like the political message being conveyed is par for the course and cannot itself be a basis for finding disruption of a kind that outweighs the speaker's First Amendment rights. Therefore, Principal Garrett's asserted administrative interest in preventing disruption among staff does not outweigh Dodge's right to free speech. For all these reasons, Dodge has presented sufficient evidence to create a triable issue regarding whether Principal Garrett violated his constitutional rights.

## 2. Clearly Established Violation

Because Dodge has presented sufficient evidence from which a jury could find a constitutional violation, we turn to the second part of the qualified immunity analysis: whether the constitutional right that Principal Garrett violated was clearly established at the time of the violation. The district [*31] court found that Principal Garrett was entitled to qualified immunity because it was not clearly established that "the outcome of the *Pickering* balance so clearly favored [Dodge] that it would have been patently unreasonable for the school officials to conclude that the First Amendment did not protect his speech." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 980 (9th Cir. 1998)*. On appeal, Principal Garrett also focuses on the *Pickering* element of First Amendment retaliation. Consequently, we analyze only whether it was clearly established that the *Pickering* balancing test favored Dodge.

To be "clearly established," "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly, 580 U.S. 73, 137 S. Ct.*

---

[5] As for Principal Garrett's view that Dodge was being insubordinate, the record establishes that his conduct did not justify restricting his speech. *See Nunez, 169 F.3d at 1228* (disagreeing with a supervisor on a "matter of public concern" was not insubordination); *cf. Weisbuch v. County of Los Angeles, 119 F.3d 778, 782 (9th Cir. 1997)* (insubordination was a valid concern where a high-level employee "insist[ed] on a mode of administering his department contrary to his supervisor's policies").

*548, 551, 196 L. Ed. 2d 463 (2017)* (citation omitted). We are not to frame the issues presented at "too high a level of generality," and must "adequately adjust[] to account for [Principal Garrett]'s interests in avoiding disruption to [the school's] operations under the *Pickering* test." *Riley's Am. Heritage Farms, 32 F.4th at 733 n.12*. Thus, it would be inappropriate to frame the right here as "the general right to be free from retaliation for one's speech." *Reichle v. Howards, 566 U.S. 658, 665, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)*. Instead, we must define the rights implicated here at a level commensurate with the specific factual and legal context of the case. *See id.*

As the *Pickering* analysis "requires a fact-sensitive, context-specific balancing of competing interests, [*32] the law regarding public-employee free speech claims will 'rarely, if ever, be sufficiently clearly established to preclude qualified immunity.'" *Brewster, 149 F.3d at 980* (quoting *Moran v. Washington, 147 F.3d 839, 847 (9th Cir. 1998)*). Nevertheless, a plaintiff need not produce "a case directly on point." *Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*. Instead, it is enough to show that "'[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)*). Put differently, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997)* (quoting *Anderson, 483 U.S. at 640*). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances" if the "case involve[s] 'mere application of settled law to a new factual permutation.'" *Eng, 552 F.3d at 1076* (quoting *Porter v. Bowen, 496 F.3d 1009, 1026 (9th Cir. 2007)*).

Applying these principles, we ask whether it is patently unreasonable for a school official to believe that she could lawfully threaten a subordinate's employment because he brought a political campaign hat to teacher-only trainings after several teachers complained about the political messaging [*33] they attributed to the hat. This case presents one of the rare occasions where the *Pickering* balancing test so clearly cuts in Dodge's favor that the violation of his First Amendment rights was clearly established. In other words, it was patently unreasonable for Principal Garrett to believe that she could restrict Dodge's speech to quell what was, in

reality, nothing more than the natural effect that disfavored political speech often has on those with different viewpoints. This is so even though there is not a prior case addressing the precise facts presented here because there are several cases that set forth clearly established rules that apply with "obvious clarity to the specific conduct in question," especially in light of the arguments that Principal Garrett raises. *Lanier, 520 U.S. at 271*.

We start our analysis with the context that gave rise to the *Pickering* balancing test. In 1968, a public-school teacher wrote a letter to the local paper criticizing certain budgetary actions of the school board. *Pickering, 391 U.S. at 564*. The school board fired the teacher after determining that the "publication of the letter was 'detrimental to the efficient operation and administration of the schools of the district'" and that the "interests of the schools require(d) **[*34]** (his dismissal)." *Id. at 564-65*. In the first application of the *Pickering* balancing test, the Supreme Court held that the *First Amendment* interests of the teacher outweighed the administrative interests of the school. *Id. at 573*. The Court emphasized that there was no evidence that the letter had affected the community as a whole or the administration of the school system. *Id. at 567*. Instead, the letter "reflect[ed] rather a difference of opinion between [the teacher] and the Board as to the preferable manner of operating the school system" that would "not normally have any necessary impact on the actual operation of the schools, beyond its tendency to anger the Board." *Id. at 571*. This was not enough to justify restricting the speech as the letter did not "impede[] the teacher's proper performance of his daily duties in the classroom or . . . interfere[] with the regular operation of the schools generally." *Id. at 572-73*.

The year after *Pickering*, the Supreme Court decided *Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969)*. In that case, students were suspended for wearing armbands to protest the United States' ongoing involvement in the Vietnam War. *Id. at 504*. The trial court held that the school authorities acted lawfully because they were motivated by "their fear of a disturbance from the wearing of the armbands." *Id. at 508*. The Court **[*35]** disagreed, concluding that the "record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students." *Id. at 509*. Instead, "the action of the school authorities appears to have been based upon an urgent wish to avoid the controversy which might result from the expression, even by the silent symbol of armbands, of opposition to this Nation's part in the conflagration in Vietnam." *Id. at 510*. The Court explicitly stated that for "school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id. at 509*. The Court noted that the school did not "prohibit the wearing of all symbols of political or controversial significance" because "students in some of the schools wore buttons relating to national political campaigns"; the armbands were "singled out for prohibition." *Id. at 510-11*. The Court concluded that "[c]learly, the prohibition of expression of one particular opinion, at least without **[*36]** evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id. at 511*.

More recently, we have addressed a school's ability to curtail speech under the guise of protecting administrative interests. In *Settlegoode v. Portland Pub. Schs.*, a teacher was hired to teach physical education to students with disabilities. *371 F.3d 503, 507 (9th Cir. 2004)*. Finding the equipment and materials provided insufficient for the students, she complained and wrote letters to her direct supervisors and to the superintendent. *Id. at 507-08*. When she subsequently received negative performance reviews and her contract was not renewed, she claimed *First Amendment* retaliation. *Id. at 509*. A jury found for the teacher, but the trial judge granted the defendants' *Rule 50* motion asserting qualified immunity and dismissed the case. *Id.* We reversed, explaining that "[w]hen balancing interests under the [*Pickering*] test, defendants must show 'actual injury to . . . legitimate interests' beyond the 'disruption that necessarily accompanies' such speech." *Id. at 513* (citation omitted). We noted that the school district "presented very little evidence of disruption" as the teacher had sent only internal letters and discussed her grievances with supervisors without making **[*37]** any public statements. *Id. at 514*. While coworkers testified that they were "hurt," "upset," "furious," and "outraged" by the letters, we found there was no evidence of "actual injury to the department," *id.*, such as "impaired discipline or control by superiors, conflicts between co-workers or interference with [her] performance of her duties." *Id. at 515-16*.

*Pickering, Tinker*, and *Settlegoode*, along with several

other cases,[6] clearly establish that disagreement with a disfavored political stance or controversial viewpoint, by itself, is not a valid reason to curtail expression of that viewpoint at a public school. Moreover, these cases each considered restrictions on disfavored or unpopular speech in the name of preventing disruption, when the only disruption was the effect controversial speech has on those who disagree with it *because they disagree with it*. Although those cases did not involve a MAGA hat, the principles that they established apply "with obvious clarity to the specific conduct" here. *Lanier, 520 U.S. at 271*.

Indeed, Principal Garrett does not seem to dispute that she discriminated against Dodge's viewpoint simply to avoid the "discomfort and unpleasantness that always accompany an unpopular **[*38]** viewpoint." *Tinker, 393 U.S. at 509*. She argues to this court that having the hat on school grounds harmed the interests of Wy'east:

> Mr. Dodge's decision to wear his MAGA hat on school grounds within weeks of the Trump Administration's loud and publicized initiative to deport as many immigrants as possible was an affront to Wy'east's agenda of cultural inclusivity and interest in creating a safe place for ELL students. Ms. Garrett had a reasonable basis, given the anti-immigrant tenor radiating from the administration, to demonstrate inclusivity and tolerance to ELL students and their parents on the school campus . . . Mr. Dodge had [no] overriding *First Amendment* right to wear the MAGA hat on campus given the school's stronger interest of fostering an atmosphere of workplace harmony, cultural inclusivity, and safety for the students and staff.

It goes without saying that Dodge disputes this characterization of his political views as evidenced by his testimony explaining why he liked the MAGA message of his hat. Accepting Principal Garrett's arguments that Dodge's hat created disruption that warranted restricting his expression would be akin to picking which of their competing political viewpoints is superior.

It would be **[*39]** one thing if Principal Garrett was enforcing a generally applicable policy that banned all political expression. A government employer can categorically prohibit political speech as a valid administrative interest such that the prohibition does not favor or disfavor any particular view. *See Hudson v. Craven, 403 F.3d 691, 700-01 (9th Cir. 2005)*. But that is not what happened here. Although the District has a policy prohibiting all political messaging in school now, the District's counsel admitted at oral argument that this policy was issued *after* Dodge filed his HIB complaint. There was no general prohibition on political speech when Principal Garrett told Dodge he could not bring his MAGA hat to school.

Even more troublesome, Principal Garrett openly admitted and defended her allowance of *other* political symbols and speech at Wy'east, including a Black Lives Matter poster hanging in the school library and a Bernie Sanders bumper sticker displayed on her own car. And this speech was not without its own controversies; when another teacher, married to a police officer, "expressed concerns about a Black Lives [Matter] poster" directly to Principal Garrett, she took no action and testified that she could not understand why the teacher "felt **[*40]** like [the poster] was disrespectful of police." Principal Garrett's explanation for her differing reactions boils down to her viewpoint preference:

> While the Black Lives Matter poster is a symbol of cultural acceptance and inclusivity . . . Mr. Dodge's MAGA hat is a symbol commonly associated with white supremacy and other anti-immigrant

---

[6] This principle has arisen again and again. *See e.g., Rankin, 483 U.S. at 384* ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of the employees' speech."); *Nunez, 169 F.3d at 1229* ("A public employer cannot claim disruption of a close personal relationship to cover up animus toward an employee's speech and a desire to silence the employee."); *see also Eng, 552 F.3d at 1074*. And the precedent establishes that "real, not imagined, disruption is required," and disruption between coworkers "cannot serve as a pretext for stifling legitimate speech or penalizing public employees for expressing unpopular views." *McKinley, 705 F.2d at 1115*; *see also* **Riley's Am. Heritage Farms, 32 F.4th at 730** ("[I]t is clearly established that a government employer's pretextual fear of a potential disruption or a claim of imagined workplace disruption for which 'there is no support' cannot outweigh the *First Amendment* interests of a government employee." (citations omitted)); *see also Moser v. Las Vegas Metro. Police Dep't, 984 F.3d 900, 909 (9th Cir. 2021)* (citing *Berger v. Battaglia, 779 F.2d 992, 1001 (4th Cir. 1985)* ("[T]hreatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech.")); *cf.* **Keyser, 265 F.3d at 748** (protected speech that naturally "'engender[s] some hostility and resistance'" cannot be limited on account of the disruption that naturally follows (citation omitted)).

sentiments. Comparing an innocuous bumper sticker and a racially supportive poster to the MAGA hat is troglodytic and unacquainted with the affairs of the world.

Based on the long-established precedent of both this court and the Supreme Court, a reasonable school administrator at the time of the events in this case would have known that this was improper and the perceived unpopularity of a political view is not itself justification to prohibit protected expression. Dodge's right to express political views, even as a public-school teacher, is clearly established. *See Tinker, 393 U.S. at 506*. That controversial political speech cannot be quelled because others may find the speech objectionable is clearly established. *See id. at 508-09*. Taking these principles together, the outcome of the *Pickering* balancing test in this case appears with "obvious clarity." Lanier, 520 U.S. at 271; Eng, 552 F.3d at 1076. Therefore, the district court erred **[\*41]** by granting summary judgment to Principal Garrett.

**B. The District**

Dodge argues that the District is liable because the school board ratified unconstitutional conduct by affirming the denial of his HIB complaint against Principal Garrett and by finding that she did not violate school policy. The Supreme Court has held that a government entity is not liable in a § 1983 action unless "the [entity] itself causes the constitutional violation at issue." City of Canton, Ohio v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (citing Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1989)). The plaintiff must establish both factual causation and proximate causation. Harper v. City of Los Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008). One way of establishing such liability is ratification, which occurs when authorized policymakers "approve a subordinate's decision and the basis for it." Bouman v. Block, 940 F.2d 1211, 1231 (9th Cir. 1991). "Ratification . . . generally requires more than acquiescence," and "a mere failure to discipline . . . does not amount to ratification" of allegedly unconstitutional actions. *Sheehan v. City & County of San Francisco, 743 F.3d 1211, 1231 (9th Cir. 2014), rev'd in part on other grounds*, 575 U.S. 600, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015).

The school board's dismissal of Dodge's HIB complaint on the grounds that Principal Garrett did not violate any District "policy or procedure," was not an *approval* of her conduct or the basis for it. Concluding that conduct was not prohibited is not the same as adopting or approving such conduct. **[\*42]** *See Sheehan*, 743 F.3d at 1231; *see also* Christie v. Iopa, 176 F.3d 1231, 1239 (9th Cir. 1999) ("[I]t is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval."). Indeed, the school board conducted further investigation into Principal Garrett's conduct after the investigation of Dodge's HIB complaint was completed, and it ultimately asked her to resign her position as principal or face discipline. These facts do not evidence ratification. Consequently, Dodge has failed to establish that a material dispute of fact exists regarding whether the District ratified any unconstitutional conduct by Principal Garrett.

**III. CONCLUSION**

Taking the facts in the light most favorable to Dodge, a jury could find that Principal Garrett retaliated against him for engaging in political speech protected by the First Amendment. Moreover, any violation of Dodge's First Amendment rights by Principal Garrett was clearly established where long-standing precedent has held that concern over the reaction to controversial or disfavored speech itself does not justify restricting such speech. For these reasons, we reverse the district court's grant of summary judgment in favor of Principal Garrett. Otherwise, we affirm the district court's grant of summary judgment **[\*43]** in favor of HR Officer Gomes and the District for the reasons explained.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**[7]

---

**End of Document**

---

[7] Each party shall bear its own costs.