IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


RACHEL DAMIANO,
KATIE MEDART,

Case No. 1:21-cv-00859-CL


Plaintiffs,

v.

OPINION AND ORDER


GRANTS PASS SCHOOL DISTRICT
NO. 7, KIRK T. KOLB, THOMAS
BLANCHARD, SCOTT NELSON, *et al*,


Defendants.

_____

CLARKE, Magistrate Judge.

Plaintiffs Rachel Sager (formerly Rachel Damiano) and Katie Medart bring this action

against Grants Pass School District  Number 7 ("the District") and other school district officials

for alleged violations of their civil rights.  Full consent to magistrate jurisdiction was entered on

August 19, 2022 (#54). This case comes before the Court on the defendants' Motion for

Summary Judgment.  Oral argument was heard on November 30, 2022.  For the reasons set forth

below, the defendants' Motion for Summary Judgment (#52) is GRANTED.

## BACKGROUND

Plaintiff Rachel Sager started working for the District as an assistant principal at North Middle School during the 2020/2021 school year. Vickers Decl. (#53) Ex. 1, Sager Dep. 16:10-16; 29:17-21. Plaintiff Katie Medart started working for the District as a science teacher at North Middle School during the 2019/2020 school year. Vickers Decl. Ex. 2, Medart Dep. 16:10-17.

In February 2021, the District provided guidance for administrators regarding student pronouns, name changes, and bathroom access. Vickers Decl. Ex. 1 (Sager Dep. 48:13-17; 48:24-49:1-5 & Dep. Ex. 1); Ex. 3 (Sager Interview Excerpt p. 1). Sager, an administrator, disagreed with the guidance. Ex. 1 (Sager Dep. 50:7-9). She knew that Medart had objections to it as well. *See* Ex. 1 (Sager Dep. 65:3-9). They began working on resolutions that contradicted the guidance. Ex. 1 (Sager Dep. 80:2-14); Ex. 2 (Medart Dep. 64:20-65:3; 74:9-23). They did some work on these resolutions on work time. *See, e.g.*, Ex. 1 (Sager Dep. 96:23-97:23; 101:13-102:8 & Dep. Ex. 2); Ex. 2 (Medart Dep. 65:25-66:6; 84:19-85:20; 86:2-18; 93:10-16 & Dep. Ex. 7); Ex. 3 (Sager Interview Excerpt pgs. 2-3); Ex. 4 (Medart Interview pgs. 1-5, 7-8) Ex. 5 (Kolb Dep. 52:25-53:7). Sager and Medart used their District email accounts to circulate the resolutions among themselves and others. *See id.*

Sager and Medart filmed a video explaining their resolutions and posted it to YouTube and other social media platforms. *See* <https://www.youtube.com/watch?v=X-pk4FOrBCw>. The video and resolutions together are called "I Resolve." *Id.*; (Sager Dep. 79:11-20). In the video, Sager discusses the current policies, guidance, and proposed legislation regarding gender identity in public schools, in Oregon, and nationwide. *Id.* In the video, both Sager and Medart discuss their objections to these policies and proposals, culminating in their resolutions, and they encourage viewers to contact their political representatives and decision-makers to advocate for

the "I Resolve" message and to protest the proposed legislation. At one point during the video, Medart describes concerns over a situation with a specific transgender student in her class. Vickers Decl. Ex. 1 (Sager Dep. 81:11-82:19). Later, Ms. Medart told a district investigator that "I Resolve" was not created to further religion, but "to write fair policies for all students." Ex. 4 (Medart Interview p. 6).

Plaintiffs Sager and Medart promoted their video and solicited feedback while at work:

> Medart: Yes. I believe [Rachel Sager] will say that she was aware of that. I would tell her after I did it, "Today, I went and talked to…" "I shared this information. I sent them the link." "This person said they would check it out," This person said, 'Thank you. They're excited,'" "This person said, 'I signed it.'"

Ex. 4 (Medart Interview pg. 8). The District's Internet filters initially blocked Plaintiffs' "I Resolve" website; Plaintiffs used their positions within the District to unblock it. Ex. 1 (Sager Dep. 94:11-18; 95:12 – 96:10); Ex. 2. Discussions, planning, and recruitment happened on campus during the workday. Ex. 5 (Kolb Dep. 93:25-94:16). As word of Plaintiffs' actions spread, the District received numerous complaints from Plaintiffs' co-workers, students, and community members regarding Plaintiffs' activities. Ex. 5 (Kolb Dep. 57:9-58:6; 103:10-20; 104:10-105:3); Ex. 6 (Ely Dep. 32:6-13; 33:1-4); Ex.7 Cooks (7:6-13; 29:4-13).

The District placed Plaintiffs on paid administrative leave to investigate. Ex. 1 (Sager Depo 114:24-115:5 & Depo Ex. 5); Ex. 2 (Medart Depo 92:13-21 & Depo Ex 9). Initially, North Middle School Principal, defendant Tommy Blanchard, and HR Director Danny Huber-Kantola began the investigation. The District later hired Bill Landis, an outside investigator, because Ms. Medart filed a counter-complaint (which she ultimately withdrew). Ex. 5 (Kolb Depo 70:15-19); Ex. 2 (Medart Depo 93:17-94:12; 97:9-18; 97:22-25). Landis determined that Plaintiffs violated several District policies. Ex. 8 (Landis Report re Sager); Ex. 9 (Landis Report re Damiano).

In particular, Landis determined that both Medart and Sager used District facilities, equipment, or supplies in connection with a political campaign. He explained:

> The stated purpose of the "I Resolve" campaign was to address gender identity policies as was stated in their video and message. The "I Resolve" campaign stated in the video that it was specifically targeting the Equality Act, Oregon Senate Bill 52, and other legislation that was in the process of being voted on, developed, or proposed in legislative bodies at the Federal, State, and local levels as the "I Resolve" video explains. In the video, Ms. Damiano and Ms. Medart ask that viewers reach out to contact Senators where the next vote is scheduled and attend an ODE meeting that was scheduled for April 15th, 2021 in order to have their voices heard lobbying for support of the "I Resolve" resolutions that would modify or change the pending legislation as it had been written.
>
> Ms. Damiano admits to using District 7 resources to include email, computers, and possibly printers however she states she doesn't recall in many of her answers when asked for specifics. The numerous email Exhibits under Exhibit 4 which included Google Docs associated with "I Resolve" and the proposed resolution, shows that Ms. Damiano used District 7 computers, email, school property, and Google Docs to share or communicate regarding the "I Resolve" campaign with staff and persons inside and outside of School District 7. While Ms. Damiano did not like referring to "I Resolve" as a political campaign, her efforts both in the video regarding legislation and through the stated purpose of "I Resolve" showed it was a political campaign. This was specifically demonstrated in emails she sent to Daily Wire host Ben Shapiro (Exhibit 4H) and another to Mr. Reynolds of the American Legislative Exchange Council (Exhibit 4I) to gain support for the "I Resolve" resolutions using District 7 School resources. The goal of "I Resolve" was to influence legislators regarding pending policies and legislation effecting gender identity issues with their own resolution that would define who could use what bathrooms based on one's anatomy, legislate the use of names and pronouns for gender identity students, and require parents be involved in a student's gender identity journey. It should be noted that this allegation would not have been sustained had Ms. Damiano chosen to not use District 7 facilities, email, equipment, or supplies for her "I Resolve" campaign.

Ex. 8 pg. 67 (Landis Report re Sager). Landis made other findings that both Plaintiffs:

- Used time during their working day for political campaign purposes.
- Failed to designate that the viewpoints they represented on the issues involved in the political campaign, were their personal viewpoints and not that of District 7.
- Used social media and public websites in such a manner that it disrupted the school environment.

*Id.*; Ex. 9 pg. 131-133 (Landis Report re Medart). Landis also determined that Ms. Medart posted confidential information about a student on social media and a public website. Ex. 9 pg. 133. This allegation was "not sustained" for Ms. Sager, as it was unclear if she knew that the information disclosed in the video was accurate and referencing a specific student or not. Ex. 9 pg. 68. An additional allegation that Plaintiffs "created a 'bias incident" was not sustained for both Plaintiffs, and multiple allegations regarding whether Ms. Medart had discriminated against a transgender student and created a hostile working environment, were determined to be "not sustained" or "unfounded," based on a lack of verifiable information, according to Landis's reports. Ex. 9 pg. 134-135.

Ultimately, Landis determined that Ms. Sager "failed to meet the standards in her job description under essential duties and responsibilities," which included:

- Establish and maintain effective relationships with students, parents, and staff to promote quality instruction and a healthy school climate.
- Communicate and collaborate with students, parents, teachers, staff, community, and when appropriate, other agencies to promote an open and participatory school environment.
- Be knowledgeable of the building's philosophy and establish effective human relationships among students, parents, and teachers, such that results in positive school climate and quality instruction.

Ex. 8 pg. 68. Similarly, Landis found that Ms. Medart failed to meet the standards in her job description in the overview, her essential responsibilities, and qualifications, which included:

- Performs instruction and related duties in accordance with District Policies and terms of the teacher contract
- The ability to effectively work and communicate with students, parents, and school personnel from diverse cultures and/or backgrounds
- The ability to work harmoniously with others
- Maintain the integrity of confidential information relating to students, staff, and district patrons
- Cultivate and model a respectful working and learning environment
- Model personal behaviors of honesty, fairness, courtesy, and consideration
- Maintain a cooperative relationship with administration, staff, students and parents
- Demonstrate competency in equity, diversity, and inclusion

Ex. 9 pg. 135.

Landis' reports first went to Sherry Ely, Chief Finance & Operations Officer for the District. Vickers Decl. Ex. 6 (Ely Depo 6:18-21). Ely reviewed the reports and requested to meet with Plaintiffs for an explanation. Plaintiffs refused to meet with Ely. *Id.* (Ely Depo 28:23-24). Ely recommended that District Superintendent, defendant Kirk Kolb, terminate Plaintiffs' employment. *Id.* (Ely Depo 28:6- 29:4); Ex. 1 (Sager Depo 121:7-20 & Depo Ex. 6); Ex. 2 (Medart Depo 101:4-16 & Depo Ex. 10). Kolb reviewed Ely's recommendations. He, too, requested to meet with Plaintiffs. Plaintiffs refused. Vickers Decl. Ex. 1 (Sager Depo 123:4-10); *see* Ex. 2 (Medart Depo 101:22-102:17). Kolb then recommended that the District Board terminate Plaintiffs' employment. Vickers Decl. Ex. 1 (Sager Depo 124:7-14 & Ex. 7); Ex. 2 (Medart Depo 104:13-21 & Depo Ex. 11); Ex. 5 (Kolb Depo 98:19- 99:1).

Plaintiffs had separate public hearings before the District's school board ("Board") regarding the recommendation for termination in July 2021. Plaintiffs had the opportunity to bring representation to the Board meeting. Vickers Decl. Ex. 1 (Sager Depo 128:16-18). The Board voted 4-3 to terminate Plaintiffs' employment. *Id.* (Sager Depo 128:21-24). Three and a

half months later, in November 2021, the Board voted 4-3 to reinstate Plaintiffs' employment. *Id.*

(Sager Depo 128:25-129:4). Sager found a new position and left the District in June 2022.

Vickers Decl. Ex. 5 (Kolb Depo 103:2-9); Ex. 1 (Sager Depo 16:19-22).

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine

dispute as to any material of fact and that the moving party is entitled to judgment as a matter of

law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The

moving party has the initial burden of showing that no genuine issue of material fact exists.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076

(9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may

only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d

796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to

the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at

250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion

for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the

opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts

which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether

a party has met its burden, the court views the evidence in the light most favorable to the non-

moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

Plaintiffs bring four broad claims: (1) violations of their First Amendment right to free speech, including content- and viewpoint-based discrimination, prior restraint, and compelled speech; (2) violation of Equal Protection under the Fourteenth Amendment; (3) violation of their right to free speech under the Oregon Constitution; and (4) employment discrimination under Title VII.  Sec. Amend. Compl. ("SAC") (#32). Defendants move for summary judgment on all claims.  For the reasons below, the motion is GRANTED, and judgment shall be entered for the defendants on all claims.

## I.     The Members of the School Board are dismissed.

As a preliminary matter, the Members of the Board of Education of Grants Pass School District 7 are dismissed from this case. First, the School Board is not an entity separate from the Grants Pass School District 7 ("the District"), such that it is subject to suit. Oregon law only allows suit against school districts in their corporate name "and not otherwise." ORS 30.310. The proper defendant is the District itself. *See, e.g.*, *Dombroski v. City of Salem*, 2012 WL 1035719, *3 (D. Or. March 26, 2012).

Moreover, because the Plaintiffs bring section 1983 claims against the District, the official capacity claims against all of the individual defendants are duplicative and must be dismissed. "A suit…against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself." *Gomez v. Vernon*, 255 F.3d 1118, 1126 (9th Cir. 2001); *Vance v. County of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996) ("if individuals are being sued in their official capacity as municipal officials and the municipal entity itself is also being sued, then claims against the individuals are duplicative and should be dismissed.").

The section 1983 claims against the Board members in their personal capacities are also dismissed. Plaintiffs seek to hold the individual Board members liable for voting to terminate

their employment. Pursuant to Oregon law, individual Board members cannot act alone with respect to an individual's employment: "The affirmative vote of the majority of members of the board is required to transact any business." ORS 332.055. In other words, only a school district board by majority vote while the board is in session has the authority to hire and fire teachers and administrators. *See Doe v. Claiborne County, Tennessee*, 103 F.3d 495, 512 (6th Cir. 1996) (explaining that school board members are unable to act except as constituent members of a majority).

Similarly, Plaintiffs seek to hold individual Board members liable for enacting District policies regarding the speech of District employees. "[L]ocal legislators are…absolutely immune from suit under section 1983 for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 50 (1998). In determining whether legislative immunity applies, the court considers: (1) whether the decision involves ad-hoc decision-making or formulation of policy; (2) whether the decision applies to a few individuals or the public at large; (3) whether the act is formally legislative in character; and (4) whether it bears "all the hallmarks of traditional legislation." *Kaahumanu v. Cnty. of Maui*, 315 F.3d 1215, 1220 (9th Cir. 2003) (citations omitted).

Here, all four factors are met with respect to the individual board members' votes regarding District policies: the challenged policies are personnel policies applicable to all District employees. Accordingly, the individual Board member defendants are entitled to legislative immunity to the extent Plaintiffs' claims against them relate to their vote for various District policies. The individual Board members are thus dismissed from Plaintiffs' section 1983 claims.

## II.    Defendants are entitled to summary judgment as to all of Plaintiffs' First Amendment claims because the District had a legitimate administrative interest in suppressing the speech, which outweighed Plaintiffs' First Amendment rights.

As discussed above, Plaintiffs bring several variations of their First Amendment claims, including content- and viewpoint-based discrimination, prior restraint, and compelled speech. To establish a prima facie discrimination or retaliation claim under the First Amendment, the Plaintiffs must show that "(1) [they] engaged in protected speech; (2) the defendants took an 'adverse employment action' against [them]; and (3) [their] speech was a 'substantial or motivating' factor for the adverse employment action." *Pickering v. Board of Education*, 391 U.S. 563 (1968); *Howard v. City of Coos Bay*, 871 F.3d 1032, 1044 (9th Cir. 2017) (quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)). If the Plaintiffs establish a prima facie case, "the burdens of evidence and persuasion ... shift to the Defendants to show that the balance of interests justified their adverse employment decision." *Eng v. Cooley*, 552 F.3d 1062, 1074 (9th Cir. 2009). That is, a defendant can avoid liability for retaliation by showing that it had a legitimate administrative interest in suppressing the speech that outweighed the plaintiff's First Amendment rights. *Pickering*, 391 U.S. at 568.

1. **The Court assumes without deciding that Plaintiffs can establish a prima facie case for First Amendment retaliation.**

First, the adverse employment action factor is not reasonably in dispute. The District took an adverse employment action when it terminated Plaintiffs' employment, even though Plaintiffs' employment was later restored.

Second, a public employee's speech is subject to protection when they speak as a private citizen on a matter of public concern. *Lane v. Franks*, 573 U.S. 228, 237 (2014) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006)). Plaintiffs claim that there are material facts in dispute regarding whether they spoke on a matter of public concern and whether they spoke as a citizen or a public employee, such that the "protected speech" factor cannot be determined at this time. The Court agrees that Plaintiffs arguably spoke on a matter of public concern. The Court also

agrees that a question of fact exists as to whether or not Plaintiffs spoke as private citizens or as public employees. A significant amount of evidence exists in the record to show that Plaintiffs speech took place as public employees, without any disclaimers that their speech did not reflect the views of the District. However, as the non-moving party, Plaintiffs are entitled to any inferences in their favor. The Court therefore assumes without deciding that this factor falls in favor of the Plaintiffs.

Third, Plaintiffs have raised a question of material fact as to whether or not their speech was a substantial or motivating factor in the District's decision to terminate their employment. For all of these reasons, the Court assumes without deciding that Plaintiffs have made a prima facie case of First Amendment retaliation.

**2. The District's legitimate administrative interests outweigh the Plaintiffs' First Amendment rights in this case.**

The District has a legitimate interest in protecting the safety and wellbeing of its students that outweigh Plaintiffs' right to comment on matters of public concern. The government has a heightened interest in regulating the speech and activities of its employees; restrictions on speech and conduct are scrutinized differently when the government acts as an employer rather than as a sovereign. *Pickering*, 391 U.S. at 568. Public employers are allowed to prohibit otherwise protected speech where the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees, outweighs the employee's right to comment on matters of public concern. *Id.*

When analyzing whether the government's interests outweigh a plaintiff's right to engage in protected speech, courts "examine disruption resulting both from the act of speaking and from the content of the speech." *Clairmont v. South Mental Health,* 632 F.3d 1091, 1107 (9th Cir. 2011). The government interests "include promoting efficiency and integrity in the discharge of

official duties and maintaining proper discipline in the public service." *Id.* Courts also examine whether a plaintiff's speech "impeded his ability to perform his job duties." *Id.* Courts also consider the extent that plaintiff's speech interfered with his workplace relationships. *Id.* To prove that an employee's speech interfered with working relationships, the government must show "actual, material and substantial disruption, or reasonable predictions of disruption in the workplace." *Id.* (quoting *Robinson*, 566 F.3d at 824). Courts are more likely to accept a government's prediction of future disruption if some disruption has already occurred. *See e.g., Munroe v. Cent. Bucks Sch. Dist.,* 805 F.3d 454, 477-78 (3d Cir. 2015) (relying on complaints from parents whose children were criticized in teacher's blog with demands for their children to be placed in a different classroom).

Additionally, because public-school teachers occupy a unique and important position in our society, the position of public-school teacher "requires a degree of public trust not found in many other positions of public employment." *Melzer v. Bd. of the City Sch. Dist. of the City of New York*, 336 F.3d 185, 198 (2d Cir. 2003). A public-school teacher must maintain a classroom that is conducive to learning where the student is comfortable and feels safe when interreacting with the teacher. *See Craig v. Rich Tp. High School Dist.,* 736 F.3d 1110 (7th Cir. 2013). Therefore, courts may also consider the reaction of students and parents to the plaintiff's conduct when applying *Pickering. Munroe*, 805 F.3d at 475-76. If there are material factual disputes when applying *Pickering*, we resolve all factual disputes in favor of the non-moving party, provided that there is evidence that reasonably would support such a finding. *See CarePartners,* 545 F.3d at 875 n.3 (citing *Scott v. Harris*, 550 U.S. 372, 379-80 (2007)).

Here, there is no question that Plaintiffs' speech caused a disruption to the District. The District claims that it received nearly 100 complaints about Plaintiffs' conduct. Superintendent

Kolb estimated the number of complaints to be between 75 and 150. MSJ Ex. 5 (Kolb Depo. 57) (#53-5). Students staged protests. *Id.* (Kolb Depo. 103); Ex. 6 (Ely Depo. 33) (#53-6). Administrators had to spend significant time responding to these issues. Other teachers and staff were offended or upset by Plaintiffs' conduct, particularly in promoting their video at school during school hours, thus harming the working relationship between school staff. MSJ Ex.7 (Cooks Depo. 29) (#53-7) (stating that Plaintiffs' conduct in promoting "I Resolve" on campus "splintered our faculty, and to this day there are people who cannot stand each other because of what [they] did.").

Plaintiffs seek to minimize the disruptions caused by their conduct, and they argue that it was not their conduct that caused the disruption. Instead, they argue that the disruption was caused by the reactions of others who disapproved of their speech. These arguments are unavailing.

First, while Plaintiffs admit that their speech "caused a stir on GPSD campuses," they claim that the number of complaints was much fewer than what was reported by the District. Plf Resp. 24 (#55). Plaintiffs claim that the investigative report outlines only fourteen complaints that came from GPSD staff and Grants Pass community, and only 23 documents classified as "complaints" were produced by the District in discovery. However, regardless of whether the complaints numbered in the range of 10-20 or closer to 100, the fact that Plaintiffs' speech caused a disturbance on campus between staff, students, and community members is undisputed and well documented. Plaintiffs' brief specifically argues, in fact, that District Superintendent Kolb's first threat to fire Plaintiffs came "after the District began receiving complaints about Plaintiffs' Video." Plf Resp 13 (#55).

Second, Plaintiffs claim that other District staff members were posting on social media in opposition to "I Resolve," attempting to mobilize students, staff, and community members, and they argue that that these efforts were the true cause of the backlash against Plaintiffs. In particular, Plaintiffs claim the disturbance was caused by: (1) Ms. Weber, by forwarding Plaintiffs' Video to GPSD staff members, "slapping Plaintiffs' "I Resolve" movement with the inflammatory "anti-trans" label," and "rousing GPSD employees against Plaintiffs;" and (2) Superintendent Kolb, by inviting GPSD staff and the Grants Pass community via e-mail to share their concerns about Plaintiffs' Video.

The Court finds that whether the disturbance was "caused" by Plaintiffs' speech or by the staff, student, and community reaction to the speech is a distinction without a difference. In either case, Plaintiffs' speech was still the catalyzing factor. In other words, "but for" the Plaintiff's conduct, there would have been no community backlash. It was reasonable for the District to consider "I Resolve" and Plaintiffs' conduct to be the cause of the disturbance, as well as the potential cause of future disturbances.

Moreover, because schools have a heightened interest in providing a safe place for students to learn, the Court finds that the very evidence submitted by the Plaintiffs, which indicates that other staff members and even members of the Board believed that students would no longer feel safe with Plaintiffs at school, weighs in favor of the District's evaluation that Plaintiffs' speech caused an unacceptable disturbance. *See* Plf. Resp. 12 (#55).[1]  For all of these

---

[1] Plaintiffs claim, for example: "At the July 15 hearing at which Ms. Sager was fired, [Defendant Brian] DeLaGrange declared, "It's hard for me to see how allowing this administrator to stay will not make some group of kids feel less safe in our schools." (citing Sager Decl., ¶¶ 85, 88). In this portion of their Response, Plaintiffs argue that the District's adverse employment action was improper because the defendants opposed the content of Plaintiffs' speech. This does certainly appear to be the case, but that factual conclusion does not lead to the legal conclusion that Plaintiffs prefer. As discussed above, the District may act to limit the content of Plaintiffs' speech when it causes a disruption to the employment

reasons, the Court finds that the District's legitimate administrative interests outweigh the

Plaintiffs' First Amendment rights. Defendants are entitled to summary judgment on Plaintiffs'

First Amendment claims for content and viewpoint-based discrimination and retaliation.

### 3. Defendants are entitled to summary judgment as to Plaintiffs' First Amendment claims for prior restraint and compelled speech.

Plaintiffs' claim for a "prior restraint" First Amendment violation states:

> Defendants' Original Speech Policy placed a prior restraint on speech by prohibiting discussion of political or civil issues during the performance of District duties.
> Defendants' Amended Speech Policy likewise places a prior restraint on speech by prohibiting employees from speaking on one side of any political or controversial civil issue while on District premises or within the scope of their employment.

SAC ¶ 132-33. Plaintiffs' claim for a "compelled speech" violation does not specify what speech

the District compelled from Plaintiffs.  The Court assumes, based on the narrative of factual

allegations contained in the Second Amended Complaint, that the Plaintiffs intend to allege that

the District policy requiring Plaintiffs to state a disclaimer at the start of their "I Resolve" video

message is the "compelled speech" at issue. Neither of these claims pass pleading muster, let

alone a summary judgment challenge.[2] Additionally, Plaintiffs' Response did not respond to the

---

environment and when the District acts in the interests of students' safe and comfortable learning environment.

[2] It is well established that public employers may restrict the speech of public employees during the scope and performance of their employment. *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548 (1973); *United Public Workers v. Mitchell*, 330 U.S. 75 (1947); *Ex Parte Curtis*, 106 U.S. 371 (1882); *Broadrick v. Oklahoma*, 413 U.S. 601, 606 (1973). Courts found that these restrictions on public employees' speech and conduct serve legitimate and important government interests. *See, e.g., Letter Carriers*, 413 U.S. at 566-60; *Waters v. Churchill*, 511 U.S. 661, 674–75 (1994). All of the interests of the District, discussed above, apply to this analysis as well. The District has a legitimate interest in protecting the safety and wellbeing of its students, and further, the District has an interest in ensuring that its teachers maintain classrooms that are conducive to learning where the student is comfortable and feels safe when interacting with the teacher.

defendants' motion for summary judgment on these claims. Therefore, the Court considers these claims conceded.

**III.    Defendants are entitled to summary judgment as to Plaintiffs' Equal Protection claim.**

Plaintiffs' third cause of action is for an alleged violation of the Equal Protection clause of the Fourteenth Amendment. Disparate treatment stemming from alleged retaliation for speech or conduct does not implicate the Equal Protection Clause of the Fourteenth Amendment. *Mazzeo v. Gibbons*, 2010 WL 4384207, at *5 (D. Nev. Oct. 28, 2010) ("The Court concludes that [Plaintiff's] allegations impermissibly combine her First Amendment Retaliation and Fourteenth Amendment Equal Protection claims*."),* aff'd sub nom. *Mazzeo v. Young*, 510 F. App'x 646 (9th Cir. 2013*); Occhionero v. City of Fresno*, 2008 WL 2690431, at *8 (E.D. Cal. July 3, 2008) ("[T]his Court agrees with other courts that a claim of different treatment in retaliation for speech is a First Amendment claim which does not invoke the Equal Protection Clause. At its core, [Plaintiff's] claim is First Amendment retaliation, not equal protection."), aff'd, 386 F. App'x 745 (9th Cir. 2010). The "right to be free from retaliation may be vindicated under the First Amendment ..., but not the equal protection clause." *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004).

Here, Plaintiffs allege that defendants have not taken any disciplinary action against employees who have expressed support for "the concept of shifting gender identity." SAC ¶ 147. Plaintiffs allege that, in contrast, defendants have taken disciplinary action against Plaintiffs, who present a dissenting view: "Defendants' actions have made clear that those GPSD employees who hold secular viewpoints concerning gender identity will be favored and those who hold Christian or opposing scientific and medical viewpoints – and dare to express them openly – are not." SAC ¶ 148. Nothing in the Second Amended Complaint alleges that Plaintiffs'

Equal Protection claim is based on membership in a protected class; the allegations that distinguish Plaintiffs from the others in the District are based only on the viewpoints they expressed. Therefore, this claim, which is factually based on retaliation for the Plaintiffs' speech, is not cognizable under the Equal Protection clause.

### IV.     The individual defendants are entitled to qualified immunity.

A defendant is entitled to qualified immunity if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity analysis requires a court to address two questions: (1) whether the facts alleged or shown by the plaintiff establish a constitutional violation and (2) whether the right at issue was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The right must have been clearly established at the time of the defendant's alleged misconduct, so that reasonable official would have understood that what he or she was doing under the circumstances violated that right. *Wilson v. Layne*, 526 U.S. 603, 615 (1999).

The Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (internal quotation marks and citation omitted). "The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.*  Even if a right is clearly established, qualified immunity protects an official from reasonable mistakes about the legality of his actions. *Wilkins v. City of Oakland*, 350 F.3d 949, 954-55 (9th Cir. 2003).  "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a

mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation marks and citation omitted).

This Court has found no constitutional violation, but even if there were, this Court finds that it was reasonable for the individual defendants to think that their conduct was lawful and not in violation of Plaintiffs' rights.  To determine whether an official violated clearly established law, courts look to cases relevant to the situation the official confronted, mindful that there need not be a case directly on point. *A.K.H. rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1013 (9th Cir. 2016).  However, because the *Pickering* balancing test is "a context-intensive, case-by-case balancing analysis, the outcome of which is rarely clear…the law regarding First Amendment retaliation claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Eng*, 552 F.3d at 1076, fn. 6 (emphasis added).

In the instant case, a reasonable official in defendants' position facing the exact same facts would have no reason to believe that terminating plaintiffs for multiple policy violations would violate the First Amendment or the Equal Protection clause of the Fourteenth Amendment. The balancing inquiry required by *Pickering* means a reasonable official would not find the law to be "clearly established" regarding which facts support a finding that the District's legitimate interests outweighed plaintiffs' alleged First Amendment rights.

Here, Plaintiffs created a disruption and the potential for disruption with both their off- and on-campus activities. They did so by advocating to reduce rights of transgender students. No law clearly establishes that Plaintiffs' termination in these circumstances violated plaintiffs' First Amendment or Equal Protection rights

**V.     The Court finds no *Monell* liability.**

For the District to be held liable under Section 1983, Plaintiffs must show that a District custom or policy caused the violation of their constitutional rights. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 690 (1978) (holding that a municipality is a "person" subject to liability under § 1983 when it causes a constitutional tort through a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers"). The District itself must cause the constitutional deprivation and may not be held vicariously liable for the unconstitutional acts of its employees under a *respondeat superior* theory. *Id.*; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (requiring "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation"). The Ninth Circuit has held that a plaintiff may establish municipal liability under *Monell* in one of three ways: (1) the government official "committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity," (2) "the individual who committed the constitutional tort was an official with final policy-making authority," or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (citations omitted).

Here, the Court has found no constitutional violation, thus the District cannot be held liable under Section 1983. While the decision to terminate Plaintiffs' employment was made according to District policies, those policies did not violate Plaintiffs' constitutional rights, as discussed above.

## VI.    Defendants are entitled to summary judgment as to Plaintiff's claim brought under the Oregon Constitution.

Plaintiffs allege that defendants violated Article I, Section 8 of the Oregon Constitution, which states, "No law shall be passed restraining the free expression of opinion, or restricting the

right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right." There is no private right of action for damages under the Oregon Constitution. *See Hunter v. City of Eugene*, 309 Or. 298, 304 (1990) (("[P]ersons whose rights are violated by a municipality or its employes [sic] may not bring an action for damages against the municipality or its employes [sic] directly under the constitution.").

Here, Plaintiffs allege that the defendants violated Article 1, Section 8 by terminating them because of the "I Resolve" video. SAC 144-145. Specifically, Plaintiffs base their claim on the premise that:

> Oregon law makes clear that "[f]ree and open expression about sexual orientation" -- which includes gender identity – "may not be punished in the interest of a uniform vision on how human sexuality should be regarded or portrayed." *Merrick*, 841 P.2d a 650 [citing *State v. Henry*, 732 P.2d 9, 18 (Or. 1987)]; *see also* Or. Admin. Rule 839-005-0003(16) [defining "sexual orientation" to include "gender identity"].

SAC 143. Plaintiffs then allege that "When Plaintiffs made and published their "I Resolve" video they spoke about gender identity, a component of sexuality." SAC 144. Plaintiffs' response to the defendants' motion for summary judgment, however, does not analyze this claim in any substantive way, except to say that it should survive due to their claim for injunctive relief from the District's policies.  Therefore, the Court considers this claim substantively conceded.

In it is clear from the record and the content of the "I Resolve" video that Plaintiffs were not speaking about their own sexuality or gender identity, but were seeking to advocate for the restriction students' rights to speak, express, and conduct their lives based on their expressions of their own sexualities and gender identities. This claim fails as a matter of law.

### VII.   Defendants are entitled to summary judgment as to Plaintiffs' Title VII employment discrimination claims.

Plaintiffs bring a claim for religious discrimination under Title VII. Plaintiffs allege that by terminating Plaintiffs for "expressing their biblically-based views on gender and sexuality, Defendants have discriminated against Plaintiffs on the basis of religion." SAC 154.

Title VII claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Bodett v. Comcox, Inc.,* 336 F.3d 736, 743 (9th Cir. 2004) (describing Title VII framework); *see Dawson v. Entek,* 630 F.3d 928, 935 (9th Cir. 2011) (applying same to ORS 659A.030 claims). Under this framework, a plaintiff has the burden of proving (1) he is a member of a protected class; (2) he was qualified for the position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or that other circumstances surrounding the adverse action give rise to an inference of discrimination. *Peterson v. Hewlett-Packard Co.,* 358 F.3d 599, 603 (9th Cir. 2004). If a plaintiff meets that burden, then the burden shifts to the District to offer a legitimate non-discriminatory reason for taking the adverse action. *Bodett,* 366 F.3d at 744. Plaintiff may then attempt to show that the given reason is pretextual. *McDonnell Douglas,* 411 U.S. at 804.

Plaintiffs fail to carry their burden under this framework. Assuming that being a Christian is a protected class, Plaintiffs do not cite to any Bible passage or scripture to support the views expressed in their "I Resolve" video. The video itself cites to no Bible passage or scripture, nor does it identify the Plaintiffs as speaking from a biblical or Christian viewpoint. Plaintiffs told the District investigator that the video was not created to promote any religious viewpoint. Therefore, Plaintiffs have not identified that they are members of a protected class.

Even assuming that Plaintiffs are members of a protected Christian class, their claim fails under this framework because Plaintiffs have not shown that they were treated differently than other teachers in the District. "Other employees are similarly situated to the plaintiff when they

have similar jobs and display similar conduct." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d

1108, 1114 (9th Cir. 2011).  Comparators must be similarly situated in all "material respects."

*Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006).  There is no evidence in the record that any

other teachers or administrative staff were creating videos to advocate and promote their

viewpoints on school policy and legislative actions. Plaintiffs have also not presented evidence

that shows other teachers were or would have been treated differently if they engaged in conduct

that caused a substantial disruption in the school setting.

Plaintiffs ask this Court to infer discrimination based on the conduct of the defendants.

In particular, Plaintiffs allege that:

> multiple fellow educators used District resources during working
> hours to express personal opinions concerning the phrase "Black
> Lives Matter" to Superintendent Kolb, failed to include the required
> disclaimer in those e-mails, and yet none of those educators received
> any form of punishment. Compl., ¶¶ 112-113, Ex. "J." One of those
> educators "Black Lives Matter" to be, "on its face, a racist
> statement" – an opinion that could easily have caused an uproar
> among GPSD staff, especially since a different GPSD employee
> declared, just as strongly, that "there is no other side – either black
> lives matter, or they don't." *Id.*, ¶ 104. Superintendent Kolb sided
> with the latter educator, declaring the phrase "not controversial." *Id.*,
> ¶ 113, Ex. "J."

Plf. Resp. (#55) 21. Plaintiffs further allege that the District has taken no disciplinary action

against educators who expressed pro-LGBTQ+ viewpoints in the 2020-21 and 2021-22 school

years – the same school years in which Plaintiffs worked for the District prior to publishing their

Video. *Id.*  Plaintiffs fail to connect the creation of the "I Resolve" video to their membership in

a protected class, and they fail to connect pro-Black Lives Matter statements or pro-LGBTQ+

statements to similarly situated individuals who are not Christians. Expressing a pro-Black Lives

Matter viewpoint is not inherently un-Christian, and expressing an anti-LGBTQ+ or anti-Trans

Rights viewpoint is not an inherently Christian viewpoint.  Public perception of these concepts

may conflate these differing viewpoints with certain religious beliefs, but there is no evidence in the record that the adverse employment actions by the District were caused by Plaintiffs' membership in a class, nor that the District's lack of action as to other expressed viewpoints had to do with those individuals' membership or status as Christian or non-Christian. Moreover, Plaintiffs have not shown that the viewpoints expressed by these other individuals caused the level of disturbance that was caused by the "I Resolve" video and the Plaintiffs' conduct in promoting that video at school. Therefore, Plaintiffs fail to show that the comparators were similar "in all respects." This claim fails as a matter of law, and the defendants are entitled to summary judgment.

## ORDER

For all the reasons above, the Defendants' Motion for Summary Judgment (#52) is GRANTED. The motion disposes of all claims. Therefore, judgment will be entered in favor of Defendants.

DATED this 2-4 day of March, 2023.

MARK D. CLARKE
United States Magistrate Judge